

U.S. Department of Justice

United States Attorney
Eastern District of New York

HDM/JRS/MAM/PC
F. #2016R00695

271 Cadman Plaza East
Brooklyn, New York 11201

July 13, 2023

<u>By ECF and E-Mail</u>

The Honorable Nicholas G. Garaufis
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:   United States v. Manuel Chang
             <u>Criminal Docket No. 18-681 (NGG)</u>

Dear Judge Garaufis:

      The government respectfully submits this letter in support of its motion that the Court detain defendant Manuel Chang. Detention is appropriate here given the serious risk of flight. As discussed further below, during most of the relevant period in the Superseding Indictment, the defendant was the Minister of Finance for the country of Mozambique. As the Minister of Finance, the defendant approved and signed guarantees for approximately $2 billion in private and syndicated loans to fund maritime projects in Mozambique. To secure these loans, the contractor for the maritime projects, a company called Privinvest, paid bribes and kickbacks totaling approximately $200 million to senior Mozambican government officials, including at least $5 million to the defendant, as well as bankers at Credit Suisse. The loans were then sold to international investors, including investors in the United States, who were unaware of the $200 million in bribes and kickbacks used to secure the loans. After Mozambique consequently defaulted on the loans and the fraud was revealed, investors, including investors in the United States, lost tens of millions of dollars, and Mozambique suffered catastrophic economic failure.

      Since the defendant's arrest in South Africa in December 2018, Mozambique, which has no extradition treaty with the United States, has sought the defendant's extradition to Mozambique, competing with the United States' own request. After several years of court appeals, South Africa extradited the defendant to the United States and the defendant arrived at John F. Kennedy Airport in the Eastern District of New York late last night. Given the defendant's prior senior-level government position in a country that does not extradite to the United States; the defendant's apparent lack of ties to the United States; his central role in this massive $2 billion bribery and fraud scheme; the substantial weight of the government's evidence; and a potential sentence of 55 years (the statutory maximum) that the defendant faces if convicted, the Court should detain the defendant pending trial. Indeed, if released on bail, the defendant only has to walk into the permanent mission of Mozambique in Manhattan to potentially avoid prosecution.

The defendant, through counsel, has proposed the following bail package: (1) a $1 million dollar personal recognizance bond, secured by a $100,000 cash deposit; (2) location monitoring; (3) travel restricted to the Eastern and Southern Districts of New York; (4) surrender of his passport; and (5) renting an apartment in New York where his daughter and son-in-law would reside with him (subject to their obtaining visas to come to the United States). For the reasons discussed herein, the government respectfully submits that the proposed set of conditions will not reasonably assure the defendant's appearance and finds it hard to conceive of a set of conditions that would.

I. <u>Background</u>

    A. <u>The Defendant Manuel Chang</u>

The defendant Manuel Chang was born in Mozambique in 1955. He obtained a degree in commerce at Eduardo Modlane University and then received a master's degree in economics from the University of London. The defendant worked for the Department of Finance for Mozambique and was the Minister of Finance from 2005 until 2015. In 2015, the defendant was elected as a Member of Parliament in Mozambique.

    B. <u>The Charged Conduct</u>

On December 19, 2018, a grand jury sitting in the Eastern District of New York returned a four-count indictment (the "Indictment") charging the defendant and others in connection with a $2 billion fraud, bribery and money laundering scheme. The government superseded on August 16, 2019 (the "Superseding Indictment"). The Superseding Indictment alleges that the defendant and his co-conspirators sought to fund three maritime projects in Mozambique, ostensibly for the benefit of the Mozambican economy, but in reality, to line their own pockets through $200 million in bribes and kickbacks. The co-conspirators arranged for international investment banks—including Credit Suisse—to finance those projects through loans. For his role in the scheme, the Superseding Indictment charges the defendant with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h).

The defendant was a central figure in the fraud, bribery and money laundering scheme. Indeed, the scheme could not have succeeded without the defendant's participation. Mozambican officials conspired with the contractor, Privinvest, to do three maritime projects in Mozambique using three Mozambican state-controlled and state-owned entities: Proindicus S.A. ("Proindicus"), Empresa Moçambicana de Atum, S.A. ("EMATUM") and Mozambique Asset Management ("MAM"). Because Mozambique did not have the money to pay for these projects, Privinvest sought to secure funding from international investment banks. One of the banks, Credit Suisse, required Mozambique to serve as a guarantor of the loans made for the maritime projects. As the Mozambican Finance Minister, the defendant personally approved the guarantees for each of the three projects, thereby securing the financing for the deals—money from which the bribes and kickbacks were paid, including at least $5 million to the defendant himself. The loans were sold to international investors, including investors in the United States, and the loan agreements

required that the loan funds be used exclusively for the maritime projects, and specifically forbade the payment of bribes and kickbacks to government officials.

In fact, the use of bribery to accomplish the scheme was systematic and well planned. Before any of the loans had even been arranged, representatives from the contractor Privinvest and the Mozambican government agreed that Privinvest would inflate the cost of goods and services of the contemplated project to account for the bribe payments; such costs would be "built in the project, and recovered." (Superseding Indictment ¶ 32(a)). In a thinly-veiled reference to bribes, on December 28, 2011, a Mozambican government co-conspirator requested "50 million chickens." (Id. ¶ 33(a)). Years later, once loans for the projects were secured, the arrangement discussed in this email exchange resulted in the payment of $50 million in bribes to Mozambican government officials, which was added to costs of the portion of the first Proindicus loan, and passed on to investors worldwide, including in the United States.

After agreeing to the first round of bribes, the conspirators needed to ensure that Mozambique would guarantee the loans required to fund the illicit payments. Referring to the defendant as "Chopstick," the conspirators obtained Chang's government guarantee for the loans. As the Privinvest representative wrote to a co-conspirator: "the only imperative matter for [Investment Bank 1] bro is Chopstick's [Chang's] signature of the guarantee for the loan." (Superseding Indictment ¶ 38). On or about February 28, 2013, the defendant signed the guarantee for the Proindicus loan. (Id. ¶ 39). In exchange for his signature, between October 20, 2013 and December 4, 2013, the defendant received approximately $5 million in bribes.

The conspirators not only arranged for bribes and kickbacks, but they also designed a scheme to use fake invoices to mask the true recipients of those payments. For example, on or about October 17, 2013, a Privinvest representative wrote to another conspirator, "I need asap invoices in the name of: Logistics International Abu Dhabi. Invoices for everything my brother. Even for [the defendant], a small paper say 'consultancy fees.'" (Superseding Indictment ¶ 78). Shortly after the email, co-conspirators created a flood of false invoices, which ultimately resulted in millions of dollars in corrupt payments flowing through U.S. bank accounts from Privinvest to front companies set up for the benefit of Mozambican officials, including the defendant, to conceal the illicit payments.

The defendant also played a major role in negotiating the fraudulent loans, meeting with representatives of Credit Suisse in Mozambique to discuss key terms. As discussed above, one critical component for each of the deals was a guarantee by the government of Mozambique, which would ensure that Mozambique would pay back the loan if the special entity created for the project could not. During those meetings, a co-defendant informed the defendant that the EMATUM loan would be financed by international investors and that it would result in the issuing of a security.

To sell the Proindicus, EMATUM and MAM loans to investors, the conspirators made material misrepresentations regarding, among other things, (i) the use of loan proceeds, (ii) bribe and kickback payments to Mozambican government officials and bankers, (iii) the amount and maturity dates of debt owed by Mozambique, and (iv) Mozambique's ability and intention to pay back the investors.

After conducting little or no business activity, Proindicus, EMATUM and MAM each defaulted on their loans, and proceeded to miss more than $700 million in loan payments.

### C. The Defendant's Arrest and Extradition

Based on the then-sealed Indictment, on December 18, 2018, a warrant was issued for the defendant's arrest. The defendant was arrested in South Africa on a provisional arrest warrant on December 29, 2018. On January 17, 2019, the United States submitted an extradition request seeking the defendant's extradition from South Africa. Shortly thereafter, Mozambique submitted a competing extradition request. Both extradition requests proceeded through the South African legal process, during which time the defendant was detained in South Africa. South Africa ultimately granted the government's extradition request, and the defendant was extradited on July 12, 2023.

## II.  Legal Standard

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e) (detention warranted where "no condition or combination of conditions would reasonably assure the appearance of the person as required and the safety of any other person and the community"). A finding of dangerousness must be supported by clear and convincing evidence. United States v. Ferranti, 66 F.3d 540, 542 (2d Cir. 1995); United States v. Chimurenga, 760 F.2d 400, 405 (2d Cir. 1985). A finding of risk of flight must be supported by a preponderance of the evidence. United States v. Jackson, 823 F.2d 4, 5 (2d Cir. 1987); Chimurenga, 760 F.2d at 405.

The Bail Reform Act lists the following four factors as relevant to the determination of whether detention is appropriate: (1) the nature and circumstances of the crimes charged, (2) the weight of the evidence against the person, (3) the history and characteristics of the defendant and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g).

In deciding whether to release or detain a defendant, a court "must undertake a two-step inquiry." United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988). "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) [which are inapplicable here] or that the defendant presents a risk of flight or obstruction of justice." Id. "Once this determination has been made, the court turns to whether any condition or combinations of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." Id.

Evidentiary rules do not apply at detention hearings, and, among other means, the government is entitled to present evidence by way of proffer. See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); Ferranti, 66 F.3d at 542 (same); United States v. Martir, 782 F.2d 1141, 1145 (2d Cir. 1986) (same). Indeed, Section 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. See United States v. Abuhamra, 389 F.3d 309, 320 N.7 (2d Cir. 2004).

III.    <u>The Bail Reform Act Factors Require Detention Pending Trial</u>

The facts before the Court establish by a preponderance of the evidence that there is no combination of conditions that could reasonably assure the defendant's appearance in this proceeding.

A.    <u>The Nature and Circumstances of the Offense, Weight of the Evidence and History and Characteristics of the Defendant Favor Detention.</u>

The nature and circumstances of the offense are serious and favor detention here. The defendant participated in a massive bribery and money laundering scheme that facilitated the payment and laundering of bribes and kickbacks totaling $200 million. As a result, the defendant is facing a serious sentence of a statutory maximum of 55 years, if convicted of all three counts and the sentences are run consecutively.

In addition to this serious potential sentence, the significant amount of funds laundered, and the fraud perpetrated on investors, including investors in the United States, and the real-world effect of the defendant's actions further underscores the nature and circumstances of the offense. The defendant was a senior government official in Mozambique and his actions helped devastate the economy of one of the world's poorest nations. As a direct result of the bribe and kickback scheme including the secret government guarantees the defendant signed, Mozambique defaulted on its loans. In addition, the scheme caused the International Monetary Fund to withhold financial support to Mozambique, creating a severe financial crisis. If the defendant were convicted, the financial and humanitarian disaster occasioned by the fraud scheme would weigh heavily in favor of a significant sentence under the applicable factors set out in 18 U.S.C. § 3553.

The overwhelming evidence against the defendant also favors his pretrial detention. In its investigation, the government has obtained numerous emails explicitly referencing bribes paid to the defendant in the scheme. In addition, U.S. bank records confirm that these bribes and kickback payments occurred. As set forth above and alleged in the Superseding Indictment, evidence of the defendant's guilt is glaring, and includes, but is not limited to, evidence that the defendant personally received $5 million in exchange for approvals required in Mozambique, including signing critical government guarantees.

Similarly, the defendant's history and characteristics favor detention in this case. The defendant's character is evidenced by the breadth and scope of this bribery, fraud, and money laundering scheme. Instead of ensuring that the projects were fairly negotiated and would benefit the Mozambican people, the defendant ensured that he would personally profit from these deals in exchange for his official acts. The defendant accepted $5 million in exchange for executing guarantees for the maritime projects and in an effort to conceal his role, conspired with others to establish shell companies to launder the bribes he received.

B.    <u>The Risk of Flight Weighs in Favor of Detention</u>

The facts and circumstances of this case demonstrate that Chang presents a serious risk of flight, which weighs in favor of detention.

First, "[t]he prospect of a severe sentence can create a strong incentive for a defendant to flee and thereby avoid that sentence." United States v. Zhang, 55 F.4th 141, 151 (2d Cir. 2022). Here, as noted above, if the defendant is convicted at trial, he faces a maximum statutory sentence of potentially 55 years. Courts have recognized that even a significantly shorter potential sentence can warrant a risk-of-flight finding. See United States v. Scali, 738 F. App'x 32, 33 (2d Cir. 2018) ("The court reasonably determined that Scali's Guidelines range of 87-108 months' imprisonment was significant enough to provide an incentive to flee."); United States v. Khusanov, 731 F. App'x 19, 21 (2d Cir. 2018) ("[E]ven if, as a practical matter, Khusanov's maximum sentence exposure were only 15, rather than 30, years' imprisonment, that would still be sufficient to provide him with a strong incentive to flee."); United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee").

Second, where, as here, the evidence of a defendant's guilt is strong, "it follows that the defendant faces an elevated risk of conviction (and of the attendant punishment), and therefore may present an elevated risk of flight." Zhang, 55 F.4th at 151; United States v. Sabhnani, 493 F.3d 63, 76 (2d Cir. 2007) (identifying a strong motive to flee because, in part, "the evidence of [the defendants'] guilt, both direct and circumstantial, appears strong"); United States v. Bruno, 89 F. Supp. 3d 425, 431 (E.D.N.Y. 2015) ("When evidence of a defendant's guilt is strong, and when the sentence of imprisonment upon conviction is likely to be long a defendant has stronger motives to flee."). The evidence of Chang's guilt is overwhelming. The documentary proof shows that the scheme would not succeed without Mozambique's guarantee, which required approval from the defendant. As the Privinvest representative wrote to a co-conspirator: "the only imperative matter for [Investment Bank 1] bro is Chopstick's [Chang's] signature of the guarantee for the loan." (Superseding Indictment ¶ 38). On or about February 28, 2013, the defendant signed the guarantee for the Proindicus loan. (Id. ¶ 39). Similarly, the documentary record demonstrates the bribe and kickback payments, including payments to front companies controlled by the defendant, and the defendant's role in the money laundering and fraud scheme. For example, on or about April 8, 2014, the Privinvest company representative sent an email to a second co-conspirator at Privinvest providing an accounting of the bribes relating to the first two Mozambican projects and stating that Privinvest had paid "125 [million U.S. dollars] for all for everything . . . ." The Privinvest company representative summarized the distribution of the bribes, including US $7 million to the defendant, apparently in connection with the first two loans. Further, an accounting spreadsheet maintained by one of the co-conspirators at Privinvest reflected that Privinvest also made bribe and kickback payments to obtain the contract related to the third project and the associated loan. Such payments included approximately $5 million to the defendant.

Finally, Chang has the means to flee if he chooses to do so. See Sabhnani, 493 F.3d at 76 ("a second factor strengthens the case for detention: defendants' ample means to finance flight"). Based on the investigation, the government understands that Chang received $5 million from the scheme, providing him with significant assets that he could use to flee. Furthermore, the defendant is a citizen of Mozambique and has no known ties to United States apart from this fraud scheme, including, but not limited to, familial ties, assets or employment related to the Eastern District of New York or the United States.

Accordingly, the government submits that the Court should find by a preponderance of the evidence that Chang poses a serious risk of flight.

IV. <u>Conclusion</u>

For the reasons set forth above, the government respectfully submits that detention is the only appropriate condition that can mitigate the risk of flight and ensure the defendant's appearance as required.

Respectfully submitted,

BREON PEACE
United States Attorney

By:    /s/
      Hiral D. Mehta
      Jonathan Siegel
      Assistant U.S. Attorneys
      (718) 254-6293/6418

cc: Clerk of the Court (NGG) (by ECF)
     Counsel of Record (by ECF)