SME:HDM/GN/PC/MC
F.#2016R00695

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

    - against -

                                Docket No. 18-CR-681 (S-2) (NGG)

MANUEL CHANG,
        also known as "Pantero" and
        "Chopstick,"

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS IN LIMINE

BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Hiral D. Mehta
Genny Ngai
Assistant U.S. Attorneys

Morgan J. Cohen
Peter L. Cooch
Trial Attorneys
    (Of Counsel)

## TABLE OF CONTENTS

RELEVANT BACKGROUND ................................................................................. 1

ARGUMENT ......................................................................................................... 3

    I.    The Court Should Admit Co-Conspirator Statements If Offered by the Government and Preclude Them If Offered by the Defendant ............................. 3

        A.    Applicable Law .................................................................... 4

            1.    Co-Conspirator Statements .......................................... 4

            2.    Statements Against Penal Interest ................................... 9

        B.    Accounting Spreadsheets and/or Ledgers of Bribes and Kickbacks Paid to the Defendant and/or Co-Conspirators Are Admissible. .......................... 10

            1.    GX 2808 and 2808A ................................................. 10

            2.    Other Spreadsheets and Ledgers .................................. 15

        C.    Statements From Boustani Are Equally Admissible. ............... 18

        D.    The Defendant's Statements Are Inadmissible If Offered by the Defendant ...................................................................... 22

    II.    The Court Should Allow the Government to Authenticate and Admit Certain Privinvest Documents Produced in Discovery ...................................... 25

        A.    Legal Standard ................................................................ 29

        B.    Discussion ...................................................................... 30

    III.    The Government Should Be Permitted to Elicit Testimony from the Banks and Other Investors Regarding Their Views on Materiality ....................... 32

        A.    Legal Standard ................................................................ 32

        B.    Discussion ...................................................................... 34

    IV.    The Court Should Determine the Elements of the Applicable Violation of Mozambican Law Alleged in Count Three .......................................... 35

        A.    Federal Rule of Criminal Procedure 26.1 ............................. 36

        B.    Applicable Mozambican Anti-Bribery Laws .......................... 37

        C.    Elements of Article 8 of Law 7/98 ...................................... 39

    V.    The Court Should Allow the Government to Prove Venue Under the First Brought Venue Statute and Preclude Any Improper Arguments About Venue ................ 40

        A.    18 U.S.C. § 3238 Lays Venue in This District ....................... 41

        B.    The Defendant Should Not Be Permitted To Argue That He Should Be Prosecuted Somewhere Else Other Than This District ...................... 45

VI.    The Court Should Preclude Other Evidence or Arguments That Are Legally Improper And/Or Seek Jury Nullification. ...................................................... 48

    A.    The Court Should Preclude the Defendant from Arguing That The Banks and Other Investors (A) Should Not Have Relied, or Did Not Rely, on Defendant's or Co-Conspirators' False Statements; (B) That They Did Not Suffer Any Loss; And (C) that the Defendant Purportedly Believed There Would Be "No Ultimate Harm" to Investors ............................................. 49

        1.    Applicable Law .......................................................................49

        2.    Arguments Inconsistent With the Controlling Law on Fraud Should Be Precluded. ......................................................51

    B.    The Defendant Should Also Be Precluded From Making Any Arguments That Suggest International Wire Transfers of Money Through U.S. Correspondent Banks Are Not Covered By 18 U.S.C. § 1956(a)(2). ....... 54

    C.    The Court Should Similarly Preclude the Defendant From Introducing Evidence of His Detention in South Africa, Lack of Ties to the United States, and His Co-Conspirator Boustani's Acquittal .............................. 57

VII.    The Court Should Preclude Improper Character Evidence................................... 59

    A.    Legal Standard ............................................................................. 60

    B.    Discussion .................................................................................... 61

VIII.    The Court Should Take Judicial Notice of an Official Decision of an Official Mozambican Entity ................................................................................... 62

IX.    The Court Should Admit Past Recorded Recollections ...................................... 65

    A.    Background ................................................................................... 66

    B.    Applicable Law ............................................................................. 67

    C.    Discussion .................................................................................... 68

X.    Improper Use of Agent Reports to Impeach Witnesses Should Be Precluded ..... 69

XI.    The Court Should Preclude Evidence or Argument Concerning Possible Punishment and Collateral Consequences ......................................................... 71

XII.    The Court Should Admit Certain Evidence Based on Fed. R. Evid. 902 and 18 U.S.C. § 3505 .................................................................................................. 72

XIII.    The Defendant Should Be Ordered to Disclose His Rule 16(b) Discovery for any Trial Exhibits To Be Introduced During its Case-in-Chief.................................. 75

XIV.    The Defendant Should Identify and Produce All Materials Received Pursuant to Rule 17(c) Subpoenas .................................................................................. 77

CONCLUSION ..................................................................................................... 79

## TABLE OF AUTHORITIES

Cases

23-34 94th St. Grocery Corp. v. New York City Bd. of Health,
    685 F.3d 174 (2d Cir. 2012)...................................................................................... 64

Bourjaily v. United States,
    483 U.S. 171 (1987).................................................................................................. 15

Com. Data Servers, Inc. v. Int'l Bus. Machines Corp.,
    262 F. Supp. 2d 50 (S.D.N.Y. 2003)........................................................................ 31

Crawford v. Washington,
    541 U.S. 36 (2004)..................................................................................................... 8

Ding Lian Zou v. R. Gonzales,
    No. 06-0057-ag, 2006 WL 2828830 (2d Cir. Sept. 27, 2006)................................. 64

Dunn v. United States,
    284 U.S. 390 (1932)................................................................................................. 47

FAA v. Landy,
    705 F.2d 624 (2d Cir. 1983) .................................................................................... 65

Force v. Facebook, Inc.,
    934 F.3d 53 (2d Cir. 2019)....................................................................................... 63

Funk v. Belneftekhim,
    No. 14-CV-0376 (BMC), 2018 WL 11169575 (E.D.N.Y. Nov. 30, 2018).............. 18

Gentile v. Cnty. of Suffolk,
    926 F.2d 142 (2d Cir.1991)..................................................................................... 58

In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig.,
    MDL No. 1358 (SAS), 2013 WL 6869410 (S.D.N.Y. Dec. 30, 2013) .................... 65

In re Parmalat Sec. Litig.,
    477 F. Supp. 2d 637 (S.D.N.Y. 2007)..................................................................... 65

In re Ply Gem Holdings, Inc. Sec. Litig.,
    No. 14 Civ. 3577, 2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016)........................... 33

Khoja v Orexigen Therapeutics, Inc.,
    899 F.3d 988 (9th Cir. 2018) ................................................................................... 64

Melendez-Diaz v. Massachusetts,
   557 U.S. 305 (2009) ................................................................................................................ 73

Neder v. United States,
   527 U.S. 1 (1999) ............................................................................................................. 33, 49

Palermo v. United States,
   360 U.S. 343 (1959) ................................................................................................................ 70

Pena v. Macy's Inc.,
   No. 22-CV-09435 (PMH), 2024 WL 1833880 (S.D.N.Y. Apr. 26, 2024) .............................. 52

Qiu Yun Chen v. Holder,
   715 F.3d 207 (7th Cir. 2013) .................................................................................................. 65

Rates Tech., Inc. v. Cablevision Sys. Corp.,
   2006 WL 3050879 .................................................................................................................. 52

Red Fort Cap., Inc. v. Guardhouse Prods., LLC,
   No. 19CV686PKCRWL, 2022 WL 118637 (S.D.N.Y. Jan. 11, 2022) ................................... 46

Rychorcewicz v. Welltec, Inc.,
   Civ. No. H-16-2, 2018 WL 3559131 (S.D. Tex. June 22, 2018) ........................................... 65

Shannon v. United States,
   512 U.S. 573 (1994) ................................................................................................................ 71

Shaw v. United States,
   580 U.S. 63 (2016) ............................................................................................................ 50, 52

Sparf v. United States,
   156 U.S. 51 (1895) .................................................................................................................. 47

United States v. Addonizio,
   405 U.S. 936, 92 S.Ct. 949, 30 L.Ed.2d 812 (1972) .............................................................. 30

United States v. Addonizio,
   451 F.2d 49 (3d Cir. 1971) ..................................................................................................... 30

United States v. Adelekan,
   567 F. Supp. 3d 459 (S.D.N.Y. 2021) .................................................................................... 21

United States v. Aiyaswamy,
   No. 15-cr-568, 2017 WL 1365228 (N.D. Cal. Ap Cal. Apr. 14, 2017) .................................. 76

2

United States v. Akinrosotu,
    637 F.3d 165 (2d Cir. 2011)..............................................................64

United States v. Almonte,
    956 F.2d 27 (2d Cir. 1992)..........................................................69, 70

United States v. All Assets Held at Bank Julius,
    251 F. Supp. 3d 82 (D.D.C. 2017)....................................................55

United States v. Allen,
    160 F. Supp. 3d 698 (S.D.N.Y. 2016)...............................................33

United States v. Amato,
    15 F.3d 230 (2d Cir. 1994)...........................................................7, 12

United States v. Arrington,
    867 F.2d 122 (2d Cir. 1988).................................................................8

United States v. Ashburn,
    No. 11-CR-0303(NGG), 2015 WL 729818 (E.D.N.Y. Feb. 19, 2015) ...........................58, 59

United States v. Ashraf,
    320 F. App'x 26 (2d Cir. 2009) ...........................................................6

United States v. Bankman-Fried,
    No. 22-cr-0673 (LAK), 2023 WL 6162865 (S.D.N.Y. Sept. 21, 2023) ...................36

United States v. Battaglia,
    No. S9 05 Cr. 774 (KMW), 2008 WL 144826 (S.D.N.Y. Jan.15, 2008) ................58

United States v. Benedetto,
    571 F.2d 1246 (2d Cir. 1978) ...........................................................61

United States v. Berger,
    188 F. Supp. 2d 307 (S.D.N.Y. 2002)..................................................51

United States v. Bin Laden,
    146 F. Supp. 2d 373 (S.D.N.Y. 2001)....................................43, 44, 45

United States v. Birney,
    686 F.2d 102 (2d Cir.1982)...............................................................46

United States v. Blake,
    195 F. Supp. 3d 605 (S.D.N.Y. 2016)..................................................22

3

United States v. Blume,
    967 F.2d 45 (2d. Cir. 1992) ........................................................................................ 71

United States v. Brown,
    293 F. App'x 826 (2d Cir. 2008) .............................................................................. 42

United States v. Calbas,
    821 F.2d 887 (2d Cir. 1987) ................................................................................. 17, 18

United States v. Calderon,
    944 F.3d 72 (2d Cir. 2019) ........................................................................................ 50

United States v. Cambindo Valencia,
    609 F.2d 603 (2d Cir. 1979) ........................................................................................ 5

United States v. Cardascia,
    951 F.2d 474 (2d Cir. 1991) ...................................................................................... 23

United States v. Carpenter,
    484 U.S. 19 (1987) ..................................................................................................... 50

United States v. Carr,
    424 F.3d 213 (2d Cir. 2005) ...................................................................................... 47

United States v. Catino,
    735 F.2d 718 (2d Cir. 1984) ...................................................................................... 45

United States v. Clark,
    613 F.2d 391 (2d Cir. 1979) ...................................................................................... 20

United States v. Corsey,
    723 F.3d 366 (2d Cir. 2013) ...................................................................................... 33

United States v. Cravero,
    545 F.2d 406 (5th Cir. 1976) ..................................................................................... 21

United States v. Cuti,
    720 F.3d 453 (2d Cir. 2013) ...................................................................................... 34

United States v. Daccarett,
    6 F.3d 37 (2d Cir. 1993) ....................................................................................... 55, 56

United States v. Deluna,
    38 F. App'x 644 (2d Cir. 2002) ................................................................................. 15

United States v. Desena,
    260 F.3d 150 (2d Cir. 2001)...................................................................... 6

United States v. DeVillio,
    983 F.2d 1185 (2d Cir. 1993).................................................................... 5

United States v. Dhinsa,
    243 F.3d 635 (2d Cir.2001)............................................................... 29, 30

United States v. Diaz,
    176 F.3d 52 (2d Cir. 1999)........................................................................ 7

United States v. Donovan,
    55 F. App'x 16 (2d Cir. 2003) .............................................................. 6, 14

United States v. Doyle,
    130 F.3d 523 (2d Cir.  1997).................................................................... 61

United States v. Duque,
    123 F. App'x 447 (2d Cir. 2005) ............................................................. 42

United States v. Edwards,
    101 F.3d 17 (2d Cir. 1996)...................................................................... 48

United States v. Eisen,
    974 F.2d 246 (2d Cir. 1992)...................................................................... 8

United States v. Ellis,
    460 F.3d 920 (7th Cir. 2006) .................................................................. 73

United States v. Fawwaz,
    694 F. App'x 847 (2d Cir. 2017) .............................................................. 5

United States v. Feng,
    277 F.3d 1151 (9th Cir. 2002) ................................................................ 44

United States v. Franco,
    874 F.2d 1136 (7th Cir. 1989) ................................................................ 68

United States v. Frenkel,
    682 F. App'x 20 (2d Cir. 2017) ............................................................... 49

United States v. Geaney,
    417 F.2d 1116 (2d Cir. 1969).................................................................... 4

United States v. Gigante,
    166 F.3d 75 (2d Cir. 1999) ........................................................................... 5, 15

United States v. Gil,
    604 F.2d 546 (7th Cir. 1979) ............................................................................. 21

United States v. Gole,
    21 F. Supp. 2d 161 (E.D.N.Y. 1997) ................................................................. 51

United States v. Gonzalez,
    399 F. App'x 641 (2d Cir. 2010) ................................................................. 23, 24

United States v. Goodwin,
    131 F.3d 132 (2d Cir. 1997) ........................................................................ 17, 20

United States v. Gotti,
    457 F. Supp. 2d 395 (S.D.N.Y. 2006) .............................................................. 23

United States v. Grady,
    544 F.2d 598 (2d Cir. 1976) ............................................................................. 65

United States v. Gramins,
    939 F.3d 429 (2d Cir. 2019) ............................................................................. 33

United States v. Gupta,
    747 F.3d 111 (2d Cir. 2014) .......................................................................... 9, 10

United States v. Harper,
    No. 05-CR-6068L, 2009 WL 140125 (W.D.N.Y. Jan. 20, 2009) ...................... 23

United States v. Hassanshahi,
    185 F. Supp. 3d 55 (D.D.C. 2016) ................................................................... 42

United States v. Hatfield,
    No. 06-CR-0550 (JS), 2010 WL 2541057 (E.D.N.Y. June 10, 2010) .............. 34

United States v. Herbert,
    No. 03 CR. 211 (SHS), 2005 WL 106909 (S.D.N.Y. Jan. 19, 2005) ............... 43

United States v. Hernandez-Miranda,
    78 F.3d 512 (11th Cir. 1996) ............................................................................ 21

United States v. Ho,
    984 F.3d. 191 (2d Cir. 2020) ....................................................................... 54, 55

United States v. Holden,
   No. 13-cr-444, 2015 WL 1514569 (D. Or. Mar. 19, 2015) ................................... 76

United States v. Hsia,
   No.  98 CR 0057 (PLF), 2000 WL 195067 (D.D.C. Jan. 21, 2000) ................................. 75, 76

United States v. Ianniello,
   621 F. Supp. 1455 (S.D.N.Y. 1985) .................................................................. 4

United States v. Jackson,
   180 F.3d 55 (2d Cir. 1999) ................................................................. 24

United States v. Jacobs,
   475 F.2d 270 (2d Cir. 1973) ................................................................. 20

United States v. Jadusingh,
   No. 18-CR-257 (KAM), 2020 WL 207950 (E.D.N.Y. Jan. 14, 2020) ................................... 71

United States v. James,
   No. 02-CR-778 (SJ), 2007 WL 2702452 (E.D.N.Y. Sept. 12, 2007) ...................................... 24

United States v. Jaramillo–Montoya,
   834 F.2d 276, 278–79 (2d Cir. 1987) ................................................................. 14

United States v. Jasper,
   No. 00 CR 825, 2003 WL 223212 (S.D.N.Y. Jan. 31, 2003) ................................... 77

United States v. Jefferson,
   215 F.3d 820 (8th Cir. 2000) ................................................................. 7

United States v. Jennings,
   487 F.3d 564 (8th Cir. 2007) ................................................................. 35

United States v. Johnson,
   688 F.3d 494 (8th Cir. 2012) ................................................................. 73

United States v. Johnson,
   507 F.3d 793 (2d. Cir. 2007) ................................................................. 23, 24

United States v. Kahale,
   789 F. Supp. 2d 359 (E.D.N.Y. 2009) ................................................................. 8

United States v. Kirk Tang Yuk,
   885 F.3d 57 (2d Cir. 2018) ................................................................. 42

United States v. Komasa,
    767 F.3d 151 (2d Cir. 2014).....................................................................73

United States v. Kozeny,
    582 F. Supp. 2d 535 (S.D.N.Y. 2008)......................................................37

United States v. Kurland,
    No. 20-CR-306 (NGG), 2022 WL 2669897 (E.D.N.Y. July 11, 2022)......6

United States v. Labate,
    S1 00-CR-632 (WHP), 2001 WL 533714 (S.D.N.Y. May 18, 2001)........4

United States v. Lange,
    834 F.3d 58, 70 (2d Cir. 2016)...........................................................42, 53

United States v. Larkin,
    No. 12-cr-319, 2015 WL 4415506 (D. Nev. July 20, 2015)....................76

United States v. Leonard,
    529 F.3d 83 (2d Cir. 2008)........................................................................53

United States v. Leonardi,
    623 F.2d 746 (2d Cir. 1980)................................................................69, 70

United States v. Levis,
    No. 10-4819-CR, 2012 WL 2914118 (2d Cir. July 18, 2012)..................53

United States v. Liang,
    224 F.3d 1057 (9th Cir. 2000)..................................................................44

United States v. Litvak,
    808 F.3d 160 (2d Cir. 2015)......................................................................33

United States v. Litvak,
    889 F.3d 56 (2d Cir. 2018)........................................................................33

United States v. Logan,
    419 F.3d 172 (2d Cir. 2005)........................................................................9

United States v. Lozano-Reyes,
    101 F.3d 686, 1996 WL 313934 (2d Cir. 1996)........................................7

United States v. Lumpkin,
    192 F.3d 280 (2d Cir. 1999)......................................................................10

United States v. Mahaffy,
No. 05-CR-613 (ILG), 2007 WL 1094153 (E.D.N.Y. Apr. 10, 2007) .................................... 22

United States v. Maldonado-Rivera,
922 F.2d 934 (2d Cir. 1990)........................................................ 5, 6, 17, 21

United States v. Malka,
602 F. Supp. 3d 510 (S.D.N.Y. 2022) ............................................... 6, 7, 9

United States v. Marin,
669 F.2d 73 (2d Cir. 1982)............................................................ 22

United States v. Mavashev,
No. 08 CR 902 (DLI), 2010 WL 670083 (E.D.N.Y. Feb. 23, 2010) ........................................ 76

United States v. McDaniel,
398 F.3d 540 (6th Cir. 2005) ........................................................... 37

United States v. Mermelstein,
487 F. Supp. 2d 242 (E.D.N.Y. 2007) ................................................. 8

United States v. Michel,
879 F. Supp. 2d 291 (E.D.N.Y. 2012) ................................................ 74

United States v. Millan-Colon,
836 F. Supp. 1007 (S.D.N.Y. 1993)................................................... 17

United States v. Miller,
808 F.3d 607 (2d Cir. 2015)................................................... 40, 42, 43

United States v. Miller,
954 F.3d 551 (2d Cir. 2020)............................................................ 9

United States v. Mitchell,
985 F.2d 1275 (4th Cir. 1993) .......................................................... 37

United States v. Morel,
751 F.Supp.2d 423 (E.D.N.Y. 2010) .................................................. 57

United States v. Morgan,
505 F.3d 332 (5th Cir. 2007) ........................................................... 73

United States v. Munson,
350 F. App'x 485 (2d Cir. 2009) ....................................................... 18

United States v. Munson,
No. 06 CR 00143 (JGK), 2008 WL 4202313 (S.D.N.Y. Sept. 11, 2008) ............................... 18

United States v. Napout,
No. 15 CR 252 (PKC), 2017 WL 6375729 (E.D.N.Y. Dec. 12, 2017) ................................... 76

United States v. Natale,
526 F.2d 1160 (2d Cir. 1975) ................................................................................................. 30

United States v. Nekritin,
No. 10-CR-491 ............................................................................................................ 60, 61, 62

United States v. Neumann,
No. 21-CR-439-01 (NSR), 2023 WL 8700974 (S.D.N.Y. Dec. 14, 2023) ............................... 7

United States v. O'Connor,
580 F.2d 38 (2d Cir. 1978) ..................................................................................................... 61

United States v. Ohle,
441 F. App'x 798 (2d Cir. 2011) ............................................................................................ 42

United States v. Orena,
32 F.3d 704 (2d Cir. 1994) ..................................................................................................... 14

United States v. Ortiz,
966 F.2d 707 (1st Cir. 1992) ................................................................................................... 30

United States v. Pendleton,
658 F.3d 299 (3d Cir. 2011) .................................................................................................... 43

United States v. Persico,
645 F.3d 85 (2d Cir. 2011) ..................................................................................................... 10

United States v. Persico,
No. 04-CR-911 (SJ), 2006 WL 3246922 (E.D.N.Y. Nov. 8, 2006) ........................................ 24

United States v. Pollack,
534 F.2d 964 (D.C. Cir.) ......................................................................................................... 50

United States v. Prevezon Holdings, Ltd.,
251 F. Supp. 3d 684 (S.D.N.Y. 2017) .................................................................................... 55

United States v. Purcell,
967 F.3d 159 (2d Cir. 2020) .................................................................................................... 41

United States v. Qualls,
    613 F. App'x 25 (2d Cir. 2015) ................................................................ 73

United States v. Qualls,
    553 F. Supp. 2d 241 (E.D.N.Y. 2008) ...................................................... 74

United States v. Rahme,
    813 F.2d 31 (2d Cir. 1987).......................................................................... 7

United States v. Ranney,
    719 F.2d 1183 (1st Cir. 1983).................................................................... 35

United States v. Rastelli,
    870 F.2d 822 (2d Cir. 1989)........................................................................ 7

United States v. Riley,
    638 Fed. Appx. 56 (2d Cir. 2016) ....................................................... 61, 62

United States v. Rivera,
    22 F.3d 430 (2d Cir. 1994)..................................................................... 6, 20

United States v. Rivera,
    No. 13-CR-149 (KAM), 2015 ................................................................... 60

United States v. Rom,
    528 F. App'x 24 (2d Cir. 2013) ................................................................ 74

United States v. Rommy,
    506 F.3d 108 (2d Cir. 2007)...................................................................... 42

United States v. Royer,
    549 F.3d 886 (2d Cir. 2008)...................................................................... 42

United States v. Russo,
    302 F.3d 37 (2d Cir. 2002).......................................................................... 6

United States v. Saget,
    377 F.3d 223 (2d Cir. 2004)...................................................................... 10

United States v. Salerno,
    868 F.2d 524 (2d Cir. 1989)........................................................................ 8

United States v. Schlesinger,
    372 F. Supp. 711 (E.D.N.Y. 2005) ............................................................. 7

United States v. Shkreli,
   779 F. App'x 38 (2d Cir. 2019) ............................................................................ 53

United States v. Shyne,
   617 F.3d 103 (2d Cir. 2010)................................................................................. 8

United States v. Shyne,
   No. S4 05-CR-1067 (KMK), 2007 WL 1075035 (S.D.N.Y. Apr. 5, 2007) ............................. 4

United States v. Simmons,
   923 F.2d 934 (2d Cir. 1991)................................................................................. 7

United States v. Skelos,
   No. 15-CR-317 (KMW), 2018 WL 2254538 (S.D.N.Y. May 17, 2018)................................ 78

United States v. Smith,
   198 F.3d 377 (2d Cir. 1999)................................................................................. 42

United States v. St. Rose,
   No. 11-CR-349 SJ, 2012 WL 1107659 (E.D.N.Y. Apr. 2, 2012)................................ 58

United States v. Stanchich,
   550 F.2d 1294 (2d Cir. 1977)................................................................................. 20

United States v. Sterritt,
   No. 21-CR-193 (KAM), 2023 WL 7386660 (E.D.N.Y. Nov. 8, 2023)........................... 50, 58

United States v. Stewart,
   433 F.3d 273 (2d Cir. 2006)................................................................................. 7

United States v. Stewart,
   No. 03 Cr. 717 (MGC), 2004 WL 113506 (S.D.N.Y. Jan. 26, 2004)................................ 61

United States v. Svoboda,
   347 F.3d 471 (2d Cir. 2003)................................................................................. 42

United States v. Swenson,
   298 F.R.D. 474 (D. Idaho 2014) ............................................................................ 76

United States v. Tarantino,
   846 F.2d 1384 (D.C. Cir. 1988)............................................................................ 6

United States v. Terry,
   702 F.2d 299 (2d Cir. 1983)................................................................................. 24

United States v. Thai,
  29 F.3d 795 (2d Cir. 1994)............................................................................. 7

United States v. Thomas,
  116 F.3d 606 (2d Cir. 1997)........................................................... 47, 48, 72

United States v. Tin Yat Chin,
  371 F.3d 31 (2d Cir. 2004)................................................................... 30, 31

United States v. Todd,
  920 F.2d 399 (6th Cir. 1990) ....................................................................... 17

United States v. Tracy,
  12 F.3d 1186 (2d Cir. 1993)........................................................................... 4

United States v. Tropeano,
  252 F.3d 653 (2d Cir. 2001)................................................................... 29, 30

United States v. Tzolov,
  642 F.3d 314 (2d Cir. 2011)......................................................................... 42

United States v. Ulbricht,
  79 F. Supp. 3d 466 (S.D.N.Y. 2015)............................................................. 2

United States v. Vanwort,
  887 F.2d 375 (2d Cir. 1989)......................................................................... 14

United States v. Vieira,
  280 F. App'x 26 (2d Cir. 2008) ................................................................... 14

United States v. Watts,
  934 F. Supp. 2d 451 (E.D.N.Y. 2013) .................................................. 46, 50

United States v. Weaver,
  860 F.3d 90 (2d Cir. 2017).......................................................................... 49

United States v. Weiland,
  420 F.3d 1062 (9th Cir. 2005) .................................................................... 73

United States v. Weingarten,
  19-CR-497 (NSR), 2024 WL 677995 (S.D.N.Y. Feb. 15, 2024) ............... 7

United States v. Weiss,
  930 F.2d 185 (2d Cir. 1991)........................................................................ 77

United States v. Williams,
    589 F.2d 210 (5th Cir. 1979) ........................................................................ 42

United States v. Williams,
    617 F.2d 1063 (5th Cir. 1980) ...................................................................... 42

United States v. Yeley-Davis,
    632 F.3d 673 (10th Cir. 2011) ...................................................................... 73

Whitfield v. United States,
    543 U.S. 209 (2005) ..................................................................................... 42

Williamson v. United States,
    512 U.S. 594 (1994) ....................................................................................... 9

Statutes

18 U.S.C. § 371 .................................................................................................... 1

18 U.S.C. § 1341 ................................................................................................. 50

18 U.S.C. §1343 ................................................................................................. 50

18 U.S.C. § 1349 .................................................................................................. 1

18 U.S.C. § 1956 .......................................................................................... passim

18 U.S.C. § 3237 ................................................................................................ 42

18 US.C. § 3238 .......................................................................................... passim

18 U.S.C. § 3500 ...................................................................................... 1, 69, 70

18 U.S.C. § 3505 .......................................................................................... 72, 74

Rules

Fed. R. Crim. P. 12 ....................................................................................... 41, 57

Fed. R. Crim. P. 16 ....................................................................................... 75, 77

Fed. R. Crim. P. 17 ............................................................................................. 78

Fed. R. Crim. P. 26 ................................................................................... 36, 37, 39

Fed. R. Evid. 106 ......................................................................................... 23, 24

Fed. R. Evid. 201 ................................................................................................ 64

Fed. R. Evid. 401 ............................................................................................. 36, 37

Fed. R. Evid. 402 ................................................................................................ 46

Fed. R. Evid. 403 ............................................................................................ passim

Fed. R. Evid. 404 ............................................................................................. 61, 62

Fed. R. Evid. 405 ............................................................................................. 61, 62

Fed. R. Evid. 613 ................................................................................................ 69

Fed. R. Evid. 801 ............................................................................................ passim

Fed. R. Evid. 803 ............................................................................................ passim

Fed. R. Evid. 804 ............................................................................................ passim

Fed. R. Evid. 901 ............................................................................................. 29, 30

Fed. R. Evid. 902 ................................................................................. 65, 72, 73, 74

The government respectfully submits this memorandum of law in support of its motions in limine in advance of trial, which is currently set to begin on July 15, 2024.[1]  For the reasons set forth below, the government respectfully submits that the Court should grant the government's motions in their entirety.

RELEVANT BACKGROUND

On December 21, 2023, a grand jury in this District issued a second superseding indictment charging defendant Manuel Chang, also known as "Pantero" and "Chopstick," with wire fraud conspiracy, in violation of 18 U.S.C. § 1349 (Count One); securities fraud conspiracy, in violation of 18 U.S.C. § 371 (Count Two); and money laundering conspiracy, in violation of 18 U.S.C. § 1956(h) (Count Three).  See Chang, 18-CR-681 (S-2) (NGG), ECF No. 543 (the "Indictment").

At trial, the government expects to prove that the defendant, while serving as the Minister of Finance of Mozambique, and his co-conspirators conspired to fraudulently obtain over $2 billion from international investment banks, including Credit Suisse and VTB (collectively, the "Banks") and other investors in connection with loans to three Mozambican entities: Proindicus, EMATUM and MAM (the "Mozambican Entities").  During the course of obtaining these loans, the defendant and his co-conspirators made or caused material statements to be made to the Banks and other investors indicating, among other things, (1) that the loan proceeds would be used solely by the Mozambican Entities for maritime projects to protect and benefit the country's coastline (the "Projects"); and (2) that there were no bribes, kickbacks or improper acts made by anyone to

---

[1] The government reserves its right to file supplemental motions in limine in the event that additional issues arise in advance of trial, including but not limited to motions to preclude the defendant's expert witnesses and exhibits once they are disclosed to the government.  In addition, the government respectfully submits that, consistent with the Office's practice, it will move to preclude cross-examination of its witnesses on certain topics when it completes its production of all 18 U.S.C. § 3500 materials.

influence their actions in connection with the Projects.  As the evidence at trial will show, those statements were false.  Unbeknownst to the Banks and other investors, the defendant and his co-conspirators either paid or received millions of dollars in bribes and kickbacks in connection with the Projects and subsequent loans.  The defendant received at least $7 million while he was serving as the Minister of Finance of Mozambique.  The defendant played an essential role in the scheme by: (1) devising the plan to have the Mozambican Entities (as special purpose vehicles) obtain the loans; (2) meeting with bankers regarding the loans and the diligence process; (3) communicating with his co-conspirators about the loans; and (4) signing the government guarantees for the loans, ensuring Mozambique's obligation to repay the loans if the borrowers defaulted (which they ultimately did).  The Mozambican government guarantee for the Projects, which the defendant signed, was crucial; without the guarantee, the Banks would have never made the loans and sold them to other investors.  The defendant and his co-conspirators subsequently concealed the defendant's criminal proceeds by laundering $7 million in bribe and kickback payments through Spanish and Swiss bank accounts in other entities' names.

The evidence at trial will show that the scheme involved three groups of co-conspirators.  First, there were officers and employees at Privinvest (the contractor for the Projects) who made and facilitated bribe and kickback payments to bankers and Mozambican officials and their associates.  The Privinvest group included Jean Boustani (the lead salesman for Privinvest), Iskandar Safa (CEO of Privinvest), Najib Allam (CFO of Privinvest), Basetsana Thokoane (an intermediary used by Privinvest) and Ayomin Senanayake (an assistant at Privinvest who worked for Allam and Boustani).  Second, there were the Mozambican officials who accepted bribe and kickback payments from Privinvest in connection with the approval of the Projects and subsequent loans and government guarantees.  This group included the defendant, who was the Minister of

Finance, Antonio do Rosario (CEO of Proindicus, EMATUM, and MAM, and an official in the State Information and Security Service ("SISE")), Isaltina Lucas (Deputy National Director of the Treasury), Armando Guebuza, Jr. (the son of then-President of Mozambique, Armando Guebuza), Teofilo Nhangumele (a representative from the Office of the President), Gregorio Leao (Director General of SISE) and Adriano Maleiane (current Prime Minister of Mozambique and the defendant's successor as Minister of Finance), among others.  Third, there were employees and former employees of Credit Suisse, who received kickbacks to facilitate the loans to the Mozambican Entities.  This group included Andrew Pearse (Managing Director at Credit Suisse), Surjan Singh (Managing Director at Credit Suisse), Detelina Subeva (Vice President at Credit Suisse), Adel Afioni (Managing Director at Credit Suisse) and Said Freiha (Managing Director at Credit Suisse).   Several of these individuals are charged as co-defendants of the defendant.  See 18-CR-681.[2]

## ARGUMENT

I.    The Court Should Admit Co-Conspirator Statements If Offered by the Government and Preclude Them If Offered by the Defendant

The government intends to introduce at trial several out-of-court statements made by the defendant and/or co-conspirators through testimony from witnesses and electronic evidence (including communications retrieved from email accounts of co-conspirators).  The government submits that these statements are relevant and are either admissible as co-conspirator statements in furtherance of the conspiracy, or alternatively, as statements against penal interest.  The evidence at trial will establish by a preponderance that these co-conspirators, whether indicted or

---

[2] Specifically, on December 19, 2018, a grand jury in this District returned an indictment against the defendant, Jean Boustani, Najib Allam, Antonio Do Rosario, Teofilo Nhangumele, Andrew Pearse, Surjan Singh and Detelina Subeva in this matter.  See Boustani, 18-CR-681 (WFK), ECF No. 1.  Boustani was acquitted at trial of all charges.

unindicted, were in fact part of the conspiracy. Moreover, many of the declarants of the communications (e.g., Boustani, Allam, Do Rosario, Nhangumele) that the government seeks to admit are unavailable witnesses pursuant to Rule 804, as they are either foreign nationals located outside of the United States (and thus, outside the subpoena power of the United States) and/or are indicted co-defendants in this case who would likely invoke their Fifth Amendment right if they testified under oath.

Accordingly, consistent with the practice in this District and Second Circuit law, the Court should admit these statements at trial on a conditional basis. As the Second Circuit explained in United States v. Geaney, 417 F.2d 1116 (2d Cir. 1969) (Friendly, J.), "statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence of" the requirements of Rule 801(d)(2)(E). United States v. Tracy, 12 F.3d 1186, 1199 (2d Cir. 1993); see also United States v. Shyne, No. S4 05-CR-1067 (KMK), 2007 WL 1075035, at *34 (S.D.N.Y. Apr. 5, 2007) ("A trial court need not . . . make these determinations prior to trial."). This practice is "well-settled" in this circuit, see United States v. Labate, S1 00-CR-632 (WHP), 2001 WL 533714, at *21 (S.D.N.Y. May 18, 2001), and avoids the need for a "mini-trial, significantly prolonging the proceedings in the case and affording the defendants a complete preview of the government's evidence," United States v. Ianniello, 621 F. Supp. 1455, 1478 (S.D.N.Y. 1985).

A.    Applicable Law

1.    Co-Conspirator Statements

Pursuant to Rule 801(d)(2)(E), a statement offered against an opposing party and "made by the party's coconspirator during and in further of the conspiracy" is not hearsay. As the Second Circuit has explained:

4

> The law is well settled in this circuit that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to eventual connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances.

United States v. Cambindo Valencia, 609 F.2d 603, 630 (2d Cir. 1979) (citation omitted); see also United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999) ("To admit a statement under the co-conspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of the conspiracy.").

Under this exception to the hearsay rule, "[t]he conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment" or the subject of the relevant trial. Id. at 82. "In fact, the Second Circuit has held that it is not even necessary that the Government charge a conspiracy to take advantage of Rule 801(d)(2)(E)." United States v. Ulbricht, 79 F. Supp. 3d 466, 483-84 (S.D.N.Y. 2015) (citing United States v. DeVillio, 983 F.2d 1185, 1193 (2d Cir. 1993)); see also United States v. Maldonado-Rivera, 922 F.2d 934, 962 (2d Cir. 1990) ("Though . . . Fed. R. Evid. 801(d)(2)(E) requires proof that both the declarant and the party against whom a declaration is offered be members of the same conspiracy, it does not require that the conspiracy be one charged in the indictment.") (citation omitted).

Importantly, nothing in the text of Rule 801(d)(2)(E) or in caselaw interpreting the Rule's scope requires that a statement be communicated to any other member of the conspiracy to qualify as a co-conspirator statement, so long as it was made during and in furtherance of the conspiracy and is admitted against a member of the conspiracy. See, e.g., United States v. Fawwaz,

694 F. App'x 847, 851 (2d Cir. 2017) (holding that list containing "information regarding the current status of the conspiracy and its membership [was] sufficiently in furtherance of a conspiracy"); United States v. Ashraf, 320 F. App'x 26, 29 (2d Cir. 2009) (internal citation and quotation marks omitted) (affirming admission of drug ledgers pursuant to Rule 801(d)(2)(E)); United States v. Donovan, 55 F. App'x 16, 22 (2d Cir. 2003) (affirming admission of a ledger and a list, each kept by individual conspirators, during the course of securities fraud conspiracy to track certain commission payments, thereby "further[ing] the operations and efficiency of the conspiracy").

As to the "requirement that the challenged statement be 'in furtherance of' the conspiracy," it "is satisfied if the statement's objective is 'designed to promote or facilitate achievement of the goals of the conspiracy.'"  United States v. Malka, 602 F. Supp. 3d 510, 533 (S.D.N.Y. 2022) (quoting United States v. Rivera, 22 F.3d 430, 436 (2d Cir. 1994)).  Courts in this District have repeatedly held that this standard "is not very restrictive."  E.g., United States v. Kurland, No. 20-CR-306 (S-1) (NGG), 2022 WL 2669897, at *3 (E.D.N.Y. July 11, 2022).  Under this standard, a co-conspirator statement is admissible if it "reasonably [can] be interpreted as encouraging a co-conspirator or other person to advance the conspiracy, or as enhancing a co-conspirator or other person's usefulness to the conspiracy."  United States v. Tarantino, 846 F.2d 1384, 1412 (D.C. Cir. 1988).  Thus, statements are in furtherance of the conspiracy if they: (1) inform or provide an update as to the status or progress of the conspiracy, see United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001), United States v. Russo, 302 F.3d 37, 46 (2d Cir. 2002); (2) "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity," Maldonado-Rivera, 922 F.2d at 958 (citation omitted); (3) "seek to induce a co-conspirator's assistance," Desena, 260 F.3d at 158 (internal quotation omitted); (4) "provide

6

reassurance," id.; (5) "serve to foster trust and cohesiveness," id.; United States v. Simmons, 923 F.2d 934, 945 (2d Cir. 1991); (6) "facilitate and protect" the conspiratorial activities, United States v. Diaz, 176 F.3d 52, 87 (2d Cir. 1999); or (7) "inform a co-conspirator of "the identity and activities of his coconspirators," United States v. Rastelli, 870 F.2d 822, 837 (2d Cir. 1989); United States v. Rahme, 813 F.2d 31, 36 (2d Cir. 1987).

Relatedly, the Second Circuit has held that a status update is sufficient to satisfy the "in furtherance" requirement of Rule 801(d)(2)(E). United States v. Amato, 15 F.3d 230, 234 (2d Cir. 1994); see also United States v. Stewart, 433 F.3d 273, 293 (2d Cir. 2006) (holding that the statement need not actually further the conspiracy, but instead need only be made with the intent to further some objective of the conspiracy); United States v. Schlesinger, 372 F. Supp. 711, 720 (E.D.N.Y. 2005). Notably, "[a] statement need not be made by one co-conspirator to another co-conspirator in order to be in furtherance of a conspiracy." Malka, 602 F. Supp. 3d at 535; accord Neumann, 2023 WL 8700974, at *3; United States v. Weingarten, No. 19-CR-497 (NSR), 2024 WL 677995, at *12 (S.D.N.Y. Feb. 15, 2024).

A narrative description of a past event is also admissible if it serves "some current purpose in the conspiracy." United States v. Thai, 29 F.3d 795, 813 (2d Cir. 1994). Indeed, "[s]tatements that describe past events are in furtherance of the conspiracy if they are made . . . simply to keep coconspirators abreast of current developments and problems facing the group." United States v. Jefferson, 215 F.3d 820, 824 (8th Cir. 2000) (internal quotation marks omitted); see also United States v. Lozano-Reyes, 101 F.3d 686, 1996 WL 313934 at *2 (2d Cir. 1996) (affirming admission of co-conspirator statements regarding past events because they served "to engender trust, to increase [the witness's] familiarity with the conspiracy's modus operandi, and to outline future conspiratorial actions and the anticipated profits"); Simmons, 923 F.2d at 945

(cooperating witness testimony about conversations related to a prior murder were in furtherance of the conspiracy because "discussions of [the] murder and the reasons for it, may well have served to promote the criminal activities of the [enterprise] by enforcing discipline among its members"); United States v. Salerno, 868 F.2d 524, 535-37 (2d Cir. 1989) (finding co-conspirator statements were made to further the goals of the charged conspiracy where conversations about past events helped to coordinate future criminal activities and brief co-conspirators).

In addition, acts taken to conceal an ongoing conspiracy are acts in furtherance of that conspiracy and, therefore, are relevant and admissible at trial. See United States v. Eisen, 974 F.2d 246, 269 n.8 (2d Cir. 1992) ("[C]learly, acts or statements designed to conceal an ongoing conspiracy are in furtherance of that conspiracy."); United States v. Kahale, 789 F. Supp. 2d 359, 384 (E.D.N.Y. 2009) (holding that "an act taken to conceal an ongoing illegal agreement . . . constitutes an act in furtherance of the charged conspiracy, and is admissible"); United States v. Mermelstein, 487 F. Supp. 2d 242, 261 (E.D.N.Y. 2007) ("Efforts to conceal an ongoing conspiracy may properly be charged as overt acts in furtherance of it."). This includes statements made in an attempt to "silence witnesses" in an ongoing conspiracy, which also "further[] the goals of the conspiracy." United States v. Arrington, 867 F.2d 122, 130 (2d Cir. 1989).

The Confrontation Clause, which only applies to testimonial statements, does not preclude the use of co-conspirator statements against the defendant. "Indeed, the Supreme Court has indicated that statements in furtherance of a conspiracy are non-testimonial for purposes of the Confrontation Clause, and are therefore not covered by its protections." United States v. Shyne, 617 F.3d 103, 108 (2d Cir. 2010) (citing Crawford v. Washington, 541 U.S. 36, 56 (2004) (acknowledging that "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a

8

conspiracy.")); <u>United States v. Logan</u>, 419 F.3d 172, 178 (2d Cir. 2005) ("[I]n general, statements of co-conspirators in furtherance of a conspiracy are non-testimonial.").

       2.    <u>Statements Against Penal Interest</u>

      Rule 804(b)(3) separately allows the admission of statements against a declarant's proprietary, pecuniary, or penal interest if the declarant is unavailable as a witness. Fed. R. Evid. 804(b)(3). This Rule "is founded on the commonsense notion that reasonable people, even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." <u>United States v. Gupta</u>, 747 F.3d 111, 127 (2d Cir. 2014) (quoting <u>Williamson v. United States</u>, 512 U.S. 594, 599 (1994)).

      A declarant is considered unavailable as a witness if, for example, he or she "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure: (A) the declarant's attendance, in the case of a hearsay exception under Rule 804(b)(1) or (6); or (B) the declarant's attendance or testimony, in the case of a hearsay exception under Rule 804(b)(2), (3), or (4)." Fed. R. Evid. 804(a). Courts have found that declarants located outside of the United States who would likely invoke the Fifth Amendment if they were questioned under oath can be considered "unavailable" for purposes of this rule. <u>See</u> <u>United States v. Miller</u>, 954 F.3d 551, 561 (2d Cir. 2020) ("When a witness properly invokes his Fifth Amendment right against self-incrimination, he is unavailable for the purposes of Rule 804(a)"); <u>United States v. Malka</u>, 602 F. Supp. 3d 510, 532 (S.D.N.Y. 2022) (deeming witnesses located abroad would likely invoke the Fifth Amendment if they testified under oath "unavailable").

      In assessing whether a statement is against penal interest within the meaning of Rule 804(b)(3), the district court must first conduct an "adequately particularized analysis" and ask whether "a reasonable person in the declarant's shoes would perceive the statement as

detrimental to his or her own penal interest."  United States v. Saget, 377 F.3d 223, 231 (2d Cir. 2004).  "The proffered statement '[need] not have been sufficient, standing alone, to convict [the declarant] of any crime, so long as it would have been 'probative'' in a criminal case against him." Gupta, 747 F.3d at 127 (citing United States v. Persico, 645 F.3d 85, 102 (2d Cir. 2011)).  If the court finds that the statement is against the declarant's penal interest, the court must then determine whether there are corroborating circumstances indicating "both the declarant's trustworthiness and the truth of the statement."  Id.; (quoting United States v. Lumpkin, 192 F.3d 280, 287 (2d Cir. 1999)).  There must be a "strong, [and] not merely allowable," inference of trustworthiness.  Gupta, 747 F.3d at 127.

B.    Accounting Spreadsheets and/or Ledgers of Bribes and Kickbacks Paid to the Defendant and/or Co-Conspirators Are Admissible.

The government expects to submit evidence at trial showing that Privinvest paid millions of dollars in bribes and kickbacks to the defendant and other conspirators.  This proof includes, among other things, several versions of accounting spreadsheets and/or ledgers created and maintained by members of the conspiracy.  As explained below, these documents detail the amounts of bribes and kickbacks paid to the defendant and other conspirators and are all admissible as co-conspirator statements and/or statements against penal interest.  Indeed, in the Boustani trial, the Court agreed that the government could admit government exhibits ("GX") 2808 and 2808A (attached as Exs. A and B), which comprise such an accounting ledger, as co-conspirator statements in furtherance of the conspiracy.  See Boustani,18-CR-681, at ECF No. 317 (granting the government's application to admit GX2808 and 2808A as co-conspirator statements).  The government respectfully requests that the Court permit it to do so here as well.

1.    GX 2808 and 2808A

As it did in the Boustani trial, the government moves in limine to admit GX 2808

and 2808A, which consist of (1) a November 23, 2014 e-mail authored by co-defendant Najib Allam, Privinvest's CFO, that he sends from his Privinvest business e-mail to his personal e-mail (GX 2808), which attaches (2) a detailed accounting spreadsheet that sets out the costs to Privinvest of each of the three maritime projects at issue in this case and meticulously details bribes and kickbacks paid to Chang and other co-conspirators with respect to each project (GX 2808A).  (See Exs. A and B, respectively).[3]   For example, the excerpted images from GX 2808A show the detailed bribe payments that were made to the defendant and co-conspirators in connection with the Proindicus and EMATUM projects:

Figure 1: GX 2808A, Excerpt of Tab "New Conso"

| Partners | | | | |
|---|---|---|---|---|
| Ematum | | -$8,000,000 | -$3,300,000 | -$400,000 |
| Proindicus Ph4 | | | | -$880,000 |
| EUG Ph4 | | | -€ 500,000 | |
| DG PH4 | | | -€ 1,000,000 | -$1,500,000 |
| AP | | | -€ 700,000 | -$1,000,000 |
| Ros | on hold | | | -$500,000 |
| CH | | | | -$400,000 |
| JB | | | | |
| Esalt | | | | $0 |
| Bruno | on hold | | | -$100,000 |
| Bassy | on hold | | | -$100,000 |
| Prof | on hold | | | -$1,000,000 |
| ArGe | | | | |
| Rosario | | -$8,700,000 | -$650,000 | -$730,000 |
| CH | | -$5,000,000 | -$1,500,000 | -$2,000,000 |
| DG | | | -$3,670,000 | -$3,300,000 |
| ArGe | | | | -$5,915,000 |
| JB | | | | -$1,000,000 |
| ESALT | | | $0 | $0 |
| Surjan | | | -$800,000 | -$800,000 |
| Petrosius | | | -$500,000 | |

---

[3] As set forth in further detail below, both documents were obtained via search warrant of Allam's personal e-mail account, and the records have been authenticated by certification from the relevant email provider.

Figure 2: GX 2808A, Excerpt of Tab "EMATUM"

| To be paid | | | Upsize 350m |
|---|---|---|---|
| CMN Contract | | -$174,555,000 | |
| Ematum | | -$4,700,000 | -$3,300,000 |
| Rosario | | -$5,000,000 | -$3,700,000 |
| Chang | | -$3,000,000 | -$2,000,000 |
| DG | | -$4,700,000 | -$3,300,000 |
| ArGe | | -$11,800,000 | -$8,200,000 |
| JB | | -$5,000,000 | -$4,000,000 |
| Esaltina | | -$1,176,000 | -$800,000 |
| Bruno | | | $0 |
| Arnaud | | | -$1,000,000 |
| Balance | | $180,810,000 | |

The government expects to prove that the names and initials on the lefthand side of the excerpted charts refer to the defendant and his co-conspirators. "Chang" and "CH" refer to the defendant and the $5 million amount next to his name in Figure 2 reflects the amount of bribe and kickback money he was expected "to be paid" in connection with EMATUM. Likewise, the government expects to prove that:

- "AP" refers to cooperating witness and co-defendant Andrew Pearse;

- "Surjan" refers to cooperating witness and co-defendant Surjan Singh;

- "JB" refers to co-conspirator Jean Boustani;

- "Rosario" refers to co-defendant Antonio Do Rosario (member of SISE);

- "ArGe" refers to co-conspirator Armando Guebaza, Jr. (son of the then-President of Mozambique); and

12

- "Esalt" and "Esaltina" refer to co-conspirator Isaltina Lucas (Deputy National Director of the Treasury).

The government expects to admit evidence showing that co-defendant Allam – the individual who emailed himself this spreadsheet – was the CFO of Privinvest and a key co-conspirator in the scheme. Evidence, including testimony from cooperating witnesses, will show that Allam was directly involved in executing the bribe payments that had been negotiated and agreed upon by Boustani, the defendant and other members of the conspiracy. Allam and others at Privinvest working at his direction executed the wire transfers of bribes to those in the conspiracy and tracked the bribe and kickback payments so that members of the conspiracy knew how much money had been paid to date, how much money remained, and how much money was still owed to conspirators. Moreover, the evidence will show that Allam and others sought to conceal the criminal nature of the bribe and kickback payments and legitimize them by creating and maintaining fake invoices for the payments. In fact, Allam even helped members of the conspiracy, including then-Credit Suisse employees Pearse, Singh and Subeva, fraudulently set up bank accounts in the United Arab Emirates ("UAE") so that they could surreptitiously deposit the bribe payments in those accounts.[4]

As such, these documents are plainly co-conspirator statements made in furtherance of the conspiracy. The documents were made during the conspiracy by one or more co-conspirators in order to keep track of the bribe and kickback payments to other co-conspirators,

---

[4] Indeed, at the <u>Boustani</u> trial, the evidence showed, among other things, that Allam was a co-conspirator who made kickback payments to Pearse in connection with the Mozambican loans (Trial Tr. 277:19-22), helped Pearse set up a UAE bank account using false information to receive kickbacks and unlawful payments (Trial Tr. 267:10-14), assisted co-defendant Surjan Singh with a fraudulent UAE residency permit (Trial Tr. 566:3-7), and sent Pearse a false contract (GX 2747A) in an attempt to retroactively make the $11 million that Privinvest paid to Pearse in kickbacks look legitimate (Trial Tr. 519:18-620:3).

"thereby indicating that the documents furthered the operations and efficiency of the conspiracy." United States v. Donovan, 55 F. App'x 16, 22 (2d Cir. 2003) (ledgers and list made during the conspiracy "to keep track of the commissions to the coldcallers, thereby indicating that the documents furthered the operations and efficiency of the conspiracy" are co-conspirator statements); see also United States v. Amato, 15 F.3d 230, 235 (2d Cir. 1994) (accounting records maintained by a co-conspirator of the names of the Colombo family members and payment amounts—"data necessary to monitor and conduct the loansharking operation"—were admissible statements made in furtherance of the Colombo family conspiracy); United States v. Orena, 32 F.3d 704, 715 (2d Cir. 1994) (finding the same); United States v. Jaramillo–Montoya, 834 F.2d 276, 278–79 (2d Cir. 1987) (pages from address book of coconspirator admissible); United States v. Vanwort, 887 F.2d 375, 388 (2d Cir. 1989) (district court did not err in admitting computer printout from disk obtained from co-conspirator's office containing list of names of other co-conspirators and accounting ledger depicting several drug transactions).

Moreover, not only do these records reflect the illicit payments that the defendant is alleged to have received, but these records illustrate the connection and ongoing criminal relationship between all of the co-conspirators that the government intends to identify at trial. See United States v. Vieira, 280 F. App'x 26, 28 (2d Cir. 2008) (drug ledger indicated ongoing drug relationship between the defendant and co-conspirator and "sufficiently established 'a likelihood of an illicit association between the declarant and the defendant'"); Vanwort, 887 F.2d at 388 (computer printout containing list of names of other co-conspirators is "analogous to a conspirator's address book, which we have found to be admissible to prove association and knowledge in drug conspiracy cases."). In light of the above, the evidence at trial will more than meet the preponderance standard necessary to submit these co-conspirator statements and

documents to the jury.  Bourjaily v. United States, 483 U.S. 171, 175 (1987); Gigante, 166 F.3d at 82.

Finally, GX 2808 and 2808A are also admissible statements against penal interest. The government understands that Allam is currently in Lebanon and therefore outside of the jurisdiction of the United States. But even if the government could subpoena his testimony, Allam would likely invoke his Fifth Amendment privilege against self-incrimination because he is a charged defendant.  In sum, Rule 804's unavailability requirement is satisfied.  See, e.g., Fed. R. Evid. 804(a) (noting that declarant "is considered to be unavailable as a witness" pursuant to Rule 804(b)(3) where a privilege applies); United States v. Deluna, 38 F. App'x 644, 645 (2d Cir. 2002) (upholding admission of coconspirator statement where coconspirator "was unavailable to testify as he would have invoked his Fifth Amendment privilege against self-incrimination").   Thus, these documents are separately admissible on this basis.

## 2.    Other Spreadsheets and Ledgers

The government also expects to introduce other versions or iterations of ledgers from Privinvest that similarly detail bribe payments to the defendant and other co-conspirators. Unlike GX 2808 and 2808A, some of these ledgers do not have accompanying cover emails indicating who sent or received these ledgers.  Nonetheless, these documents are still admissible because their contents (and in one instance, the document's metadata) provide more than sufficient basis to conclude that the records are statements of co-conspirators in furtherance of the conspiracy and/or statements against penal interest.

For example, the government intends to introduce a spreadsheet from November 2014 ("November 2014 Ledger")[5] that elaborates on the information in GX 2808A and identifies

---

[5] The means by which the government will authenticate this document, and others like it, are set forth below in Section II.

among other things, the names of co-conspirators, the amount of bribes they received, the dates the bribes were made, the project(s) that the bribes relate to, and in some instances, where the bribe payments were sent.  (See Ex. C).  As seen below in the excerpted image, the November 2014 Ledger memorializes the fact that Chang received millions of dollars in fall of 2013 in connection with EMATUM, and that certain of those payments were sent to "Thyse International Inc" on behalf of Chang (see id.):

| Name | salesman | Date | Type | Jv | Reference | Description | Branch | Shipment Cur | Debit | Credit | |
|------|----------|------|------|-----|-----------|-------------|--------|--------------|-------|--------|---|
| 1 Ros | | 4/10/2014 | JV | 2.014E+13 | 214 - 01 - Apr 2467 | Sunflower Int l Corp FZE - Inv# A4 | 0 | 0 USD | 1,000,000.00 | - | |
| 2 Chang | | 9/12/2013 | JV | 2.013E+13 | Em-Cons 3317 | Ph1 Ematum | 0 | 0 USD | - | 3,000,000.00 | |
| 2 Chang | | 10/6/2013 | JV | 2.013E+13 | Em-Ch-Pay1 3726 | Payment to CH-Thyse Internatior | 0 | 0 USD | 1,500,000.00 | - | |
| 2 Chang | | 10/22/2013 | JV | 2.013E+13 | EmatumConsUp2 3974 | Ematum upsize 350Mio | 0 | 0 USD | - | 2,000,000.00 | |
| 2 Chang | | 11/8/2013 | JV | 2.013E+13 | EM-CH-24324 | CH-Thyse-2nd payment | 0 | 0 USD | 1,500,000.00 | - | |
| 2 Chang | | 12/3/2013 | JV | 2.013E+13 | Em-Ch-Final 4781 | Final payment | 0 | 0 USD | 2,000,000.00 | - | |
| 3 DG | | 9/12/2013 | JV | 2.013E+13 | Em-Cons 3317 | Ph1 Ematum | 0 | 0 USD | - | 4,700,000.00 | |

Like GX 2808 and 2808A, this document is admissible as a co-conspirator statement and/or statement against penal interest.  The government expects to show that the document's metadata demonstrates that the November 2014 Ledger was authored or maintained by Ayomin Senanayake in November 2014; that Senanayake was an employee of Privinvest and its subsidiaries at the time; and that Senanayake helped monitor and track bribe payments made to the defendant and other co-conspirators in furtherance of the conspiracy.   For example, email communications show that in April 2017, Allam emailed Senanayake using his personal email account and told Senanayake that he was attaching a document "related to transfers made to 'consultants' of [the] Mozambique project."  (See GX 3065 and GX 3065A (attached as Exs. D-1 and D-2)).  Allam asked Senanayake to confirm the amount and dates of the payments that were made to these "consultants" and warned Senanayake that the information he was relaying was highly "sensitive" and "extremely confidential."  The document Allam sent identified among

others, Do Rosario, Armando Guebuza, Nhangumele, and Lizette Chang (the defendant's wife) as "consultants of the Mozambique project" – when in fact, all of them were either Mozambican government officials or their associates.  Id.  The above evidence thus establishes beyond a preponderance that Allam, with the assistance of Senanayake, was responsible for maintaining and tracking the bribe payments so that members of the conspiracy had an up-to-date accounting of the amount of money that was being used to bribe, among others, government officials and their associates.

Moreover, it is self-evident from the spreadsheets' content that these documents were created by and for co-conspirators in furtherance of the conspiracy.  Indeed, a document's contents can provide sufficient basis to conclude that the record at issue is a co-conspirator statement, even where the identity of the author of the record is unknown.  See United States v. Millan-Colon, 836 F. Supp. 1007, 1015 (S.D.N.Y. 1993) (citing Maldonado-Rivera, 922 F.2d at 957) (finding sufficient basis to conclude that the records at issue are authentic statements of co-conspirator where the documents were seized from the co-conspirator's residence and the notes contain the names and contact information of the defendant and the co-conspirators).  In such cases, courts "may consider such factors as the document's 'appearance, contents, substance, timing, and provenance, together with other evidence'" in determining whether a document may be attributed to a coconspirator.  Id.; see also United States v. Calbas, 821 F.2d 887, 893 (2d Cir. 1987) (pages of a spiral notebook found in a hotel room were admissible as co-conspirator statements where among other factors, the notebook was found in a hotel room which a co-conspirator had recently occupied and the notebook contained a reference to the defendant's alias); United States v. Goodwin, 131 F.3d 132 (2d Cir. 1997) (unpublished opinion) (affirming admission of financial records and organization of the narcotics trafficking operation even though

17

the author(s) of the documents are unknown, explaining that "[t]he government's inability to identify the author of the document does not preclude a finding of authenticity" and the documents "were clearly admissible against the defendants" as co-conspirator statements); United States v. Munson, No. 06-CR-00143 (JGK), 2008 WL 4202313, at *3 (S.D.N.Y. Sept. 11, 2008), aff'd, 350 F. App'x 485 (2d Cir. 2009) (district court did not err in admitting a telephone book found in a co-conspirator's house where the book contained information about the defendant and other alleged co-conspirators).[6]  Thus, the government respectfully requests that the Court conditionally admit these records as statements of co-conspirators and/or statements against penal interest.

C.    Statements From Boustani Are Equally Admissible.

In addition to the specific documents addressed above, the government intends to offer additional statements of co-conspirators, including Boustani, for the truth of the matters asserted therein under Rule 801(d)(2)(E) and/or Rule 804(b)(3).[7]  Examples of these statements include, among others:

1.  Communications amongst co-conspirators Boustani, Nhangumele and others from as early as 2011, discussing the inception of the Proindicus project and the payment of

_____

[6] The Second Circuit also made clear in Calbas that any arguments about whether the document was in fact written by the co-conspirator goes to the weight of the evidence, not its admissibility.  See Calbas, 821 F.2d. at 893, n.4 ("[The defendant] observes that Vrlaku was dealing in cocaine at the time but that there was no showing that the narcotics ledger reflected cocaine transactions; that there was no proof by way of handwriting exemplars or other testimony that Vrlaku was the author of the notebook; and that there was no proof that Vrlaku could speak and write Albanian, though the entries in the notebook were in that language. These are all considerations which speak to the weight which the jury should have placed on the evidence.").

[7] The evidence outlined in this subsection is representative of the statements the government intends to introduce at trial; it is by no means exhaustive, and the government reserves its right to introduce evidence of a similar nature that is not identified herein.  In addition, many of these statements are also admissible under exceptions to the rule against hearsay—such as the present-sense impression exception, see Fed. R. Evid. 803(1)—or for non-hearsay purposes, such as the statements' effect on the listener.  Furthermore, many of the statements, including false statements made to the Banks and other investors, will not be offered for the truth of the matter asserted because the statement being asserted was false. The government reserves the right to argue these alternative grounds for admissibility on a statement-by-statement basis.

bribes and kickbacks to Mozambican officials to get the project approved. For example, the government intends to admit email communications from 2011 between Boustani and Nhangumele, in which the two discuss how much to budget for the Proindicus project. In one email, after Boustani told Nhangumele that he needed a "% or figure," Nhangumele responded that he has "consulted" and that Boustani should "put 50 million chickens" into the loan proposal. Boustani later forwards this email to another co-conspirator, Basetsana Thokoane, laughs at Nhangumele's reference to "chickens," and tells Thokoane that he would "add 62M in total (12M for you and I =5% because the budget we put ~ 240M)." Boustani subsequently circulates the budget proposals for Proindicus, which reflect a line item directing $65 million to be paid to "partners." The government intends to establish at trial that these documents all refer to bribes and kickbacks to Mozambican officials and associates.

2. Statements made by Boustani and other co-conspirators regarding the defendant, including communications in which Boustani relays information from the defendant and/or other Mozambican officials about the Projects. For example, the government intends to introduce email communications in which Boustani relays information about how the defendant wants the loans for the Projects to be structured. In communications from 2012 and 2013, Boustani tells Credit Suisse that the defendant prefers Credit Suisse to issue the loans to special purpose vehicles, rather than to the Ministry of Finance, and that the defendant "prefers issuing a letter to CS [Credit Suisse] as a guarantee." In another communication from 2014, Boustani emails co-conspirators Pearse and Subeva and tells them that they are "all set to get MoF new guarantee for 500m$," that the "borrowers will be Proindicus and EMATUM" but that he thinks "Proindicus will borrow as we don't want public noise." Boustani further asked Pearse and Subeva to provide the "MoF guarantee so [he] can make [the defendant] sign it next week."

3. Statements made by Boustani and other charged and uncharged co-conspirators to defraud the Banks and other investors in their efforts to secure financing for the Projects. As an example, the government intends to admit an email from August 2012 in which, in response to Credit Suisse's due diligence questions, Boustani represented to Credit Suisse that the "full 355M$" would be used for Proindicus.

4. Communications amongst Boustani and other co-conspirators discussing and negotiating the amount of money to obtain from the Banks, including ways to justify seeking increases in the Proindicus and EMATUM loans. For example, the government intends to admit email communications from July 2013 showing Boustani discussing with Pearse, Subeva, and Do Rosario about how to present the "perfect package" to justify the increase for EMATUM.

As set forth above, the trial evidence will show that Boustani was a key co-conspirator who worked for Privinvest, and who made and facilitated bribe and kickback payments to Mozambican officials and bankers to get them to approve the Projects and the loan financing.

19

All these statements are thus admissible, as they are plainly made by co-conspirators to further the objectives of the conspiracy.

The fact that Boustani was previously acquitted of the charges against him, including for conspiracy, does not preclude the Court from admitting evidence that Boustani was a co-conspirator. The Second Circuit has consistently allowed co-conspirator statements to be admitted against a defendant even where the defendant himself is acquitted of a conspiracy charge because the standard of proof necessary to admit a co-conspirator statement (preponderance of evidence) is significantly lower than the proof needed to convict a person of a crime (beyond a reasonable doubt). In United States v. Stanchich, 550 F.2d 1294 (2d Cir. 1977), the Second Circuit explained this very principle when it affirmed the admission of the defendant's co-conspirator's statements at trial even though the district court had dismissed the conspiracy charges against the defendant and the co-conspirator at the end of the government's case. Id. at 1298–1299. The Second Circuit reasoned: "A judge may thus consistently find that the evidence (even including admissible hearsay declarations) did not meet the higher test required for submission of a conspiracy count to a jury [but] the independent evidence did meet the lower [preponderance of the evidence] test required for admission of the declaration." Id. at 1299 (footnote omitted). Thus, an acquittal (of either the defendant or a co-conspirator) on a conspiracy charge does not preclude the admission of hearsay statements as co-conspirator statements against the defendant. See also Goodwin, 131 F.3d 132 (2d Cir. 1997) (unpublished opinion) (admission of co-conspirator evidence against defendant was proper despite the defendant's acquittal on conspiracy charges); United States v. Clark, 613 F.2d 391, 403 (2d Cir. 1979) ("The fact that the defendants were acquitted on the conspiracy count does not destroy the admissibility of the declarations of co-conspirators on the substantive charge."); United States v. Jacobs, 475 F.2d 270, 283-84, n.28 (2d

Cir. 1973) (acquittal of defendant on conspiracy count "does not invalidate the use against him of declarations of conspirators in furtherance of the conspiracy").[8]

Having established that Boustani was a member of a conspiracy, his communications with co-conspirators regarding bribe and kickback payments, how to account for those payments in the loan proposals for the Projects, and how to justify increases to the loans all serve to "promote or facilitate achievement of the goals of [the] conspiracy." Rivera, 22 F.3d at 436. Moreover, his communications with the Banks and other investors, including statements in which he relays information from the defendant, are also admissible as co-conspirator statements because they "prompted the victim 'to respond in a way that promotes or facilitates the carrying out of a criminal activity,' i.e., by wiring money or confirming the status of the money that was wired." United States v. Adelekan, 567 F. Supp. 3d 459, 468 (S.D.N.Y. 2021) (deeming statements made by co-conspirators to victims and banks, in a money laundering and wire fraud conspiracy scheme, admissible co-conspirator statements); see also Maldonado-Rivera, 922 F.2d at 958 (co-

---

[8] Other Circuits similarly agree that the admission of a co-conspirator statement is not rendered retroactively improper by subsequent acquittal of the alleged co-conspirator. See, e.g., United States v. Cravero, 545 F.2d 406, 419 (5th Cir. 1976) ("The declarant's earlier acquittal, to be sure, forecloses a redetermination of his guilt because of considerations of double jeopardy . . . [b]ut it no more forecloses a determination, even by a preponderance of the evidence, that he was one than a subsequent acquittal, and this is more than is required for admission of his declarations."); United States v. Hernandez-Miranda, 78 F.3d 512, 513 (11th Cir. 1996) (the admission of testimony under the co-conspirator exception is "not rendered retroactively improper by subsequent acquittal of the alleged co-conspirator" (internal citations omitted)); United States v. Todd, 920 F.2d 399, 406 (6th Cir. 1990) (coconspirator's previous acquittal did not preclude district court from admitting evidence of his out-of-court statements against the defendant under coconspirator exception because a preponderance of evidence stablished that the co-conspirator was a member of the conspiracy); United States v. Gil, 604 F.2d 546, 549-50 (7th Cir. 1979) ("[O]nce the existence of a joint venture for an illegal purpose, or for a legal purpose using an illegal means, and a statement made in the course of and in furtherance of that venture have been demonstrated by a preponderance of the evidence, it makes no difference whether the declarant or any other 'partner in crime' could actually be tried, convicted and punished for the crime of conspiracy.").

conspirator statements are made "in furtherance of the conspiracy" if they "prompt the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity."). Thus, the government respectfully requests that Boustani's co-conspirator statements be admitted.

D.    The Defendant's Statements Are Inadmissible If Offered by the Defendant

The Court should preclude the defendant from admitting other statements or portions of statements made by the defendant, his agents or co-conspirators, either on cross-examination or in their case-in-chief, because such testimony would constitute hearsay without any exception.

It is well established that a defendant generally is prohibited from introducing his own out-of-court statements at trial. See United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("[W]hen the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."); United States v. Blake, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."). Therefore, a "court may . . . exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible hearsay." United States v. Mahaffy, No. 05-CR-613 (ILG), 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007). Were the law otherwise, a defendant "could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." United States v. McDaniel, 398 F.3d 540, 545 (6th Cir. 2005).

Nor, except in extremely limited circumstances, may a defendant introduce his own out-of-court statements as evidence of his state of mind. The state-of-mind exception to the hearsay rule allows into evidence "[a] statement of the declarant's then-existing state of mind . . .

22

but not including a statement of memory or belief to prove the fact remembered or believed." Fed. R. Evid. 803(3). The state of mind must be relevant, and the statement cannot be offered for any underlying truth independent of the state of mind. See Funk v. Belneftekhim, No. 14-CV-0376 (BMC), 2018 WL 11169575, at *3 (E.D.N.Y. Nov. 30, 2018) (denying admission of statements under Rule 803(3) because "[n]either statement shows [declarant's] knowledge or state of mind independent from the truth of what it asserts and it is not clear how [declarant's] state of mind is relevant."). "The exclusion of 'statement[s] of memory or belief [proffered] to prove the fact remembered or believed' is necessary to prevent the exception from swallowing the hearsay rule. This would be the result of allowing one's state of mind, proved by a hearsay statement, to provide an inference of the happening of an event that produced the state of mind." United States v. Cardascia, 951 F.2d 474, 487 (2d Cir. 1991).

A defendant also may not introduce his own statements pursuant to the rule of completeness without complying with its strict terms. Rule 106 permits the inclusion of hearsay testimony only where it is "essential to explain an already admitted document, to place the admitted document in context, or to avoid misleading the trier of fact." United States v. Gotti, 457 F. Supp. 2d 395, 397-98 (S.D.N.Y. 2006). Self-serving statements are not admissible by a defendant unless "their exclusion would unfairly distort the meaning of the declarant's non-hearsay statements that are in evidence." United States v. Harper, No. 05-CR-6068L, 2009 WL 140125, at *5 (W.D.N.Y. Jan. 20, 2009). Accordingly, the Second Circuit has excluded hearsay statements offered by the defendant that, by their omission, do not distort the admitted statements. See United States v. Gonzalez, 399 F. App'x 641, 645 (2d Cir. 2010) (affirming district court's decision to exclude portion of defendant's statement where admitted portion did not distort the meaning of the full statement); United States v. Johnson, 507 F.3d 793, 796 (2d. Cir. 2007)

(affirming district court's decision to exclude portions of confession that did not explain the admitted portion or place the admitted portion in context, noting that while "[t]he admitted portion of the confession related to . . . plans to execute the robbery, . . . the redacted portion related to the execution of the robbery").  As the Second Circuit has explained, a defendant may not introduce other parts of the same statement offered in part by the government unless the defendant makes a proper showing that the statements he seeks to introduce have a separate basis for admission.  See United States v. Jackson, 180 F.3d 55, 73 (2d Cir.), on reh'g, 196 F.3d 383 (2d Cir. 1999) (rejecting claim under the completeness doctrine that later portions of conversation provided relevant context and noting that "the portions of the tape proffered by [defendant] consisted largely of [his] own self-serving statements, which, as offered by him, are inadmissible hearsay").  The completeness doctrine does not "require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages."  Johnson, 507 F.3d at 796.

Because "Rule 106 does not render admissible evidence that is otherwise inadmissible," United States v. Terry, 702 F.2d 299, 314 (2d Cir. 1983), and for the reasons stated above, the Court should preclude the defendant from attempting to admit his own statements under Rule 106, see Gonzalez, 399 F. App'x at 645 (noting that the rule of completeness cannot be used as a "mechanism to bypass [evidentiary] rules").

Finally, a defendant also may not admit his agents' or co-conspirators' statements under Rules 801(d)(2)(D) or (E).  Such statements are not "opposing party" statement as to a defendant.  Thus, for example, courts have held that the "co-conspirator exception is a one-way street down which only the government may travel."  United States v. Persico, No. 04-CR-911 (SJ), 2006 WL 3246922, at *1 (E.D.N.Y. Nov. 8, 2006); see also United States v. James, No. 02-CR-778 (SJ), 2007 WL 2702452, at *1 (E.D.N.Y. Sept. 12, 2007) (a co-conspirator statement

24

made "during the course and in furtherance of the conspiracy is one type of '[a]dmission by party-opponent' defined as nonhearsay, but only if 'offered against' the party. The statement of a co-conspirator, offered for its truth by a co-conspirator, does not fall within this Rule.").

II.    The Court Should Allow the Government to Authenticate and Admit Certain Privinvest Documents Produced in Discovery

As the Court is aware, the Republic of Mozambique civilly sued Privinvest, and other parties, including Pearse and Singh, in the High Court of Justice in London, United Kingdom in connection with the loans to Proindicus and EMATUM (the "U.K. Proceeding"). In the U.K. Proceeding, Privinvest and Boustani produced documents in discovery to the parties named in the lawsuit. From the documents produced in discovery by Privinvest and Boustani, the government seeks to admit nine documents (six email chains and three ledgers/ spreadsheets) (collectively, the "Privinvest Documents"). All of these documents were produced in discovery in the U.K. Proceeding by either Privinvest or Boustani and all were referenced at trial and considered by the court in the U.K. Proceeding.

The government now moves in limine to authenticate these documents through the testimony of Katie Reith, an attorney at the law firm of Quinn Emmanuel Urquhart & Sullivan U.K. LLP ("Quinn LLP"), and Rupert Butler, U.K. counsel for Pearse, and admit them as co-conspirator statements. At trial, the government anticipates that Ms. Reith, a U.K. qualified attorney and officer of the court, will testify to the following: between 2019-2020, Quinn LLP represented Privinvest in connection with issues related to the Mozambican Projects. As part of its representation of Privinvest, Quinn LLP hired an e-litigation vendor (the "Vendor") to collect documents from Privinvest using search terms and custodians that Quinn LLP identified as relevant. The Vendor then uploaded the documents to an online database called Relativity for Quinn LLP's review. Ms. Reith was a member of the team at Quinn LLP that represented

Privinvest and personally reviewed the Privinvest Documents; apart from the fact that these documents now have bates-numbers and exhibit numbers, the Privinvest Documents were the same documents she reviewed on the Relativity database.

At trial, the government anticipates that Mr. Butler will testify that he received the Privinvest Documents from either Privinvest or Jean Boustani in discovery in the U.K. Proceeding. Mr. Butler's testimony is corroborated by discovery production cover letters from Privinvest's and Boustani's counsel (attached as Exhibits E-1, E-2, and E-3) as well as the bates-numbers on the documents that correspond to the discovery productions described in the cover letters.[9]    In addition, the fact that these documents were referenced at trial in the U.K. Proceeding, are highly probative and corroborated by other evidence in this case, demonstrates that they are reliable.

For the Court's consideration, the government attaches the Privinvest Documents to this motion as Exhibits C and F-1 to F-8,  and provides a short summary of each document (their Bates-number, U.K. trial exhibit number), their relevance, and how they are corroborated by other evidence, to show their reliability:

- PRI_023091 (U.K. Exhibit P4/165/1) (attached as Exhibit F-1)

   - This is an email chain on Saturday, August 3, 2013, between co-conspirators Jean Boustani and Najib Allam.  In the email chain, Boustani tells Allam that for "Chopstick: Total 2.  Please let's make 1 on Monday," and attaches a document called "KUNG FU.pdf."  See Ex. F-1, at 1-2.  At trial, the government anticipates that Pearse will testify, as he did in Boustani, that "Chopstick" is a reference to the defendant Manuel Chang.  See Boustani Tr. at 543 (Pearse) (Q: Who is Chopstick? A. Manuel Chang, who was the Minister of Finance of Mozambique).  Allam

---

[9] Bates prefix "PRI" stands for Privinvest, and Bates prefix "PRODJB" stands for Jean Boustani.  With respect to Privinvest, current counsel for Privinvest has informed the government that the company will not cooperate with the government and provide a certification even though Privinvest produced the records in question, identified them in their production cover letters, and their documents were referenced at trial in the U.K. Proceeding where Privinvest is a party.

responds, "Meaning CH in the sheet?" Id.[10]  In this email, when Allam asks if it is "1.4," for "ph1 and ph2," (which is a reference to phase 1 and phase 2 of the Proindicus loans), Boustani corrects him and says it is "2 anyways 1 now please and the other 1 next month."  The bribe payments to the defendant in this email chain are further corroborated by wire records obtained from other sources that show that Privinvest paid $1 million dollars on Monday, August 5, 2013, to an entity named "Genoa Assets" in Switzerland.  The wire records further show that Privinvest made another $1 million payment on September 4, 2013 to the same Swiss account, for a total of $2 million.  This email chain between Boustani and Allam discussing bribe payments to the defendant is thus admissible as a co-conspirator statement made in furtherance of the conspiracy.

- PRI_0003494 (U.K. Exhibit P4/499/1) (attached as Exhibit F-2)
  - This is an email chain on August 30, 2013 and September 1, 2013 between co-conspirators Jean Boustani and Najib Allam.  In this email chain, Boustani and Allam discuss bribe and kickback payments to various individuals, including "Chopstick" (the defendant) and "Esalt" (Isaltina Lucas, the Deputy National Director of the Treasury).  Boustani tells Allam, "For Chopstick: total is 2 million$ so please do $1 million." Ex. F-2.  Allam also notes that for "Chopstick," they are using the "Genoa Asset account." Id.  Again, this email chain is corroborated by wire records that show Privinvest making $2 million in payments to the Genoa Asset account in Switzerland, including $1 million on August 5, 2013 and another $1 million on September 4, 2013, just as the email chain describes.  This email chain between Boustani and Allam discussing bribe payments to the defendant is admissible as a co-conspirator statement made in furtherance of the conspiracy.

- PRI_0003808 (U.K. Exhibit P5/132/1) (attached as Exhibit F-3)
  - This is an email chain on October 3, 2013 and October 4, 2013 between co-conspirators Jean Boustani and Najib Allam discussing bribe payments to the defendant for the EMATUM loan.  On October 3, 2013, Boustani provides the account information for "Thyse International Incorporation" to Allam and says "Total of 5: 1.5, 1.5, 2." Allam responds, "Chopstick for Ematum is 3 not 5." Ex. F-3.  Boustani corrects him, "For Proindicus it is 2 in all cases. Ematum it is 5 for all so 3 for the first 500." Id. This email chain is corroborated by wire records that show payments by Privinvest to a Spanish bank account in the name of "Thyse International" for a total of $5 million, but split into three payments of $1.5 million, $1.5 million and $2 million, made starting in October 2013, just as directed by Boustani to Allam.   Also, the reference to "3 for the first 500" appears to be a reference to the fact that the EMATUM loan had two parts—$500 million from Credit Suisse and then $350 million from VTB.  This email chain between Boustani

---

[10] This appears to be a reference to GX 2808A (Ex. B), the spreadsheet of bribes and kickbacks that Allam maintains, which references the defendant Manuel Chang in a section under "Partners" as "CH."  GX 2808A also lists "AP" (Andrew Pearse) and "Surjan" (Surjan Singh) along with other bribe and kickback recipients.

and Allam discussing bribe payments to the defendant is admissible as a co-conspirator statement made in furtherance of the conspiracy.

- PRODJB0004591 (U.K. Exhibit P5/138/1) (attached as Exhibit F-4)
  - o  This is an email chain on October 7, 2013 between co-conspirators Jean Boustani and Najib Allam discussing bribe payments to the defendant for the Proindicus and EMATUM loans.  Boustani writes, "For Chopsticks, please let's do 1.5 today.  It is very important.  Chopstick total will be all in all 7 (2 for Proindicus and 5 for Ematum)."  This email chain is corroborated by wire records that show a total of $7 million from Privinvest to entities associated with the defendant, including a $1.5 million payment to Thyse International on or about October 21, 2013.  This email chain is admissible as a co-conspirator statement made in furtherance of the conspiracy.

- PRI_0023304 (U.K. Exhibit P5/193/1) (attached as Exhibit F-5)
  - o  This is an email chain on October 16, 2013 between co-conspirators Jean  Boustani and Najib Allam discussing bribe payments to the defendant.  The subject of the email chain is "Re: Chopstick," and on October 16, 2013, Allam tells Boustani that he will send "the correct details" to where to send the payment to "a bank in Spain" on "Sunday [i.e. October 20, 2013]."  Wire records show that Privinvest made a payment to a Spanish bank account in the name of Thyse International on October 20, 2013 in the amount of $1.5 million.  This email chain is admissible as a co-conspirator statement made in furtherance of the conspiracy.

- PRODJB0005188 (U.K. Exhibit P5/552/1) (attached as Exhibit F-6)
  - o  This is an email chain on November 7, 2013 between co-conspirators Jean Boustani and Najib Allam discussing bribe payments to the defendant.  The subject of the email chain is "Chopstick" and Boustani asks Allam, "Did the other 1.5 of chopstick go? He confirmed first 1.5.  So he wants 1.5 now and the final 2 first of December."  This email directive from Boustani to Allam is corroborated by wire records that show a payment of 1.5 million from Privinvest on November 12, 2013 and another $2 million payment from Privinvest on December 4, 2013 to a Spanish bank account in the name of Thyse International.

- PRI_0023113 (U.K. Exhibit P4/447/1) and PRI_0023118 (U.K. Exhibit P4/449/1) (attached as Exhibits F-7 and F-8, respectively)
  - • These two documents are standalone accounting documents that were respectively "updated" on August 18, 2013 and August 22, 2013 – during the time period of the conspiracy.  Both documents use the same nicknames and identifiers (e.g., "CH," "Esalt" and "DG") to refer to co-conspirators that were used in GX 2808 and 2808A.  Moreover, both records reflect that "CH" (the defendant) received $1 million in August 2013 and another $1 million in September 2013 – information that is again corroborated by the wire records discussed above.  The accounting records also refer to other co-conspirators by their full name, such as "Jean Boustani" and "Andrew Pearse."  For the reasons set forth supra in Section I, these accounting spreadsheets and ledgers are admissible as co-conspirator statements.

According to the transcripts from the U.K. Proceeding,[11] the first August 18, 2023 spreadsheet had been emailed from Allam to Iskandar Safa (the CEO of Privinvest)'s secretary, and the second August 22, 2013 spreadsheet was an updated version of the initial spreadsheet. (See Ex G, at 9.) For the reasons set forth above, the content of these documents show that they are statements made in furtherance of the conspiracy.

- <u>PRI_0025695 (U.K. Exhibit P7_498) (attached as Exhibit C)</u>
  - The government previously referred to this document as the "November 2014 Ledger" <u>supra</u> in Section I in connection with its discussion on the admissibility of co-conspirator statements. As set forth above, this document elaborates on the information in GX 2808A and identifies among other things, the names of co-conspirators, the amount of bribes they received, the dates the bribes were made, the project(s) that the bribes relate to, and in some instances, where the bribe payments were sent. Specifically, the November 2014 Ledger memorializes the fact that Chang received millions of dollars in fall of 2013 in connection with EMATUM, and that certain of those payments were sent to "Thyse International Inc" on behalf of Chang. Wire records obtained in this case confirm that $5 million was sent to "Thyse International Inc." on three separate occasions between October and December 2013.

A.    <u>Legal Standard</u>

A district court has broad discretion to determine whether a piece of evidence has been properly authenticated. <u>United States v. Tropeano</u>, 252 F.3d 653, 661 (2d Cir. 2001). Rule 901 provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Fed. R. Evid. 901(a). Rule 901 "does not erect a particularly high hurdle," and that hurdle may be cleared by "circumstantial evidence." <u>United States v. Dhinsa</u>, 243 F.3d 635, 658–59 (2d Cir. 2001) (internal citation and quotation marks omitted). Rule 901's requirements are satisfied "if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification." <u>Id.</u> (internal citation and quotation marks omitted).

---

[11] The government has attached excerpts from the U.K. Proceeding pertaining to the relevant evidence. (See Ex. G.) The relevant U.K. exhibits are highlighted in yellow in the transcripts.

Rule 901(b) provides examples of appropriate methods of authentication. These examples include "[t]estimony that a matter is what it is claimed to be," Rule 901(b)(1), and "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances," Rule 901(b)(4). Thus, "[i]t is clear that the connection between a message (either oral or written) and its source may be established by circumstantial evidence." United States v. Addonizio, 451 F.2d 49, 71 (3d Cir. 1971), cert. denied, 405 U.S. 936 (1972).

Once Rule 901's requirements are satisfied, "'the evidence's persuasive force is left to the jury.'" Dhinsa, 243 F.3d at 658 (quoting United States v. Ortiz, 966 F.2d 707, 716 (1st Cir. 1992)); see also Tropeano, 252 F.3d at 661 ("Authentication of course merely renders [evidence] admissible, leaving the issue of ... ultimate reliability to the jury."). As the Second Circuit explained in United States v. Tin Yat Chin, 371 F.3d 31, 37–38 (2d Cir. 2004), once this "minimal standard is met," "the other party then remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the weight of the evidence—not to its *admissibility*." Id. (emphasis in original).

B.    Discussion

The "prosecution need only prove a rational basis from which the jury may conclude that the exhibit did, in fact, belong" to the source and that "proof of the connection of an exhibit" to its source "may be made by circumstantial, as well as direct, evidence." See United States v. Natale, 526 F.2d 1160, 1173 (2d Cir. 1975).

Here, the evidence shows the following: (1) the emails at issue are with co-conspirators, Boustani and Allam, at their Privinvest business email accounts (@Privinvest.com); (2) all of the Privinvest Documents are bates-stamped and referenced by those bates-stamps in cover letters and/or production logs produced by the parties in discovery; (3) the government

30

anticipates that Ms. Reith, a U.K. qualified attorney and officer of the court, will testify that she represented Privinvest at the time the documents were collected, that Quinn LLP provided the search terms and custodians for the document collection, and she personally reviewed the Privinvest Documents on the Relativity database; (4) the government anticipates that Mr. Butler, a U.K. qualified attorney and officer of the court, will testify that he received these documents and that they were produced by Privinvest and Boustani in discovery and referenced at trial in the U.K. Proceeding; (5) trial transcripts of the U.K. Proceeding (which have been produced to the defendant) confirm that these documents were referenced at trial (see Ex. G); (6) the documents themselves are discussing topics and using an alias for the defendant (or in the case of some of the spreadsheets, the defendant's actual last name) that are consistent with the prior and anticipated testimony of Pearse as well as numerous documents in this case admitted in the Boustani trial, including GX 2808A; and (7) the emails and documents discuss amounts and entities associated with the defendant regarding bribe payments that correspond with wire and bank records that will be admitted at trial.

Thus, in light of all of the evidence above, the government has met the "minimal standard" for authentication and shown a "rational basis" for a "reasonable jury" to conclude that these are authentic Privinvest documents. See Tin Yat Chin, 371 F.3d at 37–38; see also Com. Data Servers, Inc. v. Int'l Bus. Machines Corp., 262 F. Supp. 2d 50, 58 (S.D.N.Y. 2003) (declaration from defense attorney stating plaintiff's documents were true and accurate copies of what was received from the plaintiff in response to legitimate discovery requests was sufficient to authenticate documents). Defense counsel, of course, is free to cross-examine Ms. Reith and Mr. Butler, "challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning" but these all go to the "weight of the evidence and not

its admissibility." See id.  Moreover, because these documents are either emails between two co-conspirators discussing the amounts, bank accounts, and details of the bribe payments to the defendant, or accounting ledgers and spreadsheets that track the payment of bribes and kickback payments to co-conspirators, they are relevant and admissible as co-conspirator statements.

III.    The Government Should Be Permitted to Elicit Testimony from the Banks and Other Investors Regarding Their Views on Materiality

The government moves in limine to elicit testimony from investors in Proindicus, EMATUM and MAM, including the Banks, whether misstatements about certain representations in the loan agreements and offering documents were important to their decision to invest and/or make the loans.  The government expects to prove at trial that the loan agreements and offering documents for the Projects contained false and misleading misstatements.  Specifically, the loan agreements and offering materials misrepresented that (1) the loan funds would be used exclusively for the Projects; and (2) that they would not be used for bribes, kickbacks, or any other corrupt payments.  Because the government must prove materiality at trial for its wire fraud conspiracy and securities fraud conspiracy counts, the Court should permit the government to elicit testimony as to whether such misstatements would be important to investors in their decision making.

A.    Legal Standard

Courts have routinely allowed the government to elicit testimony about materiality in criminal fraud cases.  It is well-settled that "[m]ateriality in a criminal wire and securities fraud case requires the Government [to] establish 'a fact is one that a reasonable investor would have considered significant in making investment decisions.'"  Boustani, 18-CR-681 (WFK), ECF No. 249, at 2, see also Neder v. United States, 527 U.S. 1, 25 (1999) ("[M]ateriality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes.").  "A false statement is

32

material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." Neder, 527 U.S. at 25.  Put another way, "a misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do." United States v. Corsey, 723 F.3d 366, 373 n. 3 (2d Cir. 2013).  "A finding of materiality, therefore, requires a showing only of importance, not 'actual reliance.'"  United States v. Litvak, 889 F.3d 56, 66 (2d Cir. 2018).  Given the "inherently fact-specific" nature of the inquiry, which has both "qualitative and quantitative" aspects, materiality is well suited for determination by a jury.  In re Ply Gem Holdings, Inc. Sec. Litig., No. 14 Civ. 3577, 2016 WL 5339541, at *2 (S.D.N.Y. Sept. 23, 2016) (citations omitted).

      For purposes of materiality, the Second Circuit has held that testimony from counterparties that the misrepresentations (and the truth of those misrepresentations) were important to the counterparties' decision-making processes is sufficient to sustain a finding of materiality on fraud charges.  See, e.g., United States v. Gramins, 939 F.3d 429, 446 (2d Cir. 2019) (explaining that direct point-of-view testimony from the defendants' counterparties about the importance of the defendants' lies for price negotiations is "sufficient evidence of materiality to support a conviction for securities fraud"); United States v. Litvak, 808 F.3d 160, 177 (2d Cir. 2015) (finding that a rational jury could have found that the defendant's misrepresentations were material where "counterparties' representatives testified at trial that they considered the misrepresentations meaningful in the course of those transactions and that they or their employers were harmed by Litvak's misleading course of conduct"); United States v. Allen, 160 F. Supp. 3d 698, 703 (S.D.N.Y. 2016) (testimony from counterparties and cooperating witnesses "helps to support a reasonable inference that counterparties would have been influenced by knowledge that the defendant's traders were trying to manipulate LIBOR").

B.     Discussion

In Boustani, the Court permitted the government to elicit evidence related to whether a reasonable investor would have considered false and misleading statements material in making investment decisions, including questions regarding materiality that are phrased as hypothetical questions (e.g., "If you had known that bribes were paid to Mozambican officials, would that information have been important to your purchasing decision?").  See Boustani, 18-CR-681 (WFK), ECF No. 249 (denying the defendant's motion to preclude the government from asking questions about materiality);Trial Tr. at 2174-75 (permitting the government to ask Credit Suisse employee whether Credit Suisse "would have gone through the original amount of the bond transaction" if they had known that Boustani and Privinvest had made payments to Credit Suisse employees or Mozambican officials); id. at 1900-01 (permitting government to ask VTB Capital whether they would have invested in Proindicus upsize if they had known of bribery).  The government respectfully requests permission to do so at trial in this case.

As was the case in Boustani, the government intends to ask such materiality questions to its witnesses in the form of hypotheticals to avoid asking any questions that would improperly assume the defendant's guilt.  Courts have found such hypothetical questions to be appropriate.  See United States v. Hatfield, No. 06-CR-0550 (JS), 2010 WL 2541057, at *2 (E.D.N.Y. June 10, 2010) (citations omitted) (finding materiality questions in the form of hypotheticals appropriate and "plainly relevant and probative when they concern 'the materiality of Defendant's actions' in the context of a securities fraud prosecution"); see also United States v. Cuti, 720 F.3d 453, 459 (2d Cir. 2013) ("a witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior"); United States v. Jennings, 487 F.3d 564, 582 (8th Cir. 2007) (hypothetical questions concerning materiality are appropriate because "[t]he government would be hard pressed

34

to prove this element without asking whether the undisclosed information would have affected the decision maker's analysis"); United States v. Ranney, 719 F.2d 1183, 1189 (1st Cir. 1983) (holding that the district court was "eminently correct" in admitting hypothetical questions concerning materiality).

Accordingly, consistent with the controlling case law, the government respectfully requests that the Court issue a ruling permitting it to ask investor witnesses whether it would be important for them to know how the money for the Proindicus, EMATUM and/or MAM loans was used, and whether it would be important for them to know that bribes and kickbacks were being paid in connection with these projects. Questions such as these are likely to elicit relevant evidence on the issue of materiality.

IV.    The Court Should Determine the Elements of the Applicable Violation of Mozambican Law Alleged in Count Three

As the Court knows, one of the specified unlawful activities charged in Count Three (Money Laundering Conspiracy) consists of "offenses against a foreign nation involving the bribery of a public official . . . in violation of Mozambican law." See Indictment, at ¶ 61; 18 U.S.C. §§ 1956(c)(7)(B)(iv). At trial, the government expects the evidence to show that the defendant agreed to transmit, or cause others to transmit, wire transfers to, from, or through the United States to receive millions of dollars in bribes and kickback payments from his coconspirators. The evidence will further show that these transfers were intended to conceal proceeds derived from, and to promote violations of, the Mozambican anti-bribery laws described below. Accordingly, to determine whether the defendant is guilty of the money laundering charge, the jury must be instructed on the elements of the applicable Mozambican anti-bribery laws.

On May 8, 2024, the government provided notice to the defendant, pursuant to Federal Rules of Criminal Procedure 16(a)(1)(G) and 26.1, that it may seek to offer expert

35

testimony regarding the application and elements of these laws.  See ECF No. 565.  Additionally, the government provided the declaration of its Mozambican law expert, Victor Pereira Pinto, the Assistant Attorney General of Portugal, which sets forth his expert opinions on Mozambican law that the government may seek to elicit during its case-in-chief (the "Pinto Declaration").  See ECF No. 565-3.  As set forth in his declaration, Pinto identifies several Mozambican laws that outlawed bribery of its public officials between 2013 and 2018 (the time period charged in Count Three),

The government now moves in limine to have the Court determine before trial the elements of this offense under Mozambican law.  See Fed. R. Crim. P. 26.1 ("Issues of foreign law are questions of law"); United States v. Bankman-Fried, No. 22-cr-0673 (LAK), 2023 WL 6162865, at *1 (S.D.N.Y. Sept. 21, 2023) (holding that "[i]ssues of foreign law are questions of law" and therefore are within the Court's, and not the jury's, province).   In the Boustani trial, the court relied on the declaration of the government's Mozambican law expert to determine the elements of the Mozambican laws that the defendant allegedly violated.  See Trial Tr. at 4896-4903.  The government respectfully requests that the Court do the same in this case.

A.    Federal Rule of Criminal Procedure 26.1

Federal Rule of Criminal Procedure 26.1 provides that:

[a] party intending to raise an issue of foreign law must provide the court and all parties with reasonable written notice. Issues of foreign law are questions of law, but in deciding such issues a court may consider any relevant material or source—including testimony—without regard to the Federal Rules of Evidence.

Fed. R. Crim. P. 26.1; see United States v. Kozeny, 582 F. Supp. 2d 535, 538 (S.D.N.Y. 2008) ("Though foreign law once was treated as an issue of fact, it now is viewed as a question of law and may be determined through the use of any relevant source, including expert testimony."); United States v. Mitchell, 985 F.2d 1275, 1280 (4th Cir. 1993) ("The determination of foreign law

is a question of law to be established by any relevant source, whether or not submitted by a party or admissible under the Federal Rules of Evidence.").

      B.    <u>Applicable Mozambican Anti-Bribery Laws</u>

As described in the Pinto Declaration, Mozambican law criminalizes two types of corruption: active and passive. <u>See</u> ECF No. 565-3, Ex. A ¶ 6. Active corruption occurs when a violator gives or promises money or another advantage to a public official in return for an act or omission. <u>Id.</u> Passive corruption occurs when a public official solicits or receives money or another advantage in return for an act or omission. <u>Id.</u> Mozambican law further criminalizes two types of passive corruption: solicitation or receipt of money or another advantage to commit an unlawful act, and solicitation or receipt of money or another advantage to commit a lawful act. <u>Id.</u> In this case, as part of the alleged money laundering conspiracy, the defendant is alleged to have committed passive corruption by receiving bribe and kickback payments while serving as Mozambique's Minister of Finance, and to have taken official actions, namely, the issuance of the loan guarantees.

The applicable Mozambican laws criminalizing passive corruption are: (1) Articles 1 and 8 of Law 7/98, published on June 15, 1998 in Boletim da República, I Série, Suplemento, Número 23, effective June 30, 1998 ("Law 7/98"), attached as Exhibit H and (2) Articles 318 and 322 of Executive Order of September 16, 1886, published in Diario do Governo (the "1886 Penal Code"), attached as Exhibit I. Although there are other Mozambican laws criminalizing passive corruption — the elements of which are described in the Pinto Declaration and its exhibits (<u>see</u> ECF No. 565-3, Ex. A ¶¶ 10-18, 24-34) — these laws were either repealed after the defendant was charged in this case or do not apply to offenders who, like the defendant, served as a government Minister at the time they received bribe and kickback payments. (<u>See</u> ECF No. 565-3 ¶ 5(a)-(b), Ex. A ¶¶ 24, 28.)

37

Article 8 of Law 7/98 states that holders of certain government positions identified in Article 1 of the law, including Ministers, who commit "crimes of corruption provided for in article[] 318 . . . of the [1886] Penal Code," will be punished with a prison sentence of two to eight years. See Ex. H. In turn, Article 318 of the 1886 Penal Code states:

> Any civil servant who commits a crime involving graft, bribery, and corruption, receiving a kickback or gift, personally or through an intermediary, with their authorization or consent, to perform an act of their duties, if this act is unfair and committed, shall be punished with a maximum prison sentence of two to eight years, or, alternatively, with long-term temporary imprisonment, and in both cases, a fine of one year; if, however, this act is not committed, they will be given a suspended sentence of one to three years and the same fine . . . If it is a fair act that an employee is required to perform, then he will be suspended for up to one year and sentenced to a fine of one month.

See Ex. I. Article 8 thus prohibits Ministers from soliciting or receiving bribes or other benefits in violation of the Article 318 of the 1886 Penal Code.

The defendant was Mozambique's Minister of Finance in 2013 and 2014 when he received the bribe and kickback payments, and authorized the loan guarantees, in furtherance of the money laundering conspiracy alleged in Count Three. See Indictment, ¶¶ 34, 36, 39, 44, 46, 48, 49, 51. Accordingly, the government will prove at trial that the defendant's actions violated Article 8 of Law 7/98, which is the "offense against a foreign nation" involving the "bribery of a public official," alleged as one of the money laundering conspiracy's specified unlawful activities.[12] Specifically, because the defendant agreed to accept bribe and kickback payments in connection with his role in approving the loans and signing the guarantee as Minister of Finance, he violated Mozambican law, and then laundered the proceeds of that violation—the bribes totaling at least $7 million—through the U.S banking system (including $5 million through the

---

[12] In the Boustani trial, the Court instructed the jury that Law 7/98 applies to corruption offenses committed by government Ministers. Trial Tr. 4902:3-8.

Eastern District of New York).

    C.    <u>Elements of Article 8 of Law 7/98</u>

In order to be found in violation of Article 8 of Law 7/98, the following three elements must be proven:

- <u>First</u>, at the time of the offense, the violator was either a specified official, including a Minister or Vice-Minister;

- <u>Second</u>, the specified official either (1) received a kickback or gift, personally or through an intermediary; or (2) or gave, offered or promised a kickback or gift to another public employee;

- <u>Third</u>, the kickback or gift, or offer or promise of a kickback or gift, was for one of the following purposes: (1) in the case of the specified official receiving the kickback or gift, it was in return for the specified official performing or failing to perform an act that was either consistent with or that violated the duties of his/her office; or (2) in the case of the specified official giving, offering or promising a kickback or gift to another public employee, it was in return for that public employee performing or failing to perform an act that was either consistent with or that violated the duties of his/her office.

<u>See</u> ECF No. 565-3, Ex. A ¶ 46.

The government respectfully requests that the Court instruct the jury on — and permit the parties to brief — the applicable Mozambican law, as the court did in Boustani.[13]

---

[13] On May 29, 2024, the defendant disclosed the opinion of his Mozambican law expert. (<u>See</u> Ex. J.) The defense expert argues that other Mozambican laws criminalizing passive corruption apply, namely, Articles 7 (unlawful acts) and 8 (lawful acts) of Law 6/2004. (<u>Id</u>. ¶ 12.) These laws are discussed in the Pinto Declaration. <u>See</u> ECF No. 565-3, Ex. A ¶¶ 26-34. Notably,

V.      The Court Should Allow the Government to Prove Venue Under the First Brought Venue Statute and Preclude Any Improper Arguments About Venue

The government also moves in limine to be permitted to prove venue under the first brought venue statute, 18 US.C. § 3238.  Here, as the Court is aware, the defendant was extradited from South Africa in July 2023.  When the defendant was extradited, he was first brought to the United States and the Eastern District of New York when he landed at John F. Kennedy International Airport ("JFK Airport") on July 12, 2023.[14]  Because, as alleged in the Indictment, the conspiracy offenses were "begun or committed . . . out of the jurisdiction of any particular State or district," the defendant's trial "shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought."  See Indictment ¶ 57 (Wire Fraud Conspiracy) (citing 18 U.S.C. §  3238), ¶ 59 (Securities Fraud Conspiracy) (same), ¶ 61 (Money Laundering Conspiracy) (same); see also 18 U.S.C. § 3238; United States v. Miller, 808 F.3d 607, 621 (2d Cir. 2015) ("Section 3238 may apply even when certain offense conduct occurs in the United States, if the criminal acts are nonetheless 'essentially foreign.'")

---

the elements of Articles 7 and 8 of Law 6/2004 and Article 8 of Law 7/98 are substantially similar, as would be the jury instructions corresponding to each law.  (See Ex. K (table comparing both laws).)  The main difference is the proscribed punishment for passive corruption in connection with a lawful act: a "Minister" who violates Article 8 of Law 7/98 will be punished with a prison sentence of two to eight years (ECF No. 565-3, Ex. A ¶ 45); a "public official" who violates Article 8 of Law 6/2004 will be punished with a prison sentence of up to one year (id. ¶ 32).  The government maintains that Article 8 of Law 7/98 is the proper "offense against a foreign nation" on which the jury should be instructed for the reasons stated above.  In any event, should the defendant argue that Article 8 of Law 6/2004 is the applicable Mozambican law, but cannot serve as the requisite "offense against a foreign nation" in Count Three because it is a misdemeanor, the Court should reject this argument as contrary to law.  United States v. Inniss, No. 21-1211, 2022 WL 5061706, at *3 (2d Cir. Oct. 5, 2022) ("[T]here is no requirement that the qualifying SUA . . . be a felony.").

[14] The government will prove this at trial from the testimony of FBI agents who escorted the defendant on the flight from South Africa to New York in custody and from flight and immigration records.  The flight made no stops in the United States before arriving at JFK Airport.

The government respectfully requests a ruling in advance of trial confirming that 18 U.S.C. § 3238 provides a permissible basis for the government to establish venue in this case. The government makes this request now, instead of waiting until the charge conference, because its proof on venue will vary depending on whether it will proceed on § 3238 or another venue theory and a ruling from the Court will help the government streamline its case-in-chief and potentially, eliminate certain witnesses it intends to call at trial.[15]

Relatedly, the government moves to preclude arguments from the defendant that his case should have been brought in a different venue, or outside of the United States, for example, in the United Kingdom or in Mozambique. Such arguments are highly improper and invite jury nullification. This is particularly salient here where venue should be factually undisputed as the defendant was first brought to the Eastern District of New York. See 18 U.S.C. § 3238.[16]

A.    18 U.S.C. § 3238 Lays Venue in This District

It is well-settled that while the government bears the burden of proving venue, it "need only establish it by a preponderance of the evidence." United States v. Purcell, 967 F.3d 159, 186 (2d Cir. 2020). In this case, the government can establish that venue is appropriate in this District in several ways. For instance, the government can lay venue, pursuant to 18 U.S.C.

---

[15] For example, the government has other bases for venue in the Eastern District of New York, including wires of bribe payments for the defendant through the Eastern District of New York, as well as electronic communications soliciting investors in the Projects that travelled through the Eastern District of New York, and travel by co-conspirators through the Eastern District of New York to discuss the conspiracy.

[16] Notably, the defendant did not file a motion to dismiss for improper venue, which is supposed to be raised before trial "if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(A)(i).

§ 3237(a), by proving that some act in furtherance of the conspiracy took place in this District.[17]

See United States v. Svoboda, 347 F.3d 471, 483 (2d Cir. 2003) ("[V]enue is proper in any district in which an overt act in furtherance of [a] conspiracy was committed by any of the coconspirators."). Alternatively, as the Indictment alleges, the government may also establish venue under 18 U.S.C. § 3238 because the government can prove that many of the alleged acts were "begun" or "committed" outside of the United States and the defendant was "first brought" to this District.[18] See Boustani, 18-CR-681 (WFK), ECF No. 137, at ¶¶ 57, 59, and 61.

---

[17] Under this theory, the government can prove venue in several different ways. For example, venue is proper in any district where electronic communications are sent or received. See, e.g., United States v. Lange, 834 F.3d 58, 70 (2d Cir. 2016); United States v. Royer, 549 F.3d 886, 895 (2d Cir. 2008). Venue is also appropriate in any district through which electronic communications are routed. See, e.g., United States v. Brown, 293 F. App'x 826, 829 (2d Cir. 2008); United States v. Ohle, 441 F. App'x 798, 802 (2d Cir. 2011). Venue also lies in the district where a telephonic communication in furtherance of a crime was made and where it was received. Lange, 834 F.3d at 70; see also United States v. Rommy, 506 F.3d 108, 120 (2d Cir. 2007); United States v. Smith, 198 F.3d 377, 382 (2d Cir. 1999). In addition, courts in this Circuit have routinely found that passing through a district is sufficient to confer venue. See, e.g., United States v. Kirk Tang Yuk, 885 F.3d 57, 71-72 (2d Cir. 2018); United States v. Tzolov, 642 F.3d 314, 320 (2d Cir. 2011); United States v. Duque, 123 F. App'x 447, 449 (2d Cir. 2005).

[18] The fact that the government believes Section 3238 is sufficient to establish venue in this District does not preclude the government from relying on other bases to establish venue at trial. Where the government can establish venue under both 18 U.S.C. §§ 3237(a) and 3238, as is the case here, the Second Circuit in Miller has made clear that the venue provisions are not mutually exclusive. See Miller, 808 F.3d at 620 ("[W]e do not think that venue becomes improper under § 3238 simply because it might also have been properly laid elsewhere pursuant to § 3237(a)"); accord United States v. Williams, 589 F.2d 210, 213 (5th Cir. 1979) ("The venue statutes are not mutually exclusive, and a suggestion that venue is proper under § 3237(a) will not serve to divest venue from another judicial district if venue is proper in that district under § 3238."), adopted in pertinent part, 617 F.2d 1063, 1071 (5th Cir. 1980) (en banc); United States v. Hassanshahi, 185 F. Supp. 3d 55, 58 (D.D.C. 2016) ("every court that the Court is aware of to have considered the issue has concluded that § 3238 is not a mandatory exception to § 3237(a). Both sections have been described as 'generic venue-laying statutes' that 'serve in some measure to provide a default basis for setting venue'" (quoting Miller, 808 F.3d at 614)). The same is true for the specific money laundering venue provision in 18 U.S.C. § 1956(i). See Whitfield v. United States, 543 U.S. 209, 217–18 (2005) ("Although we need not definitively construe [§ 1956(i)] here, we note that its language appears permissive rather than exclusive — § 1956(i) says a conspiracy

With respect to the latter approach, the Second Circuit has held that § 3238 venue is appropriate where the offense was "begun" outside the United States but then came "within our country's borders."  See Miller, 808 F.3d at 619;[19] United States v. Bin Laden, 146 F. Supp. 2d 373, 381 (S.D.N.Y. 2001) ("[S]ection 3238 is an appropriate basis for venue so long as the international conspiracy offense in question began outside the United States, irrespective of the fact that a few of the alleged overt acts of the conspiracy were later committed inside the United States"); see also United States v. Pendleton, 658 F.3d 299, 305 (3d Cir. 2011) (also finding prosecution in Delaware was proper under even when some of a defendant's offense conduct takes place in the United States); United States v. Herbert, No. 03 CR. 211 (SHS), 2005 WL 106909, at *1 (S.D.N.Y. Jan. 19, 2005) (explaining that § 3238 jury charge was correct because the "underlying conspiracy began-and all of [the defendant's] conduct related to the offense occurred-outside the United States").

Based on the facts of this case, the government respectfully submits that it would be legally proper for the government to proceed on § 3238 as the sole basis for venue if it chose to do so.  First, while the government intends to argue that certain acts of the conspiracy affected and were committed in the United States, including in this District, there should be no dispute that many of the alleged acts of the conspiracy were "begun" and were "committed" outside the United

---

prosecution 'may be brought' in a district meeting the specified criteria . . . .This suggests that the provision serves to supplement, rather than supplant, the default venue rule.").

[19] The Second Circuit in Miller goes even further, holding that § 3238 not only applies to offenses began outside the United States that later involve acts in the United States but also to offenses that started inside the United States but that "are in their essence committed abroad."  See Miller, 808 F.3d at 619.

States such that § 3238 applies.[20]  The conspiracy that serves as the basis for Counts One, Two and Three was formed and developed, and thus was "begun" by co-conspirators outside of the United States.  Similarly, the vast majority of the communications with the Banks and Mozambican officials, including the defendant, that led to the Proindicus, EMATUM and MAM deals occurred abroad.  As, did all the meetings between the defendant and his co-conspirators regarding the Projects.

Second, the government can also prove, beyond a preponderance of evidence, that the defendant was "first brought" to this District when he landed at JFK Airport upon his extradition to the United States.  Courts have defined the term "first brought" to mean the U.S. jurisdiction to which a person is brought from outside the United States in custody.  See, e.g., United States v. Catino, 735 F.2d 718, 724 (2d Cir. 1984) ("'[F]irst brought' . . . applies only in situations where the offender is returned to the United States already in custody."); United States v. Feng, 277 F.3d 1151, 1155 (9th Cir. 2002) ("The word 'brought' under the statute means 'first brought into a jurisdiction [from outside the United States' jurisdiction] while in custody.'" (alteration in original) (quoting United States v. Liang, 224 F.3d 1057, 1061 (9th Cir. 2000)).

Thus, in light of the above, the government respectfully requests that the Court find that the government can establish venue on the basis of § 3238.  Such a ruling would allow the government to decide as it prepares for trial, which venue theory to proceed on, and the number of witnesses it intends to call to establish venue.  For example, in Bin Laden, Judge Leonard B. Sand in the Southern District of New York decided that submitting 18 U.S.C. § 3238 as the sole basis

---

[20] Indeed, the defendant spent much time in his motion to dismiss, alleging all of the ways the conspiracy was outside of the jurisdiction of the United States, and at oral argument on May 24, 2024, suggested that this case has "nothing" to do with the United States.  See Chang, 18-CR-681 (NGG), ECF No. 543 (Def.'s Mot. to Dismiss), at 1-4, 39-40.

upon which the jury could determine venue for the charged conduct was appropriate because it streamlined the jury's deliberative task and minimized the risk of danger of confusion to the jury and prejudice to the defendants in that case.  See Bin Laden, 146 F. Supp. 2d at 382.

B.    The Defendant Should Not Be Permitted To Argue That He Should Be Prosecuted Somewhere Else Other Than This District.

The government also moves to preclude the defendant from eliciting evidence or arguing to the jury that this case should be more appropriately brought somewhere else, including in another country such as the United Kingdom or Mozambique.  Based on the defendant's submissions to date, the government anticipates that the defendant may, in fact, make such arguments.  Defense counsel has already previewed in their motion to dismiss that they intend to put the governing law provisions in the loan agreements (which state that "English law" applies to any contractual disputes arising from the agreements) at issue in trial.[21]  See Def. Mot. to Dismiss at 16 (noting that the "EMATUM Loan Agreement and the Mozambique EMATUM Guarantee were governed by English law"), at 18 (noting that the EMATUM Offering Circular "was governed by English law.").  Arguments such as these are simply irrelevant, legally incorrect, and misleading to the jury.  While the law permits the defendant to argue that the government has not carried its burden of proof to establish venue in this District, the law does not permit the defendant to confuse the jury and argue that the case would have been better brought elsewhere.

---

[21] As set forth above, the defendant is charged with federal crimes in connection with approximately $2 billion in loans made to three Mozambican entities, Proindicus, EMATUM, and MAM.  The loans for those projects are memorialized in several written agreements (the "Agreements") with the Banks that contain governing law provisions that direct English law to be applied in the event of a breach.  For example, in the Proindicus loan agreement between Credit Suisse International and Proindicus, the agreement states that "[t]his Agreement and any non-contractual obligations arising out of or in connection with it are governed by English law."  Similarly, the government guarantee for Proindicus between the Republic of Mozambique and Credit Suisse International, which is signed by the defendant, states that "[t]his Guarantee and any non-contractual obligations arising out of or in connection with it are governed by English law."

The rules governing admissible evidence are clear. Federal Rule of Evidence 402 requires that evidence be relevant to be admissible. Relevant evidence is defined as evidence having "any tendency to make the existence of any fact" that is of consequence to the determination of the action "more probable or less probable" than it would be without the evidence. See Fed. R. Evid. 401. Relevant evidence, however, is subject to the probative-prejudice balancing test of Federal Rule of Evidence 403. See United States v. Watts, 934 F. Supp. 2d 451, 462–63 (E.D.N.Y. 2013). Rule 403 permits the exclusion of evidence, even if relevant, "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting of time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Second Circuit has stated that the "'district court is obviously in the best position to do the balancing mandated by Rule 403,' and, accordingly, this Court grants 'broad discretion' to the district court to admit or exclude evidence pursuant to Rule 403." United States v. Birney, 686 F.2d 102, 106 (2d Cir. 1982).

The defendant should not be permitted to argue that he should be acquitted because the case should have been brought in the United Kingdom, Mozambique, or elsewhere. Such argument is legally wrong. This is a criminal case in U.S. federal court, and the only law that applies is U.S. federal criminal law. Governing law or choice of law provisions in contracts apply only in civil cases, and have no import here. See Red Fort Cap., Inc. v. Guardhouse Prods. LLC, No. 19CV686PKCRWL, 2022 WL 118637, at *7 (S.D.N.Y. Jan. 11, 2022) (discussing the choice of law provision in a loan agreement in a civil case). Nor does the fact that this case involves bribes and kickbacks paid to Mozambican nationals provide a basis to argue that venue is inappropriate in this District. Rather, such arguments only serve one purpose: to needlessly confuse and mislead the jury into thinking that the United States is not the appropriate forum for

the charged crimes, and that the case should be brought in other countries.  Such efforts should not be permitted.

   If the defendant is permitted to make such legally improper arguments, the risk of confusion to the jury would be especially high in this case.  At the close of the evidence, the government expects that the Court will provide the jury with a clear venue instruction based on the controlling law of this Circuit.  As discussed above, the government will clearly establish venue, including but not limited to the fact that the defendant was first brought to this District after he was extradited.  Nonetheless, the defendant is a Mozambican national and many of the acts in furtherance of the charged crimes occurred outside of this District and in other countries. Any argument from the defendant that the case should have been brought somewhere else will be inconsistent with those expected instructions and thereby risk "confusing the issues, misleading the jury, undue delay [and] wasting time." Fed. R. Evid. 403.  As such, the probative value of such arguments or evidence from the defendant (which is none) is substantially outweighed by the dangers of prejudice, confusion and delay, and they should be precluded.  See Fed. R. Evid. 401, 403.

   Arguments or evidence related to the claim that the case should have been brought elsewhere or that prosecution in this District is unfair would create an improper risk of jury nullification.  It is well-settled that "it is the duty of juries in criminal cases to take the law from the court, and apply that law to the facts as they find them to be from the evidence." Sparf v. United States, 156 U.S. 51, 102 (1895); United States v. Carr, 424 F.3d 213, 220 (2d Cir. 2005). Courts have consistently held that while juries may have "the power to misapply the law," that power does not give rise to a right to do so.  United States v. Thomas, 116 F.3d 606, 615-16 (2d Cir. 1997); see also Dunn v. United States, 284 U.S. 390, 393 (1932) (describing jury nullification

as the "assumption of power" which a jury has "no right to exercise"). "[N]o juror has a right to engage in nullification[] and, on the contrary, it is a violation of a juror's sworn duty to follow the law as instructed by the court." Thomas, 116 F.3d at 616. Indeed, "trial courts have the duty to forestall or prevent such conduct," and the Second Circuit has "categorically" rejected "the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." Id. at 614, 616; see also United States v. Edwards, 101 F.3d 17, 19 (2d Cir. 1996). Here, where the Court will instruct the jury as to the law of venue and ask the jury to apply the facts to the law, an argument by the defendant to the jury that his prosecution in this Court is unfair or should have happened elsewhere would be an argument for jury nullification. The Court should not tolerate such arguments.

Thus, for the foregoing reasons, while the defendant should be permitted to contest whether the government has met its burden of proving venue in this District by a preponderance of evidence, he should not be permitted to elicit evidence or present arguments to the jury that he should have been prosecuted in another country, or that it is unfair for him to be prosecuted in this Court for reasons unrelated to the technical venue requirements.

VI.    The Court Should Preclude Other Evidence or Arguments That Are Legally Improper And/Or Seek Jury Nullification.

In addition to the above, the government also anticipates that the defendant will make several other arguments at trial that either contradict the controlling case law in this Circuit or create an improper risk of jury nullification, or both. The government has identified such arguments below, and now moves in limine to preclude such arguments in their entirety as they have limited to no probative value and are unduly prejudicial, confusing, and misleading to a jury. See Fed. R. Evid. 403.

A.    The Court Should Preclude the Defendant from Arguing That The Banks and Other Investors (A) Should Not Have Relied, or Did Not Rely, on Defendant's or Co-Conspirators' False Statements; (B) That They Did Not Suffer Any Loss; And (C) that the Defendant Purportedly Believed There Would Be "No Ultimate Harm" to Investors

The government also respectfully moves to preclude any argument by the defendant that the Banks and other investors (a) should not have relied on misstatements by the defendant or his conspirators or that they did not in fact rely on such fraudulent misstatements; (b) that they did not suffer any loss; and (c) that the defendant believed there would be "no ultimate harm" to investors.

1.    Applicable Law

As the Supreme Court and the Second Circuit have held, reliance is not an element of the federal fraud statutes.  See Neder v. United States, 527 U.S. 1, 24-25 (1999) ("The common-law requirements of 'justifiable reliance' and 'damages,' for example, plainly have no place in the federal fraud statutes."); United States v. Weaver, 860 F.3d 90, 96 (2d Cir. 2017) ("reliance is not an element of criminal fraud").  Thus, "the government need not prove that the victims of the fraud were actually injured, but only that defendant[] contemplated some actual harm or injury to [his] victims."  Weaver, 860 F.3d at 95.

Similarly, "a victim's negligence is not a defense under the federal fraud statutes," United States v. Frenkel, 682 F. App'x 20, 22 (2d Cir. 2017), and it would not be a defense even if the victim were in fact not fooled, see Weaver, 860 F.3d at 97 ("No customers had to be tricked into purchasing the [fraudulently described items] in order for [the defendant] to be charged criminally because the government is not required to prove that an intended victim was actually defrauded to establish guilt of mail or wire fraud.").  Thus, any such evidence or arguments would have no probative value and would only confuse the jury.

49

Moreover, the government need not prove monetary loss. See United States v. Carpenter, 484 U.S. 19, 26 (1987); United States v. Pollack, 534 F.2d 964, 971 (D.C. Cir.) ("The fraud statutes speak alternatively of devising or intending to devise a scheme to defraud and do not require that the deception bear fruit for the wrongdoer or cause injury to the intended victim as a prerequisite to successful prosecution. [S]uccess of the scheme and loss by a defrauded person are not essential elements of the crime under 18 U.S.C. §§ 1341, 1343 . . . ."), cert. denied, 429 U.S. 924 (1976); cf. Shaw v. United States, 580 U.S. 63, 67 (2016) (noting that the bank fraud statute, which is analogous to the wire fraud statute, "demands neither a showing of ultimate financial loss nor a showing of intent to cause financial loss").

Indeed, in the Second Circuit, "[t]he law is clear: a defendant cannot negate the fraud he committed by wishing that everything works out for his victim in the end." Gatto, 986 F.3d at 118; see United States v. Calderon, 944 F.3d 72, 90 (2d Cir. 2019) ("[T]he fact that the defendant believes (rightly or wrongly) that he will 'ultimately' be able to work things out so that the victims suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct.")  Thus, a defendant's good faith belief in the possibility of a venture's profits does not equate to good faith regarding their representations to investors and potential investors. See, e.g., Sterritt, 2023 WL 7386660, at *2 (granting motion in limine to preclude evidence or argument about defendant's perceived profitability of his business venture; "a defendant's good-faith belief that his or her representations are truthful is distinct from a defendant's belief that knowingly false statements will ultimately cause no harm, or even that such statements will ultimately benefit, investors"); United States v. Watts, 934 F. Supp. 2d 451, 470 (E.D.N.Y. 2013) ("[A] defendant's good-faith belief in the truth of his statements or representations is very different from a defendant's belief that his untrue statements or

representations will ultimately cause no harm."); <u>United States v. Gole</u>, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997) ("The definition of good faith addresses the defendant's belief in the truth of the representations, and not the defendant's belief as to the ultimate success of the plan."); <u>United States v. Berger</u>, 188 F. Supp. 2d 307, 329 (S.D.N.Y. 2002) (finding that a guilty verdict on securities fraud charges based on the fact that the defendant intentionally caused others to issue false or misleading statements to investors would be proper regardless of evidence of the defendant's belief that his investment strategy would be successful financially).

2.    <u>Arguments Inconsistent With the Controlling Law on Fraud Should Be Precluded.</u>

The government anticipates that the defendant may introduce evidence or argument advancing one or more theories: that investors should not have relied on or did not rely on statements by the defendant and his co-conspirators; the defendant and his co-conspirators did not intend to cause harm, and that the investors ultimately did not suffer any loss.  For example, the government recently learned that defense counsel sent Rule 17 subpoenas to various entities, including investors, seeking, among other things, documents related to "the Republic of Mozambique's interjection of money or equity extended to help Proindicus, MAM or EMATUM make their interest payments in 2014 and/or 2015" and "settlement documents" Mozambique entered into with investors, including investors of the Proindicus loans . . . to resolve active litigation in the United Kingdom."[22]  The only conceivable reason why the defendant would seek these documents is to argue that investors

---

[22] Returns from the defendant's Rule 17(c) subpoenas show that as part of the U.K. Proceeding discussed above, between 2020 and 2023, multiple investors including VR Global Partners, United Bank of Africa, Moza Banco sued Mozambique, Proindicus, and/or Credit Suisse in civil court in the U.K. seeking payment of amounts purportedly owed to them under Proindicus loan, as well as damages.  In 2023, Mozambican authorities settled the disputes with the investors for almost $130 million.

were ultimately paid, either via interest payments or through settlement of the investors' civil U.K. proceedings against Mozambique, and thus did not suffer any pecuniary harm.

Not only are some of these documents plainly inadmissible,[23] they have no bearing on whether the defendant and his co-conspirators lied to the Banks and investors about receiving bribe and kickback payments. As set forth above, the law does not require victims to rely on the material misstatements such that they suffered actual loss or harm in order for fraudulent conduct to occur, Shaw, 580 U.S. at 67, nor does the law permit a defendant to defend himself by claiming that he believed all along that victims will ultimately make money or be made whole. Gatto, 986 F.3d at 118. Even if the investors received payments from Mozambique in connection with their investments in the Projects, that is not probative of whether the defendant and other members of the conspiracy lied to the Banks and investors to obtain money in the first instance.

Any probative value these documents and arguments may have is also substantially outweighed by the unfair prejudice and substantial confusion and misleading of the jury, and should be precluded under Rule 403. Indeed, in situations where a defendant has improperly presented evidence or argument of his or her good faith belief in the success of a scheme involving false statements to victims or investors, the Second Circuit has routinely upheld use of a "no ultimate harm" charge, which instructs the jury that "a belief of a defendant, if such belief existed,

---

[23] These "[s]ettlement documents" are not admissible evidence that the defendant should be permitted to use at trial. Rule 408 of the Federal Rule of Evidence strictly prohibits the admission of evidence of compromise or offers of compromise "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction." Fed.] R. Evid. 408(a). See, e.g., Rates Tech., Inc. v. Cablevision Sys. Corp., 2006 WL 3050879, at *1–3 ("Under Rule 408 of the Federal Rules of Evidence, settlement agreements are also generally held to be inadmissible at trial."); Pena v. Macy's Inc., No. 22-CV-09435 (PMH), 2024 WL 1833880, at *2 (S.D.N.Y. Apr. 26, 2024). ("Rule 408 applies to settlement agreements even 'if they are offered against a party who was not a participant in the settlement discussions or agreement.'").

that ultimately everything would work out so that no one would lose any money does not require a finding by you that he acted in good faith. No amount of honest belief on the part of a defendant that the scheme will ultimately make a profit for the investors will excuse fraudulent actions or false representations by [the defendant]." United States v. Leonard, 529 F.3d 83, 91 (2d Cir. 2008) (finding that instruction in a securities fraud trial was appropriate where the defendants, who had defrauded investors in a movie by misleading them about how investment monies would be spent, had argued at trial that they had a good faith belief that the movie would be completed); see also United States v. Lange, 834 F.3d 58, 78-79 (2d Cir. 2016) (no ultimate harm instruction appropriate where "there was evidence that [the defendant's] co-conspirators intended to immediately deprive investors of their capital through fraud, even if they truly believe that in the long term [the businesses] would ultimately succeed, deriving profits for the defrauded investors"); United States v. Shkreli, 779 F. App'x 38, 40 (2d Cir. 2019) (holding that instruction in securities fraud and wire fraud trial was appropriate where defendant argued that "that despite his many misrepresentations and omissions to" investors, "he did not have the requisite intent to defraud those investors because he believed that the investors would ultimately make money from their investments"); United States v. Levis, No. 10-4819-CR, 2012 WL 2914118, at *3 (2d Cir. July 18, 2012) (finding that instruction was appropriate where the defendant, who had made misrepresentations regarding the independent valuation of his company to investors, had argued at trial that he did not believe any harm would befall investors).

Thus, any purported belief by the defendant that Proindicus, EMATUM, or MAM would ultimately turn a profit and investors would be made whole has no bearing on whether the defendant and his co-conspirators lied to investors, including the Banks about, inter alia, the use of the loan proceeds and the bribes paid to the defendant. There is no reason to wait for the jury

to hear such an improper argument, which would only serve to mislead and confuse; rather, such an argument should be precluded in advance of trial.  See Fed. R. Evid. 403.

   B.    The Defendant Should Also Be Precluded From Making Any Arguments That Suggest International Wire Transfers of Money Through U.S. Correspondent Banks Are Not Covered By 18 U.S.C. § 1956(a)(2).

   The government further moves in limine to preclude arguments or cross-examination suggesting that international wires through correspondent banks do not constitute the movement of funds under the money laundering statute.  Such arguments would seek to create jury confusion and mislead the jury with respect to the money laundering statute and binding Second Circuit law.

   At trial, to prove the money laundering conspiracy in Count Three, the government will prove that members of the conspiracy wired at least $7 million in bribe and kickback payments for the defendant's benefit to foreign bank accounts in Spain and Switzerland.  Although these international wire transfers originated from co-conspirators' foreign bank accounts and were deposited into foreign bank accounts, the government expects to prove that the international wire transfers used U.S.-based correspondent bank accounts to transact the U.S. dollar-denominated transactions in the United States.  The Second Circuit in United States v. Ho, 984 F.3d. 191, 207 (2d Cir. 2020) has firmly held that financial transactions such as these that "use [] United States financial institutions as clearinghouses for criminal money laundering and conversion into United States currency" are covered by the money laundering statute, 18 U.S.C. § 1956(a)(2), which the defendant has been charged with conspiring to commit.  In light of the controlling case law on this issue, the defendant should be precluded from introducing evidence or argument that suggest international wire transfers of U.S. dollars through the use of U.S. correspondent banks somehow do not satisfy the elements of § 1956(a)(2).

54

In <u>Ho</u>, the Second Circuit made clear that a defendant can be convicted of violating Section 1956(a)(2) "when a defendant arranges a wire transfer that uses the U.S. banking system to go from a foreign source, to a correspondent bank in the United States, to another bank in the United States, and then to a final foreign beneficiary." 984 F.3d at 207. In doing so, the Second Circuit explained in detail the steps in which wire transfers of U.S. dollars between two foreign banks involving different U.S. correspondent accounts occur (<u>see Ho</u>, 984 F.3d at 205)[24]; how U.S. correspondent banks serve as "indispensable conduits" in such wire transfers of funds (<u>id.</u> quoting <u>United States v. Prevezon Holdings, Ltd.</u>, 251 F. Supp. 3d 684, 693 (S.D.N.Y. 2017); and how wire transfers where the United States financial institutions serve as the "clearinghouses for criminal money laundering and conversion into United States currency" is still covered by Section 1956(a)(2) even if the United States did not serve as either the point of origination or the end destination for the money (<u>id.</u> at 203, 207). <u>See also Prevezon Holdings, Ltd.</u>, 251 F. Supp. 3d at 693 ("[I]nternational wire transfers do not merely 'ricochet' off of U.S. correspondent banks. Rather, each transfer requires 'two separate transactions that cross the U.S. border'—'once upon entering a U.S. account and once upon exiting a U.S. account.'"); <u>United States v. All Assets Held at Bank Julius</u>, 251 F. Supp. 3d 82, 94 (D.D.C. 2017) (same).

Moreover, the Second Circuit has made clear that wire transfers move funds, and are not just electronic communications between banks. In <u>United States v. Daccarett</u>, 6 F.3d 37,

---

[24] The Second Circuit noted in <u>Ho</u> that the wires sent by the defendant involved the following steps: "(1) HSBC Hong Kong debiting CEFC NGO's account in Hong Kong; (2) HSBC Hong Kong sending a payment message to HSBC Bank US, asking it to debit $500,000 from HSBC Hong Kong's correspondent account in New York; (3) HSBC Bank US debiting HSBC Hong Kong's same correspondent account; (4) HSBC Bank US and Deutsche Bank, New York settling a $500,000 transfer through a payment system; (5) Deutsche Bank crediting Stanbic Bank's correspondent account in New York; and (6) Stanbic Bank crediting Food Security and Sustainable Energy Foundation's account in Uganda." <u>Id.</u> at 205.

54 (2d Cir. 1993), abrogated on other grounds, the Second Circuit held that wire transfers of money are seizable *res* under the civil forfeiture statutes. In Daccarett, the government seized millions of dollars that was the aggregate of dozens of wire transfers that had been sent to New York correspondent banks. Id. at 44. The money was seized after the New York correspondent banks had received the wire transfer but before the New York correspondent banks credited the designated correspondent accounts for the beneficiary banks. Id. Although the claimants in Daccarett attempted to argue that the wire transfers were merely electronic communications and therefore could not be seized, the Second Circuit rejected that argument and called the "conception of the intermediary banks as messengers who never hold the goods, but only pass the word along . . . inaccurate." Id. at 54. Instead, the Second Circuit explained that wire transfers were seizable because on receipt of the transfer from the originating bank, "the intermediary banks possess the funds, in the form of bank credits, for some period of time before transferring them on to the destination banks." Id. Thus, wire transfers move "funds," and any argument to the contrary is legally improper. Id. ("With each EFT[,] at least two separate transactions occurred: first, funds moved from the originating bank to the intermediary bank; then the intermediary bank was to transfer the funds to the destination bank, a correspondent bank….").

In light of the above controlling case law, international wire transfers of U.S. dollars are sufficient to satisfy the transaction requirement of Section 1956(a)(2). The defendant should not be permitted to present any arguments that undercut or contradict these decisions. Not only would such arguments be legally wrong, but they would only confuse the issue and mislead the jury. See Fed. R. Evid. 403.

C.    The Court Should Similarly Preclude the Defendant From Introducing Evidence of His Detention in South Africa, Lack of Ties to the United States, and His Co-Conspirator Boustani's Acquittal

The government also moves to preclude the defendant from introducing evidence or argument concerning: (1) the amount of time he was detained in South Africa prior to being extradited and the length of time of extradition; (2) the defendant's nationality and minimal or lack of connections to the United States; and (3) the acquittal of his co-defendant Jean Boustani in this matter.

Any argument about the age of the prosecution, including that the defendant was detained in South Africa for years resisting extradition to the United States, is not a defense on the merits of the charges against the defendant and should be excluded. As a threshold matter, issues pertaining to post indictment delay are generally resolved by the Court, not the jury. See Fed. R. Crim P. 12; United States v. Washington, 705 F.2d 489, 495 (D.C. Cir. 1983) (per curiam) (finding issues subject to Fed. R. Crim. P. 12, including preindictment delay and violations of constitutional speedy trial rights, are matters for the Court, not the jury). Notably, the defendant is not advancing a statute of limitations defense and the Court previously denied the defendant's motion to dismiss this case on speedy trial grounds. See Chang, 18-CR-681 (NGG), ECF No. 523. Evidence and argument concerning the length of the defendant's incarceration in South Africa is also entirely irrelevant to the merits of the case. In addition, permitting such evidence would open the door to evidence concerning the reasons for his delayed extradition, which would not only confuse and mislead the jury, but also waste jurors' time. Cf. United States v. Morel, 751 F.Supp.2d 423, 432 (E.D.N.Y. 2010) ("In addition to confusing and misleading the jury, if evidence of a declination of prosecution is introduced, the government will likely need to take the stand to explain the declination to the jury, which might result in unnecessary testimony and undue delay."). Therefore, any evidence and argument concerning the timing of the indictment and the length of

the defendant's detention and incarceration is irrelevant to his guilt or innocence and would be unfairly prejudicial and waste judicial resources.

Courts have also precluded evidence related to the personal characteristics of the defendant when they "do not bear on the Defendant's innocence or guilt." See United States v. St. Rose, No. 11-CR-349 SJ, 2012 WL 1107659, at *1 (E.D.N.Y. Apr. 2, 2012) (precluding defendant from arguing she should be acquitted out of sympathy for her, her family, or her immigration status); United States v. Battaglia, No. S9 05 Cr. 774 (KMW), 2008 WL 144826, at *3 (S.D.N.Y. Jan.15, 2008) (granting a motion in limine to preclude evidence of the defendant's personal status); see also United States v. Sterritt, No. 21-CR-193 (KAM), 2023 WL 7386660, at *4 (E.D.N.Y. Nov. 8, 2023) ("Courts have broad discretion concerning the admissibility of evidence related to the defendant's personal, health, or family circumstances, but particularly where such evidence 'has limited probative value . . . [and has] potential to engender sympathy in an inappropriate effort to excuse [a] defendant's commission of the charged offenses,' such evidence may be excluded, pursuant to Fed. R. Evid. 403"). Here, the defense may try to introduce evidence concerning the defendant's nationality and his lack of personal connections to the United States to create undue sympathy from the jurors. The Court should preclude such evidence and argument as irrelevant and unfairly prejudicial.

Similarly, "[e]vidence of a prior acquittal is not relevant because it does not prove innocence but rather merely indicates that the prior proceeding failed to meet its burden of proving beyond a reasonable doubt at least one element of the crime." United States v. Ashburn, No. 11-CR-0303(NGG), 2015 WL 729818, at *2 (E.D.N.Y. Feb. 19, 2015); Gentile v. Cnty. of Suffolk, 926 F.2d 142, 161 (2d Cir.1991) ("[A] judgment of acquittal does not necessarily mean that the defendant is innocent; it means only that the government has not met its burden of proof beyond a

reasonable doubt." (citing <u>Viserto</u>, 596 F.2d at 536–37)).  The Court should preclude any attempt by the defense to inform the jury of the <u>Boustani</u> acquittal as such evidence and argument is entirely irrelevant to the merits of the case against the defendant and would be extremely prejudicial.[25]

To the extent the defendant seeks to introduce evidence and argument on any of the matters identified above, the Court should preclude such evidence as irrelevant and improper attempts at jury nullification.  Such evidence would serve no purpose other than to evoke sympathy from the jury and distract the jury from evidence of the defendant's guilt or to seek to encourage jury nullification.  This is plainly an improper purpose that should be precluded not just because it is irrelevant, but also because any conceivable probative value of such evidence would be substantially outweighed by the unfair prejudice of such a ploy for sympathy. <u>See</u> Fed. R. Evid. 403; <u>see also</u> <u>United States v. Stewart</u>, No. 03 Cr. 717 (MGC), 2004 WL 113506, at *1 (S.D.N.Y. Jan. 26, 2004) (granting motion to preclude defendant from "presenting arguments or evidence that would invite the jury to question the Government's motives in investigating and indicting [the defendant]").  Given the genuine risk of jury nullification, the Court should preclude any argument about the circumstances regarding these topics.

## VII.    The Court Should Preclude Improper Character Evidence

The Court should also preclude the defendant from offering evidence that the defendant did not commit fraud and accept bribes related to other projects in Mozambique because

---

[25] The government acknowledges that defense counsel may in certain instances use prior testimony from the <u>Boustani</u> trial to cross-examine witnesses at the defendant's trial.  The court should order the defense to refer to the <u>Boustani</u> trial only as a "prior proceeding." <u>Ashburn</u>, 2015 WL 729818, at * 3 ("If the defense wishes to cross-examine a Government witness using testimony provided during [the defendant's] state trial, counsel may identify that case as a 'prior proceeding,' but may not refer to the nature of that proceeding or its outcome.").

it is irrelevant and inadmissible.[26]

A.    Legal Standard

Evidence that a defendant charged with fraud engaged in other, non-fraudulent activity is generally irrelevant and inadmissible.  See United States v. Nekritin, No. 10-CR-491 (KAM), 2011 WL 2462744, at *5 (E.D.N.Y. June 17, 2011) (defendant charged with health care fraud based upon fraudulent Medicare and Medicaid billing; defendant's proffered evidence of non-fraudulent billing unrelated to the charged conduct excluded).  While non-criminal activities may be relevant where the defendant is alleged to have engaged in "ceaseless" criminal conduct, "a defendant may not seek to establish his innocence . . .  through proof of the absence of criminal acts on specific occasions."  United States v. Scarpa, 913 F.2d 993, 1010-11 (2d Cir. 1990); Nekritin, 2011 WL 2462744, at *5; see also United States v. Rivera, No. 13-CR-149 (KAM), 2015 WL 1725991, at *2 (E.D.N.Y. April 15, 2015) (precluding evidence of good conduct because the defendant was not charged with "ceaseless" criminal conduct in connection with the charged

---

[26] Although Judge Kuntz denied the government's request to preclude improper character evidence of Boustani, and his work on other Privinvest matters in Namibia and other purportedly non-fraudulent acts, see Boustani, 18-CR-681 (WFK), ECF No. 252, the government respectfully requests that the Court grant its motion to preclude improper character evidence for Chang for the reasons stated below.  Judge Kuntz's reasoning for permitting such evidence in Boustani does not apply here.  Judge Kuntz determined that Privinvest's projects in Namibia were probative as to whether (1) Boustani wanted the projects in general to succeed and to generate revenue; (2) the government's allegation that Boustani attempted to persuade Mozambican officials to establish a coastal monitoring system; and (3) as background in light of allegations that the co-conspirators designed them as "vehicles and fronts to raise as much money as possible to enrich themselves." Id. at 5-6.  The defendant's other acts as Minister of Finance are entirely unrelated to those factual issues, and as discussed below, also unrelated to his intent to defraud investors and launder his bribe money.  Moreover, since that ruling, the government has superseded and removed any allegations in the operative indictment about the Projects being "vehicles and fronts to raise as much money as possible to enrich themselves."  Instead, the indictment alleges that "the Proindicus, EMATUM and MAM maritime projects were used by the defendant MANUEL CHANG and his co-conspirators to divert *portions* of the loan proceeds to pay millions in bribes and kickbacks to themselves, other Mozambican government officials and bankers."  See Indictment ¶ 24 (emphasis added).

racketeering conspiracy).

Similarly, evidence of a defendant's prior good conduct offered to establish his innocence is generally inadmissible under Rules 404(b), 405 and 403. While a defendant may offer general testimony from a character witness about his reputation for a "pertinent trait of character," or the witness's opinion of the defendant as regards that trait, see Fed. R. Evid. 404(a)(2)(A), 405(a), a defendant can neither testify nor offer other proof to establish specific acts in conformity with that trait that are not an element of the offense. Such evidence is impermissible under Rule 404(b) because it would "'in effect be an attempt to demonstrate [the defendant's] good character by proof of specific good acts.'" Rivera, 2015 WL 1725991, at *2 (quoting United States v. O'Connor, 580 F.2d 38, 43 (2d Cir. 1978)). For example, the Second Circuit affirmed a district court's decision in an insider trading case to permit character witnesses to offer opinion testimony regarding the defendant's reputation for truthfulness, honesty and secret-keeping, but to prohibit testimony regarding specific instances of good conduct by the defendant that formed the foundation upon which the witnesses' opinions were based. United States v. Riley, 638 Fed. App'x 56, 64 (2d Cir. 2016) (finding such evidence impermissible under Federal Rules of Evidence 404 and 405); see also United States v. Doyle, 130 F.3d 523, 542 (2d Cir. 1997); United States v. Benedetto, 571 F.2d 1246, 1249-1250 (2d Cir. 1978) (defense-proffered character evidence of defendant's specific acts improperly admitted because "character evidence has long been admissible only in the form of reputation and not in the form of a recitation of good or bad acts"). Evidence of this type should also be excluded on Rule 403 grounds because its low probative value is substantially outweighed by the dangers of unfair prejudice, confusing the issues, misleading the jury and wasting time. See Riley, 638 Fed. App'x at 64; Nekritin, 2011 WL 2462744, at *5.

B.    Discussion

The defendant might seek to introduce evidence of the defendant's prior

purportedly non-fraudulent acts, including evidence related to other projects considered or financed by the defendant while he was the Minister of Finance, or any charitable or community-oriented activities he participated in.  To the extent that this evidence is used to suggest that he did not conspire to commit fraud here, the Court should preclude this evidence under Federal Rules of Evidence 404 and 405.  See Riley, 638 Fed. App'x at 64 (finding, in insider trading case, specific instances of good conduct related to truthfulness, honesty and secret-keeping impermissible under Rules 404 and 405).  That the defendant may not have engaged in fraud on other occasions says absolutely nothing about his conduct related to the Proindicus, EMATUM, and MAM deals and it is black letter law that information about his non-fraudulent conduct should be precluded.  Furthermore, such evidence should also be precluded under Rule 403, because it is irrelevant to the charged conspiracies, including the defendant's intent, and has any probative value that this information may have is substantially outweighed by the danger of jury confusion, misleading the jury, wasting time and unfair prejudice.  See Riley, 638 Fed. Appx. at 64; Nekritin, 2011 WL 2462744, at *5.  Permitting the defendant to introduce evidence concerning all the work he performed as the Minister of Finance would be highly prejudicial and would turn the trial into a side-show about the defendant's tenure in office, wasting the jurors' time.  Other purportedly "good acts" by the defendant would serve no purpose other than to improperly paint the defendant as a noble politician who cares about his people and engender undue sympathy from the jurors.

## VIII.    The Court Should Take Judicial Notice of an Official Decision of an Official Mozambican Entity

The government also respectfully requests that the Court take judicial notice of an official decision taken by the Constitutional Council of the Republic of Mozambique (the "Constitutional Council"), Mozambique's highest governing body with jurisdiction to administer justice in matters of a legal-constitutional nature.  On June 3, 2019, the Constitutional Council

declared the EMATUM loan, and the government guarantee that the defendant signed, "null and void." A copy of this decision and a certified translation of the original document (the "EMATUM Decision") are attached hereto as Exhibits L-1, L-2, and L-3 (enclosing GX 174-1, GX 174-2, and GX 174-3).

As set forth in the "EMATUM Decision," the Constitutional Council is a sovereign body created by the Constitution of the Republic of Mozambique, which is responsible for administering justice in constitutional matters. See Exs. L-2, at 16. Specifically, after EMATUM defaulted, on June 3, 2019, the Constitutional Council published a decision declaring "the acts inherent in the loan contracted by [Empresa Moçambicana de Atum, S.A. ("EMATUM")], and the respective sovereign guarantee granted by the Government of Mozambique in 2013 null and void." Id.[27] The EMATUM Decision provides the legal basis for review by the Constitutional Council under the laws of Mozambique on pages 15-17, and the reasons for its finding, including that (1) the 2013 loan and guarantee were not included in the official budget for 2013 and (2) the guarantee exceeded the maximum amount allowed for Government guarantees, which was approximately $5 million.

In the Boustani trial, the Court took judicial notice of GX 174-1 and the accompanying translation (attached as Exs. L-1 and L-2) in connection with the Boustani trial "for the purpose of recognizing its existence as an official statement, usable as evidence of the facts and opinions stated therein." Boustani, 18-CR-681 (WFK), ECF No. 250 at 3. The Court

---

[27] In 2019, the EMATUM Decision was posted on the official website of the Constitutional Council of the Republic of Mozambique, http://www.cconstitucional.org.mz. See Boustani, 18-CR-681 (WFK), ECF No. 174 at 1. Although the link to the EMATUM decision in ECF No. 174 no longer works, the government has identified what appears to be an archived version of the Constitutional Council website with a link to the EMATUM Decision. See http://167.71.131.195/eng/Jurisprudencia/5-CC-2019.

specifically did not take judicial notice of the facts and opinions for the truth of the matter asserted, "particularly to the extent those facts remain in dispute." Id. For the reasons set forth below, the government respectfully requests that the Court do so here as well.

The Court may take judicial notice of a fact not subject to dispute because it "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." See Fed. R. Evid. 201(b)(2). In recent decisions, the Second Circuit has taken judicial notice of facts and materials published on websites. See, e.g., Force v. Facebook, Inc., 934 F.3d 53, 59 n.5 (2d Cir. 2019) (taking judicial notice of Facebook's public terms of service and community standards); 23-34 94th St. Grocery Corp. v. New York City Bd. of Health, 685 F.3d 174, 183 (2d Cir. 2012) ("We take judicial notice of a poster recently published on TobaccoFreeNYS.org."); United States v. Akinrosotu, 637 F.3d 165, 168 (2d Cir. 2011) ("According to www.bop.gov, the official website for the Bureau of Prisons ('BOP'), of which we take judicial notice for the limited purpose of obtaining the BOP's projected date for the defendant's release from prison, see Fed. R. Evid. 201(b)(2), defendant's release is scheduled for November 2, 2019.").

The Second Circuit has also taken judicial notice of the content of administrative decisions from local and provincial government administrations in China. See Ding Lian Zou v. R. Gonzales, No. 06-0057-ag, 2006 WL 2828830, *2 (2d Cir. Sept. 27, 2006). Similarly, the Ninth Circuit has taken judicial notice of a patent application published by a foreign government agency. See Khoja v Orexigen Therapeutics, Inc., 899 F.3d 988, 1001 (9th Cir. 2018). The Seventh Circuit has remanded a case in part due to the lower court's failure to consider materials posted on a foreign government's website. See Qiu Yun Chen v. Holder, 715 F.3d 207, 212 (7th Cir. 2013) ("One of the documents that the Board refused to consider had been posted on a Fujian government

website.  A document posted on a government website is presumptively authentic if government sponsorship can be verified by visiting the website itself; and in this case it can be.").

Moreover, evidence taken from government websites is admissible under Rules 803(8) and 902(5).  See Rychorcewicz v. Welltec, Inc., Civ. No. H-16-2, 2018 WL 3559131, *7 (S.D. Tex. June 22, 2018) (holding that "[i]t is well-settled that information found on government websites is self-authenticating under" Rule 902(5); and "printouts from government websites come under the public records exception to the hearsay rule"); see also In re Methyl Tertiary Butyl Ether ("MTBE") Products Liability Litig., MDL No. 1358 (SAS), 2013 WL 6869410, *4 (S.D.N.Y. Dec. 30, 2013) (vacated in part on other grounds) (holding that "Courts routinely take judicial notice of data on government websites because it is presumed authentic and reliable.").  Courts have also applied Rule 803(8) to public records of foreign governments.  "As an initial matter, Rule 803(8) is available to reports of foreign public offices and agencies that otherwise come within its terms."  In re Parmalat Sec. Litig., 477 F. Supp. 2d 637, 640 (S.D.N.Y. 2007) (Kaplan, J.) (citing FAA v. Landy, 705 F.2d 624, 633 (2d Cir. 1983) (Fed. R. Evid. 803(8) applies to foreign documents)); United States v. Grady, 544 F.2d 598, 604 (2d Cir. 1976)).

Given the well-established law in the Second Circuit and other circuits, the Court should take judicial notice of the EMATUM Decision and admit the EMATUM Decision at trial because it is a published decision available on a foreign government's website and a public record of a foreign government.

IX.    The Court Should Admit Past Recorded Recollections

The government anticipates that it will call Robert Pepitone as a witness at trial. Mr. Pepitone, who previously testified at the Boustani trial, is a vice president and senior product manager for the Clearing House Interbank Payments System ("CHIPS") product at The Clearing House, a company that provides payment services to large global banks.  The government requests

that, pursuant to Rule 803(5), Mr. Pepitone be permitted to read the contents of a record identifying the dates on which CHIPS transfers were processed through a facility located in New York City as a recorded recollection (the "CHIPS Facility Record").

A.    Background

During the Boustani trial, Mr. Pepitone testified regarding the operation of the CHIPS payment system and the locations of CHIPS facilities through which payments were processed between 2013 and 2016.  Specifically, Mr. Pepitone testified that: (1) CHIPS is a high-value payment system for clearing U.S. dollars used by large U.S. banks (Tr. 2564:24-2563:1-15); (2) he "run[s] the [CHIPS] product" and is responsible for "everything from budgeting, product pricing, [and] analysis regarding anything that . . . has any influence on the product" (id. at 2563:3-6); and (3) CHIPS used two processing centers — one in New York City and one in North Carolina — in the period between 2013 and 2016, and alternated between them on a quarterly basis (id. at 2566:22-2567:4).  Mr. Pepitone further testified that he did not remember "off the top of [his] head" which facilities were used in which quarters between 2013 and 2016.  (Id. at 2567:19-21.) The government then showed Mr. Pepitone the CHIPS Facility Record, which he testified would refresh his recollection, was prepared by The Clearing House, and was a document with which he was familiar.  (Id. at 2567: 22-2568:10.)  After consulting the CHIPS Facility Record, which was admitted in evidence (id. at 2568: 4-15), Mr. Pepitone testified which of the two processing locations, New York City or North Carolina, CHIPS used during particular quarters between 2013 and 2016.  (Id. at 2568:25-2570:5.)

In 2022, Mr. Pepitone testified in United States v. Ng Chong Hwa, No. CR 18-538 (S-2) (MKB), a criminal trial in the Eastern District of New York before Chief Judge Margo K.

Brodie (the "2022 Proceeding").[28]  He again testified regarding the operation of the CHIPS payment system and its use of New York City- and North Carolina-based processing centers. Specifically, he testified that: (1) he did not recall with specificity which facility CHIPS used on a given day between 2012 and 2015; (2) he previously testified in a 2019 court proceeding — namely, the <u>Boustani</u> trial — as to the dates on which CHIPS used its New York City facility between 2012 and 2015; (3) at the time he testified in 2019, he had referred to a document prepared by The Clearing House, and (4) his prior testimony in 2019 was truthful and accurate.  <u>See</u> Ex. M-1 at 2547.  Mr. Pepitone then identified the CHIPS Facility Record, <u>see</u> Ex. M-2, as the document to which he had referred during his prior testimony in 2019, and explained that he had testified based on the information contained in that exhibit, and that it showed when CHIPS had used its New York City facility between 2012 and 2015.  Ex. M-1 at 2548.   Following that testimony, Chief Judge Brodie permitted Mr. Pepitone to read from the CHIPS Facility Record as a recorded recollection pursuant to Rule 803(5).  <u>Id.</u> at 2553.

     B.    <u>Applicable Law</u>

        Rule 803(5) provides that a record that (a) "is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately;" (b) "was made or adopted by the witness when the matter was fresh in the witness's memory;" and (c) "accurately reflects the witness's knowledge" may be read into evidence.  Fed. R. Evid. 803(5).  The Advisory Committee Notes make clear that "[n]o attempt is made in the exception to spell out the method of establishing the initial knowledge or the contemporaneity and accuracy of the record, leaving them to be dealt with as the circumstances of the particular case might indicate."  Fed. R. Evid. 803(5) Advisory Comm. Note.  As with other questions regarding the admissibility of a statement

---

[28] Attached as Exhibit M-1 is Mr. Pepitone's testimony in <u>Hwa.</u>

under an exception to the rule against hearsay, courts are to determine whether the requirements of Rule 803(5) have been satisfied by a preponderance of the evidence. See, e.g., United States v. Franco, 874 F.2d 1136, 1139 (7th Cir. 1989) ("When making preliminary factual inquiries about the admissibility of evidence under a hearsay exception, the district court must base its findings on the preponderance of the evidence.").

C.    Discussion

The government expects Mr. Pepitone's testimony at the forthcoming trial in this case to satisfy the requirements of Rule 803(5). Thus, as in Hwa, he should be permitted to read from the CHIPS Facility Records during his testimony as a past recorded recollection. Specifically, the government anticipates that Mr. Pepitone will testify that: (1) between 2012 and 2015, The Clearing House processed CHIPS transactions through servers located at its New York City- and North Carolina-based facilities; (2) although the New York City facility was the "primary" location for processing CHIPS transactions, CHIPS no longer maintains business records showing which facility processed CHIPS transactions between 2012 and 2015; (3) he does not recall with specificity the time periods in which CHIPS used its New York City facility between 2012 and 2015; (4) he has previously testified as to the specific time periods in which CHIPS used its New York City facility between 2012 and 2015; (5) during that prior testimony, he had referred to, and testified based on the information contained in, the CHIPS Facility Record, which showed the specific time periods in which CHIPS used its New York City facility between 2012 and 2015; and (6) his prior testimony was truthful and accurate. Because this testimony would satisfy the requirements of Rule 803(5), the Court should permit Mr. Pepitone to read from the CHIPS Facility Recorded as a past recorded recollection, as the court permitted in Hwa.

X.      <u>Improper Use of Agent Reports to Impeach Witnesses Should Be Precluded</u>

        In accordance with its obligations under Federal Rule of Criminal Procedure 26.2 and 18 U.S.C. § 3500 (the "Jencks Act"), the government will produce summaries of witness interviews prepared by law enforcement.  The government respectfully requests that the Court preclude the defense from introducing the contents of these reports to impeach such witnesses during cross-examination, publishing the contents of the reports to the jury, or otherwise suggesting to the jury that the reports are statements of the witnesses who did not write or adopt them.

        A party may impeach a witness with a prior inconsistent statement of that witness, but the statement must be the witness's own statement that he or she either made or adopted.  <u>See</u> Fed. R. Evid. 613; <u>United States v. Almonte</u>, 956 F.2d 27, 29 (2d Cir. 1992) (concluding that the trial court did not err in refusing to admit prosecutor's notes taken during debriefing of witness and explaining that a "third party's characterization" of a witness's statement does not constitute a prior statement of that witness "unless the witness has subscribed to that characterization"); <u>United States v. Leonardi</u>, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]," it was "properly rejected as a prior inconsistent statement").  The problem with using a third party's summary or characterization of the witness's statement to impeach is "one of relevancy": "If a third party's notes reflect only that note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible."  <u>Almonte</u>, 956 F.2d at 29.

        The Jencks Act governs the discoverability of a witness's prior statements, and its definition of "statement" accords with Rule  613(a) and applicable case law on proper impeachment using prior inconsistent statements.  Under the Jencks Act, a statement means "a

written statement made by said witness and signed or otherwise adopted or approved by him," a recording or transcription that "is substantially [a] verbatim recital of an oral statement made by said witness and recorded contemporaneously," or a statement made by a witness to the grand jury. See 18 U.S.C. § 3500(e). Because the Jencks Act is meant to restrict the defendant's use of discoverable statements for impeachment, "only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment." Palermo v. United States, 360 U.S. 343, 349, 352 (1959). An "agent's interpretations and impressions" of a witness do not fall within the purview of the Jencks Act. Id. at 352-53.

In this case, the government has provided the defense with broad discovery, which will be supplemented when the government provides material pursuant to 18 U.S.C. § 3500, including reports summarizing investigators' interviews with government witnesses. These reports were not reviewed or adopted by any of the government witnesses. Moreover, they were finished after interviews were completed and reflect the thought processes and interpretations of the agents and officers; they do not constitute verbatim recitals or transcripts of any of the witnesses' statements.[29] As a result, the statements in these reports are not statements of any of the government's witnesses (other than the reports' authors, if called to testify at trial), cannot be used for impeachment, and should not be read aloud or shown to the jury. See Almonte, 956 F.2d at 28; Leonardi, 623 F.2d at 757. The Court should therefore preclude any use or suggestion by

---

[29] These reports would, however, constitute prior statements of the agents or officers who prepared the report if they are called as a witness to testify regarding the subject matter contained in the report.

70

defense counsel that a statement in a law enforcement summary report is a statement of the witness being interviewed.[30]

XI.    The Court Should Preclude Evidence or Argument Concerning Possible Punishment and Collateral Consequences

The government also moves to preclude any discussion or argument concerning possible collateral consequences or punishment which may result from a conviction in this case. Such argument or evidence is irrelevant and therefore inadmissible.

Where the jury has no role at sentencing — such as in this case — it "should be admonished to reach its verdict without regard to what sentence might be imposed." Shannon v. United States, 512 U.S. 573, 579 (1994). This is for good reason: argument concerning punishment "invites [jurors] to ponder matters that are not within their province, distracts them from their fact finding responsibilities, and creates a strong possibility of confusion." Id. Ultimately, any reference during trial to possible punishment may only "prejudice, distract, or confuse the jury." United States v. Jadusingh, No. 18-CR-257 (KAM), 2020 WL 207950, at *3 (E.D.N.Y. Jan. 14, 2020). Accordingly, "[f]ederal courts usually instruct juries not to consider a verdict's consequences." United States v. Blume, 967 F.2d 45, 49 (2d. Cir. 1992).

The Court should preclude the defendant and his counsel from referencing the possible punishment or consequences which will accompany a guilty verdict. Although the defendant has not stated his intention to reference the possible consequences of his conviction at

---

[30] The government acknowledges that the defense may ask a witness whether he or she made a statement that is reflected in a law enforcement report. However, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the report's contents as a prior inconsistent statement. Additionally, if a witness says that he or she does not remember a fact, the defense may attempt to refresh a witness's recollection by showing the witness the report, but only if the defense does so in a manner that does not imply that the report is the witness's own statement or publish its contents to the jury. And if the report does not refresh the witness's recollection, the defense may not try to admit that report as purported impeachment evidence.

trial, the government moves to preclude any mention of sentence out of an abundance of caution, and any collateral impact it may have on other proceedings and in Mozambique.  Any reference to sentencing will serve to confuse the jury and undermine its role as the trier of fact.  Discussion of the consequences of a conviction could invite the jury to consider nullification, a violation of the Court's instructions and an outcome the Court is duty bound to prevent.  Thomas, 116 F.3d at 616. Therefore, the Court should preclude the defendant from referencing potential punishment or collateral consequences at trial.

XII.    The Court Should Admit Certain Evidence Based on Fed. R. Evid. 902 and 18 U.S.C. § 3505

At trial, the government intends to authenticate certain certified business and electronic records pursuant to Fed. R. Evid. 902(11) and 18 U.S.C. § 3505.[31]  A table listing the producing entities, the Bates ranges for the records as produced in discovery, the Bates ranges for the applicable certifications, and whether the certified records are foreign business records is set forth in Exhibit N.[32]  The government will produce additional certifications as they become available.

The Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation.  See

---

[31] To date, the defendant has rejected the government's proposal to enter into stipulations of business records and other self-authenticating documents.  Over the last few months, the government has tried to engage with defense counsel over document stipulations, in the hopes that the parties can simplify the admission of standard business records and self-authenticating records. The government initially sent over a document stipulation for a narrow set of bank records relating to Pearse's bank accounts, along with the records and a business certification record from the bank. When the defendant initially refused to stipulate to the admissibility of such documents, the government offered to revise the stipulation to stipulate only to the authenticity of the records. Nonetheless, the defendant has refused to stipulate to the authenticity of the bank records, thus, prompting the government to make this motion.

[32] To the extent the defendant opposes admission of any of these records, the government is prepared to provide any or all of the certifications to the Court upon request.

Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009).  The Court has explained that "[b]usiness and public records are generally admissible absent confrontation . . . because — having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial — they are not testimonial." Id. at 324.

Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and therefore are permissible.  See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United States v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005).  As the Seventh Circuit explained in Ellis, an authenticating certification under Rule 902(11) is "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the procedures necessary to create a business record."  460 F.3d at 927.  It is the underlying records, not the certification, that are introduced to establish the facts at trial.

Consistent with this understanding of the confrontation right, federal law permits the authentication of business and electronic records by certification and sets forth specific requirements for their admission.  Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification.  Courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial.  See, e.g., United States v. Komasa, 767 F.3d 151 (2d Cir. 2014); Qualls, 613 F. App'x at 28 (affirming district court decision to allow government to offer into evidence foreign business records based upon a certification, absent a live witness to authenticate the documents).  Similarly, Rule 803(6)(D)

73

provides that a document may be qualified as a record of a regularly conducted activity "by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification." Fed. R. Evid. 803(6)(D); see also United States v. Michel, 879 F. Supp. 2d 291, 304 n.13 (E.D.N.Y. 2012) (bank representative's signed declaration under penalty of perjury sufficiently laid foundation for admission of bank records). Thus, "Rule 902(11) extends Rule 803(6) by allowing a written foundation in lieu of an oral one." United States v. Rom, 528 F. App'x 24, 27 (2d Cir. 2013).

Likewise, § 3505 "permits the government to authenticate foreign business records by certification by meeting certain requirements." United States v. Qualls, 553 F. Supp. 2d 241, 245 (E.D.N.Y. 2008). "Certification pursuant to § 3505 is just one option available to litigants to authenticate business records, as set forth in Rule 803(6). A party may demonstrate the foundation or authenticity of a business record by 'testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification[.]'" Id. (quoting F.R.E. 803(6)).

The government should therefore be permitted to authenticate the business records and foreign business records set forth in Exhibit N by using certifications because it is proper under the law. As noted, the government has provided the defendant with the certifications and underlying records in discovery — and will continue to do so as they become available — and the defendant is hereby informed of the government's intention to offer the business records and foreign business records set forth in Exhibit N as evidence at trial. Such a process would eliminate unnecessary witnesses and help the case proceed in an efficient manner without the need for wasteful sidebars. Accordingly, the government seeks a pretrial ruling that the records set forth in

Exhibit N may properly be authenticated as self-authenticating business records and foreign business records.[33]

XIII.   The Defendant Should Be Ordered to Disclose His Rule 16(b) Discovery for any Trial Exhibits To Be Introduced During its Case-in-Chief

        The government further moves in limine to preclude the defendant from introducing defense's case-in-chief exhibits without prior disclosure.  To date, the only documents the defendant has produced were materials received in response to Rule 17(c) subpoenas after they were directed to do so by the Court.  The defendant has not produced any other documents or record in Rule 16 discovery even though the defendant was extradited almost a year ago.  The defendant's case-in-chief exhibits are due July 5, 2024, but there is no indication from defense counsel that any Rule 16 discovery is forthcoming, notwithstanding the government's numerous requests for reciprocal discovery.

        Rule 16(b) of the Federal Rules of Criminal Procedure governs a defendant's disclosures in a criminal case.  In relevant part, it requires the defendant to provide the government with documents and records that the defendant "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A).  Rule 16 does not require a defendant to disclose documents he intends to use for purposes of cross-examining a government witness.  However, to the extent that a defendant seeks to admit into evidence a document while cross-examining a witness during the government's case-in-chief in order to affirmatively support the defendant's theory of the case, such a document falls within the ambit of Rule 16.  As explained in United States v. Hsia, No.  98 CR 0057 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 21, 2000):

> A "case-in-chief" is defined as "[t]he part of a trial in which a party presents evidence to support its claim or defense." Blacks Law

---

[33] In addition to authentication, the government will also need to establish relevancy prior to admitting documents at trial.  The government anticipates that the relevancy of each record will be plain at the time they are moved into evidence.

> Dictionary 207 (7th ed. 1999). Defendant's cross-examination of government witnesses, and the evidence introduced during that cross-examination, certainly may be used to support her defense . . . . The cross-examination of these and other government witnesses therefore is properly seen as part of defendant's case-in-chief if it buttresses her theory of the case.

Id. The Hsia court distinguished documents introduced by a defendant via a government witness—which do fall within Rule 16 and should be disclosed—from documents used by a defendant "merely to impeach a government witness, and not as affirmative evidence in furtherance of [the defendant's] theory of the case, it is not part of [the defendant's] case-in-chief." Id. at *2 n.1.

Furthermore, "Rule 16 requires Defendants to identify all non-impeachment exhibits they intend to use in their defense at trial, whether the exhibits will be introduced through a government witness[34] or a witness called by a Defendant." United States v. Napout, No. 15 CR 252 (PKC), 2017 WL 6375729, at *7 (E.D.N.Y. Dec. 12, 2017). When a defendant, like Chang, fails to timely disclose to the government under Rule 16, the Court may exclude those exhibits as untimely. See id. That is because, as Judge Chen explained in Napout:

> "[W]here a defendant cross-examines a government witness to buttress[ ] her theory of the case, rather than to impeach the testimony given by the witness on direct examination, [t]he cross-examination ... is properly seen as part of the defendant's case-in-chief."

Id. at *7 (internal quotation marks and citation omitted). Indeed, "this interpretation of Rule 16 has been adopted by almost every district court to consider the issue." Id. (citing United States v. Hsai, No. 98-cr-057 (PLF), 2000 WL 195067, at *2 (D.D.C. Jan. 11, 2000); United States v. Swenson, 298 F.R.D. 474, 478 (D. Idaho 2014); United States v. Holden, No. 13-cr-444, 2015 WL 1514569, at *5 (D. Or. Mar. 19, 2015); United States v. Larkin, No. 12-cr-319-JCM-GWF, 2015

---

[34] In addition, the government objects to the introduction of defense's case-in-chief exhibits through government witnesses.

WL 4415506, at *6 (D. Nev. July 20, 2015); United States v. Aiyaswamy, No. 15-cr-568-LHK-1, 2017 WL 1365228, at *5 (N.D. Cal. Ap Cal. Apr. 14, 2017)).

The government therefore respectfully requests that the Court order the defendant to identify and produce in Rule 16 discovery all documents and records they intend to use as case-in-chief exhibits forthwith or risk their preclusion at trial.  See, e.g. Giffen, 379 F. Supp. 2d at 344 (directing defendant to provide trial exhibit list and copies of exhibits to government "at the start of trial or no later than thirty days prior to the start of the Defendant's case"); see also United States v. Mavashev, No. 08 CR 902 (DLI), 2010 WL 670083, at *4 (E.D.N.Y. Feb. 23, 2010) ("[T]o the extent defendant intends to use any documents, objects, reports of examinations, or tests in his case-in-chief at trial, he is ordered to comply with the government's request immediately, i.e., no later than twenty-four (24) hours following the issuance of this Order.  Failure to do will result in such evidence being precluded.  See Fed. R. Crim. P. 16(d)(2)(C)"); United States v. Weiss, 930 F.2d 185, 199 (2d Cir. 1991) (district court did not abuse its discretion in precluding evidence during trial because "[d]efense counsel planned to use the documents in their case-in-chief and was obliged to disclose the documents under Rule 16(b)[;] . . . .  Permitting the defense to use the documents, particularly without the prosecution ever having seen them and despite the earlier government requests for those documents, would have given the defense an unfair advantage."); United States v. Jasper, No. 00 CR 825 (PKL), 2003 WL 223212, at *1 (S.D.N.Y. Jan. 31, 2003) (ordering the defendant to "comply with his obligations as set forth in Rule 16(b)(1)(A) and produce any materials that he intends to use in defendant's case-in-chief at trial.").

## XIV.   The Defendant Should Identify and Produce All Materials Received Pursuant to Rule 17(c) Subpoenas

The propriety of the defendant's Rule 17(c) subpoenas that were disclosed on May 24, 2024 is an issue pending before the Court and will be addressed separately.  To the extent that

there are further Rule 17(c) subpoenas issued in this case, the government respectfully requests that the Court order the defendant to disclose the subpoenas to the government, and to disclose all Rule 17(c) material received in connection with those subpoenas to both the Court and the government.  The purpose of Rule 17(c) is to provide both parties with the opportunity to inspect documents produced before trial.  <u>See</u> Fed. R. Crim. P. 17(c)(1) (providing that, "when the items arrive, the court may permit the parties and their attorneys to inspect all or part of [the subpoenaed documents]"); <u>United States v. Skelos</u>, No. 15-CR-317 (KMW), 2018 WL 2254538, at *9 (S.D.N.Y. May 17, 2018) (ordering defendants to make all items received pursuant to Rule 17 subpoenas available to the government).

CONCLUSION

For the reasons set forth above, the government respectfully submits that its motions in limine be granted in their entirety.

Dated:     Brooklyn, New York
           May 31, 2024

Respectfully submitted,

BREON PEACE
UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

By:    /s/
        Hiral Mehta
        Genny Ngai
        Assistant United States Attorneys
        (718) 254-7000

MARGARET A. MOESER
Acting Chief, Money Laundering & Asset Recovery Section
Criminal Division
U.S. Department of Justice

By:    /s/
        Morgan Cohen
        Trial Attorney
        (202) 598-2345

GLENN S. LEON
Chief, Fraud Section
Criminal Division
U.S. Dept. of Justice

By:    /s/
        Peter L. Cooch
        Trial Attorney
        (202) 924-6259