SME:HDM/GN/PC/MC
F.#2016R00695

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

                           Docket No. 18-CR-681 (S-3) (NGG)

MANUEL CHANG,
       also known as "Pantero,"
       "Chopstick and "Kung Fu,"

             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - X

REPLY MEMORANDUM OF LAW IN SUPPORT OF
THE GOVERNMENT'S MOTIONS *IN LIMINE*


BREON PEACE
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201


Hiral D. Mehta
Genny Ngai
Assistant U.S. Attorneys

Morgan J. Cohen
Peter L. Cooch
Trial Attorneys
    (Of Counsel)

TABLE OF CONTENTS

ARGUMENT ........................................................................................................... 1

    I.     Co-Conspirator Statements Are Admissible Against The Defendant..................... 1

          A.     The Common Object of the Charged Wire Fraud Conspiracy Was To Obtain Money From Investors .............................................................. 3

          B.     The Court Should Follow the *Geaney* Approach and Admit the Co-Conspirator Statements Subject to Connection........................................... 6

          C.     The Government's Proof of The Defendant's Criminal Conduct Will Be Consistent With The Law of Conspiracy.................................................... 9

          D.     The Government Can Independently Corroborate The Reliability of Co-Conspirator Statements .............................................................. 11

          E.     Co-Conspirator Statements Made Throughout The Conspiracies, Including From 2011 and 2012, Are Admissible Against the Defendant ................. 13

          F.     Accounting Spreadsheets and Ledgers Made and Prepared by Co-Conspirators Are Admissible. .................................................................. 20

    II.    The Rule of Completeness Does Not Permit the Defendant to Offer His Statements and Other Co-Conspirator Statements.................................................. 25

    III.   The Government Should Be Permitted to Authenticate the Privinvest Documents Through the Testimony of Privinvest's Former Counsel and Admit the Privinvest Documents as Co-Conspirator Statements........................................................... 26

    IV.   All of the Co-Conspirator Statements Are Separately Admissible As Statements Against Penal Interest ....................................................................................... 30

    V.    The Government Should Be Permitted To Ask Materiality Questions ............... 34

          A.     The Government Should be Permitted to Ask Hypothetical Questions to Investors to Prove Materiality.................................................................. 34

          B.     The Government Should be Permitted to Ask Materiality Questions Regarding Credit Suisse.......................................................................... 38

    VI.   18 U.S.C. § 3238 Can Provide An Alternative Basis of Venue In This Case ...... 41

          A.     Section 3238 Can Apply Where the Offense Conduct Was "Begun" Outside the United States........................................................................ 41

          B.     The Defendant Should Not Be Permitted to Make Improper Venue Arguments.............................................................................................. 45

    VII.  The Court Should Prohibit the Defendant from Arguing That The Jury Should Disregard Settled Law in Deciding the Money Laundering Conspiracy Charge . 46

    VIII. The Government Maintains That the Defendant Should Not Be Permitted to Make Jury Nullification Arguments ............................................................................ 47

A.      The Defendant Should Not Be Permitted to Make Improper Arguments About Monetary Loss and Harm ............................................................ 47

B.      The Court Should Not Permit the Defendant to Introduce Irrelevant and Prejudicial Evidence Regarding His Background and Lack of Connections to the United States .................................................................................... 49

C.      The Court Should Preclude Any Attempt by the Defendant to Introduce Impermissible Other Acts Evidence. ........................................................ 51

IX.     The Court Should Take Judicial Notice of the EMATUM Decision .................... 51

X.      The Court Should Apply the Mozambican Law Proposed by the Government and Reject the Defendant's Contradictory and Meritless Arguments in Favor of His Preferred Mozambican Law .................................................................................. 53

XI.     The Testimony of the Robert Pepitone Will Satisfy the Requirements of Rule 803(5) ............................................................................................................ 56

XII.    The Court Should Grant the Government's Motion for a Pretrial Ruling that the Records Listed in Exhibit N to the Government's Motion are Authentic Business and Foreign Records .............................................................................................. 57

XIII.   The Defendant Should Produce Rule 16 Discovery Promptly ............................. 58

XIV.    The Remaining Issues in the Government's Motion Do Not Need to Be Addressed At This Time Based On Defendant's Representations ........................................... 59

CONCLUSION ................................................................................................................... 61

## TABLE OF AUTHORITIES

Cases

A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG,
    926 F. Supp. 378 (S.D.N.Y. 1996) ............................................................................ 51

Blumenthal v. United States, 332 U.S. 539 (1947) ............................................................ 3, 4

Com. Data Servers, Inc. v. Int'l Bus. Machines Corp., 262 F. Supp. 2d 50 (S.D.N.Y. 2003) ..... 28

Fed. Ins. Co. v United States, 882 F.3d 348 (2d Cir. 2018) .............................................. 38

Kotteakos v. United States, 328 U.S. 750 (1946) .............................................................. 3

Morgan v. Salamack, 735 F.2d 354 (2d Cir. 1984) .......................................................... 25

Munoz v. United States, No. 07-CV-2080 ILG, 2008 WL 2942861
    (E.D.N.Y. July 28, 2008) ...................................................................................... 21

United States v. Abdelaziz, 68 F.4th 1 (1st Cir. 2023) ...................................................... 3

United States v. Abu-Jihaad, 531 F. Supp. 2d 289 (D. Conn. 2008) ................................. 12

United States v. Adelekan, 567 F. Supp. 3d 459 (S.D.N.Y. 2021) ..................................... 18

United States v. Agurs, 427 U.S. 97 (1976) ...................................................................... 26

United States v. Amato, 15 F.3d 230 (2d Cir. 1994) .......................................................... 23

United States v. Anderson, 747 F.3d 51 (2d Cir. 2014) ...................................................... 10

United States v. Badalamenti, 794 F.2d 821 (2d Cir. 1986) .............................................. 18

United States v. Best, 219 F.3d 192 (2d Cir. 2000) ............................................................ 12

United States v. Blake, 195 F. Supp. 3d 605 (S.D.N.Y. 2016) ........................................... 24

United States v. Coplan, 703 F.3d 46 (2d Cir. 2012) ........................................................ 18

United States v. Cuti, 720 F.3d 453 (2d Cir. 2013) ...................................................... 34, 36

United States v. D'Amato, 39 F.3d 1249 (2d Cir. 1994) .................................................... 47

United States v. Davidson, 308 F. Supp. 2d 461 (S.D.N.Y. 2004) ..................................... 25

United States v. Farhane, 634 F.3d 127 (2d Cir. 2011) ...................................................... 18

United States v. Garland, 991 F.2d 328 (6th Cir. 1993) .............................................. 52

United States v. Geaney, 417 F.2d 1116 (2d Cir. 1969) ........................................... 6, 8

United States v. Gigante, 166 F.3d 75 (2d Cir. 1999) ................................................ 11

United States v. Gilboe, 684 F.2d 235 (2d Cir. 1982) ................................................ 43

United States v. Glenn, 312 F.3d 58 (2d Cir. 2002) ................................................... 10

United States v. Gole, 21 F. Supp. 2d 161 (E.D.N.Y. 1997) ..................................... 47

United States v. Gonzalez, 399 F. App'x 641 (2d Cir. 2016) ..................................... 24

United States v. Gotti, 457 F. Supp. 2d 395 (S.D.N.Y. 2006) ................................... 24

United States v. Gramins, 939 F.3d 429 (2d Cir. 2019) ............................................ 35

United States v. Guo, No. 23 CR. 118 (AT), 2024 WL 1862022 (S.D.N.Y. Apr. 29, 2024) ....... 34

United States v. Hatfield, No. 06-CR-0550 (JS), 2010 WL 2541057
    (E.D.N.Y. June 10, 2010) ..................................................................................... 35

United States v. Jennings, 487 F.3d 564 (8th Cir. 2007) ........................................... 36

United States v. Jensen, 93 F.3d 667 (9th Cir. 1996) ................................................ 44

United States v. Kaplan, 490 F.3d 110 (2d Cir. 2007) ............................................... 21

United States v. Kidd, No. 20-CR-572 (NSR), 2022 WL 15317483
    (S.D.N.Y. Oct. 27, 2022) ...................................................................................... 19

United States v. Kopp, 562 F.3d 141 (2d Cir. 2009) .................................................. 24

United States v. Krivoi, 80 F.4th 142 (2d Cir. 2023) .................................................. 10

United States v. Lange, 834 F.3d 58 (2d Cir. 2016) ................................................... 24

United States v. Litvak, 889 F.3d 56 (2d Cir. 2018) ................................................... 39

United States v. Loera, No. 09-CR-0466 (BMC), 2018 WL 2744701
    (E.D.N.Y. June 7, 2018) ......................................................................................... 9

United States v. Lopez, No. 18-CR-736 (NSR), 2019 WL 4733603
    (S.D.N.Y. Sept. 27, 2019) ....................................................................................... 6

United States v. Marin, 669 F.2d 73 (2d Cir. 1982) ................................................................ 25

United States v. Matos–Peralta, 691 F. Supp. 780 (S.D.N.Y. 1988) .................................... 9

United States v. Millan-Colon, 836 F. Supp. 1007 (S.D.N.Y. 1993) ................................... 23

United States v. Miller, 808 F.3d 607 (2d Cir. 2015) ........................................................... 42

United States v. Nixon, 418 U.S. 683 (1974) ....................................................................... 59

United States v. Novak, 443 F.3d 150 (2d Cir. 2006) ........................................................... 47

United States v. Ojudun, 915 F.3d 875 (2d Cir. 2019) ......................................................... 33

United States v. Pace, 314 F.3d 344 (9th Cir. 2002) ............................................................ 44

United States v. Padilla, 203 F.3d 156 (2d Cir. 2000) ......................................................... 11

United States v. Pendleton, 658 F.3d 299 (3d Cir. 2011) ............................................... 43, 44

United States v. Perez, 702 F.2d 33 (2d Cir. 1983) .............................................................. 11

United States v. Persico, 645 F.3d 85 (2d Cir. 2011) ........................................................... 31

United States v. Price, 374 F. App'x 189 (2d Cir. 2010) ...................................................... 11

United States v. Rackley, 986 F.2d 1357 (10th Cir. 1993) .................................................... 39

United States v. Raniere, 384 F. Supp. 3d 282 (E.D.N.Y. 2019) ......................................... 26

United States v. Ranney, 719 F.2d 1183 (1st Cir. 1983) ....................................................... 36

United States v. Rea, 958 F.2d 1206 (2d Cir. 1992) ............................................................... 5

United States v. Rivera-Niebla, 37 F. Supp. 3d 374 (D.D.C. 2014) ............................... 43, 44

United States v. Robinson, 702 F.3d 22 (2d Cir. 2012) ........................................................ 52

United States v. Saget, 377 F.3d 223 (2d Cir. 2004) ....................................................... 31, 32

United States v. Salvador, 820 F.2d 558 (2d Cir. 1987) ....................................................... 33

United States v. Saneaux, 365 F. Supp. 2d 488 (S.D.N.Y. 2005) .......................................... 6

United States v. Saneaux, 365 F. Supp. 2d 493 (S.D.N.Y. 2005) .......................................... 6

United States v. Saneaux, 392 F. Supp. 2d 506 (S.D.N.Y. 2005)....................................8

United States v. Siembida, 604 F. Supp. 2d 589 (S.D.N.Y. 2008)...............................11

United States v. Tracy, 12 F.3d 1186 (2d Cir. 1993)....................................................6

United States v. Valle, 807 F.3d 508 (2d Cir. 2015)....................................................9

United States v. Vayner, 769 F.3d 125 (2d Cir. 2014)...............................................27

United States v. Watts, 934 F. Supp. 2d 451 (E.D.N.Y. 2013)...................................47

United States v. Yarmoluk, 993 F. Supp. 206 (S.D.N.Y. 1998)................................39

Williamson v. United States, 512 U.S. 594 (1994)..............................................31, 33

Statutes

18 U.S.C. § 1956(a)(2)........................................................................................45, 46

18 U.S.C. § 1956(c)(7)(B)(iv)....................................................................................53

18 U.S.C. § 1956(f)...................................................................................................42

18 U.S.C. § 3237......................................................................................................42

18 U.S.C. § 3238................................................................................................40, 42

18 U.S.C. §3500........................................................................................................59

18 U.S.C. § 3505......................................................................................................56

Rules

Fed. R. Evid. 401.....................................................................................................48

Fed. R. Evid. 403...............................................................................................48, 50

Fed. R. Evid. 801(d)(2)(E).................................................................................18, 24

Fed. R. Evid. 803(5).................................................................................................56

Fed. R. Evid. 804(b)(3).................................................................................29, 30, 32

Fed. R. Evid. 902(11)...............................................................................................56

<u>Other Authorities</u>

PEDRO GOMES PEREIRA ET AL., BASEL INSTITUTE ON GOVERNANCE, OVERVIEW

AND ANALYSIS OF THE ANTI-CORRUPTION LEGISLATIVE PACKAGE OF

MOZAMBIQUE (2012), https://baselgovernance.org/sites/default/files/2018-

12/Mozambique_Legal_analysis.pdf ...................................................................................... 55

The government respectfully submits this reply memorandum of law in further support of its motions in limine.  For the reasons articulated in the opening brief (ECF No. 571 ("Gov't Br.")), and the reasons set forth below, the government respectfully submits that the Court should grant its motions in their entirety.

<u>ARGUMENT</u>

I.    <u>Co-Conspirator Statements Are Admissible Against The Defendant.</u>

The government has maintained, from the inception of this case, that the object of the charged wire fraud conspiracy was to obtain money from the investors in Proindicus, EMATUM and MAM.  (<u>See</u> ECF No. 1 ("First Indictment"), at ¶ 95.)  Nonetheless, despite numerous filings that have made this point clear, including the operative Indictment and the government's motions in limine, the defendant continues to mischaracterize the object of the conspiracy in his attempt to preclude inculpatory statements made by co-conspirators including Jean Boustani, Andrew Pearse and Surjan Singh.  The defendant distorts the record and repeatedly claims, in various ways, that this was a "bribe conspiracy."  (ECF No. 584 ("Def. Br.") at 8.)[1]  But as the government has stated all along, and most recently in its opposition to the defendant's motion in limine (ECF No 585 ("Gov't Br. at 7-15)),[2] the government has alleged a single, common wire fraud conspiracy intended to obtain money from investors, namely, loan proceeds

---

[1] The defendant's opposition is replete with references to "bribe conspiracy" and the like, which is simply wrong.  (<u>See, e.g.</u>, Def. Br. at 5 ("There is no evidence that shows, and no reason to believe, that Mr. Pearse and Mr. Singh knew or cared about bribes to Mozambique government officials – and in fact they have made very clear that they were not aware of any such payments, and never joined any conspiracy involving ay such payments."); <u>id</u>. at 7 ("It remains unclear when and how the government intends to prove that Mr. Chang was told that he was in a conspiracy to pay bribes…").)

[2] Given that the defendant makes the same arguments regarding multiple conspiracies in his motion in limine, the government incorporates its opposition brief herein.

for Proindicus, EMATUM and MAM.  (See also ECF No. 573 ("Order") at 10-11 ("object of the fraud was the money investors would put into the project")).[3]

The defendant and his co-conspirators, including other Mozambican officials, bankers, and Privinvest employees, all had one goal: to obtain $2 billion from the banks and other investors.[4]  They wanted to obtain the $2 billion because they intend to divert hundreds of millions of dollars from the loan proceeds to themselves, in the form of bribes and kickbacks, including $7 million to the defendant himself.  In order to obtain the $2 billion, they lied to the banks and other investors, falsely claiming that the loan proceeds would be used solely for the specified projects and that there would be no corrupt acts involved, such as the payment of bribes and kickbacks to parties involved in the deals.  In short, they agreed to lie to get money, and did so by using United States wires, United States banks and United States investors.  That is the charged conspiracy to commit wire fraud.[5]

---

[3] The defendant has also been charged with conspiring to launder funds derived from wire fraud and bribery of a foreign official in violation of Mozambican law, through the United States.

[4] To the extent that the defendant claims that the government did not previously consider the banks to also be investors in the loans, that is incorrect.  See Trial Transcript of United States v. Boustani, 18-CR-681 (WFK) ("Tr.") at 1358 (Pearse) (Q Was Credit Suisse invested, at least in part, in the Proindicus loan? A Yes.); 2061-62 (Leemhuis) (Q Did VTB Capital lend approximately $118 million to Proindicus? A It did. Q When VTB Capital made that loan, was it invested in the loan? A It was. Q Did VTB Capital make a loan of approximately half a billion dollars to MAM? A It did. Q When VTB Capital made that loan, was it invested in the loan? A It was. Or it is.).

[5] The defendant claims that Pearse and Singh are not involved in the conspiracy because they did not bribe Mozambican officials.  The defendant does not appear to understand the charged conspiracy.  There is no charged conspiracy to bribe Mozambican officials.  Privinvest's bribes to Mozambican officials are acts in furtherance of the charged wire fraud conspiracy and the fact that Pearse and Singh were not involved in those acts does not matter; it is black letter law that not every conspirator needs to know what every other conspirator is doing to further the conspiracy.

With that objective in mind, none of the defendant's arguments or attempts to preclude co-conspirator statements or co-conspirator testimony have merit.  The government's motion to conditionally admit co-conspirator statements should be granted.

A.    The Common Object of the Charged Wire Fraud Conspiracy Was To Obtain Money From Investors

As set forth in the government's opposition to the defendant's motion in limine, the Supreme Court has distinguished between conspiracy fact patterns in which members of a broader conspiracy seek to "achiev[e] a single unlawful end" and those in which the alleged coconspirators each pursue "an end in itself, separate from all others, although all [a]re alike in having similar illegal objects."  Blumenthal v. United States, 332 U.S. 539, 558 (1947).  The defendant attempts to analogize this case to Kotteakos v. United States, 328 U.S. 750 (1946) and United States v. Abdelaziz, 68 F.4th 1 (1st Cir. 2023), which fall in the latter camp of conspiracies.  (Def. Br. at 5.) In doing so, he argues that there is no evidence that the co-conspirators "had a goal beyond benefiting him or herself with a bribe or kickback" and that there is no evidence that "any alleged co-conspirator knew, much less cared about, another's alleged bribe or kickback."  (Id.)  The defendant is wrong.  Neither Kotteakos nor Abdelaziz apply to this case.

In Kotteakos, the Supreme Court analyzed a fact pattern in which over 30 defendants were charged in a single conspiracy.  There, the president of a lumber company who had experience in obtaining federal loans acted as a broker and helped defendants fraudulently apply for loans while charging them a 5% commission fee for his services.  Id. at 753.  The defendants each paid the broker to place fraudulent loan applications on his or her behalf, but "no connection was shown between them[], other than that [the broker] had been the instrument in each instance for obtaining the loans."  Id.  Based on these facts, the Supreme Court found that the proof showed the existence of multiple conspiracies, rather than a single overarching conspiracy.

3

Id.; see also Blumenthal, 332 U.S. at 558 (distinguishing Kotteakos because there, except for the "common figure, no conspirator was interested in whether any loan except his own went through").

Similarly, in Abdelaziz, the First Circuit vacated the defendants' conspiracy convictions in the Varsity Blues prosecution because the proof did not show a single overarching conspiracy. 68 F.4th at 40. There, the government had charged the defendants – two separate parents who had paid the college admissions consultant to secure their children's admission as athletic recruits – in a single nationwide conspiracy, alleging that they conspired with the consultant and other parents to facilitate children's college admissions by means of mail and wire fraud, and to secure the children's admission to USC by means of federal programs bribery. Id. at 40. The First Circuit declined to find a single conspiracy because based on the facts of the case, it was not reasonable to infer that "any parents who sought the assistance of the core group shared a goal of getting children other than their own into any university just because they sought such assistance for their own children." Id. at 45-47. Rather, the transaction between the consultant and the defendants were that of a "discrete buyer-seller transaction" in which the defendants sought to obtain their own children's admission and "had no interest in what happened to parents seeking admission at other universities." Id. The First Circuit also found that the government could not prove "interdependence" between the defendants and other parents because the evidence showed that the consultant "brokered such arrangements . . . on an individual basis, with each 'an end to itself' rather than integrated part of a larger conspiracy," id. at 49, and the government could not prove that "the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." Id. at 50.

That is not the case here. The government has never alleged, and the evidence will not show, that each co-conspirator conspired with Boustani to somehow fraudulently obtain their

4

own separate loans such that their relationship with Boustani was akin to that of a buyer-seller. Rather, as the government explained in its opposition brief, this case is exactly the type of single overarching conspiracy the Supreme Court described in Blumenthal, in which all members of conspiracy participated in an "overriding scheme" to defraud investors to obtain commercial funding for Proindicus, EMATUM and MAM. Blumenthal, 332 U.S. at 559 (finding single conspiracy even though defendants "differed on the proof in knowledge and belief concerning the owner's identity" because "[a]ll knew of and joined in the overriding scheme," "[a]ll intended to aid the owner . . . to sell the whiskey unlawfully . . . [and] [a]ll by reason of their knowledge of the plan's general scope, if not its exact limits, sought a common end, to aid in disposing of the whiskey."). At trial, the government will prove that each co-conspirator contributed to that common goal, and that each was, in fact, critical to achieving that goal. The defendant did his part by signing the sovereign guarantees for each of the loans and their respective upsizes; the Credit Suisse cooperating witnesses played their part by coaching the Privinvest and Mozambican officials through the due diligence process for each deal and by lobbying for the deals internally at the bank; and Privinvest played its part by ensuring that all members of the conspiracy got paid for their efforts when the loan proceeds came through. To ensure that the loans would be approved, all of them affirmatively lied, or knew that other co-conspirators would affirmatively lie, to the investors about not receiving any bribes or kickbacks, and about the use of the loan proceeds. Thus, the government will be able to prove interdependence because the "activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme." Abdelaziz, 68 F.4th at 50. While members of the conspiracy may not have known the identity of each and every conspirator, and received different amounts of bribes and kickbacks, they all needed to do their part to obtain the loan proceeds and get paid. See United States v. Rea, 958

F.2d 1206, 1214 (2d Cir. 1992) ("The coconspirators need not have agreed on the details of the conspiracy, so long as they have agreed on the essential nature of the plan."). Thus, there is one single, common wire fraud conspiracy, and the defendant's attempts to recast this case as involving multiple disconnected "bribery" conspiracies should be rejected.

    B.    <u>The Court Should Follow the *Geaney* Approach and Admit the Co-Conspirator Statements Subject to Connection.</u>

        In light of the above, there is no reason for the Court to depart from the <u>Geaney</u> procedure of admitting co-conspirator statements conditionally at trial, which is the well-settled and sanctioned procedure in the Second Circuit. The rule in this Circuit is that courts should permit co-conspirator statements to be conditionally admitted and then the Court "must determine, when all the evidence is in, whether in [its] view the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence." <u>United States v. Geaney</u>, 417 F.2d 1116, 1120 (2d Cir. 1969). "If it has, the utterances go to the jury for them to consider along with all the other evidence in determining whether they are convinced of defendant's guilt beyond a reasonable doubt. If it has not, the judge must instruct the jury to disregard the hearsay or, when this was so large a proportion of the proof as to render a cautionary instruction of doubtful utility . . . declare a mistrial if the defendant asks for it." <u>Id.</u> "Under the <u>Geaney</u> rule, statements proffered as coconspirator statements may be admitted in evidence on a conditional basis, subject to the later submission of the necessary evidence" to establish the prerequisites for admission. <u>United States v. Lopez</u>, No. 18-CR-736 (NSR), 2019 WL 4733603, at *7 (S.D.N.Y. Sept. 27, 2019) (citing <u>United States v. Tracy</u>, 12 F.3d 1186, 1199 (2d Cir. 1993) (holding that the <u>Geaney</u> rule is "clear Second Circuit law")).

        Although the defendant urges the Court to depart from settled practice and follow the approach adopted in <u>United States v. Saneaux</u>, 365 F. Supp. 2d 493 (S.D.N.Y. 2005) ("Saneaux

II"), that case is not applicable here.  Saneaux involved a conspiracy in which the defendants were charged with conspiring to solicit and accept bribes in order to secure subsidized housing for individuals.  Id.  As an initial matter, the court in Saneaux acknowledged that "courts in this circuit continue to adhere to the Geaney protocol."  United States v. Saneaux, 365 F. Supp. 2d 488, 491 (S.D.N.Y. 2005) ("Saneaux I").  The issue that arose in that case was that the government sought to introduce as co-conspirator statements recorded conversations between an unindicted co-conspirator (who worked as an intermediary between prospective tenants and the defendant), a confidential informant, and an undercover agent in which the three individuals discussed securing an apartment through the payment of a bribe.  365 F. Supp. 2d at 496.  In Saneaux II, the court expressed concern that these recordings were not co-conspirator statements made in furtherance of a conspiracy because two of the three participants on the calls were law enforcement or working on behalf of law enforcement, and thus, as a matter of law, could not conspire with the co-conspirator.  Id. at 500-02.  Moreover, the evidence in the case showed that the co-conspirator later proffered to the government that while he intended to take the confidential informant's bribe money, he knew all along that he would not get the informant an apartment.  Id.  Thus, the court found that the evidence showed that the co-conspirator's statement was more likely intended to "advance a unilateral and independent venture" of theft, rather than advancing the goal of the conspiracy.  Id.

Even then, at the motion in limine stage, the court in Saneaux II declined to find the recorded statements inadmissible and agreed to largely adhere to Geaney by allowing the government the opportunity to offer additional evidence at trial.  Id. at 503.  The court departed from Geaney in one respect and precluded the government from admitting the recorded statements subject to connection.  Id. at 504.  Instead, the court directed the government to elicit evidence

7

beforehand to satisfy all prerequisites of admissibility before the recordings were shown to the jury.  Id.  The court, however, made clear that its ruling was limited solely to the recorded statements, and not to any other co-conspirator statements that the government sought to introduce. Id. at 504-05.  Other co-conspirator statements not implicated by the recordings were still "subjected to the traditional Geaney protocol" and subsequently admitted after the trial in the case concluded.  Id.; see also United States v. Saneaux, 392 F. Supp. 2d 506, 516 (S.D.N.Y. 2005) ("Saneaux III") (admitting co-conspirator statements into evidence at close of trial).[6]

Here, there is no need to depart from the traditional Geaney procedure with respect to any of the co-conspirator statements the government seeks to admit.  The government is not seeking to admit conversations with law enforcement who cannot be co-conspirators as a matter of law, as the government did in Saneaux.[7]  Instead, the cooperating witnesses have testified in Boustani, and are expected to testify again, that Privinvest paid them bribes and kickbacks for their insider assistance at Credit Suisse during the loan approval process.  Tr. at 261 (Pearse testifying that he "received kickbacks and unlawful payments in relation to approving those loans"); id. at 2753-54 (Singh testifying that he "also agreed to receive kickbacks from Mr. Jean Boustani" for "lobbying and championing the approvals of" Proindicus and EMATUM).  Documents between Boustani, Pearse, Singh, and other co-conspirators will also reflect this common scheme.  Other evidence, which will be adduced at trial, will further show that the defendant participated in the scheme by accepting bribes and kickbacks for signing the sovereign guarantees without which the loans would not have been approved.  See Geaney, 417 F.2d at 1121 (explaining that while "it is true that almost every one of these items is susceptible of an explanation other than Geaney's

---

[6] The court in Saneaux III did not have an opportunity to rule on admissibility of the recorded statements at issue because the government did not offer those statements at trial.

participation in the conspiracy . . . pieces of evidence must be viewed not in isolation but in conjunction.").

Ultimately, the defense in this case is no different than the defense in any other criminal conspiracy case. The defendant, like many others before him, denies participating in a conspiracy with his co-conspirators. Yet, courts have nonetheless admitted co-conspirator statements subject to connection pursuant to Geaney. See United States v. Loera, No. 09-CR-0466 (BMC), 2018 WL 2744701, at *6 (E.D.N.Y. June 7, 2018) ("When the existence of the underlying illicit conspiracy is disputed, as it is here, courts in the Second Circuit follow the Geaney protocol."). The Court should do so here as well.

C.    The Government's Proof of The Defendant's Criminal Conduct Will Be Consistent With The Law of Conspiracy.

The defendant also raises various arguments to preclude the conditional admission of co-conspirator statements. Many of these arguments, however, are premised on the defendant's belief that the government must prove a fact or element of conspiracy that is simply not required by the law. For that reason, these arguments should fail.

For example, the defendant argues that the government cannot "prove when (and how) Mr. Chang decided to enter into a conspiracy" or "that Mr. Chang was told that he was in a conspiracy to pay bribes, launder money, or including misleading statements in Credit Suisse's investor documents, and entered into a conspiracy to the same." (See, e.g, Def. Br. at 7.) These arguments are baseless. The government has alleged that the defendant conspired to commit wire fraud between January 2011 to December 2018, and that the money laundering conspiracy occurred between January 2013 and December 2018. (Indictment, at ¶¶ 57-59.) To prove these conspiracies, all the government has to prove is that there were conspiracies to commit wire fraud and money laundering during the relevant time periods and the defendant knowingly and willfully

became a member of those conspiracies.  See United States v. Valle, 807 F.3d 508, 516 (2d Cir. 2015).  The government does not need to prove that the defendant "was told" that he belongs to a conspiracy, or that he joined the conspiracy on a specific date.  See United States v. Matos–Peralta, 691 F. Supp. 780, 791 (S.D.N.Y. 1988) (finding courts "consistently reject[ ] demands for particulars as to the formation of a conspiracy or the entry into the conspiracy of a particular defendant" because "the government is not required to prove exactly when or how a conspiracy was formed or when or how a particular defendant joined the scheme").  Indeed, it is well-settled that the government does not need to prove any express or formal agreement or every precise detail of the conspiracy scheme.  Rather, the government just has to prove that there is a mutual understanding, either spoken or unspoken between two or more people to accomplish an unlawful act.

The defendant also repeatedly argues throughout his opposition that the government "does not have appropriate sponsoring witnesses with firsthand knowledge of many of the communications it is attempting to describe to the jury as 'bribes.'" (See, e.g., Def. Br. at 9.)  That is not true.  The government's cooperating witnesses will confirm in their testimony that they did in fact receive kickbacks and bribes from Boustani and that, among other things, Najib Allam (Privinvest's CFO) helped them fraudulently set up bank accounts in the UAE to receive the payments[8] – which corroborates emails and documents with Boustani and/or Allam discussing the same.  The fact that the witnesses did not personally know the defendant was also receiving

---

[8] The defendant also claims that "the government does not explain *how* it intends to show that" Allam helped members of the conspiracy, including Pearse, Singh and Subeva fraudulently set up bank accounts in the UAE so that they could surreptitiously deposit bribe payments into those accounts. (Def. Br, at 10.)  This argument purposefully overlooks the fact that the government provided transcript references to the Boustani trial setting forth the testimony that establishes these facts in its opening brief.  (See Gov't Br. at 13, n.4.)

bribes and kickbacks at the time does not preclude the government from proving conspiracy. A conspiracy can be shown based on circumstantial evidence alone. United States v. Krivoi, 80 F.4th 142, 156 (2d Cir. 2023). See also United States v. Anderson, 747 F.3d 51, 61 (2d Cir. 2014) ("Circumstantial evidence may be used to prove specific intent to commit the object of a conspiracy, as it may to prove agreement to join the conspiracy."); United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002) ("[T]he prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt."); United States v. Siembida, 604 F. Supp. 2d 589, 595 (S.D.N.Y. 2008), aff'd sub nom. United States v. Price, 374 F. App'x 189 (2d Cir. 2010) (denying motion for judgment of acquittal on wire fraud conspiracy count because the government's case – even though the evidence was circumstantial and no cooperator testimony was presented – was more than sufficient to sustain a conviction).

Thus, any argument that the government needs to prove its case in a manner beyond what the law requires should be rejected.

D.    The Government Can Independently Corroborate The Reliability of Co-Conspirator Statements

The defendant also alleges that there is no evidence that independently corroborates his participation in a criminal conspiracy to defraud investors. (Def. Br. at 6.) That is not true. As an initial matter, the Court may consider hearsay statements provided there is "some independent corroborating evidence of the defendant's participation in the conspiracy." United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999) (emphasis added). In cases where "the hearsay evidence itself so convincingly implicates the defendant, a district court may require less corroboration to find by a preponderance of the evidence that the defendant participated in the conspiracy for purposes of admitting co-conspirators' statements against him." United States v. Padilla, 203 F.3d 156, 162 (2d Cir. 2000) (district court properly relied on a note from a co-

11

defendant to a witness regarding suborning perjury, in which the note referred to the main defendant by his alias, to establish both the "in furtherance of a conspiracy" prong and as independent corroborating non-hearsay evidence of the relationship between the two defendants); see also United States v. Perez, 702 F.2d 33, 36 (2d Cir. 1983) ("Although each item of evidence itself may not be dispositive proof that [the defendant] was a co-conspirator, "such pieces of evidence are to be viewed not in isolation but in conjunction.").

Here, as set forth in the government's opening brief (Gov't Br. at 10-35), hearsay statements alone more than sufficiently establish that the defendant participated in the conspiracies. Ledgers prepared and maintained by co-conspirator Allam identify the defendant, his co-conspirators, and the amounts of bribes and kickbacks paid to them. (Id.) Emails between Allam and Boustani also refer to payments to the defendant, including how much to pay the defendant, when to pay him, and how to pay him. (Id.) There is also more than sufficient independent corroboration of these statements. For one, these documents, at times, refer to the defendant as "Chopstick" and other aliases – personal information that will be confirmed by the government's witnesses. Moreover, contract documents and wire records will show that after the defendant signed the government guarantees and the loan proceeds were paid out for each transaction, Privinvest paid $7 million (the exact dollar amount that was promised to the defendant by his co-conspirators in the emails) to the defendant through Thyse International and Genoa Assets bank accounts – companies that were identified as being associated with the defendant in the co-conspirator emails. See United States v. Best, 219 F.3d 192, 199 (2d Cir. 2000) ("Corroboration of the nature of the transaction . . . may be provided by circumstantial evidence."). The volume of inculpatory evidence here is simply not akin to the case the defendant cites, United States v. Abu-Jihaad, 531 F. Supp. 2d 289, 296 (D. Conn. 2008), in which the only evidence of the

defendant's participation in a conspiracy at the time the [co-conspirator] statements were made were based on the hearsay statements itself.[9]  Thus, there is no basis for the Court to preclude co-conspirator statements on the grounds that they are unreliable.

      E.    <u>Co-Conspirator Statements Made Throughout The Conspiracies, Including From 2011 and 2012, Are Admissible Against the Defendant</u>

The defendant also erroneously claims that the Court should not admit (1) statements between co-conspirator Jean Boustani and co-defendant Teofilo Nhangumele in 2011 and 2012 negotiating bribe payments to Mozambican officials in exchange for approving the Proindicus contract for Privinvest (and other co-conspirator statements purportedly predating the defendant's participation in the conspiracy); (2) statements between co-conspirators and co-defendants Pearse, Detelina Subeva and Antonio Do Rosario regarding the increase of the EMATUM loan; and (3) co-conspirator statements made "after bribes were paid and/or promised" (Def. Br. at 8, 7-12.)  In support of his argument, the defendant claims that first, he was not a member of the conspiracy in 2011 and 2012; second, Pearse, Singh and Subeva were not part of a conspiracy to bribe the defendant and other Mozambican officials, and Do Rosario was not part of a conspiracy to defraud investors; and third, that the object of the wire fraud conspiracy is "bribery" and thus, co-conspirators statements made after the conspiracy has achieved that goal cannot be admitted.  (<u>Id.</u>)  All of these arguments are completely without merit.  Contrary to the defendant's assertions, the evidence will show that the defendant was a member of the charged conspiracy in 2011 and 2012, and in any event, statements made by co-conspirators prior to the defendant formally joining are still admissible against him in this case.  The third argument also fails because, again, the defendant misunderstands the charged conspiracies.

---

[9] Importantly, the government in <u>Abu-Jihaad</u> had acknowledged that it had no independent corroborating evidence of any existing conspiracy between the defendant and the declarant during the time period when the statements at issue were made.  531 F. Supp. 2d at 297-98.

As an initial matter, as discussed above in Section I, the defendant's arguments here rest on a fundamental misunderstanding of the charged wire fraud conspiracy. For example, his assertion that Pearse, Singh and Subeva were not part of the "conspiracy" to bribe Mozambican officials, mischaracterizes the Indictment and the case. No one is charged with a conspiracy to bribe Mozambican officials. The purpose of the wire fraud conspiracy was to lie to investors to obtain the loans. See Indictment (Count One). Similarly, the defendant's claim that Do Rosario was not involved in a conspiracy to defraud investors is wrong. The evidence at trial will show that Do Rosario, who signed all of the loan agreements for Proindicus, EMATUM and MAM, knew they contained false statements about the use of proceeds and corrupt payments because he himself accepted bribes and kickbacks once the loans issued, as well as conspired to make these material misrepresentations to obtain the $2 billion in loans in the first place.

First, the evidence at trial will show that the formation of the conspiracy began as early as 2011, as the first Proindicus contract started taking form. Email communications between Boustani and other members of the conspiracy will also show that the highest levels of the Mozambican government were involved in the contractual negotiation process from the start. As set forth in the government's opening brief (Gov't Br. at 18-19), Boustani and Nhangumele and other co-conspirators began discussing the inception of the Proindicus project and the payments of bribes and kickbacks to Mozambican officials to get the project approved as early as 2011. Specifically, during this time, Privinvest, through Boustani, approached Nhangumele (a representative from the Office of the President) about building an Economic Empowerment Zone or EEZ, which would take advantage of Mozambique's coastline. Privinvest would provide ships and coastal monitoring equipment for the EEZ, allowing the Mozambique government to monetize

its lengthy coastline and protect commercial shipping.  The project would later be called Proindicus.

Between 2011 and 2012, Boustani had numerous discussions with Nhangumele about how to procure this government contract.  During those discussions, Privinvest agreed to pay bribes to Mozambique government officials as "success fees" in order to get the Proindicus project approved.  For example, in November 2011, Nhangumele broached the subject of bribe payments before the President of Mozambique could give approval: "To secure that the project is granted a go-ahead by the HoS [head of state], a payment has to be agreed before we get there, so that we know and agree, what out to be paid and when."  (See Ex. A.)  In response, Boustani readily agreed to pay bribes, referencing it as part of Privinvest's usual course of dealing: "Our group operates with the principal of 'success fee' in favor of our local Partners which will be added to the final project value."[10]  (Id.)

After agreeing to pay bribes, Boustani and Nhangumele discussed how to fund the EEZ project.  As Nhangumele stated curtly, "I can guarantee you there is no budget allocation for this project as we speak now," reminding Boustani that "Mozambique is a third world country whose state budget is 50% covered by Breton Woods institutions," such as the International Monetary Fund ("IMF").  (See Ex. B.)  In response, Boustani told Nhangumele that he would talk to "our bankers to see 'what can be done.'"  (Id.)  These statements highlight the interdependence

---

[10] Boustani's use of the word "Partners" for individuals who are being bribed is highly probative and corroborated by other evidence in the case.  For example, as set forth in the government's motion (Gov't Br. at 11-12), Privinvest CFO and co-defendant Najib Allam kept a ledger of bribe and kickback payments and under the EMATUM tab, it lists the defendant, Do Rosario, Isaltina Lucas, Pearse and Singh as "Partners" and then lists the bribe and kickback payments to them.

of the three groups of co-conspirators in this case, and how, as early as 2011, the larger objective of the conspiracy was about securing loans from the banks.

Email communications will further show that in December 2011, Nhangumele tells Boustani that they need to determine the amount of the bribes because "I can't push my board to publish any figure without adding the stake holders portion. I need a % or figure." (See Ex. C.) This shows that Nhangumele is negotiating on behalf of senior Mozambican officials – that is, the "stake holders." Indeed, Pearse will testify that Boustani told him that he was dealing primarily with three "stake holders": Armando Guebuza (the President of Mozambique), the defendant (the Minister of Finance), and Filipo Nyusi (the former Minister of Defense and now current President of Mozambique). In that same conversation, Nhangumele makes a request for $50 million in bribes, again referencing his consultation with Mozambican officials: "I have consulted and please put 50 million chickens. Whatever numbers you have on your poultry I will add 50 million of my breed." (Id.) The defendant forwards this email to other Privinvest employees, directing them to include,"50M for them and 12M for Bassy (5%)==> total of 62M on top." "Bassy" refers to Basetsana Thokane, who arranged the meetings with Rosario and Nhangumele. (See Ex. D.) Pearse is expected to testify that he met Bassy and understood that Bassy was a former South African intelligence operative who helped Privinvest source projects in Africa.

Email communications with Boustani will further show that Boustani ultimately proposes a new budget for Proindicus to Guebuza that includes $65 million for "Partners." (See Ex. E.) In January and April 2012, to paper the bribes, Boustani sends Nhangumele a fake consultancy agreement for $12 million. (See Exs. F, G.) Pearse is expected to testify that he (Pearse) received a fake consultancy agreement for some of his kickback payments, and that Boustani told him that Nhangumele was paid millions of dollars for the initial Proindicus loan.

16

Email evidence at trial will show that other members of the conspiracy were asked for "papers" (i.e., fake invoices) to legitimize their bribe and kickback payments but that the defendant (who is referred to in these email as "Pantero" and "Chopstick") refused to provide one.  (See Exs. H, I.)

While these bribe negotiations were occurring between Privinvest and Mozambican officials (see Ex. J), email communication will show that Boustani was in discussions with Credit Suisse, including with Singh, the government's other cooperating witness, to secure a loan for Mozambique for the EEZ project.  (See Exs. K, L.)

Emails in 2011 and 2012 will further show that the defendant was deeply involved in the negotiations of the Proindicus loans, and that he communicated with Privinvest and Credit Suisse through other Mozambican officials, such as Nhangumele and Do Rosario (the CEO of Proindicus, EMATUM and MAM).  (See Ex. M.)  For example, in September 2012, Nhangumele informed Boustani that the defendant approved a letter of award to Privinvest, subject to procuring financing for Proindicus from Credit Suisse, and attached the letter from the defendant.  (Id.)  From then on, the email communications will show that the defendant, Nhangumele, Do Rosario and Credit Suisse bankers, including Pearse, Singh, and their team, worked together to close the Proindicus loan.  Email communications also show that this negotiation process is repeated for the Proindicus upsizes, and for the EMATUM and MAM loans.  For each loan and loan increase, the defendant signed a government guarantee.[11]  Pearse and Singh will also testify that they met with

---

[11] Contractual documents will show that the defendant signed the government guarantee for the Proindicus loan agreement for approximately $372 million in February 2013; the government guarantee for the loan agreement that increased the Proindicus loan to approximately $622 million in June 2013; the government guarantee for the EMATUM loan agreement for $850 million in August 2013, the government guarantee for the MAM loan agreement for approximately $540 million in May 2014; and the government guarantee for the loan agreement that increased the Proindicus loan a third time to $900 million in December 2014.

the defendant regarding the Proindicus, EMATUM and MAM loans before the defendant signed the government guarantees for those loans. The government will also prove that the defendant received bribe and kickback payments after the loans for Proindicus, Proindicus upsizes, and EMATUM are executed, and show ledger entries indicating an anticipated that he was set to receive another bribe payment in connection with MAM.

In light of the above, the government has set forth a preponderance of evidence to establish that (1) the defendant was involved in the conspiracy from the start, (2) that the defendant and the declarants of the emails he seeks to exclude (e.g., Boustani, Nhangumele, Do Rosario) are part of the same conspiracy to obtain the $2 billion in loans, and (3) their respective statements during this time were made during and in furtherance of the conspiracy.[12]

Even so, the government does not need to prove that the defendant joined the conspiracy at the same time as the declarant in order to rely on Rule 801(d)(2)(E). In United States v. Badalamenti, 794 F.2d 821 (2d Cir. 1986), the Second Circuit concluded that co-conspirator statements made before a defendant joined the scheme was nonetheless admissible because "[i]t is reasonable to expect that a 'new recruit can be thought to have joined with an implied adoption of what had gone on before to enhance the enterprise of which he is taking advantage,' where, as here, there is 'sound reason to believe that he joined when he was generally aware of what his new

---

[12] To the extent that the defendant argues that the government cannot introduce statements made by the defendant or other conspirators that related to "project logistics" because those logistics were "not illegal," (Def. Br. at 11-12), that is also wrong. Co-conspirator statements do not have to discuss "illegal" activities in order to be admitted under Rule 801(d)(2)(E) – the standard is whether the co-conspirator statement was made during and in furtherance of the conspiracy. As the government argued in its opening motion, statements that "prompt[] the victim 'to respond in a way that promotes or facilitates the carrying out of a criminal activity,' i.e., by wiring money or confirming the status of the money that was wired" are still statements made in furtherance of the conspiracy. (Gov't Br. at 21 (quoting United States v. Adelekan, 567 F. Supp. 3d 459, 468 (S.D.N.Y. 2021))).

partners had been doing and saying on behalf of the enterprise.'"  Id. at 828; see also Adelekan, 567 F. Supp. 3d at 466-67 (in a conspiracy to commit wire fraud and money laundering using e-mail scams, "statements may be admitted against [defendant], even though he was not a member of the conspiracy at the time the statements were made, on the theory that he assumes the risk for what has already happened in the scheme" (citing United States v. Farhane, 634 F.3d 127, 161 n.35 (2d Cir. 2011) (internal quotation marks omitted)).  Moreover, the Second Circuit "[has] never required a statement to be disseminated to each member of the conspiracy in order to be admissible against the whole."  United States v. Coplan, 703 F.3d 46, 82 (2d Cir. 2012); see also Adelekan, 567 F. Supp. 3d at 467 (noting that in any case, "in proving the existence of a conspiracy . . . proof of multiple small conspiracies may suffice for purposes of Rule 801(d)(2)(E)") (citation omitted)).

Even assuming the defendant joined the conspiracy after the declarant, there is "sound reason" to believe that the defendant was aware of what his co-conspirators were doing and saying on behalf of the enterprise when he joined the conspiracy.  Indeed, subsequent emails sent between Boustani and Allam in 2014 and other times during the charged conspiracy will show that of the $65 million Boustani and Privinvest reserved for "Partners," $7 million was contemplated for "Chopstick" – the defendant – and the rest to other co-conspirators in the scheme.  (See Ex. N.)  And as discussed above, wire records will demonstrate that this amount was distributed to the defendant through entities associated with him.  See, e.g, United States v. Kidd, No. 20-CR-572 (NSR), 2022 WL 15317483, at *2 (S.D.N.Y. Oct. 27, 2022) (statements made by co-conspirators arranging a drug transaction are admissible against the defendant because while he was not part of the communications, he later participated in the transaction and thus had "general awareness of what [his co-conspirators] 'had been doing and saying'").

19

Second, the defendant's argument precluding statements made after bribes are paid and/or promised should also be rejected. (Def. Br. at 8-9.) The defendant alleges that because the purported "bribery" goal was attained, the government cannot introduce co-conspirator statements pertaining to a "subsidiary conspiracy to conceal." (Id.) While the contours of the defendant's argument are not quite clear, to the extent that the defendant argues that communications amongst the co-conspirators about concealing the bribe and kickback payments to the defendant and other members should be precluded, that argument must also fail. The defendant has been charged with conspiring to launder money between 2013 to 2018, and the conspiracy's objectives included concealing the nature and source of the wire fraud and bribery proceeds. As set forth in the government's opening brief, at various times during this time period, co-conspirators Allam, Boustani, Do Rosario, and others discussed when and how to transmit money to the defendant, including by sending money to companies that were not in the defendant's name to conceal the payment. (Gov't Br. at 26-29.) These statements are directly probative of the charged money laundering conspiracy, and were made during and in furtherance of that conspiracy. Thus, the government should be permitted to conditionally admit these are other similar co-conspirator statements.

F.    Accounting Spreadsheets and Ledgers Made and Prepared by Co-Conspirators Are Admissible.

The defendant raises several challenges to accounting spreadsheets and ledgers made by co-conspirators that the government intends to admit at trial, none of which have merit.

First, with respect to GX 2808 and 2808A — an accounting spreadsheet that Allam sent to himself in November 2014, which was admitted in Boustani, that identifies the payments made to the defendant and other co-conspirators in connection with the three projects — the defendant argues that the document is inadmissible because Allam "does not have knowledge of

20

this document's content and is not testifying at trial" and the government "does not have any witness with firsthand knowledge of the document's content" or a witness "who can properly testify to the alleged 'codes.'"[13]  These are not legitimate bases to preclude the admission of co-conspirator statements.

        The government is not required to call Allam (or any declarant) to testify in order to admit these documents into evidence.  The documents are relevant and may be authenticated by certification, as set forth in the government's opening brief.  (Gov't Br. at 72-75.)  They also satisfy the nonhearsay exception of being co-conspirator statements made in furtherance of the conspiracy, and as set forth below, statements against penal interest.  As the government set forth in its opening brief, accounting spreadsheets and ledgers tracking criminal payments to co-conspirators further the operations of the conspiracy and satisfy the hearsay exception.  (Gov't Br. at 13-15 (collecting cases).)  And contrary to the defendant's assertions, these documents – which identify the defendant and members of the conspiracy and their payments – do reflect an "illicit" association between the defendant and his co-conspirators, and a jury can draw reasonable inferences from these documents about the defendant's participation in the conspiracy.  Thus, there is no basis to preclude GX 2808 and GX 2808A.[14]

---

[13] Perplexingly, the defendant also argues that the spreadsheet is not a "statement."  (Def. Br. at 13.).  If that were the case, the document would not implicate any hearsay concerns.

[14] The cases that the defendant cites are inapposite.  (See Def. Br. at 13.)  In both Munoz v. United States, No. 07-CV-2080 ILG, 2008 WL 2942861 (E.D.N.Y. July 28, 2008) and United States v. Kaplan, 490 F.3d 110, 119 (2d Cir. 2007), the issue was whether a witness could offer lay opinion testimony about the defendant's knowledge of the crime or lay opinion testimony about code words.  Here, the government is not seeking a ruling as to whether a witness can speak about the ledger, but whether the ledger itself can be conditionally admitted as a co-conspirator statement under Rule 801(d)(2)(E).

Second, the defendant also argues that the government cannot introduce a spreadsheet from November 2014 which elaborates on the information in GX-2808 and 2808A (the "November 2014 Ledger") (see Gov't Br. Ex. C) as a co-conspirator statement. Instead of citing any law on this point, the defendant instead offers a litany of conclusory statements that are contradicted by the November 2014 Ledger itself. For example, the defendant claims that the ledger is inadmissible because "Ms. Senanayake is not testifying at trial," "the records do not memorialize bribes," and "the government cannot show they were made by co-conspirators." (Def. Br. at 14-15.) Again, the government is not required to call Senanayake to testify in order to admit the document into evidence. Moreover, as the government set forth in its opening brief (Gov't Br. 15-18, 29), it can show the provenance of this document. The government can prove that the November 2014 Ledger was produced by Privinvest during discovery in the U.K. Proceeding, and the document itself shows that the "author" was Ayomin Senanayake,[15] who worked for Allam. (See Gov't Br. at 15-17, 29-32.) The contents of this spreadsheet also make clear that it contains statements made by co-conspirators in furtherance of the conspiracy – the ledger has even more details about bribe and kickback payments to the defendant, including the fact that he was paid million dollars in connection with EMATUM and that certain of those payments were paid to him through Thyse International (Gov't Br. at 15-17.) The information in this ledger is also independently corroborated by the wire records in this case, and thus, admissible.

---

[15] The defendant also argues that the government has not noticed any expert testimony such that a witness could testify about the document's metadata. (Def. Br. at 14.) The government does not intend to offer any opinion about what metadata is, and thus, no expert testimony is required. The government's witness will simply testify as to what the document properties say, as they are reflected on the document itself. That is not expert opinion.

Moreover, despite the defendant's contentions, the 2017 email between Allam and Senanayake (and its attachment identifying the defendant's wife as a "consultant" of the Mozambique project, and other known co-conspirators) are equally admissible.  (See Gov't Br, Exs. D-1, D-2)  The defendant's assertion that there is "nothing on the face of the email to suggest" that this communication is a co-conspirator statement is just not true.  The email clearly shows Allam asking Senanayake for an accounting of payments made to certain "consultants" of the Mozambique project, to identify all payments that were made "directly" to the consultants and to distinguish those payments from payments to "a company name or a lawyer or whatever," and – reflect awareness of its inculpatory character – to keep the information private because it is "extremely confidential." (Id.)  The list of "consultants" includes, among others, the defendant's wife and other known co-conspirators such as Nhangumele, Do Rosario, Armando Guebaza and his son. (Id.)  These communications were made during and in furtherance of both the wire fraud and money laundering conspiracies – they further the conspiracy by tracking and monitoring direct and non-direct payments to known co-conspirators and show that as one laundering method, the conspirators are sending fraud and bribery proceeds to the defendant through his wife.  See, e.g., United States v. Amato, 15 F.3d 230, 235 (2d Cir. 1994) (records listening the name of members and payment amounts were "necessary to monitor and conduct the loansharking operation").

Finally, the defendant also argues that the government cannot rely on United States v. Millan-Colon, 836 F. Supp. 1007 (S.D.N.Y. 1993), in support of its argument to admit the ledgers and spreadsheets as co-conspirator statements.  (Def. Br. at 15.)  The defendant claims that Millan-Colon is distinguishable because there, although the identity of the author of the drug records is unknown," the records "were seized from a defendant's residence upon his arrest, listed the names and a photograph, as well the phone and beeper numbers of several of the defendant's

co-conspirators" and found in close proximity to cash, drugs, and guns.  (Id.)  Defendant further claims that the facts of Millan-Colon sharply contrasts with the "untethered records and spreadsheets" the government seeks to introduce here.  (Id.)  The defendant is wrong.

Here, the facts surrounding the accounting records and spreadsheets are comparable, or even stronger, than in Millan-Colon.  For example, unlike Millan-Colon, where the identity of the authors of the drug records was "unknown," 836 F. Supp. at 1015, the government has set forth facts to establish, beyond a preponderance of evidence, the identity of the authors of the ledgers and spreadsheets at issue.  As the government argued in its opening brief, the documents show that Allam (a co-conspirator who has also been indicted in this case) authored and maintained GX 2808 and 2808A and that his fellow Privinvest employee, Senanayake, similarly authored the November 2014 Ledger.  (See Gov't Br. 10-17.)  Moreover, Allam himself sent both GX 2808 and 2808A to his personal email account, and the metadata of GX 2808A shows that Allam is its author.  Similarly, for the November 2014 Ledger, evidence will show that Privinvest produced this document during discovery in the U.K. Proceeding and the metadata lists Senanayake as the author.  (See Gov't Br. at 29.)  Moreover, like Millan-Colon, the document's content more than "suggests that the documents were authored by one or more of the alleged co-conspirators." 836 F. Supp. at 1015.  The records and ledgers here list the defendant by name and plainly references payments to him, as well as the names/aliases of other known co-conspirators and their associated payments.

Thus, the government has met its burden to admit these statements under Rule 801(d)(2)(E), and the Court should admit the documents subject to connection.

II.    The Rule of Completeness Does Not Permit the Defendant to Offer His Statements and Other Co-Conspirator Statements

The defendant further argues that he should be permitted to introduce "his statements or other evidence" under the rule of completeness. (Def. Br. 19-20.) To the extent that the defendant believes he can offer any statements he wishes under this rule, he is incorrect. "Rule 106 permits the inclusion of hearsay testimony only where it is 'essential to explain an already admitted document, to place the admitted document in context, or to avoid misleading the trier of fact.'" United States v. Gotti, 457 F. Supp. 2d 395, 397-98 (S.D.N.Y. 2006). However, "[t]he rule of completeness is 'not a mechanism to bypass hearsay rules for any self-serving testimony.'" United States v. Blake, 195 F. Supp. 3d 605, 610 (S.D.N.Y. 2016) (quoting United States v. Gonzalez, 399 F. App'x 641, 645 (2d Cir. 2016) (summary order)). Accordingly, the doctrine of completeness "does not [] require the admission of portions of a statement that are neither explanatory of nor relevant to the admitted passages." United States v. Kopp, 562 F.3d 141, 144 (2d Cir. 2009); see also United States v. Lange, 834 F.3d 58, 79 (2d Cir. 2016) (holding that the "omitted statements were generally post-hoc explanations for prior conduct, which did not alter the meaning of the admitted redacted portion" and thus not necessary to be admitted).

As the government noted in its opening brief, the defendant may not "attempt to get [his] side of the . . . story in front of the jury without himself testifying and opening himself up to cross-examination." United States v. Davidson, 308 F. Supp. 2d 461, 480 (S.D.N.Y. 2004); see also United States v. Marin, 669 F.2d 73, 84 (2d Cir. 1982) ("When the defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible."). Thus, at trial, the government respectfully requests that the Court preclude any improper use by the defendant of the doctrine of completeness to admit statements that do not comply with the rules of evidence.

III.    The Government Should Be Permitted to Authenticate the Privinvest Documents Through the Testimony of Privinvest's Former Counsel and Admit the Privinvest Documents as Co-Conspirator Statements

In arguing about the Privinvest Documents from the U.K. Proceeding, the defendant conflates two distinct evidentiary issues—authenticity and admissibility—throughout his opposition. As the Court is aware, for evidence to be admitted, it must be first authenticated, and then once authenticated, may be admitted if relevant, not unduly prejudicial, and satisfies one of the rules for admissibility. Thus, the government will address each issue — authenticity and admissibility — for the Privinvest Documents separately.[16]

A.    The Privinvest Documents Can Be Authenticated In the Proffered Manner.

The defendant claims that the Privinvest documents cannot be authenticated by the testimony of Privinvest's former counsel, Katie Reith, who represented Privinvest during the collection of these documents from Privinvest, had a vendor upload them to a database, and personally reviewed the Privinvest Documents on the database, and from Pearse's counsel, Rupert Butler, who received them from Privinvest and Boustani in court-ordered discovery, because (1) they have no "first-hand knowledge" that these "records discuss or are details of bribe

---

[16] With respect to the defendant's claim that the government has violated its <u>Brady</u> obligations by not obtaining additional documents from the U.K. Proceeding, (Def. Br. at 20-21), the government refers to both of its oppositions to the two motions to compel such documents, <u>see</u> ECF Nos. 570 & 587, the Court's order denying the first motion to compel, ECF No. 573, and to its argument at the June 13, 2024, status conference. In short, it is well-settled law that "[a] prosecutor is not constitutionally obligated to obtain information dehors his files for the purpose of discovering information which defense counsel can use in impeaching the credibility of a prosecution witness." <u>Morgan v. Salamack</u>, 735 F.2d 354, 358 (2d Cir. 1984). Instead, the government is obligated to produce information that it possesses at the time of trial. <u>Id.</u> (citing <u>United States v. Agurs</u>, 427 U.S. 97 (1976)). "<u>Brady</u> does not require the government to search for exculpatory material not within its possession or control." <u>United States v. Raniere</u>, 384 F. Supp. 3d 282, 325 (E.D.N.Y. 2019).

payments"; and (2) attorney-client privilege prevents fulsome cross-examination of Ms. Reith by the defendant.  (See Def. Br. at 22-23).  Neither of these arguments has any merit.

First, the government agrees that Ms. Reith and Mr. Butler are not members of the charged conspiracy, and they cannot testify that the Privinvest Documents are documents discussing bribe payments to the defendant.  But that is wholly irrelevant to their anticipated testimony.  The government is not calling Ms. Reith or Mr. Butler to interpret these documents; they are testifying to their authenticity.  In order to authenticate documents, an individual need not be a member of the charged conspiracy or have first-hand knowledge of the charged crimes.  Just as a bank witness would not know that the wire records he or she is authenticating are bribe payments, there is no legal requirement that Ms. Reith or Mr. Butler know that the Privinvest Documents are discussing bribes.  There is no law to support this incredulous argument, and the defendant cites none.[17]

The defendant does cite the Second Circuit's decision in United States v. Vayner, 769 F.3d 125, 130 (2d Cir. 2014), but that case has nothing to do with the defendant's erroneous contention that an authenticating witness must have first-hand knowledge of the charged criminal conspiracy.  In Vayner, the Second Circuit held that a webpage with information about the

_____

[17] The defendant appears to be confused about Rule 901 when he says that there should be "evidence sufficient to support a finding that the item is what the proponent claims it is."  (Def. Br. at 23).  The defendant, in conflating authenticity and admissibility, somehow thinks that the authenticating witness must also be a co-conspirator because the government is seeking to admit these documents as co-conspirator statements.  That is obviously not the case.  The government is authenticating these documents as documents from Privinvest – that is what the "proponent claims" the items are.  Once authenticated, they can be separately admitted as co-conspirator statements, as discussed supra Section I.B.  Indeed, the Court should preclude any cross-examination of Ms. Reith and Mr. Butler about the underlying charged crimes because it would be completely beyond the scope of their testimony, not relevant and unduly prejudicial and confusing to the jury.

defendant could not be authenticated without more information about who created it or where it came from. See id. That is not the case here. To the contrary, Ms. Reith will testify that she represented Privinvest at the time these documents were collected, her law firm, Quinn LLP, hired a vendor to collect the documents onsite based on custodians and search terms Quinn LLP provided, the vendor uploaded the documents to a database, and she personally reviewed these documents from that database.[18] This is a far cry from the unidentified and unsourced webpage on the internet in Vayner.

Second, nothing in Ms. Reith's anticipated testimony implicates attorney-client privilege. The fact that documents produced in discovery were once collected is not privileged. The fact that a vendor collected them is not privileged, the fact that they were uploaded to a database is not privileged and the fact she reviewed these documents is not privileged. Thus, all the topics that she would testify about and be subject to cross-examination about are not privileged.

Finally, the defendant attempts to distinguish one of the many cases that the government cites in its motion, Com. Data Servers, Inc. v. Int'l Bus. Machines Corp., 262 F. Supp.

---

[18] In addition, Mr. Butler will then testify that he received these documents from Privinvest and Boustani in discovery. The defendant claims the government intends to have Mr. Butler testify about what was said in the U.K. Proceeding and to what Pearse said in the U.K. Proceedings but does not cite the government's motion. It is unclear what the defendant is referring to as the government's motion sets out Mr. Butler's anticipated testimony: "At trial, the government anticipates that Mr. Butler will testify that he received the Privinvest Documents from either Privinvest or Jean Boustani in discovery in the U.K. Proceeding. Mr. Butler's testimony is corroborated by discovery production cover letters from Privinvest's and Boustani's counsel (attached as Exhibits E-1, E-2, and E-3) as well as the bates-numbers on the documents that correspond to the discovery productions described in the cover letters." (Gov't Br. at 28). Regardless, the government does not intent to elicit testimony from Mr. Butler about what was said in the U.K. Proceeding or in any of the filings by Pearse or anyone else and the defendant similarly should not permitted to cross-examine Mr. Butler on what was said in the U.K. Proceeding or in any of the filings by Pearse or anyone else, or any discussions Mr. Butler (or any of Pearse's lawyers) had with Pearse about the filings.

2d 50, 58 (S.D.N.Y. 2003).  In that case, the court found that certain documents produced in discovery by the plaintiff to IBM could be authenticated by a declaration from IBM's counsel that they were produced in discovery to IBM.  See id.  The defendant claims in his opposition that the government "failed to disclose" that these documents were previously "'***authenticated by the sworn Declaration' of that party's employee*** who had been employed for twenty-two years and attested on the basis of firsthand knowledge that the documents were true and complete copies of documents maintained by the company in the regular course of business."  (Def. Br. at 24) (emphasis in original) (citing Com. Data Servers, Inc., 262 F. Supp. 2d at 60).  That is incorrect. The defendant is actually citing to a ruling by the court in that case on a completely different set of documents that were produced by IBM itself and had an accompanying declaration from IBM. See Com. Data Servers, Inc., 262 F. Supp. 2d at 60.  Therefore, the government did not fail to disclose this fact, as defense counsel improperly suggests; rather, defense counsel failed to read the case carefully and miscited it to the Court.

B.    The Privinvest Documents Should be Admitted Conditionally as Co-Conspirator Statements

Although the defendant acknowledges that the government intends to admit the Privinvest Documents "as co-conspirator statements," the defendant somehow also claims, "it is not clear under what exception to the hearsay rule the Government relies."  (Def. Br. at 25).  As the government explained in its opening brief, all nine Privinvest Documents are admissible as co-conspirator statements.  (Gov't Br. at 27-33).  Rather than addressing the government's arguments, the defendant claims erroneously that the government is admitting the Privinvest Documents as business records and then argues they are not.  (Def. Br. at 25-27).  The government is not seeking to admit these records under the hearsay exception for business records but as co-conspirator

statements and/or statements against penal interests for the reasons outlined in its opening brief, and as discussed herein. (Id.).[19]

## IV.   All of the Co-Conspirator Statements Are Separately Admissible As Statements Against Penal Interest

The defendant asserts that the government cannot admit certain records and statements as statements against penal interest under Rule 804(b)(3). (Def. Br at 16-19.) These arguments are meritless.

In its opening brief, the government set forth three categories of records and statements that, in addition to qualifying as co-conspirator statements, would also be separately admissible under Rule 804(b)(3): (1) GX 2808 and 2808A, which are, respectively, a November 2014 email that co-conspirator Najib Allam sent to his personal email address from his Privinvest email address, and an accounting spreadsheet entitled "Ematum – Group Cash Position," which was attached to the email and, among other entries, details bribe payments to the defendant and his co-conspirators (Gov't Br. at 10-15; id. Exs. A-B); (2) other Privinvest spreadsheets and ledgers which are not attached to emails, including a spreadsheet created in November 2014 that identifies the defendant by name and lists the amount of the bribes he was paid and the bank accounts to which the money was sent (the "November 2014 Ledger") (id. at 15-18; id. Ex. C); and (3) statements in emails sent from co-conspirator Jean Boustani regarding bribe payments to Mozambican officials, the defendant and the guarantees he provided in furtherance of the conspiracy, and representations to the banks and investors (id. at 18-22).

---

[19] The defendant contends that Mr. Butler should not testify about the entities and amounts involved in the bribe payments in the Privinvest Documents. Again, it is unclear where the government has made such a representation as the defendant does not cite the government's motion but obviously, Mr. Butler is not going to be testifying about which entities received bribe payments as he is not involved in the charged conspiracy.

Rule 804(b)(3) allows the admission of statements against a declarant's proprietary, pecuniary, or penal interest if the declarant is unavailable as a witness.  As an initial matter, the defendant does not dispute that the declarants of these statements are unavailable as witnesses.  (See Def. Br. at 16-19.)  The defendant raises other challenges, which, for the reasons set forth below, are baseless and should be rejected.

First, the defendant claims that the government is unable to show that the declarants of the records or statements at issue have personal knowledge of their contents.  (Id. at 16-17.)  That is wrong, and obviously so.  With respect to GX 2808 and 2808A, co-conspirator Allam is the author of the email that he sent to himself; he is also the author of the spreadsheet that he attached to that email, according to its metadata.  (Gov't Br. Exs. A-B.)  Co-conspirator Allam clearly has personal knowledge of documents that he authored.  Similarly, co-conspirator Boustani has personal knowledge of the contents of the emails that he himself sent.  (Id. at 15-18.)  With respect the November 2014 Ledger, the document's metadata identifies Privinvest employee Ayomin Senanayake as its author.  (Gov't Br. at 15-16.)  Once again, as the author of the November 2014 Ledger, Senanayake has personal knowledge of its contents.[20]

Second, the defendant erroneously claims that the records and statements the government seeks to admit pursuant to Rule 804(b)(3) are not actually statements against penal interest.  (Def. Br. at 17.)  In assessing whether a statement is against penal interest within the meaning of Rule 804(b)(3), the Court must first ask whether "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest," United States

---

[20] As to other Privinvest spreadsheets detailing bribe payments that are not attached to emails and were produced to the government without metadata, the government intends to admit these records as co-conspirator statements.  Accordingly, the government need not identify their author so long as their contents provide a sufficient basis to conclude that they were made by a co-conspirator, which they will.  (See Gov't Br. at 17-18.)

v. Saget, 377 F.3d 223, 231 (2d Cir. 2004), cert. denied, 543 U.S. 1079 (2005), a question that can be answered only "in light of all the surrounding circumstances," Williamson v. United States, 512 U.S. 594, 604 (1994) (an "adequately particularized analysis" is required). The proffered statement "[need] not have been sufficient, standing alone, to convict [the declarant] of any crime," so long as it would have been "probative" in a criminal case against him. United States v. Persico, 645 F.3d 85, 102 (2d Cir. 2011). Here, Allam's and Senanayake's spreadsheets (Gov't Br. at Exs. A-C) detailing bribe payments to Mozambican officials, including the defendant, would be "probative" in a criminal case against them, especially when viewed in conjunction with the government's other evidence matching the payments and bank accounts recorded in the spreadsheets to the payments made for the benefit of these officials. The same goes for Boustani's emails (Gov't Br. at 18-19) in which, among other inculpatory statements, he discusses the percentage of the Proindicus project budget that should be diverted for bribes and how to coax additional loan money out of the banks. Thus, these statements are against their penal interests and admissible on that basis.

None of the arguments the defendant raises changes that analysis. The defendant asserts that the "Government has not shown that the declarant of these statements perceived any of these records against their own interest." (Def. Br. at 18 (emphasis added).) But that, of course, is not required under Rule 804(b)(3). Instead, the government need only show that "a reasonable person in the declarant's shoes would perceive the statement as detrimental to his or her own penal interest," which it has. Saget, 377 F.3d at 231. Next, the defendant asserts that "[t]he Government has no witness who says [the spreadsheets and ledgers] were discussions or documents reflecting bribes." (Def. Opp. at 18.) That is irrelevant. The proffered spreadsheets and ledgers need only be "probative" of the declarant's criminality, not dispositive. Nor is the government required to

actually call a witness to testify that they are bribes. This material thus clears that bar. Finally, the defendant asserts that "Jean Boustani testified with the explanation of these records, and the Government does not have any qualified witness to refute that explanation." (Id.) It is unclear which testimony and records the defendant is referring to, as he provides no citations to the Boustani trial transcript. (Id.) In any event, the government did not obtain the Privinvest records it seeks to admit pursuant to Rule 804(b)(3) until after the Boustani trial. More fundamentally, in assessing statements offered under Rule 804(b)(3), courts look to what a reasonable person would perceive about their inculpatory character, not self-serving statements that the declarant himself said when testifying in his own defense.

Third, the defendant mischaracterizes the holding of Williamson in order to suggest that it "does not allow introduction of statements that implicate someone else." (Def. Br. at 18.) In reality, Williamson expressly recognizes that a statement pursuant to Rule 804(b)(3) may be admitted against, and may inculpate, a defendant who is not the declarant where the declarant is alleged to have conspired with the defendant:

> For instance, a declarant's squarely self-inculpatory confession—"yes, I killed X"—will likely be admissible under Rule 804(b)(3) against accomplices of his who are being tried under a co-conspirator liability theory . . . Likewise, by showing that the declarant knew something, a self-inculpatory statement can in some situations help the jury infer that his confederates knew it as well. And when seen with other evidence, an accomplice's self-inculpatory statement can inculpate the defendant directly: "I was robbing the bank on Friday morning," coupled with someone's testimony that the declarant and the defendant drove off together Friday morning, is evidence that the defendant also participated in the robbery.

Williamson, 512 U.S. at 603. Although Williamson does prohibit the admission of non-self-inculpatory statements under Rule 804(b)(3), the statements and records the government seeks to admit under that rule are self-inculpatory.

Fourth, the defendant contends that the government has not satisfied Rule 804(b)(3)'s trustworthiness requirement. Not so. All of the records and statements the government seeks to admit under Rule 804(b)(3) were made during the pendency of the conspiracy by co-conspirators who had no motive to lie to one another – or to themselves, in the case the spreadsheets Allam emailed himself, such as GX-2808 and 2808A (Gov't Br. at Exs. A-B). As such, they are categorically different from the statements at issue in the two cases cited by the defendant on this point (Def. Br. at 19), where the declarant had already been arrested and there was reason to believe that his statements were made to sway the government officials prosecuting him and/or his associates. See United States v. Ojudun, 915 F.3d 875, 887 (2d Cir. 2019) ("[M]ost of Gray's statements, made to a law enforcement official, were designed to minimize his involvement in the planned fraud and to deflect responsibility onto Ojudun and Cesaro."); United States v. Salvador, 820 F.2d 558, 562 (2d Cir. 1987) ("Guzman was not clearly trustworthy since he knew Oscar and may have had reason to lie for him . . . and he made the statement to the prosecutor, who was in a position to affect the charges against Oscar."). Here, by contrast, there is no reason to doubt the trustworthiness of the declarants or their statements given the context in which the statements were made. Thus, these statements are admissible as statements against penal interest.

V.    The Government Should Be Permitted To Ask Materiality Questions

    A.    The Government Should be Permitted to Ask Hypothetical Questions to Investors to Prove Materiality

The defendant also objects to the government using the word "bribe" in asking hypothetical questions to investors at trial as purportedly "guilt-assuming" and not permitted under the law. (See Def. Br. at 30-33). The government does not intend to ask "guilt-assuming" questions but rather, consistent with the law, factual hypothetical questions.

34

The Second Circuit has expressly held that when "hypothetical questions utilize[ ] facts that ha[ve] been independently established in the record," "[a] witness may testify to the fact of what he did not know and how, if he had known that independently established fact, it would have affected his conduct or behavior." United States v. Cuti, 720 F.3d 453, 459 (2d Cir. 2013). The defense is free to "challeng[e] the factual accuracy of the disputed testimony" at trial. Id. Recently, the Southern District of New York addressed this question in United States v. Guo, No. 23 CR. 118 (AT), 2024 WL 1862022 (S.D.N.Y. Apr. 29, 2024). In that case, the defendant moved to preclude the government from asking investors or other witnesses general hypothetical questions, such as 'would you have liked to know [x]' or 'would [x] have been important to you,' without reference to alleged promises or statements that were actually made to investors or others in connection with alleged investments at issue." See id. The court rejected the motion, holding that in a fraud case, "investor testimony can be relevant to whether a defendant's alleged misstatements or omissions were material." See id. (citing United States v. Gramins, 939 F.3d 429, 446 –47 (2d Cir. 2019)).

Here, the government has charged primarily two misrepresentations in the loan documents: (1) that the use of the loan proceeds would be used solely for the projects; and (2) that the loans did not involve any corrupt payments, including bribes and kickbacks to bankers and Mozambican officials. And unlike Guo, the government intends to show and reference the alleged promises or statements that were actually made to investors in connection with the loans.[21]

---

[21] The defendant purportedly and incredulously claims that there is no evidence that, as Minister of Finance for the Republic of Mozambique — the person who approved and negotiated the loans and personally signed multiple government guarantees for the $2 billon loans — he knew about the misrepresentations in the loan agreements. Regardless, the defendant is charged in a conspiracy to defraud and thus, he is culpable for the actions of his co-conspirators, even if he claims that he did not review loan agreements he approved and negotiated (including material

Moreover, the government intends to establish through other evidence "the independently established fact" that Privinvest made millions of dollars in payments to bankers and Mozambican officials, including for the defendant's benefit, and that such payments constituted bribes and kickbacks. Thus, the government should be permitted to ask hypothetical questions about disputed facts to the investor witnesses.

The defendant attempts to distinguish several of the government's cases. For example, the defendant notes that in United States v. Hatfield, No. 06-CR-0550 (JS), 2010 WL 2541057 (E.D.N.Y. June 10, 2010), the Court found the government's hypothetical questions inappropriate. In that case, the government asked the following: "If you had learned that DHB inflated the costs of direct labor included in the Incerceptor inventory . . . would that have been a significant fact to you as a shareholder?" See Hatfield, 2010 WL 2541057, at *1. That would be akin to the government asking the following here: "If you had learned that the defendant accepted $7 million in bribes from Privinvest in exchange for helping approve the loan and signing the loan guarantee, would that have been a significant fact to you as an investor?" But that is decidedly not what the government has proposed asking. And in fact, in Hatfield, the Court found it acceptable to ask, "The government has alleged [disputed fact]. If the government's allegation is true, would this [disputed fact] have been significant have been significant to you as an investor." See id.

Here, unlike Hatfield, consistent with the caselaw, the government proposed asking hypothetical questions about corrupt payments generally to bankers and Mozambican officials. For example, in United States v. Jennings, 487 F.3d 564, 582 (8th Cir. 2007), the Eighth Circuit held that questions about the materiality of undisclosed financial interests of legislators were

---

terms) and signed guarantees for and received at least $7 million in bribes and kickbacks in connection with.

36

appropriate where the issue before jury was the defendant's undisclosed financial interest.  See id.  And in United States v. Ranney, 719 F.2d 1183 (1st Cir. 1983), the First Circuit upheld hypothetical questions to investors about whether they would have made the investment if they knew that certain representations were false. [22]  Ranney, 719 F.2d at 1189. The defendant also claims that the Second Circuit's decision in United States v. Cuti, 720 F.3d 453 (2d Cir. 2013), is "about opinion testimony"[23] (Def. Br. at 34), but in fact, the two witnesses were not qualified as experts and were asked hypothetical questions that had been "independently established in the record." Cuti, 720 F.3d at 459.  In Cuti, the Second Circuit acknowledged that "'what-if-you-had-known' questions that present withheld facts to a witness are especially useful to elicit testimony about the impact of fraud" and that "other circuits have permitted the use of hypothetical questions to inquire into the effect of a fraud." Id.

Thus, with the Court's permission, the government will ask the banks and others investors: (1) whether it would have been important for them to know that the use of the loan proceeds were being used to pay millions of dollars to bankers and Mozambican officials; (2) whether it would have been important for them to know that the contractor, Privinvest, had promised to pay or had paid millions of dollars to bankers and Mozambican officials in connection with the loans, and (3) whether the banks would have approved and invested in the loans and whether other investors would have invested in the loans if they knew such information.  In addition, the government proposes asking: "The government has alleged that these payments by

---

[22] The defendant's citation to United States v. Lawrence is inapposite.  In that case, the government asked hypothetical questions of investors stating that the defendant intentionally lied to them, which is not what the government has proposed here.  767 F. App'x 77, 80 (2d Cir. 2019)

[23] The Second Circuit stated, "[w]hile we hold that the challenged testimony was properly admitted as factual testimony, we alternatively hold that it is admissible as lay opinion under Federal Rule of Evidence 701." Cuti, 720 F.3d at 459.

Privinvest are bribes and kickbacks. If the government's allegations are true, would that have been important for you to know and would you still have approved and/or invested in the loans?"

B.    <u>The Government Should be Permitted to Ask Materiality Questions Regarding Credit Suisse</u>

The defendant argues that because Credit Suisse AG entered a deferred prosecution agreement ("DPA"), and because its European subsidiary pled guilty to wire fraud conspiracy (collectively, "Credit Suisse"), both in connection with the EMATUM loan,[24] the government should be precluded from asking materiality questions about representations in the loan agreements. The defendant is incorrect and his arguments rest on a fundamental misunderstanding of corporate liability and resolutions.

As an initial matter, the defendant's motion should have no effect on the Proindicus loan or the Proindicus upsize as Credit Suisse did not enter any DPA or guilty plea with respect to those transactions. For those transactions, the government should be permitted to ask materiality questions regarding Credit Suisse, as it did in the previous trial. With respect to the EMATUM loan, the defendant claims that the government cannot ask materiality questions because Credit Suisse conspired with Pearse and Singh to deceive investors in the EMATUM loan and thus, could not be defrauded as a reasonable investor. (Def. Br. at 28-29). But that is not factually possible. Credit Suisse is an entity. It can only act through the actions of its employees and indeed, the DPA and plea make clear that Credit Suisse is acting "through Pearse, Singh and Subeva" who are its "employees and agents." As described in detail in the government's supplemental motion <u>in limine</u>, <u>see</u> ECF No. 583, a corporate resolution is based on <u>respondeat superior</u> liability and "does not require [] intentional criminal conduct." <u>Fed. Ins. Co. v United States</u>, 882 F.3d 348, 368 (2d

_____

[24] The resolution also includes the Eurobond Exchange but the government has no longer charged misstatements in the Eurobond Exchange and thus, does not intend to ask any materiality questions on the Exchange from any investor, including Credit Suisse.

Cir. 2018).  Here, Credit Suisse entered a corporate resolution with the government based on the actions of three (out of 45,800) employees at the time, Pearse, Singh, and Subeva.

At trial, the evidence will likely show that Pearse and Singh concealed the fact that they had received millions of dollars in kickbacks in connection with the Proindicus and EMATUM loans from their employer, Credit Suisse.  See, e.g., Tr. 1358 (Pearse) (Q. Did you disclose any of these payments and kickbacks to Credit Suisse.  A.  I did not."); id. at 2875 (Singh); id. at 841-842 (Pearse) (discussing how numerous members of senior management who approved the Proindicus transaction were not involved in the criminal conduct).  Singh also testified that Credit Suisse, and specifically, the bank's European Investment Banking Committee, would have never approved the EMATUM loan "if they had known about the kickbacks."  Id. at 2926.  During the approval and diligence process for EMATUM, Singh also testified that Pearse and Subeva used their personal email addresses to "conceal their involvement from Credit Suisse" in the EMATUM loan.  Id. at 2916.

Thus, as explained in more detail in the government's supplemental motion in limine, Credit Suisse's corporate resolution does not negate the fact that it was defrauded on the EMATUM loan.  See ECF No. 583.  "An institution may be defrauded even if its employees allow or participate in the fraudulent practice."  United States v. Yarmoluk, 993 F. Supp. 206, 209 (S.D.N.Y. 1998) (citing United States v. Rackley, 986 F.2d 1357, 1361 (10th Cir. 1993)).  That is particularly true here where Pearse and Singh will testify at trial that (1) they concealed their criminal scheme from Credit Suisse, including purposefully using personal email; (2) they did not disclose their criminal activities to anyone else at Credit Suisse, including senior management; and (3) that if they had disclosed their criminal conduct, Credit Suisse would not have made the loans or approved the transactions.

In support of his erroneous argument, the defendant cites one case, United States v. Litvak, 889 F.3d 56, 71-72 (2d Cir. 2018).  But that case is inapposite.  Litvak did not address a corporate defendant or anything remotely close to the facts of this case.  In Litvak, the jury acquitted the defendant of nine of the ten securities fraud counts charged in connection with misstatements made to investors in residential mortgage-backed securities ("RMBS").  On the sole count of conviction for securities fraud, the victim counterparty testified erroneously that the defendant was an agent of the victim counterparty on the bond sale even though this was not true (and agreed to by both the government and the defendant that this was false), and thus, the defendant "owed no fiduciary duties to the buyer."  See id. at 68.  Nevertheless, the court in Litvak allowed the victim counterparty to testify that he believed the defendant was the counterparty's agent because that was "his point of view."  See id.  The Second Circuit reversed, holding that because a reasonable investor is an objective standard, permitting testimony about the victim's "incorrect" and "unreasonable" belief that the defendant was his fiduciary was unduly prejudicial on the issue of materiality as a fiduciary has different duties and this was false testimony.  Id. at 70.  It is unclear how Litvak has anything to do with the facts here.

Unlike in Litvak, there is no evidence that the senior management, compliance department, legal department, Credit Risk Committee, European Investment Banking Committee, board of directors and/or executives at Credit Suisse (or the more than 45,000 employees at Credit Suisse not named Pearse, Singh and Subeva) or the shareholders of Credit Suisse knew that Privinvest had paid millions of dollars to Pearse and Singh in connection with the loans.  Thus, there is no concern that the testimony from Credit Suisse would be false and erroneous, as it was in Litvak.  Thus, the government should not be precluded from asking materiality questions regarding Credit Suisse where the facts will show that Pearse, Singh, Boustani, Do Rosario, the

defendant and other co-conspirators conspired to defraud Credit Suisse by making misrepresentations in the EMATUM loan documents about the use of proceeds and corrupt payments.

VI.    18 U.S.C. § 3238 Can Provide An Alternative Basis of Venue In This Case

In its opening brief, the government requested a ruling in advance of trial confirming that 18 U.S.C. § 3238 provides a permissible basis for the government to establish venue in this case because it should be factually undisputed that the conspiracies began outside the United States and defendant was "first brought" to this District.  The government further moved to preclude jury nullification arguments that the defendant should be tried, for example, in the United Kingdom or Mozambique.  The defendant now opposes these requests on the basis that the government's request is improperly before the Court, and that § 3238 "does not apply to domestic offenses."  (Def. Br. at 41-42.)  Relatedly, the defendant claims that he should be able to argue to the jury that this Court has no jurisdiction over him for these "domestic offenses," and that he should only be tried outside of the United States.  (Id. at 43-44 (noting that he should be permitted to argue that the government "has not proven jurisdiction or venue")).  The defendant conflates venue and jurisdiction, and his arguments are without merit.

A.    Section 3238 Can Apply Where the Offense Conduct Was "Begun" Outside the United States

First, contrary to the defendant's argument, the government is not seeking to have the Court usurp the jury's role in determining whether the government has established venue in this District, beyond a preponderance of evidence, in advance of trial.  (Def. Br. at 41.)  Venue is for the jury to decide.  The government however is seeking clarification in advance of the charge conference, to determine whether it would be legally appropriate based on the facts proffered by the government to submit this theory to the jury as it will inform the government's case-in-chief.

41

Second, the defendant conflates the issue of jurisdiction and venue. As the government argued in its opposition to the defendant's motion to dismiss, the government has alleged and will prove sufficient facts to establish jurisdiction for both the money laundering and wire fraud conspiracy charges. For example, with respect to the wire fraud conspiracy, the government will show that all of the approximately $2 billion in loan proceeds for the projects – the object of the conspiracy – was paid in U.S. dollars and wired through bank accounts in the United States. The government will also prove that there were investors based in the United States who invested in one or more of the loans and were defrauded. The government also expects to prove that for both counts, the bribe payments for the defendant and his co-conspirators were again, paid in U.S. dollars and wired through bank accounts in the United States, and that most, if not all, of the defendant's bribe payments passed through the Eastern District of New York. These facts are sufficient to confer jurisdiction in the United States on the wire fraud and money laundering conspiracy charges. Indeed, this Court already held that to be the case. See Order at 32-35 (finding that wires running through a correspondent bank account in the United States does warrant extraterritorial jurisdiction on the money laundering conspiracy charge because "allegations concerning a scheme aimed at defrauding U.S. and foreign investors through the use of the U.S. financial system satisfy the 'jurisdictional nexus' required for a foreign defendant" under 18 U.S.C. § 1956(f)); see id. at 34-35 (further recognizing that "wires for the alleged bribes and kickbacks, including to Chang, were transmitted through U.S.-based correspondent bank accounts, [and] this conduct 'renders application of the wire fraud statute to [Chang] domestic, and so he cannot be said to have acted entirely abroad"). See also 18 U.S.C. § 1956(f)(1) ("There is extraterritorial jurisdiction over the conduct prohibited by this section if . . . in the case of a non-United States citizen, the conduct occurs in part in the United States").

Venue, however, designates where in the United States the defendant should be tried for the offenses. As set forth in the government's opening brief, 18 U.S.C. § 3237 or § 3238 are not mutually exclusive, and the government can establish venue on both grounds if appropriate. See United States v. Miller, 808 F.3d 607, 620 (2d Cir. 2015) ("[W]e do not think that venue becomes improper under § 3238 simply because it might also have been properly laid elsewhere pursuant to § 3237(a)."). Here, the government is seeking confirmation that it can consider proceeding on a § 3238 theory given that the defendant was "first brought" to this District and § 3238 authorizes venue here where the "offenses [were] begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district." 18 U.S.C. § 3238.

Based on the Second Circuit's decision in Miller, the government respectfully submits that it can rely on § 3238 to lay venue in this District because the charged offenses in this case was "begun" outside the United States.[25] In Miller, the Second Circuit analyzed whether the offense in that case – removing a child from the United States to outside the United States – was nonetheless "committed upon the high seas, or elsewhere out of the jurisdiction" of the United States. Although Miller analyzed the term "committed" in the statute, Miller explained that § 3238 also applies to offenses that were "begun" outside of the United States. Id. at 619 (explaining that the "text of § 3238 invites a broader application than its title might suggest" because in particular,

_____

[25] Prior to Miller, there was a circuit split as to whether the "committed" language in § 3238 meant "wholly committed" such that it required that all of the offense conduct to take place outside the United States. See, e.g., United States v. Pendleton, 658 F.3d 299, 305 (3d Cir. 2011) (discussing the differing approaches among the circuits). This Court need not decide whether the charged conduct in this case was "committed" outside the United States in order to find that § 3238 applies. Rather, the government submits that the Court can determine the applicability of § 3238 based on the fact that the offense conduct here "began" outside the United States. See United States v. Rivera-Niebla, 37 F. Supp. 3d 374, 380-81 (D.D.C. 2014) (declining to opine on the propriety of the "committed" prong because the defendant "began his offense outside the country" and thus "section 3238 applies").

"the text addresses 'offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district.'").[26]  Reading the plain language of the statute, the Second Circuit found that "§ 3238's application is not restricted to offenses wholly committed outside the jurisdiction of the United States: The use of the word 'begun' in addition to the word 'committed' suggests that the statute encompasses offenses 'begun' outside the borders of the United States—but ending within our country's borders."  Id.; see also United States v. Pendleton, 658 F.3d 299, 305 (3d Cir. 2011) (also explaining that the terms "committed" and "begun" in the statute have "independent meaning"); United States v. Pace, 314 F.3d 344, 351 (9th Cir. 2002) ("§ 3238 does not apply unless the offense was committed entirely on the high seas or outside the United States (unless, of course, the offense was 'begun' there)"); United States v. Jensen, 93 F.3d 667, 671 (9th Cir. 1996) (B. Fletcher, J., concurring) (explaining that, as a matter of law, § 3238 is applicable where it is undisputed that the defendants negligently operated a vessel upon the high seas even though they also operated the vessels within Alaska because the statute applies to offenses "begun or committed upon the high seas" or outside the United States); Rivera-Niebla, 37 F. Supp. 3d at 380 ("[I]f an offense began outside of the country, section 3238 will apply;

---

[26] In doing so, the Second Circuit rejected the "passing comment" that the Second Circuit made in United States v. Gilboe, 684 F.2d 235 (2d Cir. 1982) about the scope of § 3238.  In Gilboe, the defendant, a foreign national, was convicted on four counts of wire fraud for committing fraudulent transactions on the international shipping industry.  The defendant was specifically charged for fraudulently misrepresenting that he would arrange shipments of grain from Argentina and the United States to China.  The Second Circuit found that venue in the Southern District of New York under 18 U.S.C. § 3237 was proper because the defendant had and caused other communications to occur between Manhattan and Hong Kong to obtain the ships to transport the grain, and he had caused fraud proceeds to be electronically transferred through Manhattan banks to his accounts in the Bahamas such that "the proceeds of the fraud were all transferred through New York" Id. at 237-38.  In Gilboe, the Second Circuit made a reference to § 3238 and stated that this provision did not apply here because § 3238 "applies only to offenses not committed in any district, as its title indicates." Id. at 239.  But as the Second Circuit in Miller later clarified, that comment is "dicta" and is "not a comment that we believe binds us."  Miller, 808 F.3d at 621.

whether an offense began or was committed outside the country are two separate inquiries.").[27]

B.    <u>The Defendant Should Not Be Permitted to Make Improper Venue Arguments</u>

Defense counsel's preview of their jury arguments show that they are plainly improper and inconsistent with the law.  For one, while the defendant is entitled to argue that the government has not proven the elements of the charged offenses (<u>e.g.</u>, intent to defraud, materiality), he should not be permitted to argue "jurisdictional" defenses.  The defendant has already moved to dismiss the money laundering conspiracy charge for lack of jurisdiction, and the wire fraud conspiracy charge on due process grounds, and the Court has denied those requests. (Order at 27.)

There is a substantial difference between an appropriate defense argument that the government has not established facts sufficient to lay venue in this District beyond a preponderance of evidence and improper defense arguments that essentially suggests that prosecution in the United States is not fair because "the loan contracts at issue have a choice-of-law provision for U.K. law," or because "the loans at issue are for Mozambique and the defendant should be tried in Mozambique."  As set forth in the government's opening brief, the latter argument – which the defendant apparently anticipates raising before the jury – serves no purpose other than to undermine the jurisdictional rulings that the Court has already made, and the venue instructions that the Court will ultimately administer to the jury.  Thus, the government's motion to preclude these arguments should be granted.

---

[27] The defendant seems to suggest that § 3238 could not apply to wire fraud or money laundering charges.  (Def. Br. at 43 (criticizing the type of cases the government cites in its motion)).  As an initial matter, other than requiring that the crimes at issue be "begun or committed" outside of the United States, the statute itself does not expressly limit itself to only certain substantive crimes.  Moreover, courts have found that § 3228 applies to money laundering and fraud charges.  <u>See, e.g.</u>, <u>United States v. Guzman Loera</u>, 09-CR-466 (February 4, 2019) (instructing jury on § 3238 venue for all counts, including money laundering) (excerpt of transcript attached as Exhibit O).

VII.    The Court Should Prohibit the Defendant from Arguing That The Jury Should Disregard Settled Law in Deciding the Money Laundering Conspiracy Charge

The government moved the Court to preclude the defendant from making arguments that suggest that international wire transfers of money through U.S. correspondent banks are not covered by § 1956(a)(2).  In opposition, the defendant claims that he will not receive a fair trial unless he is permitted to invite the jury to disregard the settled law on this issue.  (Def. Br. at 40.)  The Court should reject this transparent attempt to side-step the law of this Circuit.  (Id.)  In United States v. Ho, the Second Circuit made clear that a defendant can be convicted of violating § 1956(a)(2) by "arrang[ing] a wire transfer that uses the U.S. banking system to go from a foreign source, to a correspondent bank in the United States, to another bank in the United States, and then to a final foreign beneficiary."  984 F.3d 191, 207 (2d. Cir. 2020).  In other words, as a matter of law, a defendant located abroad who sends or receives money through U.S. correspondent banks satisfies the requirement under §1956(a)(2) that the transferred money go "from a place in the United States to or through a place outside the United States," or vice-versa.  18 U.S.C. § 1956(a)(2).  Nonetheless, the defendant wishes "to argue this point" and "let the jury decide" whether the Second Circuit is correct that § 1956(a)(2) applies to correspondent bank transfers.  (Def. Br. at 40.)  That is inappropriate.  The defendant may, of course, argue that the government has not proven that the alleged correspondent bank transfers occurred or were sent for his benefit (or dispute any other factual point related to these issues), but he should not be permitted to argue — as he apparently intends to — that § 1956(a)(2) does not apply to correspondent bank transfers.  Juries do not decide legal questions, and this particular legal question is settled.

VIII.    The Government Maintains That the Defendant Should Not Be Permitted to Make Jury Nullification Arguments[28]

    A.    The Defendant Should Not Be Permitted to Make Improper Arguments About Monetary Loss and Harm

        In its motion, the government moved to preclude any arguments that the defendant should not be permitted to argue that the government has not proven monetary loss (because it is not a requirement of wire fraud) or claim that there could be no fraud because ultimately, the victims were made whole or had even profited (because the defendant cannot negate the fraud by believing it will all work out for the victims at the end).

        The defendant's only substantive response is that he should be permitted to introduce evidence of investor losses because "evidence that the purported victims suffered any loss is probative as to whether Mr. Chang possessed the intent to enter into the purported conspiracies he is charged with committing." (Def. Br. at 45-46.)  The defendant does not state what evidence related to loss it believes is relevant to the defendant's intent, but based on the Rule 17 subpoenas issued by the defendant requesting interest payment and settlement documents from victim-investors, he seems intent in arguing that investors were ultimately paid, either via interest payments or through settlement of the investors' civil UK proceedings against Mozambique. (Gov't Br. at 51-54.)

        This evidence, however, is not probative of the defendant's intent – but rather, is being used to argue that the investors were ultimately made whole even after the loans defaulted – and thus, should be excluded for the reasons stated in the government's motion.  (Id.)  In advancing this argument, the defendant conflates the intended harm that is at issue in this case with

---

[28] Based on the defendant's representations in his motion, defense counsel seemingly acknowledges that he cannot argue, as a defense, that the victims were negligent or that they did not actually rely on the misstatements. (Def. Br. at 44-45.)  The government reserves its right to move in limine should the defendant change his position.

the amount of monetary loss owed to the investors.  The government intends to prove that the defendant contemplated actual harm and injury to the investors when he lied about not receiving corrupt payments, thus causing investors to enter into the loan agreements.  See, e.g., United States v. Watts, 934 F. Supp. 2d 451, 470 (E.D.N.Y. 2013) ("[A] defendant's good-faith belief in the truth of his statements or representations is very different from a defendant's belief that his untrue statements or representations will ultimately cause no harm."); United States v. Gole, 21 F. Supp. 2d 161, 166 (E.D.N.Y. 1997) ("The definition of good faith addresses the defendant's belief in the truth of the representations, and not the defendant's belief as to the ultimate success of the plan.").[29] The misstatements in the loan documents regarding the use of proceeds and payment of bribes were fundamental to the bargain and the defendant and his co-conspirators knowingly made those

---

[29] The cases that the defendant cites – United States v. Novak, 443 F.3d 150,156 (2d Cir. 2006), and United States v. D'Amato, 39 F.3d 1249, 1257 (2d Cir. 1994) – are inapposite.  In Novak, a union leader was charged with mail fraud in connection with receiving kickbacks from union employees who were paid for no-show jobs by contractors who had a collective bargaining agreement with the union.  443 F.3d at 153-154.  The contractors knew that they were paying for no-show jobs but were unaware of the kickbacks from the union employees to the defendant.  Id. The Second Circuit overturned the defendant's mail fraud conviction because "[a]n intent to harm a party to a transaction cannot be found where the evidence merely indicates that the services contracted for were dishonestly completed."  Id. at 159.  But the Second Circuit in Novak also recognized that an intent to harm may be found where the "defendants' compliance with the law in carrying out their contractual obligations was a fundamental part of the bargain between the parties."  Id.  D'Amato is similarly inapplicable.  In D'Amato, the Second Circuit overturned a mail fraud conviction based on false statements in a contract requiring the defendant to produce certain reports because the evidence showed the defendant "could hardly have believed that he was supposed to provide the written reports" and there was no dispute that "D'Amato performed all the services . . . that were requested of him." 39 F.3d at 1261.  The fraudulent misrepresentations at issue in this case are not that the defendant promised to deliver services but believed that he did not need to perform those services.  Instead, the government will prove at trial that the defendant and his co-conspirators promised to use the loan proceeds for the projects and not pay bribes, but nonetheless paid and concealed his bribes from the investors.

false statements to the bank to obtain the loans.[30]  The defendant should therefore not be permitted to argue that because the investors received interest payments or were made whole by way of settlement, he did not contemplate any harm when he lied.

B.    The Court Should Not Permit the Defendant to Introduce Irrelevant and Prejudicial Evidence Regarding His Background and Lack of Connections to the United States

In response to the government's motion to preclude the defendant from asserting jury nullification arguments, the defendant argues that the "wholesale prohibition" on any reference to his lack of ties to the U.S. is improper because it would lead the jury "to assume that Mr. Chang is being prosecuted here because he voluntarily appeared in the United States." (Def. Br. at 47-48.) The defendant does not say what evidence he intends to introduce regarding his lack of ties to the United States.  As an initial matter, the government does not object to basic background evidence regarding the defendant's citizenship or that he was the Minister of Finance, a public official.  The government intends to introduce such evidence in its case-in-chief because it is relevant to the crimes and proving the specified unlawful activity of bribery of a foreign official.

But the defendant should not be permitted to raise what he calls "some or all of his International Defenses at trial, which all relate to the lack of connection between Mr. Chang and the United States."  (Def. Br. at 47.)  The defendant somehow believes that he needs to explain that he did not "voluntarily appear[] in the United States."  (Id.)  There is no need to, as the government intends to prove that law enforcement brought the defendant to this District in July

---

[30]  The government intends to introduce evidence of loss for the reasons stated in its opposition to defendant's motion in limine.  See ECF No. 585, Gov't Opp. at 20-21.  The defense may cross-examine witnesses regarding their testimony about loss, but any attempt by the defendant to put on evidence that some investors did not lose money or recovered money in civil litigation years after the conspiracy ended is plainly irrelevant to the defendant's intent or any other elements of the charge, and is inadmissible under Fed. R. Evid. 401 and 403.

2023.  Moreover, whether he "voluntarily appeared" or not has no bearing on whether he is guilty of the crimes charged.  Indeed, this defense has no probative value at all, and its only purpose is to persuade the jury that the government forced him to appear in court to gain sympathy.  Thus, any arguments about whether he voluntarily appeared or not should be precluded.[31]

The defendant also argues that he should be able to introduce evidence of the defendant's incarceration to avoid "undue speculat[ion] as to the <u>five</u> <u>year</u> gap in Mr. Chang's personal history."  (Def. Br. at 48.)  Again, that is not relevant to any of the charges in the case, and is unduly prejudicial.  There is a difference between establishing that he was extradited from South Africa (which would go to the government's proof on venue) versus telling the jury that he has been incarcerated in South Africa for five years, before being presented on charges here.  Argument of this kind do go to punishment,[32] and is irrelevant and highly prejudicial and should be excluded under Rule 403.

---

[31] The  defendant argues that Judge Kuntz denied a "similar motion <u>in limine</u> . . . to preclude Mr. Boustani from introducing the circumstances of his arrival in the United States" in the <u>Boustani</u> trial.  (Def. Br. at 48 n.3.)  Judge Kuntz's ruling is inapplicable here.  In <u>Boustani</u>, the defendant there—Jean Boustani—was not legally extradited to the United States; rather he had been expelled by the Dominican Republic, and thus, Judge Kuntz concluded the evidence of his arriving in the United States (that it was done by expulsion and not by legal process) was relevant to whether the defendant targeted investors in the United States and as impeachment evidence for witnesses who texted about Boustani's extradition to the U.S.  ECF No. 252 at 2-3.  Here, the government intends to introduce evidence concerning the defendant's extradition to the United States because it is relevant to proving first-brought venue under 18 U.S.C § 3238.  The government is not seeking to exclude that evidence.  Rather, the government is objecting to other evidence of the defendant's lack of ties to the United States to the extent is runs afoul of Fed. R. Evid. 401 and 403.

[32] As set forth below, the defendant claims in his opposition that he has "no intention of opening on potential punishment or collateral consequences."  (<u>See</u> Def. Br. at 55.)

C.    The Court Should Preclude Any Attempt by the Defendant to Introduce Impermissible Other Acts Evidence.

The defendant argues that he should be permitted to introduce evidence of "other projects considered or financed" by Mozambique as evidence of the defendant's intent to defraud. (Def. Br. at 48-49.)  The defendant provides no specific examples of such evidence, much less establishes their relevance or that they are not prejudicial.  Indeed, the single reference to "evidence showing that Mr. Chang negotiated the interest rates and other terms of the relevant loans to obtain beneficial terms for his country" is not other acts evidence because it pertains to the three projects at issue in the case.  The defendant similarly does not say what "evidence of the process for other projects" he intends to introduce.  (Id. at 49.)  Indeed, the government does not intend to prove or argue that the defendant "deviated from the typical process" for approving projects.  The process of approving other projects is therefore not probative of a material issue other than character and would violate Fed. R. Evid. 403.  The defendant clearly intends to introduce such evidence as improper propensity evidence and the Court should stop the jury from hearing it.

The government reserves the right to object to any evidence the defendant seeks to introduce on grounds that it is impermissible "other acts" evidence.

IX.    The Court Should Take Judicial Notice of the EMATUM Decision.

The defendant mischaracterizes the government's position regarding the EMATUM Decision (Gov't Br. Exs. L1-L3), claiming that the government is attempting to introduce the decision to prove that the 2013 loan and guarantee were not included in the official budget for 2013 and that the guarantee exceeded the maximum amount allowed for government guarantees.  (Def. Br. at 51.) That is untrue.  The government intends to use the EMATUM Decision as it did at the Boustani trial, where Judge Kuntz took judicial notice of the EMATUM Decision for the "purpose of recognizing its existence as an official statement, usable as evidence

of the facts and opinions stated therein."  ECF No. 250 at 3 (quoting <u>A.I. Trade Fin., Inc. v. Centro Internationale Handelsbank AG</u>, 926 F. Supp. 378, 387 (S.D.N.Y. 1996)).  Judge Kuntz did not take judicial notice of the facts and opinions stated in the judgment for the truth of the matter asserted.  <u>Id.</u>[33]  During the trial, after Judge Kuntz admitted the EMATUM Decision, a government witness provided limited testimony about it.  Specifically, the agent noted the date of the decision and testified further:

> Q:    Ms. DiNardo, can we go to the last page, please. Can you    blow up the top paragraph.  Special Agent Haque, can you please read the decision in Government's Exhibit 174-2?
>
> A:    Therefore, the constitutional counsel declares the acts inherent in the loan contracted by EMATUM, S.A. and their respective sovereign guaranty granted by the government in 2013 null and void with all its legal consequences.
>
> Q:    Can you read the next sentence, please?
>
> A:    Record notify and published it. So ordered.
>
> Q:    Thank you. You can take that down, Ms. DiNardo.

Trial Tr. 3544.  The government intends to elicit the same limited testimony at the upcoming trial. The evidence is relevant because it provides important context to what happened to the EMATUM bonds and whether the government of Mozambique ever honored its guarantee.  Such evidence is "necessary to complete the story of the crime on trial."  <u>United States v. Robinson</u>, 702 F.3d 22, 37 (2d Cir. 2012).

---

[33] The defendant misleadingly suggests that the government "incorrectly" described Judge Kuntz's ruling regarding the EMATUM Decision, noting that the Court declined to take judicial notice of the facts and opinion in the judgment for the truth of the matter assert.  (Def. Br. at 53.) In its motion <u>in limine</u>, the government explicitly described that limitation on the admission of the EMATUM Decision.  (Gov't Br. at 63-64 (government noting that "the Court specifically did not take judicial notice of the facts and opinions for the truth of the matter asserted, 'particularly to the extent those facts remain in dispute.'").)

The defendant attempts to cast doubt on the reliability of the EMATUM Decision by noting that two law firms wrote opinion letters in October 2013—presumably with no knowledge of the charged conspiracies—stating that in their opinion the EMATUM Facility Agreement was legal, valid, and enforceable. (Def. Br. at 51.) Such letters, made six years before the EMATUM Decision without all the facts, including that there were bribe and kickback payments made in connection with the EMATUM loans, do not indicate the document itself is unreliable or otherwise suggest the process by which the EMATUM Decision was made is untrustworthy. Judge Kuntz rejected a similar argument in Boustani, and the Court should do so again here. ECF No. 250 at 3 ("Although Defendant notes other political bodies in Mozambique 'have questioned the Constitutional Council's jurisdiction to issue the EMAUM decision,' the parties have provided no indication the document itself is unreliable nor otherwise suggested the process by which it was made is untrustworthy.") (citing United States v. Garland, 991 F.2d 328, 335) (6th Cir. 1993)).[34]   The Court should therefore reject the defendant's arguments and admit the EMATUM Decision.

X.    The Court Should Apply the Mozambican Law Proposed by the Government and Reject the Defendant's Contradictory and Meritless Arguments in Favor of His Preferred Mozambican Law

The government maintains that the Court should apply Article 8 of Law 7/98 for the reasons set forth in its motion in limine and opposition to the defendant's motion in limine. (See ECF No. 571 ("Gov't Mot.") at 35-39; Gov't Br. at 35-37.) The defendant's arguments in support of his preferred Mozambican law, Law 6/2004, squarely contradict his prior positions on

---

[34] The defendant argues that the government is seeking to introduce the EMATUM Decision to persuade the jury that the EMATUM guarantee violated some unspecified "Mozambique Budget Laws." (Def. Br. at 52.) The government is not offering it for that purpose as described above. (See also Gov't Br. at 26 – 27 (opposing defendant's motion in limine to preclude evidence of violations of Mozambique's budget laws).)

this issue and are otherwise meritless.  Accordingly, the Court should find that Article 8 of Law 7/98 is the appliable Mozambican law, and instruct the jury on the elements of that law as stated by the government in its prior filings.  (See Gov't Mot. at 39 (listing the elements).)

           As an initial matter, the defendant's position on which provision of Law 6/2004 — Article 7, a felony offense which concerns unlawful act corruption, or Article 8, a misdemeanor offense which concerns lawful act corruption — applies in this case has materially changed.  In his motion to dismiss, the defendant stated that "[t]he allegations in the Indictment allege at best a misdemeanor under Mozambique law."  (ECF No. 543 ("Def. MTD") at 36.)  The only potentially applicable misdemeanor corruption offense under Mozambican law of which the government is aware — or that is discussed by either party's expert — is Article 8 of Law 6/2004, the penalty for which does not exceed a year of imprisonment.  (See ECF No. 572 ("Def. Mot.") at 29 ("Article 8 of Law 6/2004, which governed passive corruption for a lawful act, provided for a prison sentence of only up to one year—a misdemeanor under U.S. law.") (emphasis in original).)  However, after the Court affirmed that a specified unlawful activity ("SUA") alleged under § 1956(c)(7)(B)(iv) need not be a felony offense (Order, at 28-30),[35] the defendant switched positions.  He now contends that "the question in this trial is whether Mr. Chang violated Article 7 of Law 6/2004" (Def. Mot. at 29), which carries "a sentence of imprisonment for more than 2 to 8 years."  (Def. Br. at 38 (emphasis in original).)

           Furthermore, the defendant's contention that this case concerns unlawful act corruption (the kind prohibited in Article 7 of Law 6/2004) is undercut by his prior

---

[35] The defendant finally concedes this point.  (See Def. Opp. at 40.)  Nonetheless, he argues that "[t]he government should not be allowed to take advantage of" what he characterizes as a "drafting limitation" in § 1956(c)(7)(B)(iv).  That is not a colorable legal argument.  The defendant, like anyone else, is subject to the law as it written; his subjective opinion on the propriety of the law is irrelevant.

characterizations of the loan guarantees.  The defendant has previously stated that the loan guarantees were lawful actions undertaken in furtherance of his official duties as Minister of Finance.  (See Def. Mot. at 29 (stating that the defendant is "charged in connection with signing sovereign guarantees which he was lawfully authorized to do . . . based on the presidential decree"; Def. MTD at 4 ("[T]he prosecution of Mr. Chang derives from his official acts taken in his official capacity as the Minister of Finance of Mozambique in connection with his country's national defense.").  If that is the case, then it does not follow that—as the defendant now contends (Def. Br. at 35, 41) — the applicable Mozambican law is one that prohibits only unlawful act corruption.

    In addition to these foundational contradictions, the defendant's arguments either clash with certain of his prior claims, or are simply baseless and confusing.

    First, the defendant previously (and incorrectly) asserted that Law 7/98 could not be the applicable Mozambican law in this case because "a 2015 law explicitly repealed the entirety of the 1886 Penal Code, upon which law 7/98 relied."  (Def. Mot. at 26.)  Now, however, the defendant relies upon the same 1886 Penal Code for the proposition that the government purportedly "may not rely on inference, analogy, or solely circumstantial evidence."  (Def. Br. at 36.)  The defendant cannot have it both ways.  In any event, the defendant's claim that indirect methods of proof are not permitted in Mozambican criminal corruption cases is incorrect.[36]

---

[36] PEDRO GOMES PEREIRA ET AL., BASEL INSTITUTE ON GOVERNANCE, OVERVIEW AND ANALYSIS OF THE ANTI-CORRUPTION LEGISLATIVE PACKAGE OF MOZAMBIQUE (2012), https://baselgovernance.org/sites/default/files/2018-12/Mozambique_Legal_analysis.pdf ("Although there is no specific provision in the Criminal Procedure Code of Mozambique pertaining to the use of indirect methods of proof in the criminal proceedings, such can be inferred as the corresponding word for circumstantial evidence in Portuguese is indício, which is used throughout the procedural provisions for the production of evidence in the Criminal Procedure Code.")

Second, the defendant makes the conclusory assertion that the government's expert's description of the elements of Article 8 of Law 7/98 "is incorrect" — which it is not — without even attempting to explain why. (Def. Br. at 37.) The defendant asserts that his expert provides the missing explanation "in his Declaration" (id.), but does not bother to cite to the portion of the declaration where it may supposedly be found. Nor could he, as the defendant's expert nowhere addresses the elements of Article 8 of Law 7/98.

Third, the defendant erroneously claims that the government misled the Court in its assertion that the main difference between the parties' proposed Mozambican laws lies not in the elements of the laws, which are substantially similar, but in their prescribed punishments. (Id.) The defendant does not explain how the government purportedly mislead the Court (which it did not). To the contrary, the defendant devotes the next several paragraphs of his brief to illustrating the government's point by reviewing the differences in the potential sentences associated with violations of each law and conceding that "the elements of Articles 7 and 8 of Law 6/2004 and Article 8 of Law 7/98 are substantially similar." (Id. at 38-39 (emphasis in original).)

In sum, the Court should conclude that the Article 8 of Law 7/98 is the applicable Mozambican law and disregard the defendant's contradictory and unavailing opposing arguments. Article 8 of Law 7/98 prohibits both lawful act and unlawful act corruption. (See Gov't Mot. at 39 (listing the elements).) The jury should be instructed on both, and the government should be permitted to argue that the jury should find that the defendant violated this law if either form of corruption is proven, including — as with any other disputed factual issue — through circumstantial evidence.

## XI.    The Testimony of the Robert Pepitone Will Satisfy the Requirements of Rule 803(5)

The government moved the Court to permit its witness, Robert Pepitone — a vice president and senior product manager for the Clearing House Interbank Payments System

("CHIPS") — to be permitted to read the contents of a record identifying the dates on which CHIPS transfers were processed through a facility located in New York City (the "CHIPS Facility Record") as a recorded recollection pursuant to Rule 803(5).  (Gov't Br. at 65-68.)  The defendant contends that the Court should not rule on this issue pre-trial, and that Pepitone should be permitted to read from the CHIPS Facility Records only if he testifies that he cannot recall with specificity the time periods in which CHIPS used its New York City facility between 2012 and 2015.  (Def. Br. at 54-55.)  The government anticipates that Pepitone's testimony will satisfy the requirement of Rule 803(5) (see Gov't Br. at 68), and thus, the Court should permit the government to use past recorded recollection during his testimony, as he did previously in the Ng trial.

XII.    The Court Should Grant the Government's Motion for a Pretrial Ruling that the Records Listed in Exhibit N to the Government's Motion are Authentic Business and Foreign Records

The government seeks to authenticate certain records pursuant to Rule 902(11) and 18 U.S.C. § 3505.  (See Gov't Br. at Ex. N.)  As the defendant admits, he has refused to stipulate to the authenticity of even a small set of bank records — which the government had hoped to use as a template for the parties to stipulate to the authenticity of larger sets of records — on the grounds that he does not believe the records are relevant to the government's case.  (See Def. Br. at 58; Gov't Br. at 72 n. 31.)  Yet again, the defendant confuses the concepts of authenticity and admissibility.[37]  Regardless, both Rule 902(11) and § 3505 require the records proponent to notify the adverse party of its intent to offer the records at trial.  The government's opening brief provided the requisite notice, and the government has produced — and, if necessary, will continue to

---

[37] The government is seeking to authenticate the records pursuant to certifications, but will establish relevancy and admissibility under hearsay exceptions separately at trial.  For example, while the co-conspirator records are authenticated by third-party certifications that attest to the fact that the records were maintained as part of their businesses, the government is seeking to admit the content of the records as co-conspirator statements and as statements against penal interest.

produce — for the defendant's inspection each of the business records certifications on which it will rely to establish authenticity.[38]  Notably, the defendant has yet to challenge the authenticity of any of the business records identified by the government, despite the fact that the majority of these records were provided months ago.  Accordingly, the Court should grant the government's request for a "pretrial ruling that the records set forth in Exhibit N may properly be authenticated as self-authenticating business records and foreign business records."  (Gov't Br. at 74-75.)  As the government stated in its opening brief: "In addition to authentication, the government will also need to establish relevancy prior to admitting documents at trial.  The government anticipates that the relevancy of each record will be plain at the time they are moved into evidence."  (Id. at n.33.)  Thus, the defendant should not be permitted to raise meritless challenges to the government's method of authentication or delay the Court's ruling on this issue.

XIII.    The Defendant Should Produce Rule 16 Discovery Promptly

The government respectfully asks the Court to direct the defendant to produce Rule 16 discovery promptly.  The defendant, in response, states that he will "comply with Rule 16 and the operative scheduling order in this case."  (Def. Br. at 59.)  To date, however, the only document productions that the defendant has produced in this case are two limited productions of materials they received from Rule 17 subpoenas, which the Court has previously ordered them to provide to the government.  Meanwhile, the government has produced thousands of documents, and is continuing to supplement its productions on a rolling basis as trial advances.  To the extent that

---

[38] On June 12, 2024, the government produced certified bank records from Novo Banco S.A., along with the corresponding business records certifications.  Pursuant to §3505, the government hereby notifies the defendant that it intends to offer these records into evidence at trial.  Additionally, pursuant to Rules 902(13) and 902(14), the government hereby provides notice that it intends to authenticate the contents of the defendant's cellphone, and the Cellebrite report of the defendant's cellphone, based on the certifications produced at DOJ0005754823 and DOJ0005754808.

the defendant intends to use any exhibits in its case-in-chief, the defendant should not be permitted to surprise the government and produce them for the first time on July 5 (the date exhibits are due), and ten days before trial.  The defendant has indicated that he anticipates presenting a one-week defense case.  Any exhibits that he intends to use in its case-in-chief should be produced promptly so that the government has sufficient time to review the documents.  If the defendant fails to provide the government with the legally required Rule 16 discovery, the defendant should be precluded from using that information for its case-in-chief exhibits.

XIV.    The Remaining Issues in the Government's Motion Do Not Need to Be Addressed At This Time Based On Defendant's Representations

The defendant has represented in his motion that he "does not intend to improperly use agent reports" and that he has "no intention of opening on potential punishment or collateral consequences."  (Def. Br. at 55.)  Based on these representations, the government submits that these issues do not need to be decided now, but reserves the right to move to preclude if the defendant contradicts his representations at trial.

Defense counsel has also represented that they will continue to produce additional Rule 17(c) material they receive.  (Def. Br. at 59-60.)  As set forth above, the defendant has made two small productions of Rule 17 material.  The government will notify the Court should it require further court intervention in connection with the defendant's ongoing production of Rule 17 materials.  Moreover, since the initial conference regarding the improper issuance of the defendant's Rule 17 subpoenas, the government has learned of additional Rule 17 subpoenas the defendant has served, including to the government's cooperating witnesses Andrew Pearse for all communications he has had, directly or through counsel, with the Department of Justice (including all calendar invites) and to Credit Suisse for among other things, its lawyers' "opening statement and exhibits" in the U.K. Proceedings.  The government intends to move to quash one or more of

59

these subpoenas as they seek to circumvent 18 U.S.C. §3500 procedures, and seeks improper and inadmissible evidence pursuant to <u>United States v. Nixon</u>, 418 U.S. 683, 700 (1974).   The government will file a motion separately with the Court.

<u>CONCLUSION</u>

For the reasons set forth above, the government respectfully submits that the government's motions <u>in limine</u> be granted in their entirety.

Dated:    Brooklyn, New York
          June 17, 2024

                              Respectfully submitted,

                              BREON PEACE
                              UNITED STATES ATTORNEY
                              Eastern District of New York
                              271 Cadman Plaza East
                              Brooklyn, New York 11201

                       By:    _/s/_____
                              Hiral Mehta
                              Genny Ngai
                              Assistant United States Attorneys
                              (718) 254-7000

                              MARGARET A. MOESER
                              Acting Chief, Money Laundering &
                              Asset Recovery Section
                              Criminal Division
                              U.S. Department of Justice

                       By:    _/s/_____
                              Morgan Cohen
                              Trial Attorney
                              (202) 598-2345

                              GLENN S. LEON
                              Chief, Fraud Section
                              Criminal Division
                              U.S. Dept. of Justice

                       By:    _/s/_____
                              Peter L. Cooch
                              Trial Attorney
                              (202) 924-6259