

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

HDM/GN/PC/MC
F.# 2016R00695

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

July 28, 2024

<u>By ECF and Email</u>

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

     Re:  United States v. Manuel Chang
        <u>Criminal Docket No. 18-681 (NGG)</u>

Dear Judge Garaufis:

   The government respectfully writes in reply to the defendant's letter opposition to the government's motion to quash. (ECF No. 687 ("Def. Opp.").)

I.  <u>Relevant Background</u>

   As a threshold matter, the defendant's letter misrepresents the relevant factual background. The defendant claims that in early July he "sought clarification" from the Court on whether <u>Touhy</u> applied to trial subpoenas to FBI agents. (<u>Id.</u> at 1.) That is untrue. Before the government even had an opportunity to confer with the FBI regarding its policies for responding to such subpoenas, the defendant moved the Court to enforce them — this was an attempt to circumvent <u>Touhy</u>, not a request for clarification. (<u>See</u> <u>Letter Mot.</u>, ECF No. 627, at 2.)

   The defendant also misrepresents the parties' recent communications about <u>Touhy</u> declarations. After the jury was dismissed on July 25, the parties discussed the FBI subpoenas and <u>Touhy</u> declaration issues with the Court. During this hearing, defense counsel represented that certain of the FBI subpoenas were necessary in order to elicit testimony regarding two alleged prior inconsistent statements made by Andrew Pearse. After court, government counsel asked defense counsel to identify the two statements, but defense counsel refused to do so. Without acknowledging this conversation, the defendant's opposition states: "It is [] not the case that we have refused to tell the government the prior inconsistent statements of Andrew Pearse." (Id. at 2.) The defendant further claims, incredulously, that defense counsel could not identify the statements at that time because she had already packed up her laptop. (<u>Id</u>.)

That was Thursday. The government only learned of Mr. Pearse's alleged prior inconsistent statements yesterday when the defendant filed his opposition to the government's motion to quash.[1] There are only two possibilities: either no one on the defense team has had access to their laptops between Thursday evening and Saturday afternoon, or defense counsel refused to provide the statements to the government and then denied having done so in their submission to this Court.

In any event, neither of the alleged prior inconsistent statements by Mr. Pearse are actually inconsistent statements.[2]

II.     The Statement about the Subvention Fee is Not a Prior Inconsistent Statement

The defendant claims that a May 22, 2019 statement about the subvention fee is inconsistent with Mr. Pearse's trial testimony. It is not. Mr. Pearse testified that prior to discussing the contractor fee or subvention fee with Jean Boustani, he spoke to Surjan Singh about reducing the fee: "Q. Now, did you talk to Mr. Singh about the fee before you talked to Mr. Boustani about it. A. I spoke to him about whether the fee could be reduced, yes." (Tr. 267:14-17) (Pearse). Mr. Pearse also testified that he and Mr. Singh spoke after Mr. Boustani offered Mr. Pearse a kickback on the subvention fee: "Q. You never had a conversation with Mr. Singh about submitting the subvention fee and profiting from it. A. After Mr. Boustani offered me the kickback, I did tell Surjan Singh about that. I did give him money from my bank account at Abu Dhabi Commercial Bank. If that's what you mean, then yes, Miss." (Tr. 558:17-22.) Essentially, Mr. Pearse testified about two different conversations with Mr. Singh — one before the kickback offer, and one after the kickback offer.

The FBI 302 states: "PEARSE had a conversation with SINGH about the subvention fee reduction before PEARSE had the conversation with BOUSTANI on or about February 25 [2013]. SINGH and PEARSE discussed the concept of reducing the fee and both benefiting from the proceeds. At the time of the conversation, the expectation was that SINGH would also join what later became PALOMAR." The first sentence refers to a different conversation than the second and third sentences. Indeed, it is not possible for all three sentences to refer to the same conversation because, as of February 25, 2013, Palomar had not even been created.[3] Notably,

---

[1] To be sure, during this interim period, defense counsel did encourage the government to review "the transcript and the handful of notes we appended to the declaration" to find the statements themselves. (Def. Opp. at 2.) Of course, the transcript of Mr. Pearse's testimony is over 750 pages, and the "handful of notes" are a 19-page FBI 302, 100 pages of agent notes, and 167 pages of documents.

[2] The defendant also complains that the government ignored a request from the defendant to make the agents available to speak with the defense. (Def. Opp. at 3.) That is incorrect. Putting aside that the agents are free to but have no obligation to speak with the defense, the government did not ignore the defendant's request. The government conveyed the request to the FBI the same day the defense asked to speak to the agents.

[3] For example, on May 10, 2013, Mr. Pearse sends an email to Mr. Boustani with a presentation on how Palomar would work. See GX 3124. Indeed, Mr. Pearse previously testified

during the <u>Boustani</u> trial, defense counsel similarly claimed that these same three sentences referred to one conversation and pushed Mr. Pearse to admit that he was considering a new business, such as Palomar, in late February 2013, but Mr. Pearse denied this and did not recall any such conversation:

> Q When you were first envisioning this new business, were you thinking about the fact that you may need to open office space in London? Was that something, as you contemplated this new business, that you were thinking about?
>
> A Not at that time, no.
>
> Q Not in late February or early March?
>
> A I don't recall any plans to open a London office at that point in time.
>
> Q And do you recall in late February or early March speaking to Mr. Boustani about whether Privinvest might be able to front some of those start-up costs relating to the new business?
>
> A Yes. Mr. Boustani identified that Privinvest would be able to make a loan to the start-up vehicle. *I don't recall the timing of that conversation*, just to be clear, sir.
>
> Q And during the conversations that you had with Mr. Boustani about Privinvest potentially paying some of the start-up costs of the new business, do you recall reminding him of how much money you had saved Privinvest by pointing out that the subvention fee could be negotiated? Do you recall having that conversation with Mr. Boustani?
>
> A *I do not*.

(<u>Boustani</u> Tr. 1130-31) (Pearse) (emphasis added).

There is simply no evidence that the second and third sentences of the paragraph quoted above reference a single conversation between Mr. Pearse and Mr. Singh on February 25, 2013. Therefore, this FBI 302 does not contain any prior inconsistent statement by Mr. Pearse. In fact, these particular statements should be precluded under Rule 403 as they are tangential to the question of the defendant's guilt and will distract and confuse the jury.

---

that the concept of Palomar was conceived in March 2013: "Q Was one of the topics that [the government] asked you about whether Mr. Boustani made as much money as you did? A I was asked about my relationship with Mr. Boustani. I provided information as to Palomar and the partnership that was conceived in March of 2013." (<u>Boustani</u> Tr. 1062: 3-7) (Pearse).

3

      III.      The Court Should Preclude Testimony about Whether Mr. Pearse Said He "Did Not Contemplate Criminality" During a Proffer Session in May 2019

      Mr. Pearse testified that he thought splitting the subvention fee was fraudulent and, on cross examination, denied telling the government during a May 22, 2019 proffer session[4] that he did not think splitting the subvention fee was criminal at the time he accepted the kickback. (See Def. Opp. at 6.) The defendant seeks to elicit testimony from FBI Special Agents Haque and Tassone that Mr. Pearse previously said that he "had no thoughts that he could get in trouble" and "did not contemplate criminality at the time," as reflected in their FBI 302s. (Id.) The defendant claims that this purported prior inconsistent statement is probative of whether Mr. Pearse believed that he entered "into a criminal agreement with Jean Boustani." (Def. Opp. at 5). The defendant's argument is meritless. A few months after this May 2019 proffer with the government, Mr. Pearse pled guilty to conspiracy to commit wire fraud. Indeed, Mr. Pearse specifically allocuted to the agreement on the subvention fee with Mr. Boustani:

> While I was a managing director at Credit Suisse Securities Europe Limited, in or about late February 2013, Credit Suisse was in the process of closing a $372 million loan to ProIndicus. I led the deal team. Boustani offered to pay me half of the amount by which I, together with others, reduced a subvention fee to be paid [questions from Court omitted] by Privinvest in connection with the loan. I accepted Boustani's offer, successfully made efforts to reduce the fees paid by Privinvest, and received payments by wire from Privinvest into a bank account I opened in the United Arab Emirates with the assistance of Privinvest employees.

AP-3500-5-25-26.

---

[4] Throughout the defendant's letter, defense counsel references by name one of the government's attorneys. Defense counsel suggests that because one of the government's attorneys attended the May 2019 meeting with Mr. Pearse that the government has somehow acted improperly by not "correcting these misstatements." (Def. Opp. at 2 n.2.) As an initial matter, there is no evidence that any of the government's attorneys knows that Mr. Pearse's testimony about the two statements at issue regarding a conversation on February 25, 2013 between Mr. Pearse and Mr. Boustani are "false." None of the government's attorneys were present for the February 25, 2013 meeting and have no first-hand knowledge of the meeting. Nor are the FBI agent's notes from a May 22, 2019 meeting about a conversation that occurred on February 25, 2013 adopted by Mr. Pearse: he was not shown the FBI 302 or handwritten notes before it was finalized and was never asked to correct or adopt the notes or the report. There is no dispute that the notes are not verbatim and there is no recording of the interview. Moreover, the notes and the report were disclosed to defense counsel. To the extent that the Court permits any of the agents subpoenaed to testify, the government respectfully requests that the Court preclude any questions singling out a member of the government's team by name as attending any such meetings. Defense counsel can, of course, ask generally if members of the government were in attendance but singling out an individual member of the team in order to suggest impropriety should not be permitted.

The defendant appears to be arguing that the probative value of this alleged prior inconsistent statement is to demonstrate that Mr. Pearse is actually innocent, did not enter into a conspiracy with Mr. Boustani, and pled guilty for no apparent reason. It is absurd to believe that Mr. Pearse, an intelligent and sophisticated individual with legal training, who, shortly after this proffer session waived extradition and pled guilty in the United States, all while represented by counsel, is in fact innocent and did not believe his conduct was illegal. Indeed, there is no evidence that Mr. Pearse does not believe his own guilt. Further, such claims are entirely inconsistent with the defense's case, i.e., that Mr. Pearse and Mr. Boustani were part of a separate conspiracy that did not include the defendant. Thus, even if Mr. Pearse made these statements, they are not probative of any issue in dispute, and compelling Special Agent Haque to testify about one entry in handwritten notes she made over five years ago would serve only to waste time and mislead and confuse the jury.

IV.  The Reference to "Pantero" in the Notes

The defense seeks to introduce testimony that Mr. Pearse previously said "Pantero" is sometimes used to refer to Antonio Do Rosario, based on notes from an August 2, 2019 proffer session with the government. The notes say that "Pantero = Chang in this context." An arrow — next to which is written, "sometimes used to refer to" — runs from those words to a word that is crossed out, but looks like "Chang," and next to that there is the name "Rosario." The government has reached out to Special Agent Haque about these notes and will report back to the Court when it has more information. Nevertheless, the Court should quash the subpoena to Ms. Haque, who should not be compelled to testify about a crossed out word in handwritten notes that she made over five years ago.

The defendant has already cross-examined Mr. Pearse on this issue extensively and has provided no evidence that anyone ever referred to Mr. Do Rosario as "Pantero." Defense counsel claimed that in one email Mr. Pearse called Do Rosario "Pantero," but that is not accurate. The email chain references the need to obtain a signature on a MAM procurement contract, and Ms. Subeva states that they should have Mr. Boustani hold off on obtaining the signature because MAM does not yet have directors, and, thus, "Rosario [who is the Chairman of MAM] signing isn't good enough." See GX 3253. Mr. Pearse responds that he agrees and that he has told Mr. Boustani to "slow down" because "Pantero didn't sign yet," which as Mr. Pearse explained during his testimony, is a reference to the defendant having not yet signed the MAM guarantee, which meant that there was no reason for Mr. Boustani to obtain the signature for the MAM procurement contract:

> Q. Now, I don't believe you got a chance to explain on cross, when you say, you say Pantero didn't sign yet, what you meant Pantero to be. So please, tell the jury.
>
> A I meant Manuel Chang hadn't signed the guarantee.
>
> …
>
> Q Why was the guarantee important to sign for the MAM loan?

5

> A  The guarantee was the critical document because that was what investors -- well, that was the risk investors were taking. Without the guarantee, the loan would never have been made by the same investors that actually ended up doing the loan, including my former employer.

(Tr. 820-21) (Pearse).  Thus, given that the defendant has already cross-examined Mr. Pearse on this exact issue, there is minimal probative value to compel Special Agent Haque to testify about this issue.

    V.    <u>The Government's Evidence About Mr. Nhangumele's Role Was Not Misleading</u>

The defendant also claims that it needs to call FBI Special Agent Farrell Binder about statements made to her by Mr. Nhangumele in 2019 because the government has purportedly misled the jury into believing that Mr. Teofilo Nhangumele was a Mozambican government official. (<u>See</u> Def. Opp. at 7).  This is false.  To the contrary, the government elicited testimony from Mr. Pearse that Mr. Nhangumele was a "consultant":

> Q  You mentioned also that Mr. Boustani made statements to you about payments by Privinvest to Teofilo Nhangumele. Who is Teofilo Nhangumele?
>
> A  He was a gentleman who was *made out to be* a representative of the office of the president of Mozambique when the first Proindicus loan was introduced to Credit Suisse in 2012 and early 2013.
>
> Q  Was he also referred to as a *consultant*?
>
> A  Yes.
>
> Q  Can you explain?
>
> A  So a consultant is someone who assists someone else, in this case the Republic of Mozambique, to find a bank which was Teofilo's responsibility and to generate the business plan around Proindicus to demonstrate that it was going to make lots of money.

(Tr. 139-40) (Pearse) (emphasis added).

Mr. Pearse also expressly testified that he did not believe Mr. Nhangumele was a government official: "Q. Just to be clear, Teofilo is not a government official, correct? A. Not that I was aware of." (Tr. 506:5-7.)  In addition, the government entered into evidence a consultancy agreement between Mr. Nhangumele and Privinvest.  <u>See</u> GX 3291-A (consultancy agreement between Privinvest subsidiary, Abu Dhabi Mar, and Mr. Nhangumele for the "Exclusive Economic Zone Monitoring and Protection Solution").  The government also admitted an email from

6

Mr. Nhangumele where he tells Mr. Boustani, "Jean I never told you who I am . . . and it will remain like that, because it is not important," in response to Mr. Boustani's questions about whether Mr. Nhangumele was working as a "private" individual and why he had a "Yahoo" email account and not a government one. See GX 2031.

Thus, there is no reason to have Special Agent Binder testify that Mr. Nhangumele told her he was not a government official. The government also objects on Rule 403 grounds as it is cumulative evidence; the government's main cooperating witness has already testified that he did not view Mr. Nhangumele as a government official and the government has entered into evidence documents that show he was a consultant. It would also be highly confusing for the jury to hear about why Mr. Nhangumele spoke to the FBI in 2019 and would leave them wondering why he was not a witness at trial, thus causing more prejudice (The government understands that Mr. Nhangumele was convicted at trial in Mozambique and sentenced to 12 years in prison in 2022).

VI. The Court Should Quash the Subpoena to Special Agent Adediran

The defendant's opposition makes clear that he intends to call Special Adediran to improperly put the government's investigation and conduct on trial — something about which the Court has already had to issue a curative instruction. The defense intends to elicit testimony regarding various aspects of the government's investigation "to show the steps the government took to obtain certain information, yet avoided pursuing other investigative leads that were more likely to lead to exculpatory information." (Def. Opp. at 9.) The Court should preclude the testimony.

The defendant has failed to make "any connection between an allegedly poor investigation and any evidence introduced at trial" to justify calling Special Agent Adediran to testify about aspects of the government's investigation. See United States v. McVeigh, 153 F.3d 1166, 1192 (10th Cir. 1998), cert. denied, 526 U.S. 1007 (1999) ("There was no trial evidence whose reliability would have been undercut had McVeigh been able to prove his contentions about the Elohim City investigation."). First, the defendant wants to introduce testimony "regarding what records were sought . . . [and] what records were not sought (and why)." The defendant points to no evidence suggesting misconduct or a sloppy investigation by the government, and his vague claims do not establish a connection sufficient to merit presenting evidence to the jury regarding the scope of the government's investigation. Second, the defense wants to question Special Agent Adediran regarding whether the FBI collected any emails involving Mr. Pearse and the phrase "Kung Fu." The government has produced tens of thousands of Mr. Pearse's emails and the defendant already cross-examined him about references to "Kung Fu" in his emails and discussions he had in which the phrase was used as a nickname for the defendant. Third, the defendant wants to question Special Agent Adediran regarding "whether and why the government does not know the accountholder at Banco Mozambique [sic]." After court on Thursday, the FBI further reviewed the wire records from Barclays, including GX 1407. Those records indicate the accountholder is the Ministry of Finance of Mozambique. See GX 1407, Row 221, Column AT ("Ministerio Das Financas"). Finally, the defendant asserts that the testimony of Special Agent Adediran "would be crucial in critiquing the summary exhibits . . . as incomplete and misleading." But the defendant will have an opportunity to cross-examine Ms. Alpaugh about her summary exhibits and any testimony from Special Adediran would therefore be duplicative. Thus, the testimony sought by

7

defendant is irrelevant, cumulative and would serve only to waste time and mislead and confuse the jury.[5]

VII. The Court Should Quash the Remaining Subpoenas

The Court should quash all subpoenas for which the defendant has refused to provide a Touhy declaration.[6] The Court ordered the defendant to comply with Touhy 17 days ago, and he has not done so. Remarkably, the defendant attempts to justify his ongoing violation of the Court's order by blaming the government. The defendant asked the government on Thursday evening to reveal the subject matter of the testimony of the witnesses the government planned to call next week. (See Def. Opp. at 10.) This request is, frankly, strange. It has no relation to the defendant's obligation to comply with the Court's Touhy order. Moreover, the government has no obligation to tell the defendant "the subject matter of its remaining witnesses' testimony or what further evidence it intends to elicit." (Id.) Defense counsel served these subpoenas — presumably they knew what testimony they were seeking when they asked the Court to issue them. And even if defense counsel caused the Court to issue these subpoenas without any basis for doing so (which would constitute an abuse of the Rule 17 subpoena), the government long ago produced voluminous discovery and the 3500 materials for all of its witnesses. Defense counsel could have reviewed those records to determine which FBI Special Agents it may need to call to introduce inconsistent statements and withdrawn the rest of their subpoenas.[7] They chose not to. The Court should therefore quash the subpoenas.

---

[5] The defendant's reliance on Kyles v. Whitley, 514 U.S. 419 (1995) is misplaced. In Kyles v. Whitley, the Supreme Court held that in determining whether evidence not disclosed by the state was "material," in violation of Brady, the cumulative effect of all suppressed evidence favorable to the defendant is considered. The government in that case suppressed evidence of, among other things, statements by a witness who "made the case" for the government. Here, as noted above, there is no evidence of suppression of exculpatory information by the government or other misconduct to justify opening the door to evidence about the scope of the government's investigation, and the topics about which the defense wants to question SA Adediran are collateral issues in the case.

[6] Andrew Harris, Christian Isolda, Darrin Kibel, Taylor LaGrange, Mike Nevitt, Jonathan Polonitza, Michael Preis, Shawn Russell, Charles Thumann, Jessica Volchko, David Williams, Cara Alpaugh, Vito Cannova, Steven Cava, Matt Chenevey, and Joel DeCapua.

[7] Many of the subpoenaed individuals are not agents and/or did not produce notes or 302s of witnesses. The defendant has never attempted to explain why he subpoenaed them. For example, SA Joel DeCapua has already testified as a waters expert in the government's case subject to cross-examination. It is unclear why defense counsel does not know whether they still need to call him.

|  |  |
|---|---|
| | Respectfully submitted, |
| MARGARET A. MOESER<br>Chief, Money Laundering<br>& Asset Recovery Section<br>Criminal Division<br>U.S. Department of Justice | BREON PEACE<br>UNITED STATES ATTORNEY<br>Eastern District of New York<br>271 Cadman Plaza East<br>Brooklyn, New York 11201 |
| By: /s/<br>Morgan J. Cohen<br>Trial Attorney<br>(202) 616-0116 | By: /s/<br>Hiral Mehta<br>Genny Ngai<br>Assistant United States Attorneys<br>(718) 254-7000 |
| GLENN S. LEON<br>Chief, Fraud Section<br>Criminal Division<br>U.S. Dept. of Justice | |
| By: /s/<br>Peter Cooch<br>Trial Attorney<br>(202) 924-6259 | |

cc: Clerk of Court (NGG) (by ECF)
    Defense counsel (by ECF)