HDM/GN/JRS/PC/MC
F. #2016R00467

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                    Docket No. 18-CR-681 (NGG)

MANUEL CHANG,
      also known as "Pantero,"
      "Chopstick," and "Kung Fu"

             Defendant.

– – – – – – – – – – – – – – – – – – –X

THE GOVERNMENT'S SENTENCING MEMORANDUM

                              BREON PEACE
                              United States Attorney
                              Eastern District of New York

                              MARGARET A. MOESER
                              Chief, Money Laundering & Asset
                              Recovery Section
                              Criminal Division

                              GLENN S. LEON
                              Chief, Fraud Section
                              Criminal Division

Hiral Mehta
Genny Ngai
Jonathan Siegel
Assistant United States Attorneys

Morgan Cohen
Peter Cooch
Trial Attorneys

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

I.      RELEVANT BACKGROUND ..................................................................................... 2

II.     THE APPLICABLE GUIDELINES TERM OF IMPRISONMENT IS 135-168
        MONTHS ....................................................................................................................... 2

        1.    The Government Does Not Object to Using U.S.S.G. §2B1.1 to
              Calculate the Base Offense Level ................................................................ 4

        2.    The Court Should Adopt the Government's Wire Fraud Calculations ....... 6

        3.    The Sophisticated Laundering Enhancement Under U.S.S.G.
              § 2S1.1(b)(2)(B) Applies .......................................................................... 10

        4.    The Abuse of a Position in Trust Under U.S.S.G. § 3B1.3 Applies ......... 12

        5.    The Defendant Does Not Deserve a Minor or Minimal Reduction
              for His Role .............................................................................................. 13

III.    LEGAL STANDARD FOR SENTENCING .................................................................. 15

        A.    A Substantial Term of Imprisonment Within the Guidelines Range Is
              Warranted .................................................................................................. 16

        A.    Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1)) .................... 16

        B.    History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1)) .............. 19

        C.    The Need for General Deterrence (18 U.S.C. § 3553(a)(1)) ................................ 20

IV.     THE DEFENDANT'S ADDITIONAL ARGUMENTS FOR A TIME SERVED
        SENTENCE SHOULD BE REJECTED ...................................................................... 22

        A.    There Are No Unwarranted Sentencing Disparities ............................................. 22

        B.    The Defendant's Pre-Trial Detention Does Not Merit Time Served Sentence .... 26

        C.    The Defendant's Non-U.S. Citizenship Does Not Merit a Time-Served
              Sentence .................................................................................................... 28

V.      OTHER MONETARY PENALTIES ............................................................................ 31

        A.    The Court Should Impose Forfeiture of $7,000,000 ............................................ 31

              1.    Legal Standard .......................................................................................... 31

              2.    Evidentiary Basis for the Government's Proposed Order of Forfeiture ... 33

        B.    Restitution ................................................................................................. 34

CONCLUSION ....................................................................................................................... 34

## PRELIMINARY STATEMENT

Over the course of a four-week trial, the government proved beyond a reasonable doubt that the defendant, the former Minister of Finance of Mozambique, conspired to commit wire fraud and conspired to commit money laundering.  The defendant, along with his co-conspirators, approved and guaranteed $2 billion in loans to state-owned entities in Mozambique. He did so because of greed: because Privinvest paid him at least $7 million dollars.  In return, the defendant and his co-conspirators lied to banks and outside investors around the world, including here in the United States, and then laundered the money using the international banking system. The defendant and his co-conspirators used U.S. wires, U.S. correspondent banks, and U.S. investors to perpetrate this massive fraud and money laundering scheme.  In sum, the defendant, a corrupt public official, placed his own country, one of limited means and resources, on the hook for $2 billion in loans it ultimately could not pay, so that he and his criminal partners could pocket tens of millions of dollars for themselves.

Given the magnitude of the fraud and the defendant's conduct here, the Court should impose a meaningful punishment.  For his crimes, the defendant faces a Guidelines range of 135-168 months' imprisonment.  This range appropriately reflects the serious nature of his extensive, deceptive and deliberate criminal conduct.  Accordingly, the Court should reject the defendant's extraordinary request to avoid meaningful punishment, and impose a sentence within this Guidelines range.

## I.    RELEVANT BACKGROUND[1]

On August 8, 2024, following trial, the defendant was convicted of both counts in the Third Superseding Indictment: wire fraud conspiracy (Count One) and money laundering conspiracy (Count Two).  (See generally ECF No. 732.)

The trial evidence supporting the defendant's convictions has been set forth in great detail in the government's post-trial opposition to the defendant's Rule 29 and 33 motions. (See ECF No. 747 ("Gov't Post Trial Br.").)  The government incorporates its prior recitation of the facts and trial evidence herein.

## II.    THE APPLICABLE GUIDELINES TERM OF IMPRISONMENT IS 135-168 MONTHS

On October 28, 2024, the U.S. Probation Department ("Probation") issued a Presentence Report ("PSR"), setting forth its Guidelines calculations for the defendant.  The PSR calculated the defendant's total offense level as 42 and the defendant's criminal history category as I.  (PSR, ¶ 38-42.)  As such, Probation calculated the defendant's applicable Guidelines to be 360 months' to life imprisonment.  (Id. ¶ 89.)  In determining this range, Probation applied U.S.S.G. § 2C1.1 as a starting point to calculate the base offense level under U.S.S.G. § 2S1.1(a)(1).

On November 6, 2024, the defendant filed lengthy objections to almost all of the PSR.  (Def. PSR Obj.)  Although the defendant agrees that U.S.S.G. § 2S1.1(a)(1) applies to the

---

[1] Many of the relevant facts are also set forth in the PSR, at ¶¶ 1-25.  The defendant has objected to certain of these facts in his objections to the PSR, which were provided to the Probation Department ("Probation") on November 6, 2024 (see ECF No. 752, "Def. PSR Obj."). The government has submitted its response along with its sentencing submission, and now incorporates its responses to defense objections to these facts by reference here ("Gov't PSR Response").

grouped convictions, the defendant argues that U.S.S.G. § 2B1.1 should be used to calculate the underlying base offense level, instead of U.S.S.G. § 2C1.1.  However, the defendant disputes the applicability of any offense- or role-based enhancements, and, therefore, contends that his base offense level is 7.  Specifically, despite the trial record and witness testimony to the contrary, the defendant maintains that there were "no losses and no victims" left in the wake of his $2 billion wire fraud conspiracy involving tens of millions of dollars of bribes and kickbacks, precluding the application of any loss-related enhancements under U.S.S.G. § 2B1.1(b)(1)." (Def. Sentencing Br., 4-5.)  Moreover, the defendant argues that despite the centrality of the loan guarantees to the execution of the wire fraud scheme, he deserves a 2-level reduction for being a "minor participant" in the fraud.  (Id. at 8-11.)  Furthermore, he argues that the 2-level enhancement for abuse of a position of public trust enhancement does not apply to him, notwithstanding his acceptance of millions of dollars in bribes in exchange for signing the loan guarantees in his official capacity of Minister of Finance of Mozambique.  (Id. at 11-12.)  In short, the defendant relies on contorted, baseless arguments to artificially decrease his total offense level to 5, which, combined with his placement in criminal history category I, yield a Guidelines range of 0-6 months' imprisonment.  (See id. at 12; see also Def. PSR Obj., at 13-14.)

For the reasons set forth in the government's response to the defendant's objections — which was submitted concurrently with this submission — unless otherwise noted, the government respectfully submits that the defendant's arguments are meritless.  The defendant's Guidelines calculations plainly ignores key trial evidence in an effort to minimize his exposure and culpability.

As explained below, the government respectfully submits that the defendant's total offense level is 33, which, combined with his undisputed placement in criminal history

3

category I, yields a Guidelines range of 135-168 months' imprisonment. The government

submits that a sentence within this Guidelines range is sufficient but not greater than necessary to

achieve the objectives of 18 U.S.C. § 3553(a).

      1.     The Government Does Not Object to Using U.S.S.G. §2B1.1 to Calculate the Base Offense Level

The government submits that using the wire fraud guidelines under § 2B1.1 is

appropriate.[2] However, the government disagrees with the defendant's calculations under

U.S.S.G. § 2S1.1 and § 2B1.1. For the reasons set forth, the government respectfully submits

that the appropriate Guidelines calculation for the defendant's grouped convictions is as follows:

---

[2] § 2B1.1 is the appropriate guideline for multiple reasons. First, the defendant was convicted of wire fraud in Count One for his knowing participation in a scheme to make false and misleading statements in connection with procuring over $2 billion in loans. Wire fraud, of course, generally corresponds to Guidelines calculations under § 2B1.1. In addition to Chang and his co-conspirator's undisclosed receipt of bribes and kickbacks, the government proved that the scheme also involved lying to investors about the use of the proceeds of the loans. This wire fraud scheme was one of the two specified unlawful activities underpinning the defendant's conviction on Count Two. Application of the fraud Guidelines to this scheme is therefore appropriate.

Second, application of the fraud Guidelines is consistent with recent prosecutions against foreign officials (or their close relatives) who were convicted of money laundering with specified unlawful activities of foreign bribery laws. See, e.g., United States v. Martinelli, et al., No. 21-CR-65 (KAM) (E.D.N.Y.), ECF No. 56 (government's sentencing submission recognizing the parties' stipulated Guidelines range that a foreign law specified unlawful activity does not correspond to a U.S. offense for purposes of calculating the offense level under § 2S1.1(a)(2), which was adopted by the Court at sentencing); see also United States v. Carlos Polit, No. 22-CR-20114 (KW) (S.D. Fla.), ECF No. 238 (government's response to PSR objections setting base offense level as 8 for money laundering convictions predicated on violations of Ecuadorean bribery law, which was later adopted by the Court). The government had provided an initial Guidelines calculation to Probation that had referenced § 2C1.1. but upon further review of the government's position in prior cases, the government submits that § 2C1.1. should not be used here.

Group 1 (Counts 1 and 2)[3]

| | | |
|---|---|---|
| Base Offense Level (§ 2S1.1(a)(1)[4]; §2B1.1) | | 29 |
| | Base Offense Level | 7 |
| | Plus: More than $3,500,000 in Gain (§2B1.1(b)(1)(J)) | +18 |
| | Plus: Ten or More Victims (§2B1.1(b)(2)(A)) | +2 |
| | Plus: Sophisticated Means/Fraud Committed Outside U.S. (§2B1.1(b)(10)) | +2 |
| Plus: Conviction Under 18 U.S.C. § 1956 (§ 2S1.1(b)(2)(B))[5] | | +2 |
| Plus: Sophisticated Laundering (§ 2S1.1(b)(2)(B)) | | +2 |
| Plus: Abuse of Position of Trust (§ 3B1.3) | | +2 |
| Less: Zero-Point Offender Reduction (§ 4C1.1)[6] | | -2 |
| **Total Offense Level:** | | **33** |

Given that the defendant falls into Criminal History Category I, the applicable Guidelines range in this scenario would be 135-168 months (approximately 11 ¼ to 14 years). Thus, the sentence

---

[3] The statutorily authorized maximum sentences for Count One and Two are 20 years each. (See id. ¶ 88). The parties agree that pursuant to U.S.S.G §3D1.2(c), Counts 1 and 2 are grouped because "the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived." See Application Note 6 to §2S1.1 ("In a case in which the defendant is convicted of a count of laundering funds and a count for the underlying offense from which the laundered funds were derived, the counts shall be grouped pursuant to subsection (c) of §3D1.2 (Groups of Closely-Related Counts)."). Moreover, "[w]hen counts are grouped pursuant to §3D1.2(a)–(c) [as is the case here], the highest offense level of the counts in the group is used." U.S.S.G. §3D1.3 (Application Note 2).

[4] It is undisputed that the applicable guidelines to the grouped convictions is U.S.S.G §2S1.1, and that U.S.S.G §2S1.1(a)(1) applies here because the base offense level for the underlying offense can be determined. (See Def. Obj. at p.10.)

[5] Neither party disputes the application of this enhancement.

[6] Neither party disputes the application of this enhancement.

that the government seeks in this case is within this Guidelines range.  Because this Guidelines range is in Zone D of the Sentencing Table, the Guidelines "do not authorize a sentence of probation."  U.S.S.G. § 5B1.1 cmt. 2; see also U.S.S.G. § 5C1.1(f) ("If the applicable guidelines range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment.").

    2.    The Court Should Adopt the Government's Wire Fraud Calculations

Contrary to the defendant's arguments, each of the above-referenced wire fraud enhancements apply in this case.

First, the Court should reject the notion that there were "no losses" and "no victims" in this case.  (See Def. Sentencing Br., 4-6.)  This was a massive scheme that sought to, and did in fact, defraud investors of hundreds of millions of dollars.  Indeed, the jury heard evidence at trial that when Proindicus, EMATUM and MAM ultimately defaulted, victim-investors suffered significant losses, including for their clients: VTB Capital alone lost hundreds of millions of dollars in their investments in all three projects (GX 313); Alliance Bernstein lost approximately $22 million on behalf of its fund investors in EMATUM (GX 610, 610A); and NWI lost approximately $3 million on behalf of its fund investors (Tr. 1810-11).  The jury also heard evidence that the investors would not have invested had they known the truth — that Privinvest was paying millions of dollars in bribes and the defendant had accepted $7 million in bribes in connection with the projects.[7]  The jury also saw evidence that the victim-investors

---

[7] As set forth in the government's post-trial motion, the government proved that victims were defrauded by the defendant's scheme.  Leemhuis, Kaplan and Santamaria all testified that they were either based in New York or had locations in New York and that they relied on the anti-corruption and bribery misrepresentations in the contract to invest in one or more of the projects.  See Tr. 982-93 (Leemhuis); Tr. 1792, 1799-1807 (Kaplan); Tr. 1182, 1189-1200

were institutional investors who were investing their clients' money in the loan products.  See, e.g., GX 3213-B (record demonstrating that VTB Capital invested about $82 million for at least seven U.S. based investors in EMATUM); GX 610 (record demonstrating that Alliance Bernstein invested for at least four retirement/pension plans).

Nonetheless, the government agrees that determining a reasonable loss amount in this matter would be complex and difficult in this case due to, among other reasons, the number of victims, the complexity of the financial instruments, and the number of civil litigations and settlements pertaining to these project loans since the fraud was discovered.  That, however, does not mean that there is no mechanism to calculate loss, or that the defendant should unjustly benefit from the complexity of calculating the loss he caused.  Indeed, U.S.S.G. § 2B1.1, Application Note 3(B) specifically permits the Court to "use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."  Here, the defendant's gain from the offense was proven at trial.  The government proved that Privinvest paid $7,000,000 to the defendant for signing the Proindicus and EMATUM guarantees (see Gov't Post Trial Br., pp.8-9).  Thus, 18 levels should be added pursuant to U.S.S.G. § 2B1.1(b)(1)(J).

_____

(Santamaria).  Each of the victim-investors also testified that they would not have invested in the loans if they had known the truth that Privinvest would use millions of dollars in loan proceeds to pay bribes and kickbacks to bankers and government officials.  Tr. 982-93 (Leemhuis); Tr. 1792 (Kaplan); Tr. 1174 (Santamaria).  Leemhuis further explained that the truth of the bribes to Mozambican officials would have affected VTB's decision to invest because "[i]t would have been potentially a criminal act for VTB and its employees."  Tr. 983.  Likewise, Santamaria explained that he would not have invested in the EMATUM loan if he had known the truth because using his client's money for government bribes "would reflect poorly on my firm and my clients."  Tr. 1193.  Kaplan echoed that sentiment, testifying that the truth would have "taint[ed] the transaction" and he would not have invested in EMATUM if he had known the truth.  Tr. 1802.

Second, the record proves beyond a preponderance of evidence that there were ten or more victims.  As explained above, the government presented evidence that the victim-investors were institutional investors who were investing their clients' money in the loan products.  For example, the government proved that approximately 10 investors invested in Proindicus, including multiple funds controlled by U.S.-based investor ICE Canyon.  (GX-2568-A).  The government admitted proof that VTB Capital invested about $82 million for at least another seven U.S. based investors in EMATUM.  (GX 3213-B.)  The government also proved that Alliance Bernstein invested millions on behalf of approximately 20 clients, including at least four retirement/pension plans.  (See GX 610.)  Thus, the government has proven that this enhancement applies.

Third, the record also supports the 2-level enhancement for sophisticated means/substantial fraud committed outside the United States.  Under U.S.S.G. § 2B1.1(b)(10), the Court may apply a 2-level increase if "a substantial part of the fraudulent scheme was committed from outside the United States; or . . . the offense otherwise involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting the sophisticated means."  Both criteria provide an independent means for the Court to apply this enhancement.  First, a substantial part of the fraud scheme occurred outside the United States.  It is undisputed that the fraudulent conduct begun in Mozambique, London, and the UAE, and indeed, the jury was permitted to find venue based on 18 U.S.C. § 3238.

Fourth, the government proved at trial that Chang and his co-conspirators conducted a sophisticated wire fraud scheme, separate and apart from the sophisticated money laundering operations in which the defendant engaged to conceal the criminal proceeds of that scheme.  To conduct and conceal their loan fraud scheme, the defendant and his conspirators,

8

among other things, (1) devised three special purpose vehicles for the project entities to avoid debt limits; (2) took measures to conceal the debt from the IMF in violation of the countries' reporting requirements, including changing contractual language in the loan documents to reflect that Mozambique was in compliance with its IMF obligations (see GX 2186, 302), and restricting syndication of the MAM loan to avoid public disclosure of the debt (see Tr. 1010 (Leemhuis indicating that Mozambique barred VTB Capital from selling the MAM loan for a year); Tr. 388 (Pearse testifying that he learned that the defendant did not want the MAM loan to be sold to outside investors to keep the loan "secret" and "and that the way to do that was to restrict syndication")); (3) used complex global financial markets to fund the fraudulent loans and transfer the loan proceeds through the United States to bank accounts in other countries; and (4) used fraudulent loan documents to effectuate the fraudulent scheme.  See United States v. Regensberg, 381 F. App'x 60, 62 (2d Cir. 2010) ("the record shows that Regensberg conducted a complex and sophisticated scheme, including the creation of fraudulent loan documents, detailed reporting of fake earnings, use of Ponzi scheme payments to lull his investors, and alteration of an account statement to make it appear as if he had not lost his investors' money"); see also United States v. Jackson, 346 F.3d 22, 25 (2d Cir.2003) ("[E]ven if each step in the scheme was not elaborate, the total scheme was sophisticated in the way all the steps were linked together . . . ."); United States v. Lewis, 93 F.3d 1075, 1083 (2d Cir.1996) (holding, in tax case, that the sophisticated means enhancement applied even when "each step in the planned tax evasion was simple, [because] when viewed together, the steps comprised a plan more complex than merely filling out a false tax return."); U.S.S.G. § 2B1.1 app. n.9(B) ("Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.").

9

Thus, as a starting point, the base offense level for the grouped convictions is a total of 29.

### 3. The Sophisticated Laundering Enhancement Under U.S.S.G. § 2S1.1(b)(2)(B) Applies

The defendant claims that the application of the 2-level enhancement for sophisticated laundering under U.S.S.G. § 2S1.1(b)(2)(B) should not apply. That argument is meritless.[8] In determining whether this enhancement applies, Application Note 5 to § 2S1.1 provides that "[s]ophisticated laundering typically involves the use of–(i) fictitious entities; (ii) shell corporations; (iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or (iv) offshore financial accounts."

The government proved just that. At trial, the government proved that the defendant and his co-conspirators used Luis Rocha Brito's Spanish and Swiss bank accounts to deposit, divert, and conceal the defendant's bribe payments. The defendant instructed his co-conspirators to deposit his bribe payments into Brito's foreign bank accounts. Bank records then show that Privinvest paid the bribe money in structured installments and that once deposited into Brito's accounts, the money moved through multiple levels of transactions and transfers between different accounts belonging to Brito to further conceal the source and origin of the payments.

---

[8] The defendant cites to United States v. Eckstein, No. CR 12-3182 (JB), 2016 WL 546663, at *9 (D.N.M. Feb. 3, 2016) in support of his argument as to why the sophisticated laundering enhancement should not apply. But in Eckstein, the government conceded that the defendant did not create or provide shell entities as part of the money laundering scheme, and that it was the undercover employee who provided Eckstein with the names of apparently fictitious entities, which Eckstein paid with checks that his own legitimate companies issued. That is simply not the case here.

10

For example, bank records showed that a Privinvest subsidiary company wired a total of $5 million (split into payments of $1.5 million, $1.5 million, and $2 million) to a Spanish bank account in the name of Thyse International Corporation ("Thyse") held by Luis Rocha Brito. After the $5 million was wired to the Thyse bank account, additional payments totalling $5 million (but split again into payments of $1.5 million, $1.5 million, and $2 million) were wired from that Thyse bank account to a second Thyse International bank account, and then to Luis Rocha Brito's personal account. Shortly thereafter, a total of $5 million (split again into payments of $1.5 million, $1.5 million, and $2 million) was wired from Brito's personal account to a bank account for "Genoa Asset SA" — a bank account that the defendant had previously provided to Boustani. Any argument that this is not sophisticated money laundering should be rejected.[9]

---

[9] The Court may apply the sophisticated means and sophisticated laundering enhancements because the conduct that forms the basis for the sophisticated means enhancement is different than the conduct that forms the basis of the sophisticated laundering enhancement. See U.S.S.G. § 2S1.1, Application Note 5(B); see also United States v. Cabrera, 635 F. App'x 801, 808–09 (11th Cir. 2015) ("The guidelines do not forbid applying the sophisticated means and sophisticated laundering enhancements together. Instead, they expressly contemplate that the enhancements may be applied cumulatively so long as the conduct that is the basis for applying the sophisticated laundering enhancement is not the only conduct that is the basis for applying the sophisticated means enhancement."); Abreu v. United States, No. 09-CV-10276 (RPP), 2010 WL 2483993, at *7 (S.D.N.Y. June 15, 2010) ("Sophisticated means and sophisticated laundering are two separate enhancements, independently authorized by the Guidelines, and whether the two enhancements are overlapping so as to justify a downward departure in the circumstances of a given defendant is a matter of discretion for the Court.").

4.      The Abuse of a Position of Trust Under U.S.S.G. § 3B1.3 Applies

As set forth in the government's response to the defense objections, the government maintains that this enhancement applies, especially if the Court agrees that the fraud guidelines will be used to determine the base offense level.[10]

Chapter 3 "provides adjustments to the offense level based upon the role the defendant played in committing the offense" and "is to be made on the basis of all conduct within the scope of §1B1.3 (Relevant Conduct), i.e., all conduct included under §1B1.3(a)(1)–(4), and not solely on the basis of elements and acts cited in the count of conviction." Section 3B1.3 specifically provides a 2-point enhancement if "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."

In his submission and objections, the defendant argues that "there is no evidence that Minister Chang used his role as the Minister of Finance to facilitate money laundering or to facilitate wire fraud" and that the "alleged misstatements were not included in the documents that he signed and his role as the Minister of Finance was not used to facilitate misconduct."  Again, that argument completely ignores the facts of this case, the trial record, and the entire reason why the defendant was bribed in the first place.  The defendant was, as his counsel made a point of saying, "Minister Chang" — a high-ranking, senior government official who had the authority to sign guarantees obligating his country to repay $2 billion in loans.  Privinvest bribed the

---

[10] While U.S.S.G. § 2C1.1 directs the parties not to apply this enhancement, U.S.S.G. § 2B1.1 does not have a similar limitation applicable here.  Pursuant to the Guidelines, § 3B1.3 is inapplicable with respect to § 2B1.1(b)(8)(b), § 2B1.1(b)(9)(A), § 2B1.1(b)(13) and § 2B1.1(b)(20) — none of which are implicated here.  See Application Notes, § 2B1.1, Application Note 7, 8, 11 and 16.

defendant for that very purpose, and the defendant knowingly accepted those bribes in exchange for signing the government guarantees. That undoubtedly constitutes an abuse of a position of trust under this section, and any arguments to the contrary are baseless.

> 5. The Defendant Does Not Deserve a Minor or Minimal Reduction for His Role

The defendant also argues that he deserves a reduction for playing a minimal or minor part in the scheme. That argument should also be rejected.

In determining whether to apply a reduction for the defendant's role in the offense, the Guidelines direct the Court to consider the following non-exhaustive list of factors: (i) the degree to which the defendant understood the scope and structure of the criminal activity; (ii) the degree to which the defendant participated in planning or organizing the criminal activity; (iii) the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority; (iv) the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts; and (v) the degree to which the defendant stood to benefit from the criminal activity. See U.S.S.G. § 3B1.1, Application Note 3(C).

In support of his argument that he deserves credit for his conduct, the defendant reiterates numerous arguments that he presented at trial, including that the projects were supported and approved by other Mozambican government officials, that there "was nothing inherently criminal about Mr. Chang signing the loan guarantees," and that there was "no direct evidence he was induced to do so in exchange for receiving any illegal payments." See Def. Obj. at pp. 12-13.

13

None of that is correct, or persuasive.  While the defendant was not the one paying bribes, he was a central figure in the scheme.  The defendant, as the Minister of Finance, was one of the highest ranking government employees in the Mozambican government, and he personally profited off of both his position and his country.  The defendant then conspired to lie to international investors about accepting bribes so that the investors would lend his co-conspirators over $2 billion.  And he did so knowing that the investors would be put at risk if they learned the truth — that Privinvest was paying millions of dollars in bribes to government officials, including him personally.  He continued this conduct even though he knew that the investors would, in turn, market the loan products to other unknowing victims across the world.

Moreover, at trial, the government proved that the defendant actively colluded with Jean Boustani and Antonio Do Rosario, and enjoyed all of the illicit benefits from that relationship.  Boustani and Do Rosario flew the defendant on business and first-class trips to Paris, trips that coincided with Credit Suisse's approval of the loans and payment of millions of dollars to Privinvest.  (See GX 3236).  The defendant met with Boustani in Paris, including at Iskander Safa's estate in the south of France (see GX 2427; Tr. 143 (Pearse testifying regarding the Paris meeting)), and he even agreed to engage in a proposed corrupt business venture with Boustani, Do Rosario and other Mozambicans in which the defendant stood to earn $10-$15 million in taxpayer money from this venture.  (See GX 3301, GX 3301B, GX 2418.)  And as the jury heard, the defendant received a shipment of over 1,000 bottles of rosé wine, red wine, honey and olive oil from Boustani around the time that the EMATUM deal was approved.  (See GX 2463, 2463-A.)  None of this behavior warrants a minimal participant reduction.

### III.    <u>LEGAL STANDARD FOR SENTENCING</u>

A "district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [it] may not presume that the Guidelines range is reasonable.  [It] must make an individualized assessment based on the facts presented."  <u>Id.</u> at 50.

Title 18, United States Code, Section 3553(a) provides that, in imposing sentence, the Court shall consider:

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed—

(A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct; [and]

(C)    to protect the public from further crimes of the defendant.

Section 3553 also addresses the need for the sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner."  18 U.S.C. § 3553(a)(2)(D).  "[I]n determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, [the Court] shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation."  18 U.S.C. § 3582(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

A.    A Substantial Term of Imprisonment Within the Guidelines Range Is Warranted

For the reasons set forth below, the government believes that a significant sentence of incarceration that falls within the Guidelines range of 135-168 months' imprisonment is warranted here given the nature and seriousness of the defendant's criminal offenses, the defendant's history and characteristics and the need for general deterrence. See 18 U.S.C. § 3553(a). Such a sentence is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

A.    Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

First, the nature of and circumstances of the defendant's participation in a $2 billion fraud counsels strongly in favor of a significant sentence of incarceration. The defendant knowingly participated in a brazen international fraud, money laundering and bribery scheme that caused one of the biggest debt and corruption scandals in Africa. Hundreds of millions of dollars were paid in bribes to government officials in Mozambique, including the defendant, so that Privinvest could obtain billions of dollars in loans. Although the loans were supposed to be used for projects that would benefit the Mozambican people, the opposite was true. By the end of 2017, tens of millions of those dollars had been diverted to Privinvest, the

16

defendant, and other co-conspirators for their personal gain.  All three projects ultimately defaulted, putting the entire country of Mozambique in financial jeopardy because the defendant obligated it to repay the debt.

As proven at trial and as laid out in the government's post-trial motion, the defendant was a central player in this criminal scheme.  The defendant was the Minister of Finance of Mozambique, and at one time, he was even the Governor for Mozambique on the IMF Board.  (PSR, ¶ 82.)  The defendant helped structured the projects and the loans to persuade Credit Suisse, VTB Capital, and their investors to lend money to Proindicus, EMATUM and MAM.  He negotiated key terms with Credit Suisse and VTB Capital, and insisted on contractual language that only served to conceal the fraud further.  For example, at trial, the government proved that he was the one who insisted on changing IMF language in the Proindicus project to reflect that Mozambique was in compliance with its IMF obligations, when in fact, it was not. The defendant also insisted on incorporating a one-year non-syndication language in the MAM loan contract so that the MAM loan would not be sold (and disclosed) to the public during this time.  Critically, the defendant even signed government guarantees that promised investors that the country of Mozambique would repay the companies' debt in the event that they defaulted, all the while knowing that Privinvest — the sole contractor on all three projects and the direct recipient of $2 billion in loans — had paid him $7 million in bribes.

Although the defendant seeks to minimize his conduct, the trial evidence proves that the defendant acted knowingly and deliberately.  He knowingly colluded with Boustani and Do Rosario, and reaped all the perks and benefits of that conspiratorial relationship — receiving luxury gifts, flying on all-paid business and first class trips to Paris.  The trial evidence also proved that the defendant knew that his conduct was corrupt, and that he had no qualms about

17

using others, including his own family members, to cover his own tracks. He used his co-conspirators as intermediaries to pass along messages; used his associate's bank accounts to launder his illicit proceeds; and even had his daughter fly to Lebanon to open bank accounts.

The defendant makes no attempt to explain, let alone show contrition for, his actions. Instead, throughout his submissions, the defendant seek to minimize the complexity, scope and impact of both the criminal fraud scheme at issue in this case and his own conduct in furtherance of that scheme. He accuses other senior government officials and the Central Bank of Mozambique for approving the loans and for directing him to do so as well, and claims that Brito was the true recipient for the bribe money from Privinvest. See Def. Sentencing Br. 19-21 (arguing that these projects were approved by various senior members of the Mozambican government; that he was "instructed to sign the government guarantees" at the direction of others; and that at most, he was only a "small 'spoke' in a 'spoke and wheel' conspiracy."). The jury did not find any of these arguments credible, and neither should the Court.

Moreover, the defendant makes little, if any, mention of the impact of the defaulted loans to the people of Mozambique and to victim-investors who were defrauded by the defendant and his co-conspirators. The amount of the Proindicus and EMATUM loans alone was roughly 9% of Mozambique's GDP in 2013. (Tr. 1271.) As set forth above, at trial, the government proved that certain investor-victims (including those that invested for retirement and pension plans) lost millions of dollars in connection with these loans. Yet, the defendant continues to claim that there are no victims and that there are no losses. In short, the defendant's attempts to ignore, minimize and distract from the true severity of his crimes and culpability should not be credited, and a substantial term of incarceration is appropriate.

18

B.    <u>History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))</u>

The defendant's sentencing submission and the PSR describes certain aspects of his history and characteristics at length. The defendant's history and characteristics are notable in many respects.

It shows a defendant who grew up poor but had opportunities that his fellow Mozambicans — including his own siblings — did not have: an education, employment, and a long and storied career in public service. Indeed, as the PSR sets forth, the defendant began working for the country of Mozambique when he was only 19 years old, and over time, rose to the powerful position of Minister of Finance. (PSR, ¶ 81-82.) It shows a defendant who is intelligent, educated, and sophisticated. It shows a defendant who held impressive titles and positions at various parts of the government, including at the IMF and World Bank. (<u>Id.</u>) It also shows a defendant who has no history of abuse or neglect in the familial home, and who has the support of his family.

All of these characteristics make the defendant's crimes here even more stark and egregious. The defendant had every reason not to commit crimes, including his obligations as a public official. Yet, he chose to do so because of greed. He chose to accept millions of dollars in bribes, to lie to investors, and to conceal his criminal conduct. The defendant chose to expose his country and its people to enormous financial risk, even though he — as a former Governor for Mozambique on the IMF Board — fully knew how severe the financial and economic consequences would be to Mozambique if investors and the IMF learned the truth about the projects and the payment of bribes to government officials.

Moreover, as discussed above, from the time he was arrested in December 2018 to now, the defendant has expressed no remorse or acceptance of responsibility. Instead, despite

19

his former status as one of the highest-ranking officials in the Mozambican government, he seeks to cast blame on everyone else but himself. The defendant has not taken responsibility for his conduct, and a significant incarceratory sentence is warranted in this instance.

C.    The Need for General Deterrence (18 U.S.C. § 3553(a)(1))

The government agrees that the Court should consider the defendant's age and physical condition as mitigating factors. However, the sentence imposed must also consider the need for deterrence of those who would consider engaging in similar conduct under similar circumstances. Given the strong economic incentives in preventing public corruption, it is critical that there be equally strong counterincentives. See United States v. Blech, 550 F. App'x 70, 71 (2d Cir. 2014) (summary order) ("Blech was sentenced based on the 18 U.S.C. § 3553(a) factors, including the need for specific deterrence for a recidivist, and the need for general deterrence for those who might otherwise feel that some white-collar crimes are 'game[s] worth playing.'") (quoting United States v. Goffer, 721 F.3d 113, 132 (2d Cir. 2013)); S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("The second purpose of sentencing is to deter others from committing the offense. This is particularly important in the area of white collar crime and government corruption. Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.")). The government's recommended sentence will send a strong deterrent message to those who, like the defendant, are public officials and seeking to engage in bribery and related conduct to enrich themselves, often at the expense — as was the case here — of ordinary people in the countries where such schemes are allowed to proliferate.

20

Furthermore, given that sophisticated bribery and money laundering schemes are incredibly difficult to detect and prosecute, there is greater need for general deterrence.  See, e.g., Harmelin v. Michigan, 501 U.S. 957, 988 (1991) (noting that "since deterrent effect depends not only upon the amount of the penalty but upon its certainty, crimes that are less grave but significantly more difficult to detect may warrant substantially higher penalties").  Because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."  See, e.g., United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006) (quoting Stephanos Bibas, White-Collar Plea Bargaining and Sentencing After Booker, 47 Wm. & Mary L. Rev. 721, 724 (2005)); United States v. Heffernan, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Drago Francesco, Roberto Galbiati & Pietro Vertova, The Deterrent Effects of Prison: Evidence From a Natural Experiment, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime.  This corroborates the theory of general deterrence.").

The defendant's arguments that he need not be sentenced to any additional prison time whatsoever because his incarceration and trial has been "highly publicized" should be rejected.  (See Def. Sentencing Br., 41-42.)  The defendant does not deserve a lower sentence because the fraudulent and money laundering scheme he engaged in was so egregious that it garnered global media attention.  The reason the case has international visibility is due in large part to the staggering amount of the loans, the fact that high-ranking senior government officials

21

(including the defendant) and investment bankers had been bribed as part of the scheme to obtain the loans, and the significant collateral consequences the scheme had on Mozambique and investors around the world. If anything, the defendant's argument would lead to perverse results — that the more damage a crime has inflicted and the international attention a case has, the more credit a defendant should receive at sentencing. This approach would lead to similarly short or non-existent custodial sentences in all corruption cases, regardless of their size, scope, or complexity, which would frustrate proportionality, a paramount goal of sentencing. See United States v. Booker, 543 U.S. 220, 264 (2005).

For these reasons, a Guidelines sentence is necessary here to achieve the sentencing goal of general deterrence.

## IV.    THE DEFENDANT'S ADDITIONAL ARGUMENTS FOR A TIME SERVED SENTENCE SHOULD BE REJECTED

The defendant raises a number of additional arguments in support of his request for a sentence of time served, i.e., an effective sentence of approximately 70 months and 22 days as of the date of sentencing, including: (1) the need to avoid sentencing disparities between the defendant and other similarly situated defendants, (2) the prison conditions in South Africa and at the MDC and its effect on the defendant's physical and emotional well-being, (3) the collateral consequences of a conviction on a non-U.S. citizen, and (4) his time spent in foreign custody awaiting extradition. None of these arguments supports his extraordinary request of reducing his sentence to time served.

### A.    There Are No Unwarranted Sentencing Disparities

First, the defendant raises a litany of arguments claiming that he deserves a time-served sentence because (1) the defendant's co-conspirator Jean Boustani received no sentence;

22

and (2) the government's cooperating witness Detelina Subeva received no incarceration as part of her sentence. (Def. Sentencing Br., at 44-47.) These arguments should be rejected.

As an initial matter, a Guidelines sentence for the defendant would not result in unwanted disparities between the defendant and other similarly-situated individuals. Recently, in United States v. Ng Chong Hwa, 18-CR-538 (MKB), Judge Brodie imposed a ten-year sentence on the defendant, a sophisticated investment banker at Goldman Sachs who played a critical role in a massive bribery and money laundering scheme that stole billions of dollars intended for infrastructure and economic projects to aid the Malaysian people. Ng profited off of the stolen proceeds and used millions of dollars and pay bribes to at least a dozen corrupt government officials in Malysia and Abu Dhabi. Although the defendant in Ng personally received over $35 million in illicit payments, unlike the defendant here, Ng was not a senior-ranking public official who had a responsibility to serve his country and not take bribes consistent with the duties of his office.

Moreover, although there is no perfect comparison, courts across the country have also imposed sentences on similarly situated defendants that demonstrate that the defendant's requested sentence here is wildly disproportionate given his conduct. For example, within the Second Circuit:

- United States v. Napout, No. 15-CR-252 (PKC) (E.D.N.Y.) (the defendant, who was the former president of CONMEBOL, a FIFA Vice President, and a member of the FIFA Executive Committee, was sentenced to 108 months' imprisonment after being convicted at trial for receiving over $3 million in bribes and agreeing to receive more than $20 million more in connection with a scheme involving the sale of marketing and media rights for various soccer tournaments);

- United States v. Marin, No. 15-CR-252 (PKC) (E.D.N.Y.) (defendant, the former Brazilian soccer federation president, sentenced to 48 months' imprisonment after being convicted at trial for receiving over $3 million in bribes and agreeing to

23

receive approximately $10 million more in connection with a scheme involving the sale of marketing and media rights for various soccer tournaments);

- United States v. Thiam, No. 14-CR-47 (DLC) (S.D.N.Y.) (former Minister of Mines and Geology of the Republic of Guinea sentenced to 84 months' imprisonment and there years of supervised release after being convicted at trial for receiving and laundering approximately $8.5 million in bribes from a Chinese conglomerate in connection with the awarding of investment rights in the Republic of Guinea);

- United States v. Portillo, No. 09-CR-1142 (RPP) (S.D.N.Y.) (defendant sentenced to 70 months' imprisonment after pleading guilty to receiving $2.5 million in bribery payments from the government of Taiwan while he was serving as president of Guatemala);

- United States v. Ng Lap Seng, No. 15-CR-706 (VSB) (S.D.N.Y.) (defendant sentenced to 48 months' imprisonment after being convicted at trial for paying over $1 million in bribes to two senior United Nations ambassadors); and

- United States v. Chinea, United States v. DeMeneses, No. 14-CR-240 (DLC) (S.D.N.Y.) (defendants sentenced to 48 months' imprisonment after pleading guilty to arranging bribe payments to a Venezuelan state-owned bank in exchange for that bank directing its trading business to the defendants' company, which earned Chinea and DeMeneses approximately $3.6 million and $2.7 million, respectively, in commissions and/or bonuses).

Sentences imposed outside of the Second Circuit also demonstrate that a time-served sentence would create significant disparities with similarly situated defendants, and does not accord with the purposes of Section 3553(a)(6):

- United States v. Carlos Polit, No. 22-CR-20114 (KW) (S.D. Fla.) (defendant, former Comptroller General of Ecuador, sentenced to 10 years' imprisonment after being convicted at trial of money laundering offenses relating to his receipt of over $16 million in bribes);

- United States v. Claudia Diaz and Jose Velasquez, No. 18-CR-80160 (WPD) (S.D. Fla.) (defendant Diaz (former National Treasurer of Venezuela) and Velasquez (her husband) originally sentenced to 15 years' imprisonment (later reduced to 12 years on re-sentencing after passage of the two-point Guidelines reduction for no prior criminal history) for receiving over $136 million in bribes);

- United States v. Esquenazi, United States v. Duperval, United States v. Rodriguez, No. 09-CR-21010 (JEM) (S.D. Fla.) (defendants sentenced to 15 years', 9 years' and 7 years' imprisonment, respectively, after being convicted

24

at trial for conspiring to pay approximately $2.2 million in bribes to a Haitian-run telecommunications company);

- United State v. Jefferson, No. 07-CR-209 (TSE) (E.D. Va.) (defendant, a U.S. Representative, sentenced to 13 years' imprisonment after being convicted at trial for receiving approximately $500,000 in bribe payments in exchange for using his position to promote deals in Nigeria, Ghana, Equatorial Guinea, Botswana and the Democratic Republic of the Congo);

- United States v. Harder, No. 15-CR-1 (PD) (E.D. Pa.) (defendant sentenced to 60 months' imprisonment after pleading guilty to paying approximately $3.5 million in bribes to corruptly influence a foreign official's actions regarding energy project approvals);

- United States v. Reyes, No. 17-CR-20747 (KMW) (S.D. Fla.) (defendant sentenced to 53 months' imprisonment after pleading guilty to receiving $2.1 million in bribes in connection with a bribery scheme to provide illicit payments to officials from Ecuador's state-run oil company);

- United States v. Domenech, No. 20-CR-20179 (DPG) (S.D. Fla.) (defendant sentenced to 51 months' imprisonment after pleading guilty to using his official position as an advisor to the president of Ecuador to award insurance contracts and obtain more than $2 million in bribes);

- United States v. Chacin Haddad, United States v. Veroes, No. 19-CR-20351 (CMA) (S.D. Fla.) (defendants each sentenced to 51 months' imprisonment after pleading guilty to conspiring to pay bribes to secure contracts for a state-owned electricity company and for which each defendant personally benefitted approximately $5.5 million); and

- United States v. Lambert, No. 18-CR-12 (TDC) (D. Md.) (defendant sentenced to 48 months' imprisonment after being convicted at trial for conspiring to authorize $1.5 million in corrupt bribe payments that provided over $11 million in benefits to the defendant's company).

Here, the sentences received by defendants convicted of similar crimes

demonstrate that the defendant's request is not appropriate.

Second, the defendant argues that it is unfair to subject him to further

incarceration when Jean Boustani "received no sentence." There is no parallel to Boustani.

Boustani was acquitted at trial, whereas the defendant was convicted of all of the charges against

him. There is also no evidence to suggest that if Boustani had been convicted and sentenced, he would have faced a lesser guidelines range than the defendant.

Third, the defendant should not be permitted to gain credit by comparing his sentencing to that of Detelina Subeva's. Subeva is a cooperating witness, who accepted responsibility for her conduct and agreed to cooperate with the government almost immediately after her arrest. In contrast, the defendant fought extradition for years, proceeded to trial, and has not accepted any responsibility whatsoever for his crimes. In short, Subeva's sentence does not pose any unwanted disparity here because she is not similarly situated to the defendant. The defendant should not benefit from someone else's cooperation.

B.    The Defendant's Pre-Trial Detention Does Not Merit a Time Served Sentence

In his sentencing memorandum, the defendant discusses at length the conditions of his incarceration in South Africa between his arrest on December 29, 2018, his extradition to the United States on July 12, 2023 and subsequent detention, and the alleged effects of those conditions on his physical and mental health. (Def. Sentencing Br., 31-39). He argues that that experience and its impact on him warrant a sentence of time served. Of course, the Court can — and indeed, should — consider the circumstances of the defendant's pre-trial detention. But that is not all that the Court must consider, and for multiple reasons, the defendant's claim that he has been sufficiently punished for the time he spent in pre-trial detention should be rejected.

First, as set forth in the government's response to the defense objections, the government understands that the Federal Bureau of Prisons ("BOP") will ordinarily apply a credit towards the defendant's U.S. sentence for the time he served in South Africa awaiting extradition. The operable statute is 18 U.S.C. § 3585(b), titled "Calculation of a term of imprisonment," which states that a defendant "shall be given credit toward the service of a term

26

of imprisonment for any time he has spent in official detention prior to the date the sentence commences (1) as a result of the offense for which the sentence was imposed." The Supreme Court has also held that the Bureau of Prisons is "the agency charged with administering the credit statute," Reno v. Koray, 515 U.S. 50, 60 (1995), and that § 3585(b) does not authorize a district court to award such credit at sentencing, see United States v. Wilson, 503 U.S. 329, 333-335 (1992) ("Congress has indicated that computation of the credit must occur after the defendant begins his sentence. A district court, therefore, cannot apply § 3585(b) at sentencing.").

Thus, in circumstances such as those here, a defendant "shall be" credited for any time spent in detention on the charges for which he or she is sentenced. Consequently — other than taking into account the conditions of the defendant's prior confinement, and any resulting effects on him — the Court should issue its sentence in this case as it would in any other case. To do otherwise would be to improperly double-count that time: for example, if the Court would otherwise have sentenced the defendant to 180 months' imprisonment but took the defendant's pre-trial detention into account to impose a lesser sentence, the BOP would still credit the defendant for the time he served in South Africa, and further reduce the defendant's sentence.

Second, the defendant's pre-trial detention does not support such an extraordinary departure from the applicable guidelines of 135-168 months' imprisonment to time-served. The defendant was arrested in December 2018, but fought extradition to the United States for approximately 4.5 years.[11] After the defendant was extradited to the United States, he was

---

[11] The defendant claims, at various times, that "had Minister Chang been tried, convicted and sentenced, closer to the time of his arrest, today, he would be eligible for compassionate release." (Def. Sentencing Br., at 39-40.) Certainly, the defendant could have waived

27

detained at the MDC.  Although the defendant cites the harsh conditions at the MDC, and 

Thus, the record does not support the conclusion that the defendant should not serve any additional time incarcerated.[12]

### C. The Defendant's Non-U.S. Citizenship Does Not Merit a Time-Served Sentence

The defendant also urges the Court to give him a time-served sentence based on his assertion that he would not be eligible for certain release options, or for certain other sentence reductions due to his status as a non-citizen.  (Def. Sentencing Mem. at 38).[13]  As an initial matter, many foreign national non-resident defendants are subject to the exact same factors, yet routinely receive substantial sentences.

Moreover, the Second Circuit has repeatedly rejected the same argument in the context of a downward departure for reasons that apply with equal force to the defendant's request for time served.  In United States v. Restrepo, 999 F.2d 640 (2d Cir. 1993), the Second

---

extradition at the time of his arrest, and agreed to be brought to the United States for prosecution. But the defendant did not do so, and as such, the government had to undertake the formal extradition process.  The defendant cannot now blame the U.S. government for his pre-trial detention in South Africa to seek credit for his sentencing.

[12] The government respectfully seeks leave to file this memorandum under seal with a publicly-filed version redacting the portion addressing the defendant's health.

[13] The defendant also argues, at various points, that had he been sentenced to 71 months, he would be eligible for early release or good time credit.  (Def. Sentencing Mem., at 35-36.) That, however, presupposes the Court's sentence.  Moreover, when the defendant is actually sentenced, the BOP will calculate whether he is eligible for such credit.

Circuit held that, although there may be rare circumstances when alienage can be considered in sentencing a defendant, a district court may <u>not</u> consider "(1) the unavailability of preferred conditions of confinement [or] (2) the possibility of an additional period of detention pending deportation following the completion of sentence." <u>Id.</u> at 644.

With respect to the issue of whether the defendant could be designated to a "camp," the Second Circuit has stated:

> Even if it were a steadfast policy of the B[OP] to deny reassignment to relaxed-security facilities to alien prisoners who must be deported on account of their convictions, we would consider that policy an inappropriate basis for departure from the imprisonment range prescribed by the Guidelines.  Assuming that § 3624(c) was intended to apply to deportable aliens, the statute does not on its face require the B[OP] to ensure that all prisoners participate in such a program, but only to do so if practicable.  For example, the B[OP] need not reassign the prisoner to a halfway house if there is no such unit in his home state, and the absence of such a facility has been held to be an impermissible ground for departure from the Guidelines.

<u>Id.</u> at 645.  The Second Circuit concluded that, "if there is a defect in the B[OP]'s policy toward reassignment of deportable aliens, the appropriate way to remedy that defect would be pursuit of an action that challenges such a policy head-on, not the ad hoc granting of departures that have the effect of creating the very type of disparity in sentencing that the adoption of the Guidelines was intended to eliminate." <u>Id.</u> at 646.

In any event, courts — principally in other circuits — that have permitted departures based on alienage have done so where, unlike in this case, "the conditions in question are 'substantially more onerous than the framers of the guidelines contemplated in fixing the punishment range for the defendant's offense [ . . . ,] and the differences in the conditions of confinement or other incidents of punishment between deportable aliens and other citizen (or

nondeportable alien) defendants . . . are not great.'" United States v. Mohammed, 315 F. Supp. 2d 354, 367 (S.D.N.Y. 2003) (quoting United States v. Guzman, 236 F.3d 830, 834 (7th Cir. 2001)) (alterations in original).  The court in Mohammed, in rejecting a departure, found that "[i]neligibility for half-way houses or minimum security institutions, the only consequences Mohammed relies upon, are not such extraordinary deprivations as to warrant a finding that the Commission did not take into account the chance that someone in this sentencing range would be subjected to them."  Id.

The Second Circuit has reaffirmed its holding in Restrepo in the post-Booker advisory Sentencing Guidelines regime.  See United States v. Duque, 256 F. App'x 436, 437-38 (2d Cir. 2007) (citing Restrepo for the proposition that "'(1) the unavailability of preferred conditions of confinement, [and] (2) the possibility of an additional period of detention pending deportation following the completion of sentence,' generally do not justify a departure from the Sentencing Guidelines range"); see also United States v. Wills, 476 F.3d 103, 107 (2d Cir. 2007) ("Now, after Booker, we reaffirm the reasoning of Restrepo and apply it to Wills's non-Guidelines sentence, which was partly based on the purported 'additional punishment' of deportation."); Rosario v. United States, 625 F. Supp. 2d 123, 130 (S.D.N.Y. 2008) (declining to exercise discretion afforded by Kimbrough v. United States, 552 U.S. 85 (2007), and holding "[i]n light of the legal authority in this Circuit, therefore, Petitioner's ineligibility for certain correctional programs due to his alien status, while unfortunate, is not an adequate basis for a downward departure of his sentence").  And again, even if this Court were to consider, or even fully credit, the defendant's argument, it does not warrant the extraordinary sentence that he seeks.

## V.    OTHER MONETARY PENALTIES

Lastly, the government respectfully submits that forfeiture is mandatory on the offenses of conviction and should be ordered in the amount of $7 million.  With respect to restitution, the government has not received any restitution requests from the known victims to date but is following up and at least one victim has indicated that it may want to file a claim. Lastly, Probation has indicated that the defendant appears unable to pay a fine (PSR, ¶ 87), and the government defers to Probation's assessment.

### A.    The Court Should Impose Forfeiture of $7,000,000

As a result of the defendant's convictions of 18 U.S.C. §§ 1349 and 1956(h), the defendant is liable to forfeit: (a) any property, real or personal, constituting, or derived from, proceeds obtained directly or indirectly as a result of the defendant's violation of 18 U.S.C. § 1349; (b) any property, real  or personal, involved in the defendant's violation of 18 U.S.C. § 1956(h), or any property traceable to such property; and/or (c) a substitute assets, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C. § 982(b)(1).  Forfeiture is mandatory for the aforementioned counts of conviction.  Pursuant to Title 28, United States Code, Section 2461(c), if a defendant is convicted of an offense giving rise to forfeiture, the court shall order the forfeiture of the property as part of the sentence.

Thus, the government respectfully requests that the Court order forfeiture in the amount of $7,000,000, which constitute the defendant's ill-gotten gains from the scheme.

### 1.    Legal Standard

Rule 32.2(b)(1)(A) of the Federal Rules of Criminal Procedure provides that if the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.  See Fed. R. Crim. P. 32.2(b)(1)(A).  Courts in the

31

Second Circuit have routinely imposed forfeiture money judgments pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(1).  See, e.g., United States v. Marsh, Nos. 10-CR-0480, 10-CR-0697, 10-CR-0700, 10-CR-0800, 10-CR-801, 2011 WL 5325410 (E.D.N.Y. Oct. 26, 2011) (Weinstein, J.); United States v. Dipascali, No. 09-CR-764, 2010 WL 9002774 (S.D.N.Y. June 18, 2010); United States v. Capoccia, No. 03-CR-35, 2009 WL 2601426 (D. Vt. Aug. 19, 2009), aff'd, 402 Fed. Appx. 639 (2d Cir. 2010).  Any unpaid amount that remains outstanding may be reduced to an in personam forfeiture money judgment.  United States v. Awad, 598 F.3d 76, 78 (2d Cir. 2010) ("[W]hen a defendant lacks the assets to satisfy the forfeiture order at the time of sentencing, the money judgment [against the defendant] is effectively an in personam judgment in the amount of the forfeiture order . . ."); United States v. Kalish, 626 F.3d 165, 168-69 (2d Cir. 2010) (same); United States v. Roberts, 696 F. Supp. 2d 263, 268 (E.D.N.Y. 2010) (Irizarry, J.) (same), aff'd and forfeiture order vacated on other grounds, 660 F.3d 149, 168 (2d Cir. 2011).

Further, Rule 32.2(b)(1)(B) provides that the Court's determination may be based on evidence already in the record, and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable.  See United States v. Capoccia, 503 F.3d 103,109 (2d Cir. 2007); United States v. Roberts, 660 F.3d 149, 166 (2d Cir. 2011) ("district courts may use general points of reference as a starting point for a forfeiture calculation and 'make reasonable extrapolations' supported by a preponderance of the evidence").

In contrast to the guilt phase of the criminal trial, the government bears the burden of establishing the amount of money subject to forfeiture only by a preponderance of the evidence.  See Capoccia, 503 F.3d at 116; United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) (upholding trial court's application of preponderance standard on grounds that criminal forfeiture is part of sentencing).  The government is not required to provide a precise calculation

of the amount of money a defendant must forfeit.  See United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011).  Instead, the money judgment amount can be reasonably estimated based upon the available information.  Id.  Sentencing courts may consider trial evidence, hearsay, as well as "evidence or information submitted by the parties and accepted by the court as relevant and reliable," in determining forfeiture. Fed. R. Crim. P. 32.2(b)(1)(B); Capoccia, 503 F.3d at 109-10 (citing United States v. Gaskin, 364 F.3d 438, 462-63 (2d Cir. 2004)).

Notably, criminal forfeiture "serves no remedial purpose, [and] is designed to punish the offender . . . ."  United States v. Contorinis, 692 F.3d at 146.  Furthermore, criminal forfeiture is mandatory, and a creature of statute.  See United States v. Monsanto, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory" in cases where the relevant forfeiture statute provides that the court "shall order" forfeiture).  It is well-settled in the Second Circuit that forfeiture is a mandatory obligation of a defendant at sentencing that is entirely separate from restitution, which is also mandatory. United States v. Kalish, 626 F.3d 165, 169 (2d Cir. 2010) (There is "no infirmity in the District Court's imposition of both a forfeiture remedy and a restitution remedy.  These remedies are authorized by separate statutes, and their simultaneous imposition offends no constitutional provision."); see also United States v. Bengis, 631 F.3d 33, 41 (2d Cir. 2011) (same) (quoting Kalish).  Accordingly, the court should impose forfeiture as part of the defendant's sentence, separate and apart from any restitution that is awarded to victims.

2.    Evidentiary Basis for the Government's Proposed Order of Forfeiture

The evidence at trial, detailed above, established that the defendant illegally obtained at least $7,000,000 from his involvement in the scheme.  Thus, the defendant is liable to forfeit $7,000,000 to the United States as a result of his commission of the crimes of conviction.

As a result, the government has submitted a proposed Order of Forfeiture pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, which provides for the entry of a forfeiture money judgment in the amount of $7,000,000 ($7,000,000).

B.    Restitution

As per the PSR, restitution is mandatory pursuant to 18 U.S.C. § 3663A; U.S.S.G. § 5E1.1(a)(1).  The government has conferred with certain victims, and has provided the list of contact information for known victims to the Probation Department.  However, as set forth above, to date, the government has not received affidavit of losses from known victims.  The government is following up with victims to confirm whether any of them will make a restitution claim and at least one victim has indicated that it may want to file a claim.

## CONCLUSION

For the foregoing reasons, the government respectfully submits that the Court should sentence the defendant to a Guidelines sentence within the range of 135-168 months'

imprisonment, which is sufficient, but not greater than necessary, to advance the goals of

sentencing.

Dated: Brooklyn, New York
      November 13, 2024

                                     Respectfully submitted,

                                     BREON PEACE
                                     United States Attorney

By:           /s/               
                                     Hiral Mehta
                                     Genny Ngai
                                     Jonathan Siegel
                                     Assistant U.S. Attorneys
                                     (718) 254-7000

                                     MARGARET A. MOESER
                                     Chief, Money Laundering & Asset Recovery Section
                                     Criminal Division
                                     U.S. Department of Justice

                                     GLENN S. LEON
                                     Chief, Fraud Section
                                     Criminal Division
                                     U.S. Dept. of Justice

By:           /s/               
                                     Morgan Cohen
                                     Peter Cooch
                                     Trial Attorneys