UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
UNITED STATES OF AMERICA

                                Case No. 1:18-CR-00681

v.


MANUEL CHANG


                    Defendant.
-------------------------------------------------------------x


**DEFENDANT MANUEL CHANG'S SENTENCING MEMORANDUM**

FORD O'BRIEN LANDY LLP

Adam C. Ford
Jamie H. Solano
Anjula S. Prasad
Stephen R. Halpin III
Carolyn A. Sartori
275 Madison Avenue, 24th Floor
New York, New York 10016
*aford@fordobrien.com*
*jsolano@fordobrien.com*
*aprasad@fordobrien.com*
*shalpin@fordobrien.com*
*csartori@fordobrien.com*
(212) 858-0040

*Attorneys for Minister Chang*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................1

II.   The Sentencing Guidelines Calculation ...........................................................3

    A.  The Base Offense Level for Count One is 7 ...............................................3

    B.  There were No Losses and No Victims ......................................................4

    C.  The Guidelines Range and Offense Conduct for Count Two ................6

    D.  Minister Chang Should Receive a Minor Role Adjustment ...................8

    E.  An Abuse of Trust Enhancement Should Not Be Applied ...................11

    F.  The Appropriate Guidelines Range is 0-6 Months ...............................12

III.  72 Months of Time Served by Minister Chang is Sufficient to Accomplish the Goals

    of Sentencing ...................................................................................................12

    A.  The Applicable Guideline Range for Minister Change Overstates the Gravity of

        the Offense ..................................................................................................12

    B.  The Cour Can and Should Impose a Non-Guidelines Sentence ..........17

    C.  A Consider of the 18 U.S.C. § 3553(a) Factors Confirms that a Non-Guidelines

        Sentence Is Appropriate ...........................................................................19

        1.  1.18 U.S.C. § 3553(a)(1): The "Nature and Circumstances of the Offense" and

            the "Characteristics of the Defendant" Warrant a Sentence of Time Served ..19

            a.  Nature and Circumstance of the Offense ..................................19

            b.  Minister Chang's Background and Characteristics...................22

                i.    Minister Chang's background ...........................................22

                ii.   Minister Chang's Character ..............................................25

                iii.  Minister Chang's incarceration since December 2018.......31

                iv.   Minister Chang's mental health .......................................33

                v.    Minister Chang's physical condition ...............................33

        2.  18 U.S.C. § 3553(a)(2): A Sufficient Sentence .................................34

            a. 18 U.S.C. § 3553(a)(2)(A): The need to reflect the seriousness of the

            offense, promote respect for the law, and provide just punishment for the offense

            ...........................................................................................................35

                i.  Minister Chang would be entitled to credit for good behavior.............35

ii. Minister Chang's conditions in both Modderbee Prison and MDC were dire ..................................................................................36

iii. The stress of Minister Chang's pretrial incarceration should be considered. .............................................................................38

iv. Had Minister Chang been tried at the time of his arrest in 2018 and sentenced 6 years ago, he would be eligible for compassionate release today.....................................................................................39

b. 18 U.S.C. § 3553(a)(2)(B): The need to afford adequate deterrence to criminal conduct.......................................................................41

c. 18 U.S.C. § 3553(a)(2)(C): The need to protect the public from further crimes of the defendant................................................................42

d. 3553(a)(2)(D): The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective way ......................................................................43

3. 18 U.S.C. § 3553(a)(3)..........................................................43

4. 18 U.S.C. § 3553(a)(6)..........................................................44

CONCLUSION.........................................................................47

# TABLE OF AUTHORITIES

Page(s)

Cases

*Ciminelli v. United States*,
  598 U.S. 306 (2023) ................................................................................ 6
*Gall v. United States*,
  552 U.S. 38 (2007) ................................................................................... 2
*Kimbrough v. United States*,
  552 U.S. 85 (2007) ................................................................................. 18
*Percoco v. United States*,
  598 U.S. 319 (2023) ................................................................................ 6
*Rita v. United States*,
  551 U.S. 338 (2007) ......................................................................... 17, 18
*United States v. Adelson*,
  441 F. Supp. 2d 506 (S.D.N.Y. 2006) ................................... 13, 14, 41
*United States v. Algahaim.*,
  842 F.3d 796 (2d Cir. Dec. 1, 2016) ...................................... 16, 17
*United States v. Alston*,
  899 F.3d 135 (2d Cir. 2018) ................................................................ 8
*United States v. Arthur*,
  2006 WL 3857491 (E.D. Wis. Dec. 22, 2006) ................................... 7
*United States v. Cavera*,
  550 F.3d 180 (2d Cir. 2008) ......................................................... 2, 17
*United States v. Chavez*,
  2024 WL 50233 (S.D.N.Y. Jan. 4, 2024) ......................................... 36
*United States v. Crosby*,
  397 F.3d 103 (2d Cir. 2005) ................................................................ 2
*United States v. Ebbers*,
  458 F.3d 110 (2d Cir. 2006) ................................................................ 3
*United States v. Eckstein*,
  2016 WL 546663 (D.N.M. Feb. 3, 2016) ........................................... 7
*United States v. Ekwunoh*,
  888 F. Supp. 369 (E.D.N.Y. 1994) .............................................. 38, 39
*United States v. Frias*,
  521 F.3d 229 (2d Cir. 2008) .............................................................. 46
*United States v. Full Play Group, S.A.*,
  690 F. Supp. 3d 5 (E.D.N.Y. 2023) .................................................... 6
*United States v. Goffer*,
  721 F.3d 113 (2d Cir. 2013) .............................................................. 46
*United States v. Griffin*,
  2024 WL 2891686 (E.D.N.Y. June 10, 2024) .................................. 37
*United States v. Gupta*,
  904 F. Supp. 2d 349 (S.D.N.Y. 2012) .................................. 13, 18, 41
*United States v. Hatcher*,
  2021 WL 1535310 (S.D.N.Y. Apr. 19, 2021) ................................... 37

*United States v. Herbert,*
  2024 WL 1931962 (S.D.N.Y. May 2, 2024) ............................................ 42
*United States v. Hoffenberg,*
  1997 WL 96563 (S.D.N.Y. Mar. 5, 1997) ............................................ 38
*United States v. Hoskins,*
  44 F.4th 140 (2d Cir. 2022) ............................................................ 6
*United States v. Johnson,*
  567 F.3d 40 (2d Cir. 2009) ............................................................ 46
*United States v. Johnson,*
  2018 U.S. Dist. LEXIS 71257 at *14  (E.D.N.Y. Apr. 26, 2018) ............................................ 14
*United States v. Jolly,*
  102 F.3d 46 (2d Cir. 1996) ............................................................ 12
*United States v. Jones,*
  531 F.3d 163 (2d Cir. 2008) ............................................................ 18
*United States v. Londono,*
  2022 WL 17905065 (S.D.N.Y. Dec. 23, 2022) ............................................ 38, 45
*United States v. Lora,*
  2022 WL 1055749 (S.D.N.Y. Apr. 8, 2022) ............................................ 37
*United States v. Mcrae,*
  2021 WL 142277 (S.D.N.Y. Jan. 15, 2021) ............................................ 37
*United States v. Medina,*
  607 F. App'x 60 (2d Cir. 2015) ............................................................ 46
*United States v. Moran,*
  2024 WL 2577970 (E.D.N.Y. May 24, 2024) ............................................ 4
*United States v. Paredes,*
  185 F. Supp. 3d 287 (E.D.N.Y. 2016) ............................................ 10
*United States v. Parris,*
  573 F. Supp. 2d 744 (E.D.N.Y. 2008) ............................................ 14
*United States v. Perez Sanchez,*
  2024 WL 1069884 (E.D.N.Y.) ............................................................ 45
*United States v. Rodriguez,*
  492 F. Supp. 3d 306 (S.D.N.Y. 2020) ............................................ 37
*United States v. Rutkoske,*
  506 F.3d 170 (2d Cir. 2007) ............................................................ 3, 5
*United States v. Soborski,*
  708 F. App'x 6 (2d Cir. 2017) ............................................................ 8
*United States v. Speed Joyeros, S.A.,*
  204 F. Supp. 2d 412 (E.D.N.Y 2002) ............................................ 35, 38, 39, 44
*United States v. Tellier,*
  2022 WL 1468381 (S.D.N.Y. May 10, 2022) ............................................ 37
*United States v. Wynn,*
  37 F.4th 63 (2d Cir. 2022) ............................................................ 11

Statutes

18 U.S.C. § 1343 ................................................................................................... 5, 6
18 U.S.C. § 1346 ................................................................................................... 5, 6
18 U.S.C. § 1956 ................................................................................................... 7, 19
18 U.S.C. § 3553(a) ....................................................................................... 2, 18, 19, 39
18 U.S.C. § 3553(a)(1) ....................................................................................... 1, 2, 19
18 U.S.C. § 3553(a)(2) ....................................................................................... 1, 34
*18 U.S.C. § 3553(a)(2)(A)* .................................................................................. 35
*18 U.S.C. § 3553(a)(2)(B)* .................................................................................. 41, 42
*18 U.S.C. § 3553(a)(2)(C)* .................................................................................. 42
18 U.S.C. § 3553(a)(2)(D) .................................................................................. 43
18 U.S.C. § 3553(a)(3) ....................................................................................... 43
18 U.S.C. § 3553(a)(6) ....................................................................................... 44, 46
18 U.S.C. § 3582(c)(1)(A) .................................................................................. 39
18 U.S.C. § 3583(b)(2) ....................................................................................... 43
18 U.S.C. § 3624(b) ...................................................................................... 35, 36
18 U.S.C. § 3624(c) ........................................................................................... 45
18 U.S.C. § 3624(g)(3) ....................................................................................... 45
U.S.C. § 3553(a) ............................................................................................... 13

Rules

U.S.S.G. 2S1.1 ................................................................................................... 6
U.S.S.G. §1B1.13 ............................................................................................... 39
U.S.S.G. §1B1.13(b)(2) ....................................................................................... 40
U.S.S.G. §2B1.1 ......................................................................................... 3, 4, 5, 6
U.S.S.G. §2B1.1(b)(1) ....................................................................................... 3
U.S.S.G. §2C1.1 .............................................................................................. 5, 8
U.S.S.G. §2S1.1(a)(1) ......................................................................................... 6
U.S.S.G. §2X1.1 ................................................................................................ 4
U.S.S.G. §5B1.1 ................................................................................................ 12
U.S.S.G. § 5C1.1 .......................................................................................... 12, 13
United States Sentencing Commission Guidelines Manual § 2A2.1 ............................. 16
United States Sentencing Commission Guidelines Manual § 2A2.2 ............................. 16
§2B1.1(b)(2) ..................................................................................................... 4
§2C1.1(b)(1) ..................................................................................................... 8
§2S1.1(b)(2)(B) ................................................................................................ 7
§2S1.1(b)(3) ..................................................................................................... 7

Other Authorities

*Purposes and Functions of Sentencing*,
    34 Crime & Just. 1 (2006) ................................................................................

## I.    INTRODUCTION

As this Court knows full well, the purpose of sentencing any defendant is to impose a sentence that is sufficient but not greater than necessary to fulfill the goals of sentencing. 18 U.S.C. § 3553(a)(2). This case is relatively unusual in that the defendant, Manuel Chang, has already been imprisoned for almost six years. He spent the first four-and-a-half years in one of the most infamous prisons in the world, known for its harsh conditions, where he served his time—awaiting extradition—spending 23 hours a day locked in a solitary cell. And more recently, he was in federal custody for a year-and-a-half in MDC in Brooklyn, a facility that this Court is well aware has troubling conditions that other judges have noted make the time served there even more punitive than usual. This period of incarceration already served by a man who —as even the government witnesses at trial testified—is a good, decent man who was attempting to do right by his country—is more than sufficient to satisfy the goals of sentencing. We respectfully request that Your Honor impose a sentence of time served so that he can promptly be deported back to his home country of Mozambique.

Of course, a sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime. In addition to considering the Guidelines range, the district court must form its own view of the "nature and circumstances of the offense and the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). The sentencing judge is directed, moreover, to consider: (A) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; (B) the need to afford adequate deterrence to criminal conduct; (C) the need to protect the public from further crimes by the defendant; and (D) the need for rehabilitation. *Id.* § 3553(a)(2)(A)-(D). Additionally, district courts must take into account: the kinds of sentences available, *id.*

§ 3553(a)(3); any pertinent Sentencing Commission policy statement, *id.* § 3553(a)(5); the need to avoid unwarranted sentence disparities among similarly situated defendants, *id.* § 3553(a)(6); and, where applicable, the need to provide restitution to any victims of the offense, *id.* § 3553(a)(7); *see also United States v. Cavera*, 550 F.3d 180, 188–89 (2d Cir. 2008).

Even after *Gall* and *Kimbrough*, sentencing judges, certainly, are not free to ignore the Guidelines, or to treat them merely as a "body of casual advice."  *See United States v. Crosby*, 397 F.3d 103, 113 (2d Cir. 2005). A district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range. *See Gall v. United States*, 552 U.S. 38, 48-49 (2007); *see also United States v. Crosby*, 397 F.3d 103,112 (2d Cir. 2005) (describing situations in which "precise calculation of the applicable Guidelines range may not be necessary"). The Guidelines provide the "starting point and the initial benchmark" for sentencing, *Gall*, 552 U.S. at 40, and district courts must "remain cognizant of them throughout the sentencing process," *id.* at 49-50 n.6.

It is now, however, emphatically clear that the Guidelines are guidelines—that is, they are truly advisory. A district court may not presume that a Guidelines sentence is reasonable; it must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense. District judges are, as a result, generally free to impose sentences outside the recommended range. When they do so, however, they "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* at 50. In this way, the district court reaches an informed and individualized judgment in each case as to what is "sufficient, but not greater than necessary" to fulfill the purposes of sentencing. 18 U.S.C. § 3553(a); *Cavera*, 550 F.3d at 189.

## II.    THE SENTENCING GUIDELINES CALCULATION

### A.  The Base Offense Level for Count One is 7.

The applicable Offense Conduct guideline is U.S.S.G. §2B1.1. Under §2B1.1, the Base Offense Level should be level 7. The Adjusted Offense Level should be 7. The Total Offense Level should be 5 with the advisory guidelines range being 0-6 months in Zone A of the Guidelines Table. Zone A of the Guidelines makes Minister Chang eligible for Probation.

There is no evidence that Minister Chang intended to cause any loss or that there was ever any "intended loss" as that term is defined by the Application Notes. Quite the opposite, while he was the Minister of Finance, all payments were made as required on all of the loans. Nor is there any "actual loss," as there was no reasonably foreseeable pecuniary harm that resulted from the offense. Obviously, because "[m]any factors may cause a decline in [an instrument's] price," the Court "must exclude deflations caused by other factors, such as changed economic conditions[.]" *United States v. Nordlicht*, ECF No. 1005 (Order on Loss Calculation), No. 16-CR-00640 (BMC) (E.D.N.Y. July 18, 2023) (quoting *United States v. Rutkoske*, 506 F.3d 170, 179 (2d Cir. 2007)).

The government has not shown that there was any loss caused by this offense, accordingly, no increase is warranted under U.S.S.G. §2B1.1(b)(1). *See, e.g.*, *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006) ("the loss must be the result of the fraud"); *Rutkoske*, 506 F.3d at 179 ("there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines"); *United States v. Nordlicht*, ECF No. 1005 (Order on Loss Calculation), No. 16-CR-00640 (BMC) (E.D.N.Y. July 18, 2023) (finding that the loss amount was zero where investors' loss was caused by "a massive and unforeseen collapse in the price of oil that rattled the entire energy market and forced [the company] into bankruptcy"). Minister Chang reserves his right to contest any late "proof" of

3

loss, none of which has been provided by the government and none of which is outlined in the PSR. *See, e.g., United States v. Moran*, 2024 WL 2577970, at *1 (E.D.N.Y. May 24, 2024) (Garaufis, J.) (finding zero loss amount where government failed to meet its burden).

**B.  There were No Losses and No Victims.**

The government also has not shown that this offense involved *any* victims, so no increase is warranted under §2B1.1(b)(2). No other specific offense characteristics apply. Therefore, under §2B1.1, the base offense level is 7. Under U.S.S.G. §2X1.1, the base offense level for the wire fraud conspiracy charge is thus 7.

To the extent the government will seek to argue loss even without having providing any witness affidavits of loss or any other evidence of loss and notwithstanding that the PSR does not contain any proof of loss, the record contains evidence that any eventual problems with the loans were due to a myriad of other factors having nothing to do with Minister Chang's alleged conduct, such as the depreciation of local currency. *See* Tr. at 2155-2156 (reviewing DX 20407-A); Tr. at 2156 ("The substantial depreciation of the metical and the decrease in foreign exchange reserves has exacerbated the economic crisis."); Tr. at 1214-15 (investor discussing effect of devaluation on an investment, including "that if periods of currency devaluation are associated with less international reserves, in other words, because the country has less dollars at its disposal, it takes more local currency to buy those dollars"); Tr. at 1231 (investor agreeing that the risk of "[c]urrency and commodity price devaluation and volatility" was specifically disclosed for the Loan Participation Notes); Tr. at 1816 (investor acknowledging that depreciation of the local currency is an economic risk involved in investing in Mozambique sovereign debt).

Likewise, the collapse of the natural gas market in 2014 played a significant role in problems servicing the loans. *See* Tr. at 1023 (investor testifying: "Mozambique had recently

discovered enormous amounts of natural gas and that was one of the main reasons under which we could feel comfortable that the Mozambican Government would have enough money to repay us was because of the development of these gas fields"); *id.* at 1199 (same); *id.* at 614-16 (explaining that "[t]here is no doubt that the oil price crash had an impact on the ProIndicus [project] at a high level" and nobody predicted the crash); Tr. at 1213.

In addition, political appetite for the projects following the change of administration after the election was also a factor that contributed to problems with the loans. There were multiple opportunities for the loans to be restructured, which were rejected by the new administration's officials. The risk of a new administration's lack of interest in these projects was a risk that these sophisticated investors knew of at the time that they invested in these projects.

The PSR suggests that the applicable sentencing guideline for 18 U.S.C. § 1343 is U.S.S.G. §2C1.1 This is wrong, as is using any calculations and enhancements under this guideline. Minister Chang respectfully submits that the applicable sentencing guideline for 18 U.S.C. § 1343, wire fraud, is U.S.S.G. §2B1.1. *See* 2023 Guidelines Manual Annotated, Appendix A (Statutory Index). U.S.S.G. §2C1.1 applies only to offenses for which Minister Chang has never been charged, much less convicted. *See id.* The Commentary to 2C1.1 makes clear that Section 2C1.1 only applies to Section 1343 "if the scheme or artifice to defraud was to deprive another of the intangible right of honest services of a public official." *See* U.S.S.G. §2C1.1, Commentary, "Statutory Provisions."

The Indictment has never charged Minister Chang or any other defendant in this case with honest services wire fraud under 18 U.S.C. § 1346 or conspiracy to commit honest services wire fraud. Nor could it, because honest services fraud does not apply to foreign bribery, as Judge Chen detailed in an exhaustive opinion analyzing and applying two recent Supreme Court

5

decisions. *See United States v. Full Play Group, S.A.*, 690 F. Supp. 3d 5, 39-40 (E.D.N.Y. 2023) ("the evidence at trial was insufficient to sustain Defendants' honest services wire fraud convictions under § 1346 because the statute does not apply to foreign commercial bribery schemes"), *appeal docketed*, No. 23-7183 (2d Cir. Sept. 26, 2023). Read together, *Percoco v. United States*, 598 U.S. 319 (2023), and *Ciminelli v. United States*, 598 U.S. 306 (2023), reiterate that § 1343's reach is limited to traditional tangible property interests and the statutory expansion in § 1346 to the intangible right to honest services should be narrowly construed. The underlying offense here must be traditional wire fraud and cannot be deemed honest services wire fraud, so the appropriate sentencing guideline is §2B1.1. *See* Appendix; Commentary to U.S.S.G. 2B1.1 (listing 1343 offenses generally).

### C. The Guidelines Range and Offense Conduct for Count Two.

The appropriate guideline for Count Two is U.S.S.G. 2S1.1. *See* Appendix A. Under §2S1.1, the base offense level should be 7 because the base offense level for the underlying offense from which the laundered funds were derived—wire fraud—can be determined. *See* U.S.S.G. §2S1.1(a)(1).

Under Application Note 2 to §2S1.1, where there are multiple underlying offenses for a money laundering charge, "the offense level for the underlying offense is to be determined under the procedures set forth in Application Note 3 of the Commentary to §1B1.5." Under that Application Note, wire fraud is the underlying offense that should be applied. As established, any violation of Mozambique law would have been, at most, a misdemeanor offense, and there is no FCPA liability for foreign officials under federal law, even if the offense would have occurred in the United States. *See United States v. Hoskins*, 44 F.4th 140, 145 (2d Cir. 2022) ("Because Hoskins is not an American citizen, was not employed by the American subsidiary, and did not enter the United States while allegedly working on the scheme, he falls outside the category of

6

persons directly covered by the FCPA."). Accordingly, the appropriate underlying offense to be used for the money laundering calculation is wire fraud.

Under §2S1.1(b)(2)(B), a two-level increase is warranted because Minister Chang was convicted under 18 U.S.C. § 1956, resulting in an Offense Level 9. Contrary to the PSR, however, the Court should not impose a sophisticated laundering enhancement under §2S1.1(b)(3). The money laundering conduct consisted of Privinvest wiring money to business bank accounts, which the government argued was later wired back to the Republic of Mozambique. There is nothing about this conduct that makes this sophisticated. The offense conduct is, if anything, the "concealment," required to satisfy the offense conduct itself. *See, e.g.*, *United States v. Eckstein*, 2016 WL 546663, at *10 (D.N.M. Feb. 3, 2016) ("There must be such a thing as 'garden-variety' money laundering if §2S1.1(b)(3) is to retain any meaning. In the end, if Eckstein's money laundering operation qualifies as 'sophisticated,' so too does every money laundering operation. Thus, the Court will sustain Eckstein's objection to the PSR's application of a 2-level enhancement under §2S1.1(b)(3) for 'sophisticated laundering.'").

Additionally, under Application Note 5(B), "If subsection (b)(3) applies, and the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of subsection (b)(3) of this guideline, do not apply subsection (b)(3) of this guideline." Here, any argument that there was sophisticated laundering is identical to the offense conduct underlying the wire fraud offense, i.e., that Minister Chang must have engaged in wire fraud because $7 million was sent to Luis Brito's accounts, which the government has alleged are illegal bribe payments purportedly contrary to what investors were told. This subsection, thus, should not be applied. *See United States v. Arthur*, No. 04-CR-122, 2006 WL 3857491, at *2 (E.D. Wis. Dec. 22, 2006) (declining to apply subsection

7

(b)(3) where "no additional conduct supported the enhancement on the money laundering group"), *aff'd*, 582 F.3d 713 (7th Cir. 2009). Accordingly, the offense level for the money laundering count should be Level 9.

To the extent it is determined that §2C1.1 is an appropriate guideline for either offense, Minister Chang objects to the two-level increase under §2C1.1(b)(1). Under Application Note 2, "Related payments that, in essence, constitute a single incident of bribery or extortion (*e.g.*, a number of installment payments for a single action) are to be treated as a single bribe or extortion, even if charged in separate counts." The government was unable to cohesively articulate what each payment purportedly induced; accordingly, this increase should not apply.

**D. Minister Chang Should Receive a Minor Role Adjustment.**

Minister Chang agrees that he should not receive an aggravating-role adjustment under §3B1.1, but he objects that he should not receive a two-level mitigation role adjustment under §3B1.2(b) as a "minor participant." For purposes of the adjustment, courts must "determine a defendant's relative culpability only by reference to co-participants in the case at hand[.]" *United States v. Soborski*, 708 F. App'x 6, 11 (2d Cir. 2017) (summary order); *see also United States v. Alston*, 899 F.3d 135, 150 (2d Cir. 2018).

As an initial matter, the PSR states that a mitigation role adjustment is not appropriate because Minister Chang "received bribes and profited from the instant offense." But Minister Chang never received a penny of the money that the government alleged was a "bribe," all of which the government argued was later returned to the Republic of Mozambique. Additionally, there is no evidence whatsoever that Minister Chang "profited from the instant offense" in any way, shape, or form. The loans were undertaken to address significant national security and infrastructure concerns of the highest levels of the Republic of Mozambique. Minister Chang never received anything for signing the loan guarantees.

Further, under Application Note 3 to §3B1.2, "a defendant who does not have a proprietary interest in the criminal activity and who is simply being paid to perform certain tasks should be considered for an adjustment under this guideline." The note continues that "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative." Note 3 establishes even further that Minister Chang should receive a minor role adjustment.

Indeed, Minister Chang was "less culpable than most other participants in the [alleged] criminal activity," and is thus entitled to a two-level reduction. *See* Cmt. 5. On the government's theory, the main orchestrators of the alleged criminal scheme were the bankers (including Pearse and Singh, who ensured approval on Credit Suisse's end and both pled guilty), as well as Jean Boustani (whom the government alleges facilitated bribes to the bankers as well as to several Mozambican officials). Despite the government's theory that Mr. Boustani was the supposed "mastermind" of the alleged conspiracy, Minister Chang maintains that Mr. Boustani engaged in no wrongdoing and reiterates that Mr. Boustani was acquitted of all charges against him.

Minister Chang cannot be said to have played a central part of the alleged conspiracy because he is not alleged to have spoken to anyone about the said conspiracy nor is he alleged to have even known about the criminal conduct. He was, if anything, a "spoke" in a "spoke and wheel" conspiracy.

Indeed, Andrew Pearse and Surjan Singh testified that they never spoke to Minister Chang about their criminal conduct and admitted to lying to Minister Chang in order to hide their criminal conduct from him. *See* Tr. at 472; 474-75 (Pearse testimony that he "did not have an agreement[] with Mr. Chang."); Tr. at 493-94 (Pearse testimony that during his meeting with Minister Chang, he did not talk about "bribes or corrupt payments" or that he was receiving

money from the subvention fee); Tr. at 704-05 (Pearse testimony that he never told Minister Chang that he was splitting part of the reduced subvention fee with Jean Boustani, that he never told Minister Chang that he was giving $2.2 million dollars to Detelina Subeva, that he never told Minister Chang that he was giving money he received from Privinvest to Surjan Singh, that he did not tell Minister Chang that Surjan Singh was receiving payments from Privinvest following the EMATUM loan, and that he did not discuss his partnership distribution agreement with Palomar with Minister Chang); Tr. at 731-32 (Pearse testimony that while he was working for Palomar, he did not tell Minister Chang that he had left Credit Suisse); Tr. at 733-34 (Pearse testimony that he did not tell Minister Chang that he was receiving kickbacks from Privinvest in connection with the MAM loan, that he did not tell Minister Chang that Surjan Singh received any money in connection with the loans, and that he did not tell Minister Chang that anyone at VTB received any money in connection with the loans); Tr. at 1374-75 (Singh testimony that he did not tell anyone within Mozambique about the payments he received and that he did not tell Minister Chang about the payments he received).

Further, Minister Chang had no role in creating or developing any of the three projects for which the loans were extended. *See United States v. Paredes*, 185 F. Supp. 3d 287, 296 (E.D.N.Y. 2016) ("Paredes had no involvement in any other aspects of the conspiracy and worked solely at the behest of others, qualifying him for a 2–level minor role adjustment." (cleaned up)). And the projects were all supported by other senior Mozambican government officials, including the President of Mozambique and the entire Mozambican government. *See* DX 20007-A-T (Letter from Filipe Jacinto Nyusi, the Minister of National Defense, to Minister Chang regarding approval of the Exclusive Economic Zone Monitoring and Protection System); DX 20022-A-T, DX 20046-A-T, DX 20103-A-T, and DX 20251-A-T (four Central Bank

10

approval letters); Tr. at 516 (Pearse Testimony) (Q: "It was your understanding at the time before the Proindicus loan was signed, that President Guebuza supported the Proindicus project, is that correct?" A: "Yes."); Tr. at 2275 (Boustani testimony that President Guebuza had approved Proindicus); Tr. at 2287-89 (Boustani Testimony) ("So he welcomed me and he stressed also a lot about his [President Guebuza's] vision of the project and about his happiness to do the project and about his strategic view of the importance of this project for security of Mozambique and for the economy of Mozambique."); *see also United States v. Wynn*, 37 F.4th 63, 69 (2d Cir. 2022) (vacating sentence for denial of mitigating-role adjustment and explaining that "[n]o record evidence suggests that [defendant] Wynn participated in planning or organizing the . . . criminal activity, or exercised decision-making authority or influenced the exercise of decision-making authority" (cleaned up)).

There was nothing inherently criminal about Minister Chang signing the loan guarantees, and there was no direct evidence he was induced to do so in exchange for receiving any illegal payments. There was only evidence of payments going to Luis Brito and then later to the Mozambique government. As compared to the other members of the conspiracy, Minister Chang played a "minor role." Accordingly, a 2-level reduction should be applied to the applicable offense level for minor role adjustment under §3B1.2.

### E. An Abuse of Trust Enhancement Should Not Be Applied.

Minister Chang should not receive a two-level enhancement for abuse of a position of public trust under §3B1.3. There is no evidence that Minister Chang used his role as the Minister of Finance to facilitate money laundering or to facilitate wire fraud. The alleged misstatements were not included in the documents that he signed, and his role as the Minister of Finance was not used to facilitate misconduct.

11

Additionally, the government's theory at trial was *not* that Minister Chang victimized the Mozambican public; it was that he defrauded international investment banks and secondary U.S. investors. In the proper context, his relationship to the alleged victims was commercial in nature—Minister Chang was acting on behalf of a guarantor for the three entities that borrowed money from the banks who later sold off pieces of the loans to private investors. *See United States v. Jolly*, 102 F.3d 46, 48 (2d Cir. 1996) (no abuse-of-trust enhancement because "[b]orrower-lender relationships are typically at arm's-length, and a firm's obligations to creditors are generally regarded solely as contractual"). Such alleged conduct does not fit the profile for "abusing a position of public trust." *See* PSR ¶ 34.

Finally, in the alternative, if the Court concludes that §2C1.1 instead of §2B1.1 applies, the two-level enhancement is not appropriately applied. Application Note 6 to §2C1.1 expressly provides: "Inapplicability of §3B1.3.—Do not apply §3B1.3 (Abuse of Position of Trust or Use of Special Skill)." Cmt. 6.

### F. The Appropriate Guidelines Range is 0-6 Months.

As explained elsewhere, the Adjusted Offense Level should be 7 and the Total Offense Level should be 5. A Total Offense Level of 5 yields a range of 0-6 months in Zone A of the Guidelines Table and renders Minister Chang eligible for probation. *See* U.S.S.G. §5B1.1. And no factor supports an upward departure or variance.

## III.  72 MONTHS OF TIME SERVED BY MINISTER CHANG IS SUFFICIENT TO ACCOMPLISH THE GOALS OF SENTENCING

### A. The Applicable Guideline Range for Minister Chang Overstates the Gravity of the Offense.

U.S.S.G. § 5C1.1 provides a presumption against imprisonment for defendants who (1) receive the Zero-Point Offender Adjustment, and (2) the applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an

otherwise serious offense. As discussed above, Minister Chang is entitled to the Zero-Point Offender Adjustment. Because the sentence recommended by probation—360 months to life in prison—grossly overstates the gravity of Minister Chang's offense, for reasons set forth herein, in determining the appropriate sentence for Minister Chang, the Court should consider that his conduct warrants a presumption against imprisonment under U.S.S.G. § 5C1.1.

Minister Chang acknowledges that the offense conduct for which he was convicted is a serious offense. However, Second Circuit courts have questioned the disproportionate effect loss adjustment has on a defendant's base offense level, and therefore, his sentence range. The court in *United States. v. Adelson* recognized that the Sentencing Guidelines place an "inordinate emphasis" on "putatively measurable quantities" such as the amount of actual or intended financial loss in fraud cases "because of their arithmetic approach and also in an effort to appear 'objective,' . . . without, however, explaining why it is appropriate to accord such huge weight to such factors. *See generally* Kate Stith José A. Cabranes, FEAR OF JUDGING: SENTENCING GUIDELINES IN THE FEDERAL COURTS (1998)." *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) (summary order). Similarly, the court in *United States v. Gupta* characterized [t]he numbers assigned by the Sentencing Commission to various sentencing factors" as "more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice," further emphasizing that "[b]y making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351-53 (S.D.N.Y. 2012), *aff'd*, 747 F.3d 111 (2d

Cir. 2014). In sum, New York federal courts have repeatedly criticized the grossly disproportionate nature of the loss tables, calling the loss tables "patently absurd" (*Adelson*, 441 F. Supp. 2d at 515) and "a black stain on common sense" (*United States v. Parris*, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008)) that rely upon a "flawed methodology for tabulating white-collar sentences[.]" *United States v. Johnson*, 2018 U.S. Dist. LEXIS 71257 at *14 (E.D.N.Y. Apr. 26, 2018).

Probation's recommended sentence of 360 months to life for Minister Chang is irrational on its face, "patently absurd," and highlights the grossly disproportionate nature of the loss tables. As an initial matter, and as discussed above, probation incorrectly attributed a base offense level of 14 to Minister Chang's conduct. Given this flawed starting point, augmented through a series of enhancements—including a "potential" loss assumption of $7mm that was *never* proven at trial—probation concluded that the total offense level for Minister Chang, a 69-year-old Mozambique national convicted of a non-violent crime, is 42. To put this in perspective, the base offense level for a conviction for first degree murder pursuant to §2A1.1 is 43, with a corresponding sentence of life in prison.[1] Certainly, the Sentencing Commission did not envision such disparate sentencing results based on arbitrary enhancements.

But had probation applied the correct base level for a money laundering violation with an underlying offense of wire fraud—7—the appropriate sentence according to the guidelines for a first-time offender of a non-violent crime, like Minister Chang, is 0-6 months incarceration. However, according to probation, "The Government has yet to provide the loss suffered by each

---

[1] Had probation not applied the two point reduction for a Zero-Point Offender pursuant to U.S.S.G. §§4Cl.l(a)(l)-(10), it would have calculated a total offense level of 44 for Minister Chang—one point *higher* than the offense level for first degree murder—and beyond what the sentencing guidelines even contemplate.

14

of the victims for [Minister Chang's] offense[,]" and provided probation with a "list of approximately 75 victims two business days prior to the disclosure of th[e] PSR." (PSR pg. 8). In fact, as Minister Chang enters his sixth year in prison, now in MDC awaiting his sentencing, "the Probation Department is continuing to send out affidavits of loss." *Id.* In other words, no losses were proven at trial, and probation and the government seek to augment Minister Chang's sentence indefinitely based on potential "affidavits" purporting to substantiate unproven losses, which once "received, the Court will be made aware [of] via an addendum to th[e] PSR." *Id.* Should such affidavits ever arrive, this Court should reject such late additions to the PSR. Compelling a *Fatico* hearing on an issue not proven at trial, where the government did not even attempt to obtain these affidavits prior the filing of the (belated) PSR, and on the eve of sentencing, would be patently unfair. It is currently unclear to Minister Chang, when all is said and done, what, according to probation, the corresponding offense level to his conduct might be—highlighting the completely arbitrary nature of the guideline enhancements corresponding to losses.

Given the evidence at trial, the government failed to prove any losses as acknowledged in the PSR. Accordingly, no loss enhancements should be applied to the corresponding base level for a wire fraud violation, which is 7. But to further point out both the arbitrary nature of loss calculations and how they grossly overstate the gravity of the offense, if affidavits are returned to probation (at some unidentified time in the future) averring cumulative losses between $3.5 million and $9.5 million, with no other applicable enhancements, a first time-offender like Minister Chang would face an offense level of 25 with a corresponding guideline range of 57–71 months. Such an offense level advises a prison term comparable to that recommended for arson, aggravated assault or robbery involving serious bodily injury, and transmission of biological

weapons causing serious bodily injury.[2] Similarly, a first-time fraud offender convicted of an offense with a loss exceeding $9.5 million would face an offense level of 27—with no other enhancements—and a guideline range of 70–87 months. Again, under the guidelines, this sentence is comparable to that recommended for serious, violent offenses, including attempted murder, arson, and assault with intent to commit murder.[3] Significantly, these severe sentences are recommended equally to offenders who caused $9.5 million in losses to actual individuals and to offenders who caused little or no actual economic harm to any persons.

The Second Circuit addressed this sentencing disparity in *United States v. Algahaim*, under circumstances similar to Minister Chang's, where the defendants' base offense level calculations were increased roughly two-and-a half times driven by loss amount. The court in *Algahaim* vacated the defendants' sentences of 30 and 21 months, respectively, for food stamp fraud for the district court to consider imposing nonguideline sentences on the ground that the defendants' Guidelines ranges were significantly increased by the loss enhancements, an unusual feature of the Guideline scheme. 842 F.3d 796, 800 (2d Cir. Dec. 1, 2016). Like here, the sentences in *Algahaim* were "driven by the loss amount," which increased the offense level from a 6-month base to levels 18 and 16 respectively. *Id.* The court noted that the Commission's loss determinant approach is "unknown to other sentencing systems" and reasoned that "its

---

[2] *See* 2023 United States Sentencing Commission Guidelines Manual § 2A2.2 (aggravated assault involving a firearm and serious bodily injury to a victim, OL 24 (14 + 5 +5)); *Id.* § 2B3.1 (robbery involving firearm, OL 25 (20 + 5)); *Id.* § 2B3.2 (extortion by force with the threat of death and brandishing of a firearm, OL 25 (18 + 2 + 5)); *Id.* § 2K1.4 (arson knowingly creating a serious risk of death or bodily injury, OL 24); *Id.* § 2M3.3 (unauthorized disclosure of classified national defense information to a foreign government, OL 24); *Id.* § 2M6.1 (transmitting biological weapons causing serious bodily injury to a victim, OL 24 (20 + 2 + 2)); *Id.* § 2N1.1 (tampering with consumer products involving risk of death or bodily injury, OL 25).

[3] *See* 2023 United States Sentencing Commission Guidelines Manual § 2A2.1 (attempted murder); *Id.* § 2A2.1 (assault with intent to commit murder); Id. § 2B3.2 (extortion by force with the threat of death and use of a firearm); *Id.* § 2D1.10 (endangering human life while illegally manufacturing methamphetamine); *Id.* § 2K1.4 (arson creating a serious risk of death or bodily injury).

16

unusualness is a circumstance that a sentencing court is entitled to consider," ultimately concluding that "[w]here the Commission has assigned a rather low base offense level to a crime and then increased it significantly by a loss enhancement, that combination of circumstances entitles a sentencing judge to consider a non-Guidelines sentence." *Id*.

Given the foregoing considerations, the Court is entitled to consider a non-guidelines sentence should this Court conclude the guidelines range is "driven by the loss amount," and can otherwise begin its analysis with the presumption of a non-incarceration sentence for Minister Chang. However, Minister Chang has already served a sentence comparable in length—though under far more dire prison circumstances than a United States citizen—to someone convicted of attempted murder, arson, and assault with intent to commit murder. Accordingly, we respectfully request that the Court find a sentence of time-served—particularly in consideration of the additional sentencing factors enumerated in Section 3553—is appropriate for Minister Chang.

**B. The Court Can and Should Impose a Non-Guidelines Sentence.**

Although the Court is obligated to give fair consideration to the United States Sentencing Guidelines (the "Guidelines") before imposing the sentence, "the Guidelines are guidelines—that is, they are truly advisory" and "a district court may not presume that a Guidelines sentence is reasonable." *Cavera*, 550 F.3d at 189. But the Guidelines range is only one component for the Court's consideration at sentencing. The Court must also consider, among other things, the defendant's "history and characteristics" and "the need for a sentence to reflect the basic aims of sentencing." *Rita v. United States*, 551 U.S. 338, 345-47 (2007). Accordingly, the district court has "very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *Cavera*, 550 F.3d at 188.

Ultimately, the Court "must make an individualized assessment of the sentence warranted by Section 3553(a) based on the facts presented." *United States v. Jones*, 531 F.3d 163, 182 (2d Cir. 2008) (internal quotations omitted). In addition to the applicable guidelines range, the court in *Rita* summarized the Section 3553(a) factors for consideration as: "(1) the offense and offender characteristics; (2) the need for a sentence to reflect the basic aims of sentencing, namely (a) just punishment (retribution), (b) deterrence, (c) incapacitation, (d) rehabilitation; (3) the sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted disparities; and (7) the need for restitution." *Rita,* 551 U.S. at 347-48. These factors are the "bedrock of all federal sentencing." *Gupta*, 904 F. Supp. 2d at 353.

Considering all of the Section 3553(a) factors, and that a district judge is to "'impose a sentence sufficient, but *not greater than necessary*,' to accomplish the goals of sentencing," we respectfully submit that this Court should impose a sentence of either time served, or a sentence of less than six years, with the explicit finding that Minister Chang is entitled to credit for the full amount of time he has been imprisoned in South Africa and the MDC. *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)) (emphasis added).[4]

---

[4] A sentence that is sufficient but not greater than necessary is one in which Minister Chang is able to immediately be deported back to Mozambique. If the Court determines that the guidelines range is more than the six years he has already served, this Court should impose a non-Guidelines sentence. If the Court agrees with Minister Chang's guidelines calculation, the Court can sentence him to a guidelines sentence, which would have the same effect. For ease and avoidance of confusion, if the Court sentences Minister Chang to time served, that would permit him to start the process to be returned to Mozambique immediately.

**C. A Consideration of the 18 U.S.C. § 3553(a) Factors Confirms that a Non-Guidelines Sentence Is Appropriate.**

**1. 18 U.S.C. § 3553(a)(1): The "Nature and Circumstances of the Offense" and the "Characteristics of the Defendant" Warrant a Sentence of Time Served.**

*a. Nature and circumstances of the offense.*

Minister Chang was convicted for conspiracy to commit money laundering, a violation of 18 U.S.C. § 1956, with the underlying violations of wire fraud and Article 7 or 8 of Mozambique law 6/2004. He played a minimal role in the "scheme," and the evidence at trial showed that, although Minister Chang signed the Guarantees, he was unaware of the breadth of the scheme. Nor is there any evidence that he was motivated by "greed," since payments that form the basis of his conviction went to an individual named Luis Brito. The payments that went to Mr. Brito remained in his accounts until December 2019—when the US government named Mr. Brito in its indictment. The facts do not support that Minister Chang was motivated by greed or that he personally received any money, either from the violation of Mozambique law, nor from the wire fraud.

Minister Chang was not a "central figure in the fraud, bribery, and money laundering scheme," because he was not a central figure and is alleged to have been—if anything—one small "spoke" in a "spoke and wheel" conspiracy. Minister Chang signed and approved the government guarantee on behalf of the Mozambique Ministry of Finance. Minister Chang notes further that these projects were approved by the Minister of National Defense (Filipe Nyusi), the Council of Ministers, and President Guebuza, and that he was directed to secure the financing. *See* DX 20037-A-T (Letter from Filipe Jacinto Nyusi, the Minister of National Defense, to Minister Chang regarding approval of the Exclusive Economic Zone Monitoring and Protection System); Tr. at 545 (Pearse Testimony) (Q: "When you met with Mr. Chang in February of

19

2013, Mr. Chang confirmed to you that the Proindicus transaction had the approval of President Guebaza; is that correct?" A: "Yes." Q: "He also confirmed to you that the project had the approval of the Council of Ministers; is that correct?" A: "Yes."); GX 3261-A-T at 1 ("The letter is an instruction from the Minister of Defence in his capacity as 'Head of Defense Forces' to the Minister of Finance to implement his part of the decisions subject of the Memorandum (i.e. the signing of the term sheet and the guarantee to CS for the loan contract to be signed by PROINDICUS"), at 4 ("In that regard, we hereby submit the Terms of Agreement to Your Excellency, the Minister of Finance, *with the request that Your Excellency, in your capacity as a representative of the Republic of Mozambique, in this act, provide your signature on the same*." (emphasis added); DX 20037-T (Letter from Filipe Jacinto Nyusi, the Minister of National Defense, stating: "[T]he Company has taken out an initial loan of Three Hundred Seventy-Two Million US Dollars ($372,000,000.00) to pay for the necessary equipment and Services, *by means of a guarantee given by Your Excellency.* Taking into account the need to increase the number of pieces of equipment and contract additional services in order to face the current international situation, *we hereby request that Your Excellency grant a guarantee* for the loan in the amount of two hundred and fifty million US dollars ($250,000,000.00) in favour of Credit Suisse, pursuant to the attached documents.") (emphasis added). Further, each of the loans was separately approved by the Central Bank of Mozambique, and each of the loans and loan upsizes came at the specific request of the Republic of Mozambique's agency that is the equivalent of its Secret Service. *See* DX 20022-A-T, DX 20046-A-T, DX 20103-A-T, and DX 20251-A-T (four Central Bank approval letters); DX 20037-T and DX 20091-T (SISE Letters).

The evidence at trial established that Minister Chang was instructed to sign the government guarantees at the direction of the Ministry of Defence or the Secret Service with the

full support of the President of Mozambique and signed the government guarantee on behalf of the Ministry of Finance. *See* GX 3261-A-T at 1 ("The letter is an instruction from the Minister of Defence in his capacity as 'Head of Defense Forces' to the Minister of Finance to implement his part of the decisions subject of the Memorandum (i.e. the signing of the term sheet and the guarantee to CS for the loan contract to be signed by PROINDICUS"), at 4 ("In that regard, we hereby submit the Terms of Agreement to Your Excellency, the Minister of Finance, *with the request that Your Excellency, in your capacity as a representative of the Republic of Mozambique, in this act, provide your signature on the same*.") (emphasis added); Objection to PSR ¶ 17 (listing people who directed Minister Chang to sign). Further, each of these increases were done at the specific request of Mozambique's Secret Service. *See* DX 20037-T; DX 20091-T (SISE Letters).

Each of the government witnesses explicitly testified that they never agreed to do anything with Minister Chang, and certainly never agreed to lie to investors. The Court will recall it was Mr. Pearse and Mr. Singh who lied to Minister Chang about their wrongful conduct. *See* Tr. at 472; 474-75 (Pearse testimony that he "did not have an agreement[] with Mr. Chang."); Tr. at 493-94 (Pearse testimony that during his meeting with Minister Chang, he did not talk about "bribes or corrupt payments" or that he was receiving money from the subvention fee); Tr. at 704-05 (Pearse testimony that he never told Minister Chang that he was splitting part of the reduced subvention fee with Jean Boustani, that he never told Minister Chang that he was giving $2.2 million dollars to Detelina Subeva, that he never told Minister Chang that he was giving money he received from Privinvest to Surjan Singh, that he did not tell Minister Chang that Surjan Singh was receiving payments from Privinvest following the EMATUM loan, and that he did not discuss his partnership distribution agreement with Palomar with Minister

Chang); Tr. at 731-32 (Pearse testimony that while he was working for Palomar, he did not tell Minister Chang that he had left Credit Suisse); Tr. at 733-34 (Pearse testimony that he did not tell Minister Chang that he was receiving kickbacks from Privinvest in connection with the MAM loan, that he did not tell Minister Chang that Surjan Singh received any money in connection with the loans, and that he did not tell Minister Chang that anyone at VTB received any money in connection with the loans); Tr. at 1374-75 (Singh testimony that he did not tell anyone within Mozambique about the payments he received and that he did not tell Minister Chang about the payments he received).

### b. Minister Chang's background and characteristics.

#### i. Minister Chang's background.

Manuel Chang was born on August 22, 1955, in the Gaza Province, Mozambique. He was the second of eight children born to Chang Dai Fao and Angelina Rosalina Mugabe, and was raised by both parents in the suburbs of Maputo, Mozambique. (PSR ¶¶ 57, 60).

Manuel's childhood was difficult. While growing up, his living conditions presented numerous challenges, since his father worked in agriculture, which paid a meager salary, and was the sole breadwinner for their family of eight children. (PSR ¶ 60). They had no electricity or sewer system in their home, and relied on a public fountain for drinking water. Given such a large family, their small home was overcrowded. (PSR ¶¶ 60, 62). At times, Manuel and his siblings didn't have proper clothing and had to ask others to lend them shoes. (PSR ¶ 62). These harsh conditions were due to the country's lack of independence, as Mozambique was still colonized by Portugal during Manuel's childhood. (PSR ¶ 60).

Despite these difficulties, Manuel had access to an education—an opportunity his siblings did not share. (PSR ¶ 60). Because, unlike his siblings, Manuel played soccer, and

through the connections he made there, he learned how to pursue an education, which eventually led to him earning a scholarship to continue the pursuit of higher education. (PSR ¶ 61).

Growing up, Manuel was a very obedient child, deeply dedicated to his studies. (PSR ¶ 67). He walked 10 kilometers to school each day and sold peanuts to afford school supplies. (PSR ¶ 67). In 1975, when Manuel was still in school, he was selected to participate in an official protocol of Mozambique's Independence ceremony. While assisting in the ceremony, he watched the President of Mozambique lower the Portuguese flag and raise the Mozambique flag. (PSR ¶ 61). This experience had a great impact on Manuel and inspired his lifelong path of public service. (PSR ¶ 61). That same year, due to the financial strain their family was facing, Manuel's father pressured him to leave school and begin working to support the family. During this time, many public workers and employees left Mozambique, creating a national need for employers, since they had to substitute the colonizers that left. This made it relatively easy for Manuel to find a job. So at 19, he began working for the country of Mozambique. (PSR ¶¶ 61, 63).

In 1977, Manuel married Lizette Adriano Simoes Maia Chang, and together, they had four children: Gizela, Gerson, Catia, and Manuela. (PSR ¶¶ 65, 66). At the time of their marriage, Manuel worked as an "Aspirante lnterimo" for the Mozambique Ministry of Finance before becoming an official, and soon thereafter advanced to a Budget Technician for the State. (PSR ¶ 80). In 1985, Manuel earned his bachelor's degree in economics from the Universidade Eduardo Mondlane in Maputo, Mozambique, and later earned a master's degree in public finance at the School of Oriental and African Studies (SOAS) at the London University in England. (PSR ¶ 76). Upon completing his education, Manuel became an Economist. (PSR ¶ 80).

From 1985 onward, Manuel held multiple positions within the government of Mozambique, continuing to work his way up through the Ministry of Finance [5]. Throughout his career, he continued to participate in academic and professional trainings, including Gestao Macroeconomics training at the World Bank Group Academy[6] in Lisbon, Portugal; training in Gestao Macroeconomics and Public Finance at the Finance at the International Monetary Fund (IMF) in Washington D.C.; and a Public Administration training in Paris, France. (PSR ¶ 77). Then, in 2005, Manuel was selected by the President of Mozambique to become the deputy Minister of Finance. (PSR ¶ 63). Initially, he was hesitant and discussed it with his wife and children prior to accepting the position. Manuel's wife, Lizette, advised him not to accept the role, as she believed he should avoid getting involved in politics. However, his daughter, Manuela, who was quite young at the time, overheard this conversation, and reminded her father that the country's population was almost eight million people, and that he had been chosen from such a vast group. This moment deeply moved Manuel, and he decided to accept the position. (PSR ¶ 63). From there, in 2015, Manuel went on to become Minister Chang, Mozambique's Minister of Finance.

---

[5] Minister Chang's positions included: National Deputy Director of Treasury (1985 to 1990); National Director of Budget (1990 to 1995); National Director for Treasury (1995 to 2000); Vice-minister of Planning and Financer (2000 to 2005); Minister of Finance (2005 to 2015); Member of Parliament (2015 to 2020); Chief de SECCAO; and Chief of Department of Treasury. (PSR ¶ 80). He also held positions including Member of the Board of the primary Mozambique courier company, Couriers of Mozambique; Member of the Fiscal Banco Commercial de Mozambique; Member of the Board for Company do Gas Pipeline Mozambique and Zimbabwe; and President of Fiscal Board of the Bank de Mozambique. Also, between 2010 and 2015, the defendant was elected to be a member of the Central Committee of the Frelimo political party.

[6] The World Bank Group Academy provides capacity development and training to policymakers and development practitioners to help them design and implement effective social and economic policies that reduce poverty and boost shared prosperity on a livable planet. The Academy aims to help build a cadre of development leaders and practitioners in WBG client countries. *See About the WBG Academy*, WORLD BANK GROUP ACADEMY, https://connect.newibnet.org/WBGAcademy.

While Manuel experienced gratifying success in his professional world, he simultaneously experienced significant loss in his personal world. Later in his life, Manuel lost four of his siblings in rapid succession: His eldest brother, Auralho Chang, died at age 67 from throat cancer. (PSR ¶ 58). His younger brother, Lorenzo Chang, died at age 59 from issues related to alcohol addiction. (PSR ¶ 58). His younger sister, Joana Chang died in her early 40s from human immunodeficiency virus (HIV). (PSR ¶ 58). And his youngest brother, Carlos Chang, died in 2015 from throat cancer. (PSR ¶ 58).

But Manuel suffered his most significant loss in 2016. One day, in 2016, when his wife, Lizette, was driving a small car, she was hit by a truck. Tragically, Lizette died in the accident. For 39 years, Manuel and Lizette had shared a strong and happy marriage. As a result, losing Lizette was extremely difficult for Manuel, as she had played a significant role in helping him achieve much of what he had in life. (PSR ¶ 65). Though their children were adults at the time of her passing, Manuel felt the weight of having to step into both mother and father roles for them. (PSR ¶ 65).

Since the significant losses that he has endured, Manuel has focused on helping others, particularly his siblings and some of his children, whose financial condition were difficult. (PSR ¶ 64). Prior to his incarceration, there were no limits to the financial support that Manuel provided to his extended family. For example, he helped register Joana's children for school and paid for their books, gave Geraldina money for food, and supported Auralho's children after his passing, as he had not left them in a stable financial position. (PSR ¶ 64).

  ii.  *Minister Chang's character.*

Manuel's humble background and experience with loss led him to become a person who wants to help others. According to his friends and family, this is not out of character for Manuel,

and is the person he always has been. One colleague described him as someone who "always had a welcoming and generous personality, someone willing to help those around him." Exhibit A (Letter from Calisto Moises Cossa).

Regardless of circumstances, including his incarceration for the past six years, Manuel is and has always been a caring father and grandfather, as well as a source of strength for his family. Since the significant losses that Manuel endured, he found solace in focusing on helping others, including his siblings and his children, whose financial conditions were especially difficult. (PSR ¶ 64). One of Manuel's colleagues who had worked under him since 2004, remarked that knowing him for "more than twenty years [] is enough time for me to say that he is a person of good conduct, dedicated to his family and our community." He added that "[Manuel's] integrity and commitment to others were examples that [he] ha[d] always appreciated," since Manuel had always "assumed the responsibility of taking care of his siblings, always present in their education and that of other family members." Exhibit A (Letter from Calisto Moises Cossa).

Another family member, one of Manuel's nephews, expressed how his uncle had helped him since childhood: "We grew up in the Chamanculo neighborhood, a shantytown, where we faced countless difficulties. Between 1998 and 2002, my mother, Elvira, with the encouragement of my uncle Manuel, decided that it would be best for me to live with him." Exhibit B (Letter from Elson Faizal Latifo Abubacar). Having benefitted greatly from his uncle's generosity, Manuel's nephew added, "My uncle has always shown genuine concern for others. He is known for helping those around him, always helping those in need, whether in times of joy or hardship. His generosity and integrity have left a lasting impression on everyone who has had the opportunity to know him." *Id.*

Manuel's generous spirit and desire to help others manifested as a genuine concern that those around him become educated, as that was Manuel's path to independence, financial and otherwise. He continuously stressed the importance of education to the younger generation, and through his actions, inspired and helped educate his family, friends, and those around him. His youngest daughter, Manuela, recalls that her father "always said that the greatest help he could give was academic and professional training, the basics, and moral principles." Exhibit C (Letter from Manuela Chang). Indeed, he imparted this wisdom and these values to his nephew, who said that during the period that he lived with his uncle, "He made education an absolute priority in my life, constantly reinforcing that 'study, study, study' was the path to a better future. Thanks to his guidance and continuous encouragement, I was able to fulfill my dream of graduating." Exhibit B (Letter from Elson Faizal Latifo Abubacar).

Even Manuel's grandchildren learned the values of education and hard work from him— Manuel's personal values and inspiration that led him from a life of poverty on to the path of becoming the Minister of Finance of Mozambique. Manuel was "proud of the recognition of his work, and loved the profession he had chosen," but he "always thought about teaching, [and] could spend all his time talking about his academic knowledge and professional career." Exhibit C (Letter from Manuela Chang). And he did. One grandchild recalled that "[o]ne of my grandfather's most significant teachings is that every young person should never stop studying because through studying, we can achieve everything we dream of and our independence." Exhibit D (Letter from Ana Patrícia Martins). She described him as someone who "knows how to listen to the opinions of young people and guide them towards the best path with the best guidance, never forgetting his principles and values." *Id.*

Significantly, Manuel's path from poverty to becoming the Minister of Finance didn't change his core. According to those close to him, Manuel has always acted with humility and remained down to earth, regardless of circumstances. One of Manuel's friends, who has known him for over 20 years, stated that "his simplicity, humility, and way of being have always made it clear how important it is to be good, regardless of social status." He explained that "[a]nyone who had the opportunity to spend time with him would not say they were dealing with a high-ranking government official devoid of all the vanity or arrogance that sometimes characterizes some people because they hold high management positions." Exhibit E (Letter from Joao Maria Cecilia Alberto Grachane). And, he added, "Due to his straightforward manner, [Manuel] gained great sympathy both within and outside his family. Even those who were not his friends but listened to his public lectures learned from him lessons on how a man of great character should behave. Above all, his humility and simplicity." *Id.*

This sentiment was echoed by employees who worked for Manuel's family in his home. One employee expressed gratitude, that "Manuel had played a vital role in my life because, through our conversations, he always wanted me to improve myself and provide better living conditions for my children. Anyone with the privilege of spending time with him knows how valuable a man he is, always willing to help and with an uncommon humility." Exhibit F (Letter from Hermenegildo Limeme).

Another employee who had been working for Manuel's family since 2003, described "Mr. Manuel" as "an extremely approachable person, allowing his employees to approach him (in fact, we didn't even feel like employees, but rather like family) since he was very friendly even when he held critical positions." Exhibit G (Letter from Salomão Sitoe). By example, his employee explained that Manuel was "[a] man of simple habits, he would do everything from

clearing the table to filling up the car all by himself (it may seem like something simple, something that any human being would do, but let's remember that at the time, he was the Minister of Economy and Finance of a country)." And of course, in typical fashion, his employee recalled that "[w]henever possible, when [Manuel] wasn't busy with his duties, he loved to chat, trying to find out about our goals and where we wanted to be in a few years, insisting that we had to prioritize and always opt for studies." *Id.*

Throughout his career, Manuel remained a source of inspiration to not only his family, but to his colleagues as well. As articulated by Mr. Cossa, who worked in the Mozambique government under Manuel for over 20 years, "Ethics and integrity have always guided Manuel Chang, and his life trajectory reflects a genuine commitment to his family and society." Exhibit A (Letter from Calisto Moises Cossa). Mr Cossa remarked, "I learned a lot with Manuel Chang as a man and a professional. I improved my academic training because he always advised me to study, and a properly educated man is prepared for any challenge in life. *Id.* He further explained, "His teachings and advice gave me technical knowledge and essential values, such as ethics, determination, and responsibility. It was thanks to him that I was able to follow a successful path, which allowed me to occupy influential positions and be recognized for my contribution in the various areas where I worked with Mr. Manuel Chang, from his Assistant, Head of the Public Relations Department, Communications Office and Advisor." *Id.* "Over the years, he has spoken out against harmful behavior and has always strived to do what is right." *Id.* According to Mr. Cossa, Manuel influenced his life "as the kind of man he has always been: a mentor, a guide, and an example of integrity." *Id.* With Manuel's support, Mr. Cossa was eventually elected to the position of President of the Municipal Council of the City of Matola, the largest municipality in Mozambique. *Id.*

Another colleague, Ms. Bernado, recalls a similar story of professional support from Manuel. Exhibit H (Letter from Ludovina Bernado). She recalled, "When I experienced difficult times [], I did not hesitate to ask him for help, and he promptly gave me the support I needed, even though I was just his collaborator. I felt valued and through his vote of confidence I progressed professionally until I became a leader in one of the most important public companies in Mozambique." *Id.*

Beyond the personal assistance and guidance Manuel provided to those around him, the benefits of Manuel's personal integrity and professional contributions were far and wide. One of Manuel's colleagues, Mr. Alves—who attended Manuel's trial in the E.D.N.Y.—described the effect that Manuel's professional contributions had on the economy of Mozambique. Mr. Alves "met Minister Chang in 2010, when [Mr. Alves] had just taken over as Deputy Director General of the Mozambique Investment Promotion Centre (CPI), at a time when Mozambique's economy was growing at an unprecedented pace, that is, at a Gross Domestic Product (GDP) annual growth rate of 8 to 9%, ranking among the 10 fastest growing economies in the world." Mr. Alves observed firsthand that "[t]he good economic policies (monetary and fiscal) adopted by the Government contributed to Mozambique's good economic performance." Exhibit I (Letter from Godinho Alves). But Mr. Alves was clear that Manuel himself had greatly contributed to this outcome. He said about Manuel, that "[a]s Minister of Finance, Mr. Chang has contributed in part to the better pursuit and proper implementation of the most disciplined, responsible and pragmatic monetary and fiscal policies, proving his commitment to the country." *Id.* He added that "Mr. Manuel Chang is a man of integrity, visionary and dedicated to the highest interests of the nation, having contributed to the adoption of better economic policies in the county. There is no doubt that Minister Chang left an indelible legacy in Mozambique, both among his

colleagues, family and friends." *Id.* Succinctly put by another colleague: "He is an inspiring leader, and a politician dedicated to the cause of the Nation." Exhibit H (Letter from Ludovina Bernado).

As described by one individual who had never met Manuel, Manuel inspired an entire generation of economists in Mozambique. He wrote, that "[w]hile I have not known Mr. Chang personally, I have followed part of his tenure as the Mozambique's Minister of Finance in critical times of the Mozambique economic transition from a socialist into a market economy. I have witnessed Mr. Chang's commitment and role, under very difficult conditions, to his work as a leader and mentor to many of my peer young economists in Mozambique. Through his efforts and extraordinary support, a generation of competent economists has subsequentially succeeded into brilliant careers domestic and internationally." Exhibit J (Letter from Rui Benfica).

Minister Chang's profound dedication and contributions to the development of his family, his friends, his colleagues, and his country, cannot be overlooked when determining an appropriate sentence for him.

> iii.    *Minister Chang's incarceration since December 2018.*

Minister Chang was arrested on December 29, 2018, when he was 63 years old. Exhibit K (Letter from Stiaan Krause). He was incarcerated in South Africa at Modderbee Prison until July 12, 2023, when he was extradited to the United States of America, after having been incarcerated for a period of 4 years, 6 months and 13 days. *Id.*

While incarcerated at Modderbee Prison, Minister Chang did not receive proper care for his health issues. According to Christian Krause, an admitted legal practitioner of the High Court of South Africa, duly licensed to practice law in the Republic of South Africa—and the individual who represented Manuel in the Republic of South Africa: "At the time of Mr. Chang's

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ At the time of Mr.

Chang's bail application, and as early as January 2019, the aforesaid were brought to the

attention of the Magistrates' Court, Kempton Park." *Id.*

Mr. Krause, who saw Minister Chang in Modderbee Prison on a regular basis, expressed

that "[t]he conditions of Mr. Chang's incarceration were dire. In respect of his medical needs, he

was not provided with a low sodium diet (as required)." *Id.* Moreover, "Mr. Chang spent the vast

majority of his time in incarceration under solitary confinement. The result of that was that he

was deprived of his freedom of movement (within the confines of the correctional services

centre) for approximately 23 hours a day. Resulting from the aforesaid, there was no opportunity

to do any physical exercise. The facilities of the correctional centre were of such a nature that

Mr. Chang could not be provided physical therapy." He was not permitted to have any contact

visits from anyone excluding his legal team and therefore could also not secure the services of an

external physical therapist." *Id.*

According to Minister Chang's daughter, Manuela, this isolation had a deleterious effect

on Manuel's mental state, as she expressed deep concern that her father had "spent five years in

prison in South Africa, where he could not maintain physical contact with his family." (PSR ¶

67). Minister Chang's family visited him in South Africa while he was in custody, but it was a

difficult trip which required a one hour flight, followed by a five-hour drive, and the visits were

limited. (PSR ¶ 67). Exacerbating conditions, Minister Chang was incarcerated over the period of

COVID-19, presenting unprecedented challenges and isolation in an already dire circumstance.

Manuela lamented that "[i]t has been more than six years since we last hugged our father, whom we love very, very, very much," adding that he "clings to the hope of being able to hug us again, to live as a family, and to be a citizen with social usefulness." Exhibit C (Letter from Manuela Chang).

When Minister Chang was extradited to the United States of America, his conditions of pre-trial incarceration did not improve. In July 2023, he was brought from Modderbee Prison in South Africa to Metropolitan Detention Center in Brooklyn, New York—a detention center plagued with a host of issues. Minister Chang has remained incarcerated there for 16 months—12 of which were pre-trial. On August 22, 2024, he turned 69 years old while in MDC.

### iv. Minister Chang's mental health.

According to his youngest daughter, Manuel speaks to his grandchildren daily, putting on a strong front, but they are unsure how he is truly feeling. (PSR ¶ 67). ███████████ ████████████████████████████████████ Manuela expressed concern, sharing that "[w]e lost our mother in 2016. Since then, he has been with us, trying to be a father and mother, but we know how much he suffers and tries to show us that he is strong. There is no way to be strong after having ended his career in prison, being far from his family, far from his culture, far from home, from the growth of his grandchildren." Exhibit C (Letter from Manuela Chang).

### v. Minister Chang's physical condition.

Minister Chang's medical records indicate that his daughter's concern for her father and her suspicion that he is not doing as well as he says is not unfounded. Specifically, when the probation officer inquired at Minister Chang's presentence interview about his *three* visits to the hospital (the most recent visit occurring the day before his presentence interview) where blood work was conducted, and the ████████████████████████████████████████████



**2. 18 U.S.C. § 3553(a)(2): A Sufficient Sentence.**

The Court is tasked with imposing a sentence that is "sufficient, but not greater than necessary" to comply with the purposes set forth in the statute: "to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2). We

respectfully submit that, under an analysis of these factors, Minister Chang's pre-trial incarceration of six years already served has been greater than necessary to meet the intended objectives of sentencing, let alone sufficient.

> *a. 18 U.S.C. § 3553(a)(2)(A): The need to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense.*

To date, Minister Chang has been incarcerated for 71 months—one month short of six years. As discussed herein, he spent 56 months in Modderbee Prison in South Africa, and the remaining 15 months in the Metropolitan Detention Center in Brooklyn, New York. Minister Chang is now 69 years old. Given the length and circumstances of his incarceration, we respectfully request the Court find that his pre-trial sentence has been greater than necessary to reflect the seriousness of the offense, promote respect for the law, and provide just punishment for his offense.

> *i.    Minister Chang would be entitled to credit for good behavior.*

As an initial matter, had Minister Chang been a citizen of this country, sentenced to 71 months of incarceration in the United States, he would have had the opportunity to receive credit towards early release. 18 U.S.C. § 3624(b) provides for early release of prisoners who have displayed exemplary compliance with institutional disciplinary regulations. For each year a prisoner has been in custody, he or she may be credited with up to 54 days toward a prison sentence, subject to the determinations of the Bureau of Prisons that the prisoner deserves such a credit; in the final year of incarceration, the good-behavior credit is prorated. *United States v. Speed Joyeros, S.A.*, 204 F. Supp. 2d 412, 443 (E.D.N.Y 2002). Pretrial incarceration is entitled to this credit. *Id.* Minister Chang was incarcerated in Modderbee Prison in South Africa for almost five years with no disciplinary issues, yet he was not afforded the opportunity for credit against his time in custody because he was not in a United States prison. Nor has he

incurred any disciplinary infractions while in federal custody at MDC. *See* PSR ¶ 68. Pursuant to Section 3624(b), Minister Chang has served the same amount of time he would have been required to serve had he been sentenced to 83 months.

> ii.    *Minister Chang's conditions in both Modderbee Prison and MDC were dire.*

As discussed above, the conditions of Minister Chang's incarceration at Modderbee prison were dire, where he spent approximately 23 hours a day in solitary confinement. To accurately describe his condition at Modderbee, Minister Chang's attorney in South Africa noted the remark by Gubbay CJ in the Zimbabwean Supreme Court in the matter of *Conjwayo v Minister of Justice*, Legal and Parliamentary Affairs 1992 (2) SA 56 (ZS), in which he stated: "In my opinion, to deprive the Applicant of access to fresh air, sunlight and the ability to exercise properly for a period of 23 hours per day, by holding him in a confined space, is virtually to treat him as non-human." Exhibit K (Letter from Stiaan Krause). Furthermore, due to the conditions of his incarceration in Modderbee Prison, Minister Chang was prevented from receiving adequate medical care for his ailing health, and deprived of any contact with his family during limited visits. These conditions were compounded by the fact that he was incarcerated throughout the global pandemic (COVID-19)—a period that lasted for over two years. Minister Chang endured those conditions at Modderbee Prison for *almost five years*. *Id.*

When Minister Chang was extradited to the United States in July 2023 and transferred to MDC, the conditions there were not an improvement for him. As the Court in *United States v. Griffin* recently acknowledged, "it has been well documented that the MDC has an ongoing issue with frequent lockdowns due to violence and the threat of violence, among other concerns, which has delayed medical care for a number of inmates. *See, e.g., United States v. Chavez,* No. 22-CR-303 (JMF), 2024 WL 50233, *5-*8 (S.D.N.Y. Jan. 4, 2024) (noting frequency of lockdowns —

including as a result of violence — and of delayed medical care)." *United States v. Griffin,* 2024 WL 2891686, at *3 (E.D.N.Y. June 10, 2024). Not only has Minister Chang experienced multiple lockdowns at MDC due to violent crimes occurring within MDC, but here in the United States at MDC, he has been completely isolated from his family and friends, and further isolated due to the fact that he speaks Portuguese—not English. In the past 15 months, the only visits Minister Chang has received at MDC have been from his U.S. counsel.

Courts in this Circuit have recognized that the conditions of incarceration endured by Minister Chang are more punitive than would have otherwise been the case. For example, in resolving a compassionate release motion, the court in *United States v. Hatcher* considered the effect that COVID related conditions had on incarcerated individuals. The *Hatcher* court recognized that under these circumstances, "courts . . . have considered the extent to which onerous lockdowns and restrictions imposed by correctional facilities attempting to control the spread of the virus have made sentences 'harsher and more punitive than would otherwise have been the case.'" *United States v. Hatcher*, 2021 WL 1535310, at *3 (S.D.N.Y. Apr. 19, 2021) (quoting *United States v. Rodriguez*, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020)); *see also United States v. Mcrae*, 2021 WL 142277, at *5 (S.D.N.Y. Jan. 15, 2021) ("[A] day spent in prison under extreme lockdown and in fear of contracting a deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While not intended as punishment, incarceration in such conditions is, unavoidably, more punishing."); *United States v. Lora*, 2022 WL 1055749, at *5 (S.D.N.Y. Apr. 8, 2022). Minister Chang experienced lockdowns while incarcerated, before, during, and after COVID—his isolation was not confined to the period of pandemic. He endured prison conditions for almost 6 years that are considered by courts in this Circuit to be "harsher and more punitive" than intended. *See, e.g.*, *United States v. Tellier*, 2022 WL 1468381, at *4

(S.D.N.Y. May 10, 2022) ("Although the harsh conditions of confinement do not, on their own, constitute extraordinary and compelling reasons, courts have recognized that the pandemic has made incarceration harsher and more punitive than would otherwise have been the case.").

When considering whether a defendant is entitled to early release on the basis of compassion, courts in this Circuit have also recognized other limiting circumstances that Minister Chang has and continues to endure in while in custody. For example, in granting compassionate release for a non-citizen, the court in *United States v. Londono* noted that "[t]he defendant also has had a series of health conditions, including one three-day stay at a hospital, and some of these conditions have not received prompt attention from the Bureau of Prisons." 2022 WL 17905065, at *2 (S.D.N.Y. Dec. 23, 2022). The court further acknowledged that "[b]ecause the defendant has been housed at facilities outside the range that his family could reasonably travel to visit him frequently, his family contact during his period of incarceration has also been severely limited." *Id.* Although Minister Chang is not being considered for compassionate release at this time, factors that courts consider when determining such a motion—factors that require a consideration of compassion—are relevant to determining whether his nearly six-year sentence has been sufficient, but not greater than necessary, to provide just punishment for the offense.

   iii.  *The stress of Minister Chang's pretrial incarceration should be considered.*

A court may depart if the defendant has suffered from unusual stress due to a lengthy or particularly stressful incarceration. *See, e.g.*, *United States v. Ekwunoh*, 888 F. Supp. 369, 374 (E.D.N.Y. 1994); *United States v. Hoffenberg*, 1997 WL 96563, at *12 (S.D.N.Y. Mar. 5, 1997). For example, in *Speed Joyeros*, in determining that a downward departure from the sentencing guidelines was appropriate, the court considered that "lengthy pretrial incarceration, and the

stress and uncertainty which accompanies such lack of freedom, may be a factor removing a case from the 'heartland' of the guidelines sufficiently to warrant departure." 204 F. Supp. 2d at 441. The court pointed to the defendant in *Ekwunoh* for example, where "[she] was in pretrial detention for two and a half years. During this time, her case was subject to various appeals. In addition, her family situation deteriorated because of her incarceration . . . . The effect of her pretrial incarceration was sufficient to remove that case from the heartland of the guidelines, and a departure was granted." *Id.* (internal citations omitted). Minister Chang spent almost five years in pretrial incarceration in South Africa, unsure of whether he would be returned to Mozambique to be tried in his own country, or extradited to the United States. We respectfully request that the Court consider this additional stress upon Minister Chang of waiting in uncertainty, beginning when he was 63 years old and continuing for almost 5 years, in determining whether his punishment to date has been sufficient to reflect the offense.

> iv.    *Had Minister Chang been tried at the time of his arrest in 2018 and sentenced 6 years ago, he would be eligible for compassionate release today.*

Under certain circumstances, defendants in the United States are entitled to consideration for compassionate release. U.S.S.G. §1B1.13 provides for a "Reduction in Term of Imprisonment" under 18 U.S.C. § 3582(c)(1)(A). Specifically, upon motion of the Director of the Bureau of Prisons or the defendant pursuant to 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that extraordinary and compelling reasons warrant the reduction. *See* 18 U.S.C. § 3582(c)(1)(A). Pursuant to the guideline, extraordinary and compelling reasons exist under any

of the following circumstances or a combination thereof if the defendant: (A) is at least 65 years old; (B) is experiencing a serious deterioration in physical or mental health because of the aging process; and (C) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less. U.S.S.G. §1B1.13(b)(2).

Had Minister Chang been tried, convicted, and sentenced, closer to the time of his arrest, today, he would be eligible for compassionate release. Minister Chang is 69 years old, and as discussed herein, ███████████████████████████████████████████ ██████████████████████████████████████ If this Court were to find that a sentence of 8 years were appropriate for him, then to date, Minister Chang would have served 75% of such a prison term.

Upon consideration of the factors above, we respectfully request this Court find that that Minister Chang's pre-sentence-incarceration period of six years has been sufficient punishment for the offense for which he was convicted, and no further incarceration is necessary. Specifically, six years of incarceration without time reduced for good behavior—five of which were spent on lockdown, compounded with the anxiety related to the global pandemic—with limited access to adequate healthcare and no physical contact with his family, and now, no visits from his family whatsoever, is sufficient punishment for a 69 year old Mozambique national, convicted for a non-violent crime with no determined losses.

When determining a sentence, it should be sufficient but not greater than necessary to achieve all of the sentencing goals—not punishment alone. Probation's flawed method of calculating Minister Chang's base offense in order to arrive at a recommendation for a life sentence for him reflects an unfortunate desire for punishment without regard to the other factors this Court must consider. In addition to just punishment, the Court must craft a sentence that also

considers the need for protecting the public, specific and general deterrence, and rehabilitation. As discussed below, those considerations all point to the conclusion that time served is the only appropriate sentence for Minister Chang.

> b. 18 U.S.C. § 3553(a)(2)(B): The need to afford adequate deterrence to criminal conduct.

18 U.S.C. § 3553(a)(2)(B) provides that the Court, in crafting an appropriate sentence, should consider the need to adequately deter criminal conduct, both by the defendant as well as others. There is little need for a sentence including further incarceration to promote specific deterrence for Minister Chang, as he is highly unlikely to be a repeat offender. He has already suffered complete devastation to his career and his reputation for brilliance and extremely hard work. Minister Chang lost virtually all of his business contacts overnight, and his conviction ensures he will never be able to work in Mozambique's government again. *See Adelson*, 441 F. Supp. 2d at 514 (specific deterrence was achieved where defendant's reputation was ruined by his conviction for a white-collar crime, and he was extremely unlikely to involve himself in future misconduct); *Gupta*, 904 F. Supp. 2d at 355 (concluding that a reputational blow makes it unlikely a particular defendant would "repeat his transgressions and no further punishment is needed to achieve this result."). Until Minister Chang was arrested South Africa, he was a highly respected member in his community, in his country. But now that has been completely devastated. Minister Chang's highly publicized incarceration over the last six years, and reputational harm resulting from global press coverage regarding his case make it extremely unlikely that he will ever be entrusted with the same types of professional responsibilities that he experienced throughout his life, whether for the government of his country, or anywhere.

Also, based on Minister Chang's age, the inherent likelihood of recidivism is significantly reduced. In making such a determination, the court in *United States v. Herbert*

relied upon United States Sentencing Commission "statistics showing that the rate of recidivism drops dramatically as age increases and is significantly lower for those with lower criminal history categories. *See*, e.g., U.S. Sentencing Commission, *Recidivism of Federal Offenders Released in 2010* at 30 (2021)." 2024 WL 1931962, at *3 (S.D.N.Y. May 2, 2024), The court determined that the defendant, a fifty-year-old, was in the lowest criminal history category, where his "re-arrest rate is 15%, compared to a re-arrest rate of 67% for those younger than 21." *Id.*

Moreover, given the fact that Minister Chang's case over the last six years has been highly publicized worldwide—including his pre-trial detention in two foreign countries under such dire conditions—this is sufficient to deter other individuals, including foreign public figures, from committing crimes that reach the United States, without having to incarcerate Minister Chang for any longer period than he has already served.[7]

Based on the foregoing, this Court should find that keeping Minister Chang incarcerated for any longer than the six-year period that he has already spent in custody is not required to deter him or anyone else from committing future crimes in the United States.

### c. 18 U.S.C. § 3553(a)(2)(C): The need to protect the public from further crimes of the defendant.

18 U.S.C. § 3553(a)(2)(B) requires that the Court consider the need to protect the public from further crimes of the defendant. As discussed above, there is no doubt that Minister Chang poses no threat to the American or Mozambique public. His publicized arrest and conviction—which serves as a deterrent to him committing future crimes—simultaneously assures that the public will be adequately protected from Minister Chang in the future. That he will be deported

---

[7] It is worth noting that "increases in severity of punishments do not yield significant (if any) marginal deterrent effect." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006).

to Mozambique at the conclusion of his sentence further assures that he will not pose a threat to the American public.

> *d. 3553(a)(2)(D): The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective way.*

Pursuant to 18 U.S.C. § 3553(a)(2)(D), the Court must also consider the need for any sentence imposed "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). ██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Minister Chang does not require vocational training, and the services which may be available to him through incarceration as a noncitizen are limited and would not serve to rehabilitate him. Instead, being able to return to his family in Mozambique will have the greatest rehabilitative force, whereas a sentence including additional imprisonment would further punish not just him, but his entire family.

### 3. 18 U.S.C. § 3553(a)(3).

The Court must also consider the "kinds of sentences available." 18 U.S.C. § 3553(a)(3). Here, probation acknowledges that, pursuant to 18 U.S.C. § 3583(b)(2), "[t]he Court may impose a term of supervised release of not more than three years" for Counts 1 and 2. *See* PSR ¶ 90. If the Court finds that after a consideration of all of the relevant factors, a further sentence is required for Minister Chang, respectfully, given his age and isolation from his family, culture, and language, the Court should sentence him to a term of supervised release, to be served in his homeland, Mozambique. A further sentence of incarceration in a United States prison will only

exacerbate those circumstances that Minister Chang faces, potentially creating further isolation, as it is possible that he would be incarcerated in a prison away from his legal counsel—sadly, the only connection he has here.

The court in *Speed Joyeros* considered the parameters of supervised release for a non-citizen, concluding that "[t]he fact that [the defendant] will probably be promptly deported and thus unsupervised during [the] term of 'supervised release' does not lift the court imposed inhibitions; the court may consider the defendant's background in concluding that [the defendant] is unlikely to violate [the] supervised release terms." *Speed Joyeros*, 204 F. Supp. 2d at 440-41. Considering Minister Chang's background, character, and circumstances of his incarceration, he is unlikely to violate any terms of supervised release that this Court may impose, if it decides it a longer sentence is required.

### 4. 18 U.S.C. § 3553(a)(6).

18 U.S.C. § 3553(a)(6) directs the Court to consider "the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct." As an initial matter, given the circumstances of Minister Chang's arrest, pre-trial incarceration in South Africa, and conviction by a United States jury, his circumstances are not easily compared to United States "defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). United States citizens do not face the same dismal incarceration circumstances as Minister Chang did, and rarely do they spend five and a half years in pre-trial incarceration for non-violent crimes.

The court in *United States v. Perez Sanchez* recognized this disparity between United States and foreign defendants, acknowledging that "any defendant with a similar record who was found guilty of similar conduct and sentenced to supervised release is eligible to apply FSA

credits toward early release and, as a result, may be released from incarceration as many as twelve months earlier than [a foreign defendant]." 2024 WL 1069884, at *4 (E.D.N.Y.), (Mar. 12, 2024) (citing 18 U.S.C. § 3624(g)(3)). The court held that "[a] twelve-month sentencing disparity between defendants who are similarly situated in all respects other than their immigration status is certainly unwarranted." *Id.* Respectfully, this Court should also find that Minister Chang's pre- and post-trial incarceration sentence of six years, without the ability to apply FSA credits towards early release during that time, presents, at the very least, a twelve-month sentencing disparity between him and a "similarly situated" American defendant.

But that is not the extent of the incarceration disparities that Minister Chang faces as a non-citizen versus an American citizen in federal custody. For example, the Bureau of Prisons may, if practicable, place a prisoner into "pre-release custody" for a reasonable portion of the last ten-percent of a prison sentence, not to exceed 6 months. *See* 18 U.S.C. § 3624(c). The prerelease custody, which may include home confinement, affords the prisoner the opportunity to adjust and prepare for re-entry into society. *Id.* But as the court found in *Londono,* "because the defendant is not a citizen, he has been unable to make use of various release options." 2022 WL 17905065, at *2. Although probation points out that while in federal custody, Minister Chang has "participated in no education courses, and did not complete any work assignments," (PSR ¶ 68), he speaks Portuguese and requires an interpreter, and is 69 years old with debilitating health issues. Moreover, while Minister Chang was in custody at Modderbee Prison, any such programs which may have contributed to his early release were not available to him.

While the Court is not required to consider disparities between co-defendants, courts frequently do, and the Second Circuit has approved this practice. *See United States v. Frias,* 521 F.3d 229, 236 (2d Cir. 2008). For example, in *United States v. Goffer*, 721 F.3d 113, 130 (2d Cir.

2013), the Second Circuit found that the district court had properly considered sentencing disparities between similarly situated defendants. The *Goffer* court noted that "the district court weighed 'the need to avoid unwarranted sentencing disparity between Mr. Goffer and similarly situated defendants.' The district court distinguished between Goffer and his co-defendants" and found a disparate sentence between co-defendants because that defendant was the "leader[ ] of a fraudulent enterprise" who "recruited people" and poisoned other traders. *Id.* Thus, because "a district court may—but is not required to—consider sentencing disparity among co-defendants under 18 U.S.C. § 3553(a)(6)," this Court should consider the sentences of other co-defendants in this case. *See United States v. Johnson,* 567 F.3d 40, 54 (2d Cir. 2009); *United States v. Medina*, 607 F. App'x 60, 61 (2d Cir. 2015),

As Minister Chang's defense counsel repeatedly pointed out, the individual who the government has alleged was the mastermind of the criminal scheme, Jean Boustani, was acquitted and therefore, of course, received no sentence. The only individual to have been sentenced in this case is Detelina Subeva, whose conduct was significantly more culpable than Manuel's. Indeed, the evidence in Minister Chang's trial established that she was the individual who drafted the EMAMTUM and MAM business plans that her partner, Andrew Pearse, testified were "rubbish." *See* Tr. at 590, 733, and 831 (Andrew Pearse testifying that Detelina Subeva worked on the EMATUM and MAM business plans); Tr. at 391 (Andrew Pearse testifying that the MAM loan was rubbish. There was no chance from the outset that the MAM business plan would have succeeded"). Mr. Pearse testified that he entered into an agreement with Ms. Subeva but that he never entered into any illegal agreement with Minister Chang. *See, e.g.*, Tr. at 472; Tr. at 474-75 ("I did not have an agreement[] with Mr. Chang."). Mr. Pearse further testified that as part of his agreement with Ms. Subeva, he lied to Minister Chang about the MAM business

plan, and never told Minister Chang he believed it to be rubbish, thereby leaving Minister Chang to believe in the project and to support it. *See* Tr. at 787 (Pearse Testimony) (Q: "And when you met with him, you did not tell Minister Chang that you thought the MAM business project was rubbish, did you?" A: "No."). Ms. Subeva also received significant sums of money which she actually received and used. Mr. Pearse testified that he gave Ms. Subeva over $2,000,000. Tr. at 158 (Pearse Testimony) (Q: "Did you make payments to Ms. Subeva in connection to the loan to Mozambique?" A: "Yes, I did." Q: "How much?" A: "I gave her $2.2 million."). Minister Chang, in contrast to Ms. Subeva, never received a single penny of the money that was sent to Luis Brito's bank accounts, which Mr. Brito himself later sent to the government of Mozambique. Ms. Subeva did not receive any incarceration as part of her sentence. *See* ECF No. 447; 447-1.

Although this Court is not required to consider the sentence given to Ms. Subeva, we respectfully submit that it should take this non-incarceration sentence into consideration.

## **CONCLUSION**

For the foregoing reasons, Minister Chang respectfully requests that this Court find a sentence of time already served by Minister Chang is sufficient to satisfy the goals of sentencing.

Dated: November 6, 2024

Respectfully submitted,

FORD O'BRIEN LANDY LLP

 /s/ Adam C. Ford
Adam C. Ford
Jamie H. Solano
Anjula S. Prasad
Stephen R. Halpin III
Carolyn A. Sartori
275 Madison Avenue, 24th Floor
New York, NY 10016
aford@fordobrien.com
jsolano@fordobrien.com
aprasad@fordobrien.com
shalpin@fordobrien.com
csartori@fordobrien.com

*Attorneys for Defendant Manuel Chang*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 6, 2024, a true and correct copy of the foregoing was

served via the Court's ECF filing system on all counsel of record.

/s/ Adam C. Ford
Adam C. Ford